Slip Op. 21-43

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SEAH STEEL CORPORATION, | |
| Plaintiff, | |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD., AJU BESTEEL CO., LTD., and ILJIN STEEL CORPORATION, | |
| Consolidated Plaintiffs, | |
| and | |
| HYUNDAI STEEL COMPANY and ILJIN STEEL CORPORATION, | |
| Plaintiff-Intervenors, | Before: Jennifer Choe-Groves, Judge |
| v. | Consol. Court No. 19-00086 |
| UNITED STATES, | |
| Defendant, | |
| and | |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., IPSCO TUBULARS INC., VALLOUREC STAR, L.P., and WELDED TUBE USA INC., | |
| Defendant-Intervenors. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2016–2017 administrative review of the antidumping duty order on oil country tubular goods from the Republic of Korea.]

Dated: April 14, 2021

<u>Jeffrey M. Winton</u> and <u>Amrietha Nellan</u>, Winton & Chapman PLLC, of Washington, D.C., for Plaintiff SeAH Steel Corporation.  With them on the brief was <u>Jordan L. Fleischer</u>, formerly Law Office of Jeffrey M. Winton PLLC, of Washington, D.C.

<u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Brady W. Mills</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, and <u>Sabahat Chaudhary</u>, Morris, Manning & Martin LLP, of Washington D.C., for Consolidated Plaintiff Husteel Co., Ltd.

<u>J. David Park</u>, <u>Henry D. Almond</u>, <u>Daniel R. Wilson</u>, <u>Leslie C. Bailey</u>, and <u>Kang Woo Lee</u>, Arnold & Porter Kaye Scholer LLP, of Washington, D.C., for Consolidated Plaintiff NEXTEEL Co., Ltd. and Plaintiff-Intervenor Hyundai Steel Company.

<u>Jarrod M. Goldfeder</u>, Trade Pacific PLLC, of Washington, D.C., for Consolidated Plaintiff AJU Besteel Co., Ltd.

<u>Jarrod M. Goldfeder</u>, Trade Pacific PLLC, of Washington, D.C., for Consolidated Plaintiff and Plaintiff-Intervenor ILJIN Steel Corporation.  With him on the brief were <u>Joel D. Kaufman</u>, <u>Richard O. Cunningham</u>, and <u>Stephanie W. Wang</u>, Steptoe & Johnson LLP, of Washington, D.C.

<u>Hardeep K. Josan</u>, Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., for Defendant United States.  With her on the brief were <u>Joseph H. Hunt</u>, then-Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Mykhaylo Gryzlov</u>, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Thomas M. Beline</u>, <u>Myles S. Getlan</u>, and <u>James E. Ransdell</u>, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel

Corporation.

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Matthew W. Solomon, White & Case LLP, of Washington, D.C., for Defendant-Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc.[1]

Roger B. Schagrin, Christopher T. Cloutier, Elizabeth J. Drake, Kelsey M. Rule, Luke A. Meisner, Paul W. Jameson, and William A. Fennell, Schagrin Associates, of Washington, D.C., for Defendant-Intervenors Vallourec Star, L.P. and Welded Tube USA Inc.

Choe-Groves, Judge:  Plaintiff SeAH Steel Corporation ("SeAH"),

Consolidated Plaintiffs Husteel Co., Ltd. ("Husteel"), NEXTEEL Co., Ltd.

("NEXTEEL"), AJU Besteel Co., Ltd. ("AJU"), and ILJIN Steel Corporation

("ILJIN"), and Plaintiff-Intervenors Hyundai Steel Company ("Hyundai") and

ILJIN, (collectively, "Plaintiffs"), bring this consolidated action challenging the

final results published by the U.S. Department of Commerce ("Commerce") in the

2016–2017 administrative review of the antidumping duty order on oil country

tubular goods ("OCTG") from the Republic of Korea ("Korea").  See Certain Oil

Country Tubular Goods From the Republic of Korea ("Final Results"), 84 Fed.

Reg. 24,085 (Dep't Commerce May 24, 2019) (final results of antidumping duty

admin. review; 2016–2017); see also Issues and Decision Mem. for the Final

Results of the 2016–2017 Admin. Review of the Antidumping Duty Order on

Certain Oil Country Tubular Goods from the Republic of Korea (May 17, 2019),

[1] Defendant-Intervenor IPSCO Tubulars Inc. (formerly TMK IPSCO) is wholly owned by Defendant-Intervenor Maverick Tube Corporation.  Letter, ECF No. 80.

ECF No. 20-5 ("OCTG III Final Issues & Decision Memorandum" or "Final

IDM").[2]  Before the court are the Rule 56.2 motions for judgment on the agency

record filed by Husteel, SeAH, ILJIN, NEXTEEL, Hyundai, and AJU.  Consol. Pl.

Husteel Co., Ltd.'s Mot. J. Agency R., ECF No. 59; Mot. Pl. SeAH Steel

Corporation J. Agency R., ECF Nos. 60, 61; Consol. Pl/Pl.-Inter. Rule 56.2 Mot. J.

Agency R., ECF No. 62; Rule 56.2 Mot. J. Agency R. Consol. Pl. NEXTEEL Co.,

Ltd., ECF Nos. 63, 66; Rule 56.2 Mot. J. Agency R. Pl.-Inter. Hyundai Steel

Company, ECF No. 64; Consol. Pl. AJU Besteel Co., Ltd.'s Rule 56.2 Mot. J.

Agency R., ECF No. 65; see also Consol. Pl. Husteel Co., Ltd.'s Br. Supp. Its Mot.

J. Agency R., ECF No. 59-2 ("Husteel Br.");[3] Br. SeAH Steel Corporation Supp.

Its Rule 56.2 Mot. J. Agency R., ECF Nos. 60-1, 61-1 ("SeAH Br."); Br. Consol.

Pl./Pl.-Inter. ILJIN Steel Corporation Supp. Its Mot. J. Agency R., ECF No. 62-1

("ILJIN Br.");[4] Mem. Supp. Consol. Pl. NEXTEEL Co., Ltd.'s Rule 56.2 Mot. J.

Agency R., ECF Nos. 63-2, 66-2 ("NEXTEEL Br."); Mem. Supp. Pl.-Inter.

Hyundai Steel Company's Rule 56.2 Mot. J. Agency R., ECF No. 64-2 ("Hyundai

---

[2] Citations to the administrative record reflect the public record ("PD") document numbers.

[3] Husteel joins NEXTEEL's and SeAH's arguments as to Commerce's particular market situation adjustment, and adopts and incorporates by reference NEXTEEL's and SeAH's arguments as to the other issues contested in their briefs.  Husteel Br. at 13, 29–30.

[4] ILJIN agrees with and supports each of the counts in the complaints filed by NEXTEEL and SeAH, but addresses only Commerce's particular market situation determination and adjustment in its brief.  ILJIN Br. at 13.

Br.");[5] Mem. Supp. Mot. Consol. Pl., AJU Besteel Co., Ltd., J. Agency R., ECF

No. 65-1 ("AJU Br.").[6]  For the following reasons, the court sustains in part and

remands in part the Final Results.

## ISSUES PRESENTED

The court reviews the following issues:

1. Whether Commerce's application of its differential pricing analysis in
   calculating SeAH's dumping margin is in accordance with the law;

2. Whether Commerce's determination that a particular market situation
   existed in Korea is supported by substantial evidence;

3. Whether Commerce's calculation of constructed value profit is
   supported by substantial evidence;

4. Whether Commerce's reallocation of NEXTEEL's reported costs for
   non-prime products is supported by substantial evidence;

5. Whether Commerce's adjustment to NEXTEEL's production line
   suspension costs is supported by substantial evidence;

---

[5] Hyundai concurs with and incorporates by reference NEXTEEL's arguments as to Commerce's particular market situation determination and adjustment and NEXTEEL's and SeAH's arguments as to the other issues contested in their briefs, and does not make any independent arguments.  See Hyundai Br. at 4–5.

[6] AJU concurs with and incorporates by reference SeAH's, NEXTEEL's, Husteel's, and ILJIN's arguments as to the particular market situation adjustments and the constructed value profit calculations, and does not make any independent arguments.  See AJU Br. at 7.

6. Whether Commerce's exclusion of freight revenue profit in calculating SeAH's constructed export price is in accordance with the law;

7. Whether Commerce's application of SeAH's affiliated seller's general and administrative expense ratio to both further manufactured and non-further manufactured products is in accordance with the law;

8. Whether Commerce's inclusion of a penalty in SeAH's general and administrative expense ratio is supported by substantial evidence; and

9. Whether Commerce's inclusion of SeAH's inventory valuation losses in its general and administrative expense ratio is supported by substantial evidence.

## BACKGROUND

Commerce initiated this third administrative review ("OCTG III") of the antidumping duty order on OCTG from Korea for the period covering September 1, 2016 through August 31, 2017. Initiation of Antidumping and Countervailing Duty Admin. Reviews, 82 Fed. Reg. 52,268, 52,271 (Dep't Commerce Nov. 13, 2017) (initiation notice). Commerce selected NEXTEEL and SeAH as mandatory respondents for individual examination. Certain Oil Country Tubular Goods From the Republic of Korea, 83 Fed. Reg. 51,442, 51,442 (Dep't Commerce Oct. 11, 2018) (prelim. results of the antidumping duty admin. review; 2016–2017).

In the Final Results, Commerce assigned weighted-average dumping

margins of 32.24% for NEXTEEL, 16.73% for SeAH, and 24.49% for non-

examined companies.  Final Results, 84 Fed. Reg. at 24,086; see Final IDM at 5–6.

Commerce based normal value on constructed value for NEXTEEL and SeAH

because neither mandatory respondent had a viable home market or third-country

market during the period of review.  Final IDM at 49.

Commerce applied a differential pricing analysis and calculated SeAH's

weighted-average duty margin by the alternative average-to-transaction method.

Id. at 60–71.  Commerce determined that a particular market situation existed in

Korea based on a totality-of-the-circumstances assessment of the same four

conditions that were alleged in the first administrative review covering 2014–2015

("OCTG I") and the second administrative review covering 2015–2016 ("OCTG

II"), namely: (1) subsidies from the Government of Korea to producers of hot-

rolled coil; (2) the deluge of Chinese hot-rolled products exerting downward

pressure on Korean domestic hot-rolled coil prices; (3) strategic alliances between

Korean hot-rolled coil suppliers and Korean OCTG producers; and (4) the

Government of Korea's influence over the cost of electricity.  See id. at 10.

Commerce adjusted for the particular market situation determination by increasing

the reported hot-rolled coil costs by the revised AFA-based subsidy rate of 41.57%

assigned to POSCO.  See id. at 41–42 (citing POSCO v. United States, 43 CIT __,

378 F. Supp. 3d 1348 (2019), subsequently vacated and remanded, Appeal No. 19-

2095 (Fed. Cir. Mar. 4, 2021) (order issued as a mandate vacating and remanding

for further proceedings consistent with POSCO v. United States, 977 F.3d 1369

(Fed. Cir. 2020) (vacating and remanding for further proceedings regarding the

final affirmative determination in the countervailing duty investigation of certain

cold-rolled steel flat products from Korea))); see also Certain Hot-Rolled Steel Flat

Products From the Republic of Korea, 81 Fed. Reg. 53,439 (Dep't Commerce Aug.

12, 2016) (countervailing duty investigation final affirmative determination),

amended by 81 Fed. Reg. 67,960, 67,961 (Dep't Commerce Oct. 3, 2016)

(countervailing duty investigation amended final affirmative determination),

amended by 84 Fed. Reg. 23,019 (Dep't Commerce May 21, 2019) (notice of court

decision not in harmony with amended final determination of the countervailing

duty investigation) (reducing POSCO's total AFA subsidy rate from 58.68% to

41.57%); SeAH Final Calculations Mem. at 2, PD 358 (May 17, 2019); NEXTEEL

Final Calculations Mem. at 4, PD 356 (May 17, 2019).  Commerce applied the

constructed value profit and selling expense ratios calculated for SeAH in OCTG I

to determine SeAH's constructed value profit and selling expenses here in OCTG

III.  Final IDM at 48–49.  Commerce adjusted NEXTEEL's reported costs for non-

prime products, id. at 91–93; calculated as general and administrative ("G&A")

expenses NEXTEEL's costs related to the suspension of two production lines, id.

at 95–96; deducted SEAH's reported freight revenue up to actual freight cost, id. at

73–74; and included affiliate indirect selling expenses, a penalty, and inventory

losses in SeAH's G&A expenses, id. at 77–80, 83–84, 82–83.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28

U.S.C. § 1581(c), which grant the court authority to review actions contesting the

final results of an administrative review of an antidumping duty order.  The court

will uphold Commerce's determinations unless the findings are unsupported by

substantial record evidence or are otherwise not in accordance with the law.  19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.      Statutory Framework

Commerce determines antidumping duties by calculating the amount by

which the normal value of subject merchandise exceeds the export price or the

constructed export price for the merchandise.  Id. § 1673.  When reviewing

antidumping duties in an administrative review, Commerce must determine: (1) the

normal value and export price or constructed export price of each entry of the

subject merchandise, and (2) the dumping margin for each such entry.  Id.

§ 1675(a)(1)(B), (a)(2)(A).  The statute dictates the steps by which Commerce may

calculate normal value "to achieve a fair comparison" with export price or

constructed export price.  Id. § 1677b(a).

Commerce normally determines dumping margins "by comparing the
weighted average of the normal values to the weighted average of the export prices
(and constructed export prices) for comparable merchandise" or "by comparing the
normal values of individual transactions to the export prices (or constructed export
prices) of individual transactions for comparable merchandise."  See id. § 1677f-
1(d)(1)(A)(i)–(ii); JBF RAK LLC v. United States, 790 F.3d 1358, 1364–65 (Fed.
Cir. 2015).  Commerce may "compar[e] the weighted average of the normal values
to the export prices (or constructed export prices) of individual transactions for
comparable merchandise," if two statutory conditions are met: "there is a pattern of
export prices (or constructed export prices) for comparable merchandise that differ
significantly among purchasers, regions, or periods of time," and "[Commerce]
explains why such differences cannot be taken into account using a method
described in paragraph (1)(A)(i) or (ii)."  19 U.S.C. § 1677f-1(d)(1)(B).

If Commerce cannot determine the normal value of the subject merchandise
based on home market sales, then Commerce may use qualifying third-country
sales or constructed value as a basis for normal value.  Id. § 1677b(a)(4),
(a)(1)(B)(ii), (b)(1).  Constructed value represents: (1) the cost of materials and
fabrication or other processing of any kind used in producing the merchandise;
(2) the actual amounts incurred and realized for selling, general, and administrative

expenses, and for profits, in connection with the production and sales of a foreign

like product, in the ordinary course of trade, for consumption in the foreign

country; and (3) the cost of packing the subject merchandise.  Id. § 1677b(e).

When calculating constructed value, if Commerce determines that a particular

market situation exists "such that the cost of materials and fabrication or other

processing of any kind does not accurately reflect the cost of production in the

ordinary course of trade, [then] [Commerce] may use . . . any other calculation

methodology."  Id.  The statute directs Commerce to calculate cost of production

and constructed value "based on the records of the exporter or producer of the

merchandise, if such records are kept in accordance with the generally accepted

accounting principles of the exporting country (or the producing country, where

appropriate) and reasonably reflect the costs associated with the production and

sale of the merchandise."  Id. § 1677b(f)(1)(A).

     When Commerce is required to calculate constructed value for a respondent,

Commerce must utilize the respondent's actual selling, general, and administrative

expenses and profits from the home market or a third-country market.  Id.

§ 1677b(e)(2)(A).  If those data are unavailable, the statute provides Commerce

with three alternatives:

> (i)    the actual amounts incurred and realized by the specific exporter
> or producer being examined in the investigation or review for
> selling, general, and administrative expenses, and for profits, in
> connection with the production and sale, for consumption in the

> foreign country, of merchandise that is in the same general category of products as the subject merchandise,
>
> (ii)   the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (iii)  the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise.

Id. § 1677b(e)(2)(B).

The statute also dictates the steps by which Commerce is to calculate export price or constructed export price (collectively, "U.S. price"). Export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States,

subject to certain adjustments. Id. § 1677a(a). Constructed export price is:

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter,

subject to certain adjustments.  Id. § 1677a(b).  The statute provides for increases to export price and constructed export price for packing expenses, certain rebated or uncollected import duties, and countervailing duties; and reductions for additional charges to transport the subject merchandise to the place of delivery in the United States and any export charge imposed by the exporting country.  Id. § 1677a(c).  The statute provides for additional reductions when calculating constructed export price for selling commissions, expenses directly related to the sale, expenses paid by the seller on behalf of the purchaser, further manufacture or assembly costs, and profit earned for the previously listed services.  Id. § 1677a(d).

## II.    Differential Pricing Analysis

Commerce determined that the results of the differential pricing methodology justified using the alternative average-to-transaction methodology to calculate SeAH's dumping margin.  See Final IDM at 71.  SeAH argues that because the differential pricing methodology was not implemented through notice and comment rulemaking, Commerce was required to demonstrate a factual justification for applying the differential pricing methodology and the relevant numerical thresholds but did not.  SeAH Br. at 36, 38–39.  SeAH contends that Commerce's application of the Cohen's $d$ test to the non-normal distribution of SeAH's U.S. sales was inappropriate and Commerce did not explain the use of the 0.8, 33%, and 66% thresholds and why the average-to-average method was

inadequate to account for the pattern of differences.  Id. at 39–43.

Commerce ordinarily uses an average-to-average ("A-to-A") comparison of "the weighted average of the normal values [of subject merchandise] to the weighted average of export prices (and constructed export prices) for comparable merchandise" when calculating a dumping margin.  See 19 U.S.C. § 1677f-1(d)(1)(A)(i); 19 C.F.R. § 351.414(c)(1).  The statute allows Commerce to depart from using the A-to-A methodology and instead use an average-to-transaction ("A-to-T") comparison of the weighted average of normal values to the export prices and constructed export prices of individual transactions for comparable merchandise when: (1) Commerce observes "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time;" and (2) "[Commerce] explains why such differences cannot be taken into account using [the A-to-A methodology]."  19 U.S.C. § 1677f-1(d)(1)(B)(i)–(ii).  In contrast to the A-to-A method, which may mask dumped sales at low prices by averaging them with sales at higher prices, the A-to-T method allows Commerce "to identify a merchant who dumps the product intermittently—sometimes selling below the foreign market value and sometimes selling above it."  Apex Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1337, 1341 (Fed. Cir. 2017) (citation and internal quotation marks omitted).  Commerce may apply the alternative A-to-T methodology on the same

basis in administrative reviews as in antidumping investigations.  See JBF RAK

LLC, 790 F.3d at 1364–65.

    The U.S. Court of Appeals for the Federal Circuit and this Court have held

the steps underlying the differential pricing analysis as applied by Commerce to be

reasonable.  See e.g., Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d

662, 670–74 (Fed. Cir. 2019) (discussing zeroing and the 0.8 threshold for the

Cohen's *d* test); Apex Frozen Foods Priv. Ltd. v. United States, 40 CIT __, __, 144

F. Supp. 3d 1308, 1314–35 (2016) (discussing application of the A-to-T method,

the Cohen's *d* test, the meaningful difference analysis, zeroing, and the "mixed

comparison methodology" of applying the A-to-A method and the A-to-T method

when 33–66% of a respondent's sales pass the Cohen's *d* test), aff'd, 862 F.3d

1337; Apex Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1322 (Fed. Cir.

2017) (affirming zeroing and the 0.5% *de minimis* threshold in the meaningful

difference test).  Commerce's use of the differential pricing analysis was not

subject to the notice and comment requirements of the Administrative Procedure

Act.  See Apex Frozen Foods Priv. Ltd., 40 CIT at __, 144 F. Supp. 3d at 1321,

aff'd on other grounds, 862 F.3d 1337.

    In Apex Frozen Foods Private Ltd. v. United States ("Apex Frozen Foods"),

862 F.3d 1337, 1342–43 (Fed. Cir. 2017), Commerce applied a two-step

differential pricing analysis to determine whether there was an unaccountable

pattern of significant price differences warranting the alternative A-to-T

comparison.  First, Commerce applied the Cohen's *d* test and the ratio test to

determine whether application of the A-to-T method was warranted for a portion or

all of a respondent's sales.  See id. at 1343; Prelim. Decision Mem. at 11–12, PD

274 (Oct. 3, 2018) ("Prelim. DM").  The Cohen's *d* test is "a generally recognized

statistical measure of the extent of the difference between the mean of a test group

and the mean of a comparison group."  Apex Frozen Foods, 862 F.3d at 1342 n.2.

The Cohen's *d* test yields a coefficient that expresses the extent of the difference

between the means relative to three fixed thresholds: the small threshold of 0.2, the

medium threshold of 0.5, and the large threshold of 0.8.  See id.; Final IDM at 66.

In Commerce's application of the Cohen's *d* test, Commerce chose to consider

only the large 0.8 threshold.  See Apex Frozen Foods, 862 F.3d at 1342 n.2.  If the

coefficient exceeded 0.8, the large threshold, the sales "pass[ed]" and gave "the

strongest indication[] that there [wa]s a significant difference between the means

. . . ."  See id.  In its ratio test, Commerce considered the percentage of each

respondent's sales that passed the Cohen's *d* test.  See id.  Commerce decided that

for the respondent with more than 66% of its sales passing, application of the A-to-

T method to all sales was warranted.  Id.  For the respondent with between 33%

and 66% of its sales passing, Commerce decided that application of the A-to-T

method to the passing sales was warranted, but that the A-to-A method would be

applied to sales not passing.  Id.  Second, Commerce applied the "meaningful

difference" test, which is a comparison of the weighted-average margin computed

using the A-to-A method to the weighted-average margin computed using the A-

to-T method.  Id. at 1344–45, 1343.  For the A-to-T method, Commerce applied its

practice of "zeroing," by which Commerce gives a value of zero to negative

dumping margins (sales at non-dumped prices), and averages only positive

dumping margins (sales at dumped prices) to "reveal[] masked dumping."  Id. at

1342 ("When examining individual export transactions, using the [A-to-T]

comparison methodology, prices are not averaged and zeroing reveals masked

dumping." (quoting Union Steel v. United States, 713 F.3d 1101, 1109 (Fed. Cir.

2013))) (additional citation omitted).  The margins calculated for the two

respondents by the A-to-A method were 0% and the margins calculated by the A-

to-T method were 1.97% and 3.01%.  Id. at 1343.  Commerce explained that the A-

to-A method could not account for the pattern of price differences because the

differences crossed the *de minimis* threshold of 0.5%, making them "meaningful."

Id. at 1343, 1345.  The U.S. Court of Appeals for the Federal Circuit held that the

statute is silent on how Commerce should identify a pattern of differing prices and

how Commerce should determine that the A-to-A method cannot account for

differences, and upheld Commerce's differential pricing methodology as a

"reasonable implementation of the statutory scheme."  Id. at 1346.

As in <u>Apex Frozen Foods</u>, Commerce applied its two-step differential

pricing methodology here.  <u>See</u> Prelim. DM at 11–13; Final IDM at 5–6, 71

(applying the same methodology as in the Prelim. DM without change to its

differential pricing methodology).  Commerce applied the Cohen's *d* test and

determined that 79.77% of SeAH's U.S. sales and 93.19% of NEXTEEL's U.S.

sales passed.  SeAH Final Calculations Mem. at 2–3; NEXTEEL Final

Calculations Mem. at 4–5.  Commerce also applied its meaningful difference test

to determine whether the A-to-A method could account for the identified pattern of

price differences by comparing the weighted-average dumping margins calculated

by the A-to-A method and the A-to-T method with zeroing.  <u>See</u> Prelim. DM at

11–12.  Because the percent of relative change between SeAH's margin calculated

by the A-to-A method and SeAH's margin calculated by the A-to-T method with

zeroing was greater than 25%, Commerce determined that the A-to-A method

could not account for the pattern of price differences.  <u>See</u> SeAH Final

Calculations Mem. at 3.  Commerce applied the A-to-T method to all of SeAH's

U.S. sales because more than 66% of SeAH's U.S. sales had passed the Cohen's *d*

test.  <u>See</u> <u>id.</u>  For NEXTEEL, Commerce determined that there was no meaningful

difference between the margin calculated by the A-to-A method and the margin

calculated by the A-to-T method with zeroing, and applied the A-to-A method to

calculate NEXTEEL's dumping margin.  NEXTEEL Final Calculations Mem. at

4–5.  The court notes that Commerce used the same differential pricing

methodology steps and analysis here as were upheld by the U.S. Court of Appeals

for the Federal Circuit in Apex Frozen Foods.

### A.    Whether Commerce Must Justify Application of the Differential Pricing Analysis on a Case-by-Case Basis

SeAH argues that Commerce must explain why application of its differential

pricing analysis and the numerical thresholds are appropriate in the context of each

administrative review.  See SeAH Br. at 36.  SeAH cites Washington Red

Raspberry Commission v. United States, 859 F.2d 898 (Fed. Cir. 1988), and

Carlisle Tire & Rubber Co., Division of Carlisle Corp. v. United States ("Carlisle

Tire"), 10 CIT 301 (1986), as support for the proposition that Commerce can apply

mathematical assumptions and numerical thresholds that have not been adopted in

accordance with the Administrative Procedure Act only if Commerce explains the

basis for its decision "in light of specific factual findings showing that

[application] was appropriate in that case."  SeAH Br. at 38.  Both cases concerned

only Commerce's application of the 0.5% *de minimis* standard in antidumping

investigations and thus are distinguishable from the instant case.  See Wash. Red

Raspberry Comm'n, 859 F.2d at 902–04; Carlisle Tire, 10 CIT at 302, 304–06.

While it may have been necessary for the *de minimis* standard to be promulgated in

accordance with the notice and comment provisions of the Administrative

Procedure Act, see Carlisle Tire, 10 CIT at 305, that is not true of Commerce's

differential pricing analysis.  See Apex Frozen Foods Priv. Ltd., 40 CIT at __, 144

F. Supp. 3d at 1321 ("Commerce's shift from the Nails test to the differential

pricing analysis is not subject to notice and comment requirements."), aff'd on

other grounds, 862 F.3d 1337.  Because Commerce is not required to apply only

mathematical assumptions and numerical thresholds that have been adopted in

accordance with the Administrative Procedure Act if the record contains

substantial evidence supporting the application, as alleged by SeAH, the court need

not disturb Commerce's practice.

### B.    Commerce's Use of the Cohen's *d* Test and the 0.8 Threshold

SeAH contends that Commerce's use of the Cohen's *d* test was contrary to

well-recognized statistical principles.  SeAH Br. at 40–41.  Specifically, SeAH

argues that the Cohen's *d* test can only be used when comparing "random samples

drawn from Normal (*i.e.*, bell-curve shaped) distributions with roughly equal

variance containing a sufficient number of data points."  Id. at 40.  SeAH asserts

also that Commerce must justify its use of the 0.8 threshold.  Id. at 39–40.

The statute does not set forth the analysis for how Commerce is to identify a

pattern of price differences.  See 19 U.S.C. §§ 1677, 1677f-1; see also Apex

Frozen Foods, 862 F.3d at 1346; Dillinger France S.A. v. United States, 981 F.3d

1318, 1325 (Fed. Cir. 2020).  The Court affords Commerce deference in

determinations "involv[ing] complex economic and accounting decisions of a

technical nature . . . ." See Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1039

(Fed. Cir. 1996) (citation omitted). However, Commerce still "must [] explain

[cogently] why it has exercised its discretion in a given manner . . . ." See Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983)

(citation omitted).

Commerce chose the Cohen's *d* test "to evaluate the extent to which the

prices to a particular purchaser, region, or time period differ significantly from the

prices of all other sales of comparable merchandise." Final IDM at 62 (quoting

Prelim. DM at 11–12) (internal quotation marks omitted). Commerce explained

that application of the Cohen's *d* test was appropriate because "the U.S. sales data

. . . reported to Commerce constitute[] a population. As such, sample size, sample

distribution, and the statistical significance of the sample are not relevant to

Commerce's analysis." Id. at 66. Commerce determined that of the fixed small,

medium, and large thresholds of the Cohen's *d* test, 0.2, 0.5, and 0.8, respectively,

application of the 0.8 large threshold was reasonable and consistent with its

statutory authority because the large threshold was the strongest indicator that the

difference between the mean of the test group and mean of the comparison group

was significant. Id.

Commerce's application of the Cohen's *d* test to determine whether there

was a significant pattern of differences was reasonable. Commerce did not need to

consider sample size, sample distribution, and the statistical significance of the

sample.  See NEXTEEL Co. v. United States ("NEXTEEL II First Op."), 43 CIT

__, __, 392 F. Supp. 3d 1276, 1295 (2019) (citing Tri Union Frozen Prods., Inc. v.

United States, 40 CIT __, __, 163 F. Supp. 3d 1255, 1302 (2016)).  Commerce

explained its use of the 0.8 threshold and the U.S. Court of Appeals for the Federal

Circuit has upheld the 0.8 "rigid measure of significance" for the Cohen's *d* test as

an exercise of Commerce's discretion under 19 U.S.C. § 1677f-1(d)(1)(B).  See

Final IDM at 66; Mid Continent Steel & Wire, 940 F.3d at 673 ("[T]he 0.8

standard is widely adopted as part of a commonly used measure of the difference

relative to such overall price dispersion; and it is reasonable to adopt that measure

where there is no better, objective measure of effect size." (citation and internal

quotation marks omitted)).  Commerce's decision to apply one of the three

thresholds widely used with the Cohen's *d* test and explanation for selecting the

large threshold are reasonable.  The court concludes that Commerce's approach

regarding use of the Cohen's *d* test and application of the 0.8 threshold is in

accordance with the law.

### C.    The Ratio Test Thresholds

When more than 66% of a respondent's sales pass the Cohen's *d* test,

Commerce determines that the pattern of price differences may warrant application

of the A-to-T method to all of the respondent's sales (pending the outcome of the

meaningful difference test).  Final IDM at 67.  Because 79.77% of SeAH's U.S.

sales passed the Cohen's *d* test, Commerce applied the A-to-T method to all of

SeAH's U.S. sales based on application of the ratio test.  See SeAH Final

Calculations Mem. at 3; Final IDM at 71.  SeAH argues that Commerce did not

provide any evidence or reasonable explanation to support the 33% and 66%

thresholds used in the ratio test portion of the differential pricing analysis.  SeAH

Br. at 42–43.

     "The statute provides no methodology for how Commerce identifies and

measures a pattern of export prices, how significantly those prices must differ

among purchasers, regions, or periods of time, or what form of 'export prices'

Commerce must consider in its pattern analysis."  U.S. Steel Corp. v. United

States, 41 CIT __, __, 219 F. Supp. 3d 1300, 1308–09 (2017) (citing 19 U.S.C.

§ 1677f-1(d)(1)(B)(i)); see 19 U.S.C. §§ 1677, 1677f-1; see also Apex Frozen

Foods, 862 F.3d at 1346; Dillinger France, 981 F.3d at 1325.  The Court affords

Commerce deference in determinations "involv[ing] complex economic and

accounting decisions of a technical nature . . . ."  See Fujitsu Gen. Ltd., 88 F.3d at

1039 (citation omitted).  However, Commerce still "must [] explain [cogently] why

it has exercised its discretion in a given manner . . . ."  See Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 48 (citation omitted).

     Commerce explained that "when a third or less of a respondent's U.S. sales

are not at prices that differ significantly, then these significantly different prices are not extensive enough to satisfy the first requirement of the statute." Final IDM at 67. Commerce stated that "when two thirds or more of a respondent's sales are at prices that differ significantly, then the extent of these sales is so pervasive that it would not permit Commerce to separate the effect of the sales where prices differ significantly from those where prices do not differ significantly," so application of the A-to-T method to all sales is warranted. Id. "[W]hen Commerce finds that between one third and two thirds of U.S. sales are at prices that differ significantly, then there exists a pattern of prices that differ significantly, and [] the effect of this pattern can reasonably be separated from the sales whose prices do not differ significantly," so application of the A-to-T method is warranted only for sales implicated in the pattern of significantly differing prices. Id.

Commerce's use of the ratio test thresholds was reasonable because it is apparent to the court that Commerce developed its ratio test to identify the existence and extent of a pattern of export prices for comparable merchandise that differed significantly among purchasers, regions, or periods of time. The court concludes that Commerce's use of the 33% and 66% thresholds in the ratio test is in accordance with the law.

### D.    Commerce's Explanation as to Why the A-to-A Comparison Could Not Take the Alleged Pattern into Account

Commerce relied on the results of its meaningful difference test to justify

application of the A-to-T method to SeAH's U.S. sales.  Id. at 70–71.  SeAH

argues that Commerce's application of the A-to-T comparison was unlawful

because Commerce's "meaningful difference" test was insufficient to explain why

the A-to-A comparison could not account for price differences.  SeAH Br. at 43–

44.  Specifically, SeAH argues that Commerce is required to explain how record

documents provide a factual basis for concluding that the results of the A-to-T

calculation are more accurate than the results of the A-to-A calculation in this

specific case.  Id. at 44.

    The statute does not set forth the analysis for how Commerce is to determine

whether the A-to-A method can or cannot take price differences into account.  See

19 U.S.C. §§ 1677, 1677f-1; see also Apex Frozen Foods, 862 F.3d at 1346.  The

U.S. Court of Appeals for the Federal Circuit has held that Commerce's

meaningful difference test, by which Commerce calculates weighted-average

dumping margins by both the A-to-A method and the A-to-T method and considers

the percent of relative difference between the two margins, is a reasonable method

to determine whether the A-to-A method can or cannot account for price

differences.  See Apex Frozen Foods, 862 F.3d at 1346–48.  The Court affords

Commerce deference in determinations "involv[ing] complex economic and

accounting decisions of a technical nature . . . ."  See Fujitsu Gen. Ltd., 88 F.3d at

1039 (citation omitted).  However, Commerce still "must [] explain [cogently] why

it has exercised its discretion in a given manner . . . ."  See Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 48 (citation omitted).

Commerce asserted that the meaningful difference test indicates to

Commerce the extent to which the A-to-A method "mask[s]" dumping due to

higher prices offsetting lower prices in the test group average such that the A-to-A

method would be unable to account for price differences.  Final IDM at 68.  The

meaningful difference test is a "comparison of a weighted-average dumping

margin based on comparisons of weighted-average U.S. prices that also reflects

offsets for non-dumped sales, with a weighted-average dumping margin based on

comparisons of individual U.S. prices without such offsets (*i.e.*, with zeroing)

. . . ."  Id. at 69.  Commerce explained the five possible scenarios identified by the

meaningful difference test and that Commerce regards only one scenario—a

significant amount of dumping offset by a significant amount of non-dumped

sales—as justification for application of the A-to-T method because "there must be

a significant and meaningful difference in U.S. prices in order to resort to an

alternative comparison method."  Id. at 69–70.  Commerce defines the difference

between the two weighted-average dumping margins as meaningful only when the

margin including offsets from non-dumped sales is: (1) *de minimis* and "mask[s]" a

non-*de minimis* amount of dumping or (2) 25% relative change lower than a

margin excluding offsets.  Id. at 70.

Commerce's use of the meaningful difference test to determine whether the

A-to-A method accounts for price differences is reasonable in light of the fact that

"[a] meaningful difference test is not even required under the statute." Apex

Frozen Foods, 862 F.3d at 1347.  The U.S. Court of Appeals for the Federal Circuit

has upheld the meaningful difference test as reasonable.  See e.g., id. at 1348.

Commerce explained as required by 19 U.S.C. § 1677f-1(d)(1)(B)(ii) that the A-to-

A method could not account for price differences when a significant amount of

dumped sales was masked by a significant amount of non-dumped sales.  The court

concludes that Commerce's explanation as to why the A-to-A method could not

account for SeAH's pricing behavior is in accordance with the law.

In summary, the court holds that Commerce's application of the Cohen's *d*

test, the 0.8 threshold, and the 33% and 66% ratio test thresholds are in accordance

with the law; Commerce's explanation for why the A-to-A method could not

account for the pattern of price differences in SeAH's sales is in accordance with

the law; and Commerce's use of the alternative A-to-T method to calculate SeAH's

dumping margin is in accordance with the law.  The court sustains Commerce's

application of its differential pricing analysis in calculating SeAH's dumping

margin.

## III.    Particular Market Situation Determination

Commerce based normal value for NEXTEEL and SeAH on constructed

value because neither respondent had a viable home market or third-country

market during the period of review.  Final IDM at 49.  In calculating constructed

value, Commerce determined that a particular market situation distorted the cost of

production of OCTG.  Id. at 6, 9.

Plaintiffs aver that the record does not support Commerce's particular

market situation determination.  SeAH argues that Commerce's reliance on the

identical record developed during OCTG I necessitates the same conclusion—

remand of the particular market situation determination as unsupported by

substantial evidence.  SeAH Br. at 21–22.  NEXTEEL asserts that the more

voluminous record here than in OCTG I and OCTG II—with the additions

consisting of "irrelevant news articles that covered periods predating [OCTG III]

and various Commerce decision documents"—still does not support a particular

market situation determination.  NEXTEEL Br. at 15–17.  Husteel argues that this

court should follow its holding in NEXTEEL Co. v. United States ("NEXTEEL I

First Op."), 43 CIT __, __, 355 F. Supp. 3d 1336, 1351 (2019), because the

additional record evidence introduced in OCTG III is "window dressing."  Husteel

Br. at 14–15.  Husteel faults Commerce for its particular market situation

determination in OCTG III despite this court's reversal of Commerce's particular

market situation determinations in OCTG I and OCTG II, when the additional

documents submitted on the OCTG III record "did not add quantitatively nor

qualitatively to support Commerce's [particular market situation] determination."
See id. at 15.  ILJIN contends that Commerce relied primarily in its OCTG III
particular market situation determination on record documents from the OCTG I
and OCTG II records, the additional OCTG III record documents did not resolve
the deficiencies this court identified in remanding Commerce's particular market
situation determinations in the previous administrative reviews, and Commerce's
determination in this OCTG III review is likewise unsupported by the record.
ILJIN Br. at 13–15, 20–22.  ILJIN presents a juxtaposition of Commerce's analysis
of each of the four factors from its OCTG I final issues and decision memorandum
with Commerce's analysis in the OCTG III Final Issues & Decision Memorandum
to assert "that [Commerce] is simply following its already rejected reasoning and
conclusions from the first administrative review."  Id. at 15–18.

        Defendant United States ("Defendant") responds that additional record
documents introduced on the OCTG III record on which Commerce extensively
relied support Commerce's determination of a particular market situation based on
the confluence of "[a]ll four factors, taken together . . . ."  Def.'s Resp. Opp'n
Mots. J. Admin. R. at 19–20, 18, ECF No. 71 ("Def. Resp.").  Defendant-
Intervenor United States Steel Corporation ("U.S. Steel") asserts that Commerce
supported each factor underpinning the particular market situation determination
with record documents greater in number and detail and different in kind than the

documents that comprised the OCTG I and OCTG II records.  <u>See</u> United States

Steel Corporation's Resp. Rule 56.2 Mots. J. Agency R. at 28–30, ECF Nos. 70,

75, 76.

　　　The Trade Preferences Extension Act amended certain subsections of the

Tariff Act of 1930.  <u>See</u> Trade Preferences Extension Act of 2015, Pub. L. No.

114-27, 129 Stat. 362 (2015).  When calculating constructed value under the

revised statute, if Commerce determines that a particular market situation exists

"such that the cost of materials and fabrication or other processing of any kind

does not accurately reflect the cost of production in the ordinary course of trade,

the administering authority may use another calculation methodology under this

subtitle or any other calculation methodology."  19 U.S.C. § 1677b(e).

　　　In OCTG I, Commerce reviewed the allegation made by Maverick Tube

Corporation that each of four factors individually were responsible for a particular

market situation in Korea that distorted the OCTG cost of production:

(1) subsidization of Korean hot-rolled coil products by the Korean Government;

(2) distortive pricing of unfairly-traded Chinese hot-rolled coil; (3) "strategic

alliances" between Korean hot-rolled coil suppliers and Korean OCTG producers;

and (4) distortive government control over electricity prices in Korea.  <u>NEXTEEL</u>

<u>I First Op.</u>, 43 CIT at __, 355 F. Supp. 3d at 1345–46.  Commerce made a

preliminary determination that the record did not support the existence of a

particular market situation due to any of the four individually alleged factors.  Id.

at __, 355 F. Supp. 3d at 1346 (citation omitted).  Without receiving any new

record documents, Commerce reversed itself and determined in the final issues and

decision memorandum that a particular market situation existed based on the

"cumulative effect" of the four factors.  Id. at __, 355 F. Supp. 3d at 1346, 1349.

The court held that the determination was unreasonable and unsupported by

substantial evidence because no reasonable mind could find that "individually the

facts would not support a particular market situation, but when viewed as a whole,

these same facts could support the opposite conclusion."  Id. at __, 355 F. Supp. 3d

at 1351.  On remand, Commerce recalculated the relevant dumping margins

without a particular market situation adjustment.  NEXTEEL Co. v. United States,

43 CIT __, __, 399 F. Supp. 3d 1353, 1357 (2019).  No appeal was initiated of this

court's OCTG I rulings.

In OCTG II, Commerce determined again that a particular market situation

in Korea distorted the OCTG cost of production.  NEXTEEL II First Op., 43 CIT

at __, 392 F. Supp. 3d at 1287–88.  Maverick Tube Corporation made the identical

four particular market situation allegations in OCTG II that Commerce reviewed in

OCTG I and submitted the same supporting exhibits.  Id. at __, 392 F. Supp. 3d at

1288.  Commerce abandoned the approach of examining each of the four factors

individually and in OCTG II relied instead only on the "totality of circumstances"

methodology it had applied in the final issues and decision memorandum in OCTG

I. See id. at __, 392 F. Supp. 3d at 1287.  Commerce determined that the

circumstances present in the Korean market in the OCTG II review remained

"largely unchanged" since the prior OCTG I review because the "facts in the

[OCTG II] administrative review [we]re largely identical to the facts in the [OCTG

I] administrative review, and the same evidence [wa]s on the record of the instant

[OCTG II] review." Id. at __, 392 F. Supp. 3d at 1287–88.  Commerce reasoned

that the "collective impact" of the same four factors considered in its particular

market situation analysis in OCTG I and the "largely identical" facts in OCTG II

compelled the determination that a particular market situation existed.  Id. at __,

392 F. Supp. 3d at 1288.  Given that the OCTG I particular market situation

determination was based on substantially the same facts and record evidence, the

court concluded that Commerce's particular market situation determination in

OCTG II likewise was unsupported by substantial evidence.  Id.  On remand,

Commerce examined the same four factors that Maverick Tube Corporation had

alleged as creating a particular market situation (subsidization, effects of Chinese

hot-rolled coil imports, strategic alliances, and government control over electricity

prices), but also cited a new fifth factor as supporting a particular market

situation—an allegation of a "steel industry restructuring effort by the Korean

Government." NEXTEEL Co. v. United States ("NEXTEEL II Remand Op."), 44

CIT __, __, 450 F. Supp. 3d 1333, 1339 (2020) (brackets omitted).  Commerce

reasoned that the cumulative effect of these five factors supported a determination

that a particular market situation distorted the cost of production of OCTG and

compelled making an upward adjustment to the mandatory respondents' reported

costs based on the countervailing duty rate found in Certain Hot-Rolled Steel Flat

Products From the Republic of Korea, 81 Fed. Reg. 53,439, amended by Certain

Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea, 81 Fed.

Reg. 67,960, amended by Certain Hot-Rolled Steel Flat Products From the

Republic of Korea, 84 Fed. Reg. 23,019.  NEXTEEL II Remand Op., 44 CIT at __,

450 F. Supp. 3d at 1339, 1336 n.4.  The court considered the record evidence on

which Commerce relied for each of the five factors and found that Commerce's

determinations and explanations were unsupported by substantial evidence, when

viewed both individually and collectively.  Id. at __, 450 F. Supp. 3d at 1339–43.

    First, the court reviewed Commerce's determination that hot-rolled coil

subsidization was a contributing factor in the existence of a particular market

situation.  Id. at __, 450 F. Supp. 3d at 1339–40.  Although the review in Certain

Hot-Rolled Steel Flat Products From the Republic of Korea of the countervailing

duty order on hot-rolled coil covering calendar year 2016, which overlapped eight

of the twelve months of the OCTG II period of review, yielded subsidy rates of

0.54% for POSCO, 0.58% for Hyundai Steel Co., Ltd., and 0.56% for all others,

Commerce rejected those subsidy rates and chose to rely on the almost 60% AFA-

based subsidy rate assigned to mandatory respondent POSCO in calendar year

2014. Id. at __, 450 F. Supp. 3d at 1340. The court found that Commerce's

determination that a particular market situation existed based on hot-rolled coil

subsidization was not supported by substantial evidence. Id.

Second, the court reviewed Commerce's determination that Chinese hot-

rolled coil imports were a contributing factor in the existence of a particular market

situation. Id. at __, 450 F. Supp. 3d at 1340–41. Commerce cited a January 2016

Asian Steel Watch article titled "China's Steel Exports Reaching 100 Mt: What It

Means to Asia and Beyond" ("Steel Watch Article (OCTG II)"), which discussed

2014 market conditions several months removed from the OCTG II period of

review. Id. at __, 450 F. Supp. 3d at 1341. The court observed that the Steel

Watch Article (OCTG II) described China and Korea as major steel producers and

consumers with imports and exports, but did not support Commerce's assertion

that Chinese imports into Korea placed downward pressure on Korean domestic

steel prices. Id. at __, 450 F. Supp. 3d at 1340–41. Commerce also cited a

translated document excerpt, dated September 30, 2016, titled "Announcement for

and Excerpts from Relevant Ministries of the Government of Korea, Proposal for

Strengthening the Competitiveness of the Steel Industry" ("Announcement (OCTG

II)"). Id. at __, 450 F. Supp. 3d at 1341. Commerce quoted the Announcement

(OCTG II) as purported evidence that "Chinese excess supply is 'especially targeted' towards Korea," although the full quote from the Announcement (OCTG II) stated that "China's excess supply [is] *especially targeted towards Korea, ASEAN, and EU*." Id. The court noted that it was unreasonable for Commerce to determine that this evidence demonstrated that Chinese excess supply was "especially targeted towards Korea" alone, when Chinese hot-rolled coil imports were also aimed at the ten countries comprising the Association of Southeast Asian Nations (ASEAN) and the twenty-eight countries comprising the European Union (prior to the United Kingdom's exit from the European Union). Id. Commerce had conceded that "petitioners have not pointed to any evidence that Chinese overcapacity is directed toward the Korean market. That Chinese steel overcapacity affects the whole world is not disputed." Id. The court found that Commerce's determination that a particular market situation existed based on Chinese hot-rolled coil imports was not supported by substantial evidence. Id.

Third, the court reviewed Commerce's determination that strategic alliances were a contributing factor in the existence of a particular market situation. Id. at __, 450 F. Supp. 3d at 1341–43. Commerce had conceded that nothing on the record showed that strategic alliances between Korean hot-rolled coil producers and Korean OCTG producers created a distortion in hot-rolled coil costs, but determined that the possibility of the strategic alliances' past, present, and future

impact on hot-rolled coil prices was "relevant." Id. at __, 450 F. Supp. 3d at 1342. The court noted that Commerce's speculative conclusions that strategic alliances "may have created distortions" and "may continue to impact [hot-rolled coil] pricing in a distortive manner during the [OCTG II] [period of review] and in the future" were not themselves record evidence. Id. The court found that Commerce's determination that a particular market situation existed based on strategic alliances was not supported by substantial evidence. Id. at __, 450 F. Supp. 3d at 1342–43.

Fourth, the court reviewed Commerce's determination that the Korean Government's regulation of the Korean electricity market was a contributing factor in the existence of a particular market situation. Id. at __, 450 F. Supp. 3d at 1343. Commerce relied on the Korean Government's control of the electricity market and the impact of electricity prices on the OCTG manufacturing process without substantiating its assertion that any impact on electricity prices distorted the OCTG cost of production. Id. The court noted that Commerce had found in prior countervailing duty investigations, more than once, no evidence that Korean steel producers received countervailable subsidies as to electricity. Id. The court found that Commerce's determination that a particular market situation existed based on government control over electricity was not supported by substantial evidence. Id.

Fifth, the court reviewed Commerce's determination that the Korean

Government's steel industry restructuring efforts, the new fifth factor that Commerce introduced on remand, were a contributing factor in the existence of a particular market situation.  Id.  The court noted that Commerce cited a press release from the Korean Ministry of Strategy and Finance announcing the Korean Government's "2017 Action Plan for Industrial Restructuring" dated five months after the OCTG II period of review ended.  Id.  Commerce had also considered an article from Invest Chosun, noting the investment industry's support for additional restructuring.  Id.  The court observed that the record evidence cited by Commerce did not demonstrate actual restructuring during the OCTG II period of review.  Id. The court held that Commerce's determination that a particular market situation existed based on restructuring efforts was not supported by substantial evidence. Id.

        In summary, the court held that Commerce's particular market situation determination on remand was unsupported by substantial evidence, whether the five alleged factors were viewed individually or collectively.  Id.  On second remand, Commerce recalculated the relevant dumping margins without a particular market situation adjustment.  NEXTEEL Co. v. United States, 44 CIT __, __, 475 F. Supp. 3d 1378, 1379–80 (2020), appeal docketed, Appeal No. 21-1430 (Fed. Cir. Dec. 21, 2020).

        Here in OCTG III regarding the third administrative review for the period

covering September 1, 2016 through August 31, 2017, Commerce determined that

a particular market situation distorted the cost of production of OCTG based on the

cumulative effect of the original four factors alleged in prior administrative

reviews, namely: (1) Korean subsidies of the hot-rolled coil input; (2) imports of

hot-rolled coil into Korea from China; (3) strategic alliances between Korean hot-

rolled coil producers and Korean OCTG producers; and (4) government control

over prices in the Korean electricity market.  Final IDM at 23.  Defendant-

Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., United States

Steel Corporation, IPSCO Tubulars Inc. (formerly TMK IPSCO), Vallourec Star,

L.P., and Welded Tube USA Inc. collectively submitted in OCTG III a particular

market situation allegation letter with fifty-two attached exhibits.  Domestic

Interested Parties' Particular Market Situation Allegation Submission, PD 116–33

(May 16, 2018) ("OCTG III Allegation").  The exhibits included the particular

market situation allegation letter regarding electricity with twenty-six attached sub-

exhibits submitted by Maverick Tube Corporation in OCTG I, Exhibit 21; the

particular market situation allegation letter with twelve attached sub-exhibits

submitted by Maverick Tube Corporation in OCTG II, Exhibit 24; and the

particular market situation allegation letter with twenty-five attached sub-exhibits

submitted by United States Steel Corporation in OCTG II, Exhibit 25.  See id. at

9–11, Exs. 21 ("OCTG I Electricity Allegation"), 24 ("Maverick OCTG II

Allegation"), 25 ("U.S. Steel OCTG II Allegation").  Although the record in

OCTG III contains some additional documents not included on the OCTG I or

OCTG II records, the court observes that Commerce's examination of the OCTG

III record overall, including previously submitted documents and newly submitted

documents, with related explanations, does not support Commerce's OCTG III

determination that a particular market situation affected the cost of production of

OCTG.[7]

     As to the first factor, Commerce determined in OCTG III that the

Government of Korea subsidized hot-rolled coil production, which contributed to

the existence of a particular market situation.  Final IDM at 23.  Commerce

supported its determination of subsidization of hot-rolled coil by citing to:

Commerce's final issues and decision memorandum from OCTG I, final issues and

---

[7] NEXTEEL asserts that Commerce's determination that subsidies to POSCO, a producer of hot-rolled coil, contributed to a particular market situation distorting the cost of production of OCTG was not in accordance with the law because it amounted to consideration of an upstream subsidy. NEXTEEL Br. at 28.  NEXTEEL argues that fundamental principles of statutory construction require Commerce to address the hot-rolled coil subsidy under the specific upstream subsidy framework set forth in 19 U.S.C. § 1677-1 rather than the general particular market situation framework set forth in 19 U.S.C. § 1677b(e).  Id. at 29–30.  Commerce considered whether a particular market situation existed that affected the comparison of normal value to export price or constructed export price, not whether remediable subsidies existed in the Korean market. Because the court finds that the record evidence does not support Commerce's determination that subsidies of hot-rolled coil contributed to the existence of a particular market situation, the court need not address NEXTEEL's argument that "the statutory provisions remedying upstream subsidies preclude the use of the particular market situation provisions to remedy alleged market distortions that affect the cost of an input, where those alleged distortions include allegations of subsidies."  See Husteel Co. v. United States, 44 CIT __, __ n.16, 426 F. Supp. 3d 1376, 1390 n.16 (2020).

decision memorandum from OCTG II, and issues and decision memorandum from

the countervailing duty investigation in <u>Certain Hot-Rolled Steel Flat Products</u>

<u>From the Republic of Korea</u>; the amended final calculation memorandum for

POSCO in <u>Certain Hot-Rolled Steel Flat Products From the Republic of Korea</u>,

dated August 23, 2016 ("POSCO Subsidy Calculation"); the Steel Watch Article

(OCTG II); a Bloomberg article from the OCTG II record, dated January 28, 2016,

titled "POSCO Posts Smallest Ever Profit Amid Chinese Steel Deluge"

("Bloomberg POSCO Article (OCTG II)"); and the Announcement (OCTG II). <u>Id.</u>

at 23–24 & nn.179–82 (citing OCTG III Allegation Exs. 2, 1, 14, 15, 25 (U.S. Steel

OCTG II Allegation Exs. 2, 4), 24 (Maverick OCTG II Allegation Ex. 5)).

The court observes that these record documents cited by Commerce do not

demonstrate that subsidization of hot-rolled coil, considered with other factors,

amounted to a particular market situation.  Commerce determined that Korean steel

production was "heavily subsidized" based on "subsidies received by Korean hot-

rolled steel producers [that] totaled almost 60 percent of the cost of hot-rolled

steel" in the countervailing duty investigation with a period of investigation

covering calendar year 2014 in <u>Certain Hot-Rolled Steel Flat Products From the</u>

<u>Republic of Korea</u>.[8] <u>Id.</u> at 23–24 (citing POSCO Subsidy Calculation).  <u>But see</u>

---

[8] This court's decision in <u>POSCO v. United States</u>, 43 CIT __, 378 F. Supp. 3d 1348 (2019),
sustaining the AFA-based subsidy rate of 41.57% assigned in the countervailing duty

(footnote continued)

SeAH Final Calculations Mem. at 2 (applying the amended 41.57% subsidy);

NEXTEEL Final Calculations Mem. at 4 (applying the amended 41.57% subsidy);

Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 84 Fed. Reg.

at 23,019–20 (reducing POSCO's total AFA subsidy rate from 58.68% to 41.57%).

In the course of performing its first administrative review of the countervailing

duty order with a period of review from August 12, 2016 (the date of publication

of the countervailing duty investigation final affirmative determination) to

December 31, 2016, Commerce assigned preliminarily lower subsidy rates of

1.73% for POSCO, 0.65% for Hyundai Steel Co., Ltd., and 1.21% for all others.

Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 83 Fed. Reg.

55,517, 55,518 (Dep't Commerce Nov. 6, 2018) (prelim. results of countervailing

duty admin. review; 2016).  Commerce's reliance on the subsidy rate of nearly

60% or the revised subsidy rate of more than 40% from the countervailing duty

investigation covering calendar year 2014 was unreasonable in light of available

information of more contemporaneous subsidy rates of less than 2% for the period

of review from August 12, 2016 to December 31, 2016, which overlaps partially

with the OCTG III period of review from September 1, 2016 through August 31,

2017.  The court observes that it is unreasonable for Commerce to determine that

---

investigation, was vacated and remanded for further proceedings consistent with POSCO v.
United States, 977 F.3d 1369 (Fed. Cir. 2020), by an order issued as a mandate on March 4,
2021.  See POSCO v. United States, Appeal No. 19-2095 (Fed. Cir. Mar. 4, 2021).

Korean steel production was "heavily subsidized" based on the subsidy rate of
almost 60% from a timeframe outside the period of review, when other information
that Commerce noted in the OCTG III Final Issues & Decision Memorandum
demonstrates alternate subsidy rates of less than 2% for the relevant period of
review.  See Final IDM at 31 n.239 & 41.

     In explaining its determination that hot-rolled coil subsidization contributed
to a particular market situation, Commerce asserted that "as a result of significant
overcapacity in Chinese steel production, which stems in part from the distortions
and interventions prevalent in the Chinese economy, the Korean steel market has
been flooded with imports of cheaper Chinese steel products, placing downward
pressure on Korean domestic steel prices" based on the final issues and decision
memorandum from OCTG II, the Steel Watch Article (OCTG II), the
Announcement (OCTG II), and the Bloomberg POSCO Article (OCTG II).  Id. at
23 & n.182.  The court notes at the outset that citation to a prior issues and decision
memorandum drafted by Commerce does not suffice as evidence that can be
considered by the court or as substantial evidence upon which Commerce may
rely.  Nucor Corp. v. United States, 44 CIT __, __, 461 F. Supp. 3d 1374, 1379
(2020) (citing Hyundai Heavy Indus., Co. v. United States, 42 CIT __, __, 332 F.
Supp. 3d 1331, 1349 (2018) ("Commerce's Issues and Decision Memorandum, by
itself, does not constitute substantial evidence.")).  The court notes further that the

other cited record sources, including the Steel Watch Article (OCTG II), the

Announcement (OCTG II), and the Bloomberg POSCO Article (OCTG II),

discussed the global increase in low-priced hot-rolled coil exports from China and

its effect on the profits of POSCO, a Korean hot-rolled coil producer, and do not

demonstrate subsidization of hot-rolled coil by the Korean Government or whether

hot-rolled coil subsidization was a contributing factor in the existence of a

particular market situation.

In summary, the court finds with respect to the first factor that Commerce's

determination that "heavily subsidized" hot-rolled coil contributed to a particular

market situation that distorted the cost of production is not supported by substantial

evidence because the documents cited by Commerce do not address the issue of

subsidization of hot-rolled coil by the Korean Government, and as noted earlier,

Commerce's reliance on a subsidization rate of nearly 60% from a timeframe

outside the relevant period of review is unreasonable in light of existing contrary

record information referenced by Commerce of significantly lower subsidization

rates of less than 2% from within the period of review.

As to the second factor, Commerce determined that an onslaught of

imported "cheaper Chinese steel products" in the Korean steel market exerted

"downward pressure on Korean domestic steel prices." Final IDM at 24. In

addition to citing the Steel Watch Article (OCTG II) and the Bloomberg POSCO

Article (OCTG II), Commerce also relied on the following record documents

introduced on the OCTG III record: Global Trade Atlas, South Korea Import

Statistics for Hot-Rolled Products, 2012–2017 ("GTA 2012–2017"); an article in

The Investor, Korea Herald, dated September 20, 2016, titled "POSCO, Hyundai

Steel merger to benefit industry: report;"[9] an article in Pulse by Maeil Business

Newspaper, dated November 23, 2016, titled "Hyundai Steel, Dongkuk Steel

become latest beneficiaries of fast-track restructuring program;" an article in

Business Korea, dated September 19, 2016, titled "Korean Steel Industry Advised

to Reduce Number of Steel Plate Plants by Half;" an article in the Korea Times,

dated September 22, 2016, titled "Voices growing for merger of POSCO, Hyundai

Steel" ("Korea Times Article"); and Korean Purchases of Hot-Rolled Coils –

Calendar Year 2017, United Nations COMTRADE ("COMTRADE").  See id. at

24 & nn.183–88 (citing OCTG III Allegation Exs. 38, 43, 44, 45, 47, 25 (U.S.

Steel OCTG II Allegation Exs. 2, 4), 41); OCTG III Allegation at 16–18.[10]

---

[9] The OCTG III Allegation and the attached Exhibit List both refer to Exhibit 43 as "Ahn Sung-mi, *Hyundai Steel strongly denies merger with POSCO*, The Investor, Korea Herald (Nov. 1, 2016)."  OCTG III Allegation at 17 & Ex. List.  However, Exhibit 43 that was filed with the court in the Joint Appendix is an article in The Investor, Korea Herald, dated September 20, 2016, titled "POSCO, Hyundai Steel merger to benefit industry: report."  J.A., ECF Nos. 92-7 at ECF pp. 644–45, 93-3 at ECF pp. 860–61.  The court reviewed Exhibit 43 as filed with the court in the Joint Appendix.

[10] Commerce also cited "Letter from the Domestic Interested Parties, 'Oil Country Tubular Goods from the Republic of Korea: Factual Information Relating to the Particular Market Situation in Korea,' dated August 20, 2018 (the Domestic Interested Parties' Supplemental [Particular Market Situation] Allegation), at Exhibit 1 (The Investor, Korea Herald, 'Hyundai
(footnote continued)

The articles and statistics cited by Commerce do not support a determination

that the influx of Chinese hot-rolled coil is particular to Korea because the record

documents describe a global influx that affected many other countries in addition

to Korea, rather than an effect that is unique or particular to Korea.  See, e.g.,

Korea Times Article ("The global market will likely be saddled with a supply glut

for the foreseeable future because of China's overcapacity.").  Commerce noted

that Korea was China's largest hot-rolled coil export market in 2014.  Final IDM at

24 (citing Steel Watch Article (OCTG II)).  Commerce also cited statistics that

China was the top hot-rolled coil exporter into Korea from 2012 to 2017.  Id.

(citing GTA 2012–2017; COMTRADE).  Commerce considered the challenges

faced by POSCO, a Korean hot-rolled coil producer, in competing with low-priced

Chinese hot-rolled coil imports.  Id. (citing Bloomberg POSCO Article (OCTG

II)).  The court observes that the statistics and articles cited by Commerce do not

indicate that the experience in Korea due to Chinese hot-rolled coil imports is

distinct from the experience in other countries around the world, which were also

inundated with the global oversupply of low-priced Chinese products.  Although it

---

Steel strongly denies merger with POSCO,' by Ahn Sung-mi (November 1, 2016)."  Final IDM
at 24 n.184.  It appears that the "Letter from the Domestic Interested Parties, 'Oil Country
Tubular Goods from the Republic of Korea: Factual Information Relating to the Particular
Market Situation in Korea' dated August 20, 2018 (the Domestic Interested Parties'
Supplemental [Particular Market Situation] Allegation)," was not included in the Joint Appendix
so the court was unable to review it or any of its exhibits.  See J.A., ECF Nos. 92, 93 at Table of
Contents.

is clear that the oversupply of low-priced Chinese products affects many countries

in the global market, the court notes that Commerce has cited nothing on the record

to support its determination that the oversupply of low-priced Chinese products is

*particular* to the Korean market.

Commerce conceded that the global oversupply of Chinese hot-rolled coil

depressed prices in other countries:

> NEXTEEL's point that its input costs are consistent with prices in other markets does not refute our finding that global excess steel capacity contributes to a [particular market situation] in Korea. As reported in Asian Steel Watch, "China's oversupply situation . . . is expected to result in increased exports and price decline pressures." This global excess steel capacity has the potential to depress steel prices not just in Korea but in various markets. Although the effect may vary, steel prices in various countries are likely lower than they would be but for global excess capacity. Therefore, a comparison of [hot-rolled steel] prices in various countries does not prove that [hot-rolled steel] prices in Korea are not lower than they would be but for global excess steel capacity.

Id. at 28 (quoting Steel Watch Article (OCTG II)); see also Def. Resp. at 25–26.

Commerce's acknowledgment that any downward pressure caused by China's

oversupply was not specific to Korea undermined its determination that Chinese

hot-rolled coil imports contributed to a particular market situation in Korea.  See

Husteel Co. v. United States, 44 CIT __, __, 426 F. Supp. 3d 1349, 1391 (2020)

("Although 19 U.S.C. § 1677b may not demand that a [particular market situation]

be such that it only affects the subject market, there is no evidence on the record

that Chinese overcapacity affects the Korean market in some way that is specific to

the Korean market at all.").

The court observes that the record evidence cited by Commerce does not

support a conclusion that the global glut of Chinese hot-rolled coil imports caused

price distortions specific to the Korean steel market.  The court finds that

Commerce's determination that excess capacity of Chinese hot-rolled coil imports

contributed to a particular market situation in Korea is not supported by substantial

evidence.

As to the third factor, Commerce determined that strategic alliances between

certain Korean hot-rolled coil producers and Korean OCTG producers affected the

cost of hot-rolled coil.  Commerce cited new record documents introduced on the

OCTG III record, including: a notice from the Korean Free Trade Commission,

dated December 21, 2017, of penalties imposed on SeAH, other Korean OCTG

producers, and Korean hot-rolled coil suppliers for engaging in bid-rigging

schemes between January 2003 and December 2013; an article in the Korea Times,

dated December 20, 2017, titled "Steelmakers fined W92 bil. for bid rigging;" a

translated resolution of the Korean Fair Trade Commission, dated December 21,

2017, issuing a finding of unfair corporate action in bidding agreements on steel

pipe orders between 2003 and 2014; a translated resolution of the Korean Fair

Trade Commission, dated July 7, 1998, issuing a finding of unfair corporate action

in coordinated price increases between April 1997 and March 1998; and a

translated resolution of the Korean Fair Trade Commission, undated, issuing a

finding of unfair corporate action in bidding agreements on steel pipe orders in

1995 and 1996.  See Final IDM at 25 & nn.189–90 (citing OCTG III Allegation

Exs. 30–34).  Despite these numerous documents added to the OCTG III record,

Commerce conceded that the record does not show "that strategic alliances directly

created a distortion in [hot-rolled coil] pricing in the current period of review."  Id.

at 25.  The record documents cited by Commerce relate to findings of unfair

corporate action that occurred in 2014 or earlier, and no evidence relates to unfair

corporate action or other strategic alliances during the relevant period of review

from 2016–2017 in this case.  Because none of the evidence pertains to the relevant

period of review, Commerce's purely speculative conclusions that strategic

alliances "may have created distortions" and "may continue to impact [hot-rolled

coil] pricing in a distortive manner during the [OCTG III] [period of review] and in

the future" are not supported by the record.  See id.  The court finds that

Commerce's determination that strategic alliances between Korean hot-rolled coil

producers and Korean OCTG producers affected prices in the Korean steel market

during the OCTG III period of review and contributed to a particular market

situation is not supported by substantial evidence.

As to the fourth factor, Commerce determined that the Korean

Government's regulation of the Korean electricity market contributed to a

particular market situation.  Id.  Commerce relied on the Form 20-F annual report

filed by Korea Electric Power Corporation ("KEPCO") with the U.S. Securities

and Exchange Commission on April 30, 2014[11] "[f]or the fiscal year ended

December 31, 2013;" South Korea Import Statistics for January 2013 through

December 2013 for Commodities "Containing a Volatile Matter Less than 22% By

Weight (On A Dry, Mineral-Matter-Free Basis)," "Other," and "Anthracite;" the

U.S. Energy Information Administration's full report on South Korea, last updated

April 1, 2014; and the questionnaire response, dated January 21, 2015, and the

supplemental questionnaire response on electricity rate, dated March 6, 2015,

submitted by the Government of Korea in the countervailing duty investigation in

Welded Line Pipe From the Republic of Korea.  See id. at 25 & nn.191–94 (citing

OCTG I Electricity Allegation Exs. 2, 8, 1, 4, 9).  The two questionnaire responses

from the countervailing duty investigation in Welded Line Pipe From the Republic

---

[11] Commerce cited "Letter, 'Certain Oil Country Tubular Goods from the Republic of Korea: Particular Market Situation Allegation on Electricity,' dated February 3, 2016 (Maverick's Electricity Allegation), at 3, referencing Korea Electric Power Corporation Form 20-F (*April 30, 2016*) (KEPCO 20-F) . . . ."  Final IDM at 25 n.191 (emphasis added); see also id. at 25 n.192 (referencing Form 20-F as *Exhibit 2*).  Page 3 of the allegation letter, which Commerce referred to as Maverick's Electricity Allegation and the court refers to as OCTG I Electricity Allegation, cited "Korea Electric Power Corporation Form 20-F (*Apr. 30, 2015*) ("KEPCO 20-F") at 82, attached as *Exhibit 2* . . . ."  OCTG I Electricity Allegation at 3 n.3 (emphasis added).  Exhibit 2 (KEPCO Form 20-F) of Exhibit 21 (OCTG I Electricity Allegation) of the Joint Appendix that was filed with the court is the Form 20-F filed by KEPCO on *April 30, 2014*.  J.A., ECF Nos. 92-4 at ECF pp. 373–537, 93-6 at ECF pp. 985–1029 to 93-1 at ECF pp. 1–120.  Commerce's citations to pages 46, 47, and 82 of Exhibit 2 correspond with information on pages 46, 47, and 82 of the Form 20-F filed by KEPCO on April 30, 2014.  See OCTG I Electricity Allegation Ex. 2.  The document properly on the OCTG III record is Commerce's Exhibit 2 of the OCTG I Electricity Allegation, Form 20-F filed by KEPCO on April 30, 2014.

of Korea refer to the period of investigation from January 1, 2013 through

December 31, 2013.  See Welded Line Pipe From the Republic of Korea, 80 Fed.

Reg. 61,365 (Dep't Commerce Oct. 13, 2015) (final negative countervailing duty

determination).

The court observes that the record evidence does not support Commerce's

determination that a particular market situation existed in Korea based in part on

government control over electricity during the OCTG III period of review from

2016–2017 because Commerce's determination that the Korean Government's

control of electricity contributed to a particular market situation has a temporal

problem.  Commerce cited only record documents that relate to April 2014 or

earlier to determine that the Korean Government controlled the supply and pricing

of electricity and that KEPCO, the largest supplier of electricity in Korea, was

government controlled.  See Final IDM at 25 & nn.191–94 (citing OCTG I

Electricity Allegation Exs. 1, 2, 4, 8, 9).  The content of the record evidence relied

upon by Commerce is at least two years removed from the OCTG III period of

review of 2016–2017 and is inconclusive regarding government control over

electricity during the OCTG III period of review.  The court finds, therefore, that

Commerce's determinations that the Korean Government controlled the price of

electricity and that government control over electricity contributed to a particular

market situation during the OCTG III period of review are not supported by

substantial evidence because none of the cited documents pertain to the relevant period of review in this case.

In summary, the court concludes that Commerce's determination that a particular market situation affected the cost of production of OCTG in Korea is not supported by substantial evidence. Commerce based its particular market situation determination on the cumulative effect of four alleged factors, but the court observes that the record evidence does not support the existence during the OCTG III period of review of any of these factors. The court finds that Commerce's assertions regarding the two factors that the Korean Government heavily subsidized hot-rolled coil and controlled electricity prices during the OCTG III period of review are not supported by record evidence. Commerce conceded that it presented no evidence to support the existence of strategic alliances during the OCTG III period of review, and in the absence of evidence, the court cannot consider whether the possibility of a factor contributes to a particular market situation. As to the remaining factor, the record evidence does not support Commerce's assertion that the impact of Chinese hot-rolled coil imports is particular to Korea.

The court holds that substantial record evidence does not support Commerce's cumulative particular market situation determination in Korea for the 2016–2017 period of review because the record evidence does not demonstrate the

existence during the period of review of the four factors allegedly underlying the particular market situation determination. The court remands Commerce's particular market situation determination and adjustment for further explanation or reconsideration consistent with this opinion.

## IV.   Constructed Value Profit Calculation

Commerce calculated constructed value profit by the third alternative method based on SeAH's profit on OCTG sales to the Canadian market during the OCTG I period of review, citing it as the best information available on the record. Id. at 48–49, 51; Def. Resp. at 36. NEXTEEL faults Commerce's use of: (1) non-contemporaneous data as unreasonable when there were important differences in the marketplace between the two periods of review; and (2) SeAH's Canadian market sales subject to a Canadian antidumping duty case with respect to subject merchandise as contradictory to Commerce's prior practice. NEXTEEL Br. at 36–42. SeAH argues that Commerce failed to apply a "profit cap" in accordance with the statute. SeAH Br. at 31–35.

When calculating constructed value by the third alternative method, Commerce may use "any other reasonable method" to calculate profits and selling, general, and administrative expenses. 19 U.S.C. § 1677b(e)(2)(B). "The objective is to find a good proxy (or surrogate) for the profits that the respondent can fairly be expected to build into a fair sales price of the particular merchandise." Mid

Continent Steel & Wire, 941 F.3d at 542 (citations omitted).

In calculating constructed value, Commerce determined that SeAH and NEXTEEL did not have a viable home market or third-country market during the period of review for purposes of calculating constructed value profits and selling expenses under 19 U.S.C. § 1677b(e)(2)(A). Final IDM at 49. When considering the statutory alternatives under 19 U.S.C. § 1677b(e)(2)(B)(i)–(iii), Commerce eliminated subsection (i) because NEXTEEL's and SeAH's other steel products were in different categories than OCTG, and subsection (ii) because NEXTEEL had no sales of OCTG in the home market of Korea. Id. at 50. Commerce calculated constructed value under subsection (iii). Id. The nine sources of information on the record identified by Commerce included SeAH's data from OCTG I of OCTG sales in Canada, NEXTEEL's data of home market sales of non-OCTG standard pipe, and the financial statements of seven non-Korean producers, "Nippon Steel," "Tenaris," "TMK," "Borusan Mannesmann," "Chung Hung Steel Corporation," "Maharashtra Seamless Limited," and "EVRAZ plc," many of which included significant sales of non-OCTG products. Id. at 50, 53–54. Commerce chose to calculate constructed value profit by utilizing SeAH's Canadian market profit data from OCTG I. Id. at 50–51. Commerce favored SeAH's data as the only data available on the record that reflected the profit of a Korean OCTG producer on sales of OCTG in the ordinary course of trade. Id. at

51–53.

NEXTEEL contends that the use of SeAH's data from the OCTG I review is unreasonable as applied to the current period of review because the OCTG market declined in the interim.  NEXTEEL Br. at 37–38.  NEXTEEL's first contention is incorrect.  Using subsection (iii) to calculate constructed value, Commerce may use "any reasonable method" to determine constructed value.  See 19 U.S.C. § 1677b(e)(2)(B)(iii).  Commerce explained that "[w]hile the financial data from SeAH are less contemporaneous with the [period of review] than are the other alternative financial data sources, we continue to find that the specificity of the SeAH financial data outweighs concerns over contemporaneity."  Final IDM at 51. Because SeAH's data reflect "profit from OCTG produced by a Korean producer in Korea," and profit made on comparison market sales in the ordinary course of trade, Commerce reasoned that using the data therefore "eliminates some of the inherent flaws that occur with using surrogate financial statements (e.g., profits reflecting products that are not in the same general category of products as OCTG)."  Id.  The court regards as reasonable Commerce's explanation that SeAH's financial data are specific and relate to a Korean producer conducting production in Korea and are more accurate than surrogate financial statements from non-Korean producers or regarding a product other than OCTG.  The court concludes that Commerce's use of SeAH's OCTG I data is reasonable and

supported by substantial evidence.

In addition, NEXTEEL and SeAH contend that Commerce's use of SeAH's

data is inconsistent with Commerce's prior practice of disregarding sales subject to

antidumping duties.  NEXTEEL Br. at 41–42; SeAH Br. at 32.  On March 3, 2015,

the Canadian Border Services Agency made a final determination of dumping and

assigned dumping margins of 8.8% to SeAH Steel Corporation and 37.4% to all

other exporters.  NEXTEEL's CV Profit and Selling Expenses Rebuttal Comments

Exs. 8-b, 8-c, PD 208 (July 20, 2018); SeAH's CV Profit Rebuttal Submission

Attachs. 2–4, PD 210–13 (July 19, 2018).  Despite the Canadian antidumping

determination, Commerce's use of SeAH's OCTG I data does not run afoul of the

preference against using "dumped third country prices to calculate [normal value],"

see Alloy Piping Prods., Inc. v. United States, 26 CIT 330, 341 (2002), because

Commerce made adjustments for possible distortions.  Commerce "subjected

SeAH's Canadian market sales to a cost test, and only those sales that were made

above the cost of production (*i.e.*, made in the ordinary course of trade) were used

in constructing the aggregate [constructed value] profit and selling expenses."

Final IDM at 54.  Commerce explained that SeAH's OCTG I data were the most

accurate because they were the only data available from a Korean producer of sales

of OCTG and, with Commerce's exclusion of the dumped sales, they reflected

sales made in the ordinary course of trade.  Id. at 51–52, 54.  The court's

conclusion that Commerce's selection of SeAH's OCTG I data is reasonable is not altered by the existence of a Canadian antidumping determination because Commerce did not include the dumped sales in the constructed value profit calculation.  The court finds that Commerce's use of SeAH's Canadian market sales of OCTG from OCTG I is reasonable.

SeAH also argues that Commerce's calculation of constructed value profit is inconsistent with the statute because Commerce did not apply a "profit cap" based on the financial statements of global OCTG producers.  SeAH Br. at 33–34. Specifically, SeAH argues that Commerce's "use of the same figures to determine both the profit rate and the 'profit cap' . . . mean[s] that no 'profit cap' was actually applied" and that Commerce erred by not applying a profit cap based on the profit earned on all home-market sales of merchandise in the same general category of merchandise.  Id.

In utilizing a "reasonable method" under subsection (iii), Commerce normally must apply an upward limit for profit commonly termed the "profit cap." Atar S.r.l. v. United States, 730 F.3d 1320, 1322 (Fed. Cir. 2013) (citation omitted).  "This 'profit cap' prevents the 'various possible calculation methods from yielding anomalous results that stray beyond the amount normally realized from sales of merchandise in the same general category.'"  Mid Continent Steel & Wire, 941 F.3d at 545 (quoting Atar S.r.l., 730 F.3d at 1327).  Congress

contemplated situations, however, in which a profit cap would not be calculable:

> [W]here, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available."  This ensures that Commerce can use alternative (3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products.

Id. (quoting H.R. Doc. No. 103-316, vol. 1 at 841 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4177).  When Commerce explains reasonably that information is not available for Commerce to calculate a profit cap, Commerce may calculate constructed profit under subsection (iii) without calculating a profit cap.  Id. at 545–46.

Commerce explained that "[it] [wa]s unable to calculate a profit cap based on the actual amounts reported in accordance with the statutory intent under section [1677b(e)(2)(B)(iii)]" because "[t]here is no profit information for sales in Korea of OCTG and products in the same general category on the record."  Final IDM at 55; see also Mid Continent Steel & Wire, 941 F.3d at 545 ("[T]he statutorily specified information was not available to calculate a profit cap" when "there [wa]s no viable domestic market in the exporting country for merchandise that is in the same general category of products as the subject merchandise.").  The court observes that Commerce noted that the record did not contain any information regarding the profit for sales in Korea of OCTG and products in the same general category.  See Final IDM at 55.  Because Commerce "articulate[d] a

reasonable justification for its decision, tied to the record in the proceeding,"
Commerce's decision not to calculate a profit cap when "the statutorily specified
information was not available" is reasonable.  See Mid Continent Steel & Wire,
941 F.3d at 545–46.

In contrast, Commerce asserted that SeAH's Canadian OCTG I data were
the best available data that "reflect the profit and selling expense experiences of a
Korean OCTG producer, are based on OCTG sales to a viable comparison
market[,] and are derived from sales made in the ordinary course of trade."  Final
IDM at 48.  The court finds that Commerce's calculation of constructed value
profit based on SeAH's Canadian market sales during the OCTG I period of review
is reasonable and supported by substantial evidence.

## V.    Costs for Non-Prime Products

Commerce decided not to allocate full costs for NEXTEEL's downgraded
merchandise because Commerce determined that the non-prime products were not
subject merchandise based on their unsuitability for the same applications as prime
OCTG and their lower market value.  Id. at 91–92.  Commerce reduced
NEXTEEL's reported cost for the non-prime products to the sales price of the non-
prime products and allocated the difference to the cost of prime OCTG.  Id. at 92.
NEXTEEL argues that the cost reallocation was contrary to Commerce's prior
practice of treating non-prime OCTG as subject merchandise and contrary to

NEXTEEL's records, which reported the same full cost to the downgraded

products as to OCTG.  NEXTEEL Br. at 42–43.

      The statute directs Commerce to calculate costs for constructed value "based

on the records of the exporter or producer of the merchandise, if such records . . .

reasonably reflect the costs associated with the production and sale of the

merchandise."  19 U.S.C. § 1677b(f)(1)(A); see also Thai Plastic Bags Indus. Co.

v. United States, 746 F.3d 1358, 1365 (Fed. Cir. 2014).  Commerce may determine

that a respondent's reported costs include costs incurred in the production of non-

prime products, which are not included in the normal value calculation.  See, e.g.,

Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1381 (Fed. Cir. 2008)

(citing Koyo Seiko Co. v. United States, 66 F.3d 1204, 1206 (Fed. Cir. 1995))

(additional citation omitted).  The U.S. Court of Appeals for the Federal Circuit

has affirmed that products may be non-prime if they have "material defects," "[are]

sold outside the ordinary course of trade," or "ha[ve] commercially significant

differences from prime merchandise."  Id. at 1381–82 (citations omitted).

      Commerce determined that NEXTEEL's non-prime products were not

suitable for the same applications as prime OCTG and reallocated NEXTEEL's

reported costs for the non-prime products.  Final IDM at 92.  NEXTEEL's non-

prime pipes "w[ere] downgraded [from OCTG] to non-prime at the end of the

production process and w[ere] never certified to be sold as OCTG."  Id.

Commerce considered NEXTEEL's explanation that downgraded pipes "do not

meet the strict technical requirements" for use as OCTG and "are generally used

for structural purposes such as pile." Id. (citing NEXTEEL's Suppl. Sections A–D

Questionnaire Resp. at 4–6, PD 192 (June 7, 2018); NEXTEEL's Second Suppl.

Section D Questionnaire Resp. at 11–14, PD 237 (Aug. 13, 2018)).  Commerce

noted the unsuitability of the downgraded pipe for uses requiring the specialized,

high-value OCTG resulting in considerably lower sales (market) prices "than the

full production costs that [NEXTEEL] assigns to them in the normal course of

business." Id. (citing NEXTEEL's Prelim. Cost Calculation Mem., Attachs. 4A,

4B).  Commerce's determination that the non-prime products are not subject

merchandise is reasonable based on the commercially significant differences

between the non-prime products and prime OCTG in terms of usage and market

value.

Commerce determined that "assigning full costs to these non-prime products

d[id] not reasonably reflect the costs associated with the production and sale of the

merchandise." Id.  Commerce reduced the reported cost of non-prime products to

their market value and added the difference between full production cost and their

market value to the reported cost of prime OCTG products.  Id.  In Dillinger

France S.A. v. United States, 981 F.3d 1318, 1324 (Fed. Cir. 2020), the U.S. Court

of Appeals for the Federal Circuit remanded Commerce's assignment of costs for

Commerce to determine the actual costs of prime and non-prime products when

Commerce calculated costs based on recorded projected sales prices rather than

costs of producing and selling merchandise.  The same defect impairs Commerce's

adjustment of NEXTEEL's reported cost for non-prime products to market value

and the subsequent adjustment to NEXTEEL's reported cost for prime OCTG to

include the net cost for non-prime products since neither adjustment reflects actual

costs.

The court holds that Commerce's determination that NEXTEEL's non-prime

products are not subject merchandise is supported by substantial evidence, but

remands for Commerce to allocate costs based on the actual costs of prime and

non-prime products.

### VI.    Production Line Suspension Costs

Two of NEXTEEL's production lines were suspended temporarily, one for

one month and the other for one year.  NEXTEEL Sections C&D Resp. at D-10–

D-11, PD 96 (Feb. 27, 2018); NEXTEEL Br. at 44.  Commerce reallocated costs

related to the production line suspensions from the cost of goods sold as reported

by NEXTEEL to G&A expenses.  Final IDM at 95; see also NEXTEEL Br. at 44–

45.  NEXTEEL argues that Commerce's reallocation contravened 19 U.S.C.

§ 1677b(f)(1)(A) and that costs should be attributed to production costs, consistent

with NEXTEEL's normal books and records and "appropriately borne by the

products manufactured on the lines that were shut down."  NEXTEEL Br. at 45.

The statute directs Commerce to calculate costs based on a respondent's records if the records are compliant with generally accepted accounting principles ("GAAP") and reasonably reflect production and selling costs.  19 U.S.C. § 1677b(f)(1)(A).

Here, Commerce reallocated the costs associated with the production line suspensions as G&A expenses consistent with its practice of distinguishing costs for routine shutdowns such as for maintenance from costs for extended suspension of production.  Final IDM at 95.  Commerce's stated practice is to attribute costs for routine shutdowns as manufacturing costs and costs for extended shutdowns as G&A expenses "related to the general operations of the company as a whole, and not specific to products associated with that production line."  Id. at 95–96. Commerce determined that NEXTEEL's production line suspensions of one month and one year were non-routine, extended suspensions, the costs of which should be attributed as G&A expenses.  Id. at 95.  Commerce explained that "unlike a routine maintenance shutdown, once a production line is suspended, it no longer relates to the ongoing or remaining production" and "[r]egardless of the reason for the suspension, in contrast to the routine maintenance shutdowns, there are no longer products produced on those production lines or current intentions to produce products on those lines that can bear the burden of the costs associated with those

production lines." Id.

Section 1677b(f)(1)(A) directs Commerce to use NEXTEEL's records so long as the records are GAAP-compliant and reasonably reflect costs.  Commerce explained its own practice, but did not explain the deficiency in NEXTEEL's records that warrants Commerce's departure from the statutory preference for determining costs according to an exporter's or producer's records.  The court remands for further explanation or reconsideration consistent with this opinion.

### VII.   Exclusion of Freight Revenue Profit

Commerce capped the deduction for freight expenses at the amount actually incurred.  Id. at 73–74; see also SeAH Br. at 7.  SeAH argues that because the freight charges were billed separately, the freight charges were not included in the starting price of the merchandise and Commerce's adjustment was not permitted by statute.  SeAH Br. at 8–9.  SeAH asserts that Commerce's determinations that separately-invoiced freight revenue are included in the price of the merchandise and that the portion of freight revenue up to actual freight expenses, but not exceeding actual freight expenses, is included in the price of the merchandise are contrary to the law.  Id. at 9.  SeAH also contends that Commerce's cap at actual freight costs results in full deduction of freight revenue when SeAH's affiliate shipped at a loss, but partial deduction capped at actual freight cost when SeAH's affiliate shipped at a profit.  Id. at 9–10.  SeAH argues that Commerce must treat

freight profits and losses uniformly, either ignoring both or including both.  Id. at

10.

Export price or constructed export price is the price at which the subject

merchandise is first sold in the United States.  See 19 U.S.C. § 1677a(a), (b).

Under 19 U.S.C. § 1677a(c)(2)(A),

> [t]he price used to establish export price and constructed export price
> shall be reduced by . . . the amount, if any, included in such price,
> attributable to any additional costs, charges, or expenses, and United
> States import duties, which are incident to bringing the subject
> merchandise from the original place of shipment in the exporting
> country to the place of delivery in the United States . . . .

Id. § 1677a(c)(2)(A).  Commerce uses adjustments when calculating export price

or constructed export price "to achieve 'a fair, apples-to-apples comparison'

between U.S. price and foreign market value . . . ."  Fla. Citrus Mut. v. United

States, 550 F.3d 1105, 1110 (Fed. Cir. 2008) (quoting Torrington Co. v. United

States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  Such adjustments prevent exporters

from improperly inflating the export price of a good by charging a customer for

freight more than the exporter's actual freight expenses.  See Dongguan Sunrise

Furniture Co. v. United States, 36 CIT 860, 894 (2012).  Commerce adjusts its

price calculation using net freight revenue, and it is reasonable for Commerce not

to consider freight revenue profit as part of the price of the subject merchandise in

accordance with the statutory language.  See id. at 894–95.

Here, Commerce determined that increasing the merchandise gross unit

selling price with profit SeAH earned on the sale of freight would artificially

inflate the constructed export price.  <u>See</u> Final IDM at 74.  Commerce isolated the

price of SeAH's merchandise alone without any additional charges by capping

SeAH's freight expenses at the actual cost incurred in order to exclude freight

revenue profit.  <u>Id.</u>

      SeAH contends that Commerce's treatment of freight revenue below the cap

as part of the U.S. price in its calculations, and freight revenue above the cap as not

part of the U.S. price in its calculations, is inconsistent with the statute.  <u>See</u> SeAH

Br. at 9–10.  SeAH argues that under the language of 19 U.S.C. § 1677a(c)(2)(A),

when Commerce deducted the actual freight costs for sales with separately-

invoiced freight charges, it must have determined that those costs were included in

the "price used to establish export price and constructed export price," otherwise

Commerce would not have been permitted to adjust them.  <u>See id.</u> at 8–9 (quoting

19 U.S.C. § 1677a(c)(2)(A)).  This is an incorrect reading of the statute.  Section

1677a requires Commerce to make adjustments when calculating export price or

constructed export price "to achieve a fair, apples-to-apples comparison between

U.S. price and foreign market value . . . ."  <u>Fla. Citrus Mut.</u>, 550 F.3d at 1110

(citation and internal quotation marks omitted).  A proper comparison between the

U.S. price and foreign market value would not include a profit earned from freight

rather than from the sale of subject merchandise.  The court concludes that

Commerce's exclusion of freight revenue profit reflects the statutory method and is in accordance with the law.

### VIII.  Application of Affiliated Seller's General and Administrative Expense Ratio to Both Further Manufactured and Non-Further Manufactured Products

The general activities of SeAH's U.S. affiliated reseller, Pusan Pipe America, Inc. ("PPA"), include the further manufacture and sale of further manufactured OCTG pipe and the direct resale of non-further manufactured OCTG pipe.  Final IDM at 78.  Commerce applied PPA's G&A expense ratio to calculate deductions from SeAH's constructed export price for further manufacturing costs and indirect selling expenses.  Id. at 77–79.  "[F]or further manufactured products, Commerce applied PPA's G&A expense ratio to the total cost of the further manufacturing plus the [cost of production] of the imported OCTG pipe and included the amount" in the further manufacturing cost deducted under 19 U.S.C. § 1677a(d)(2).  Id. at 79.  "[F]or products not further manufactured, Commerce applied PPA's G&A expense ratio to the [cost of production] of the imported OCTG and included the amount" in the indirect selling expense deducted under 19 U.S.C. § 1677a(d)(1)(D).  Id.

When a foreign producer or exporter sells a product to a U.S. selling affiliate, the law permits using "constructed export price" in calculating the dumping margin.  19 U.S.C. § 1677a(d).  Constructed export price is the price at

which the subject merchandise is first sold in the United States by a seller affiliated

with the producer or exporter to a non-affiliated purchaser.  Id. § 1677a(b).

Commerce must deduct both the selling expenses and cost of further

manufacture from the price used to determine constructed export price.  Id.

§ 1677a(d).  The relevant provision provides:

> (d) Additional adjustments to constructed export price.  For purposes
> of this section, the price used to establish constructed export price shall
> also be reduced by—
>
>> (1) the amount of any of the following expenses generally
>> incurred by or for the account of the producer or exporter, or the
>> affiliated seller in the United States, in selling the subject
>> merchandise (or subject merchandise to which value has been
>> added)—
>>
>>> (A) commissions for selling the subject merchandise in the
>>> United States;
>>> (B) expenses that result from, and bear a direct
>>> relationship to, the sale, such as credit expenses,
>>> guarantees and warranties;
>>> (C) any selling expenses that the seller pays on behalf of
>>> the purchaser; and
>>> (D) any selling expenses not deducted under subparagraph
>>> (A), (B), or (C); [and]
>>
>> (2) the cost of any further manufacture or assembly (including
>> additional material and labor) . . . .

Id. § 1677a(d)(1)–(2).  The selling expenses referenced in Section 1677a(d)(1)(D)

are commonly referred to as "indirect selling expenses."  Micron Tech., Inc. v.

United States, 243 F.3d 1301, 1306, 1310 (Fed. Cir. 2001).

### A.      Cost of Further Manufacturing

Commerce calculated the deduction for the portion of PPA's G&A expenses

attributable to further manufacturing under 19 U.S.C. § 1677a(d)(2) by applying

"PPA's G&A expense ratio to the total cost of the further manufacturing plus the

[cost of production] of the imported OCTG pipe . . . ."  Final IDM at 79.  SeAH

asserts that Commerce's historical practice was to apply a company's G&A

expense ratio to the sum of the material, labor, and overhead expenses of further

manufacturing but that Commerce's recent practice in contravention of the statute

is to apply the expense ratio to the cost of the imported pipe in addition to the cost

of further manufacturing, as Commerce did here.  See SeAH Br. at 11–12, 15.

Commerce asserted that "because the denominator of the G&A expense ratio

as calculated by SeAH (i.e., the cost of goods sold from the financial statements)

includes both directly resold and further manufactured OCTG (i.e., the cost of the

imported pipe plus the further manufacturing cost), Commerce's approach [wa]s

balanced and reasonable."  Final IDM at 79.  Commerce decided that "[a]pplying

such a ratio to only the cost of further manufacturing would result in a mismatch

between the figures used in the G&A expense ratio calculation . . . ."  Id.  The

explanation as to balanced accounting does not address Commerce's statutory

authority or the reasonableness of applying PPA's expense ratio to the cost of

further manufacturing plus the cost of the imported OCTG pipe to calculate the

amount deductible as the cost of further manufacturing under 19 U.S.C.

§ 1677a(d)(2).  See Husteel Co. v. United States, 44 CIT __, __, 471 F. Supp. 3d

1349, 1370 (2020).

The statute authorizes Commerce to reduce the constructed export price by

"the cost of any *further* manufacture or assembly (including *additional* material

and labor) . . . ."  19 U.S.C. § 1677a(d)(2) (emphasis added).  The cost of

production of the imported OCTG pipe is not a cost incurred for further

manufacture.  Commerce's application of PPA's G&A expense ratio to the cost of

production of the imported OCTG pipe is not permitted by the statute.  The court

concludes that Commerce's calculation of further manufacturing cost is not in

accordance with the law.

### B.    Indirect Selling Expenses

Commerce calculated the deduction for the portion of PPA's G&A expenses

attributable to indirect selling expenses under 19 U.S.C. § 1677a(d)(1)(D) by

applying "PPA's G&A expense ratio to the [cost of production] of the imported

OCTG" for products not further manufactured.  Final IDM at 79.  SeAH contends

that as PPA's activities included both manufacturing and sales, PPA's G&A

expenses should have been classified as non-selling general expenses, not selling

expenses.  SeAH Br. at 3, 10–11.

In "calculating indirect selling expenses, Commerce generally will include

G&A expenses incurred by the United States selling arm of a foreign producer."

Aramide Maatschappij V.o.F. v. United States, 19 CIT 1094, 1101 (1995)

(affirming Commerce's inclusion as indirect selling expenses of G&A expenses

incurred by parent company that provided administrative, accounting, and finance

services to subsidiary in the United States).  The U.S. Court of Appeals for the

Federal Circuit affords Commerce deference in developing a methodology for

including G&A expenses in the constructed value calculation because it is a

determination "involv[ing] complex economic and accounting decisions of a

technical nature . . . ."  Fujitsu Gen. Ltd., 88 F.3d at 1039 (citation omitted); see

Motor Vehicle Mfrs. Ass'n, 463 U.S. at 48–49 (reiterating that Commerce must

provide a cogent explanation supporting its exercise of discretion).

     To the extent that PPA directly resells SeAH's non-further manufactured

OCTG pipe, the associated G&A expenses are properly understood as expenses

facilitating sales, not manufacturing.  Commerce's application of PPA's G&A

expense ratio to the cost of production of the imported non-further manufactured

OCTG pipe to calculate the portion of PPA's G&A expenses attributable to resale

of the non-further manufactured OCTG pipe is reasonable.  The court concludes

that Commerce's treatment of PPA's G&A expenses as indirect selling expenses of

non-further manufactured OCTG pipe is in accordance with the law.

## IX.    SeAH's General and Administrative Expenses

"In calculating G&A expenses, it is Commerce's practice to include those expenses which relate to the activities of the company as a whole rather than to the production process." Husteel Co. v. United States, 39 CIT __, __, 98 F. Supp. 3d 1315, 1357 (2015) (citations and internal quotation marks omitted). "Commerce typically excludes expenses from the G&A rate calculation only when the expenses are both: (1) unusual; and (2) infrequent in nature." Id. (citations and internal quotation marks omitted) (sustaining Commerce's exclusion of a loss because "guaranteeing loans was not an ordinary aspect of [steelmaker]'s business operations").

### A.    Penalty

Commerce included in SeAH's G&A expenses a penalty imposed by the Korean Fair Trade Commission related to bids for orders of line pipe in the Korean market between 2003 and 2013. Final IDM at 83. SeAH argues that inclusion of the penalty was improper because the penalty was unrelated to OCTG production, was imposed for actions taken before the period of review, and was unusual and infrequent. SeAH Br. at 19–20 (citing Husteel Co., 39 CIT at__, 98 F. Supp. 3d at 1357).

Commerce explained that it included the penalty in SeAH's G&A expense calculation according to its practice of treating penalties as a cost of general

operations "rather than the current production of a specific product."  Final IDM at

83–84.  For penalties incurred due to actions taken outside the period of review,

Commerce's stated practice is to follow the treatment of the penalty in the

respondent's GAAP-based financial statements.  Id. at 84.  SeAH reported the

penalty as a "current year miscellaneous loss . . . under other non-operating

expenses" in its financial statements for 2017.  Id. (citing SeAH's Questionnaire

Resp., App. S2D-9-A, PD 227 (Aug. 3, 2018)).

     Commerce reasonably included the penalty in SeAH's G&A expenses.

SeAH's business operations include production and sales of line pipe, which is

related to the penalty SeAH incurred.  Although the penalty was imposed for

SeAH's actions taken before the period of review, SeAH reported the penalty in its

2017 financial statement and Commerce's inclusion of the penalty was based on

SeAH's reporting of the penalty during the relevant period of review.

     SeAH argues that the incurrence of the penalty was unusual.  SeAH Br. at

20.  Defendant responds that the penalty was not unusual or infrequent and cites

record documents (described in Section III above) showing that SeAH incurred

previous penalties for actions taken between 1995 and 1998.  Def. Resp. at 59–60

(citing OCTG III Allegation Exs. 30–34).  The court is not persuaded that

Commerce's practice of excluding expenses "only when the expenses are both: (1)

unusual; and (2) infrequent in nature" is equivalent to a typical practice of

excluding all unusual and infrequent expenses as SeAH asserts.  See SeAH Br. at

20; Husteel Co., 39 CIT at __, 98 F. Supp. 3d at 1357 (citations and internal

quotation marks omitted).  The court finds that Commerce's inclusion of the

penalty in SeAH's G&A expense ratio is supported by substantial evidence.

### B.    Inventory Valuation Losses

Commerce included inventory valuation losses related to raw materials and

work-in-process in SeAH's G&A expense ratio.  Final IDM at 82.  SeAH argues

that the inventory valuation losses are not losses but rather a GAAP-required

record of the difference between inventory market value and actual purchase price

when the market value of the inventory falls below the actual purchase price.

SeAH Br. at 16.  SeAH contends that because SeAH's cost of production already

accounted for the actual historic price of materials, Commerce's inclusion of the

inventory valuation losses as G&A expenses resulted in double-counting.  Id. at 17.

Defendant-Intervenors Maverick Tube Corporation ("Maverick") and Tenaris Bay

City, Inc. ("Tenaris") argue that because SeAH's policy in its normal books and

records is to restate its inventory market value and corresponding inventory

valuation losses in an attempt to use the lower-valued inventory in a subsequent

period to calculate its cost of production, Commerce properly used its discretion to

include the inventory valuation losses in SeAH's G&A expenses.  Resp. Br. Def.-

Inters. Maverick Tube Corporation and Tenaris Bay City, Inc. at 20–21, ECF No.

72 ("Maverick Resp.").

Here, SeAH reflected the net loss in the value of its inventory consistent with GAAP by comparing the purchase price with the current market value of raw materials and work-in-process on a quarterly basis and recording the loss on the balance sheet as a periodic adjustment when the market value was lower than the purchase price. Final IDM at 82. No periodic adjustment was recorded when the market value was higher than the purchase price. SeAH Br. at 16. Contrary to assertions by Maverick and Tenaris that SeAH attempted to use the lower market value to calculate its cost of production, Commerce confirmed that the periodic adjustments for inventory losses did not alter the purchase price of consumed raw materials and work-in-process used in calculating the cost of production. Final IDM at 82; see Maverick Resp. at 21. Commerce included the inventory valuation losses reflected on the balance sheet as G&A expenses, explaining that as period expenses "related to an accounting period and not directly related to manufacturing merchandise," the inventory valuation losses are related to the general operations of the company as a whole. Final IDM at 82.

It is unclear from the record or from Commerce's explanation whether the inventory valuation losses related to SeAH's raw materials and work-in-process were expenses. Commerce did not cite record evidence demonstrating that the inventory valuation losses became realized costs, which it seems would occur only

if the raw materials and work-in-process were sold.  Cf. Torrington Co. v. United

States, 20 CIT 632, 640 (1996) ("Inventory carrying costs are designed to measure

the cost to a company of holding merchandise that could be sold to generate

revenue.  Because raw materials and work in process are, by definition, not yet

salable merchandise, [Commerce] bases inventory carrying cost on the value of

finished goods only.").

 The court concludes, therefore, that because Commerce did not cite any

relevant record evidence, Commerce's decision to include SeAH's inventory

valuation losses as G&A expenses is not supported by substantial evidence.  The

court remands for further explanation or reconsideration consistent with this

opinion.

## CONCLUSION

 For the foregoing reasons, the court sustains the following determinations of

Commerce:

1. The court sustains Commerce's calculation of constructed value profit

   based on SeAH's OCTG I Canadian market sales and inclusion of a

   penalty in SeAH's G&A expense ratio as supported by substantial

   evidence; and

2. The court sustains Commerce's differential pricing analysis, exclusion

   of freight revenue profit, and application of PPA's G&A expense ratio

to SeAH's non-further manufactured products as in accordance with the law.

The court remands the following determinations of Commerce:

1. The court remands for Commerce to further explain or reconsider its particular market situation determination and adjustment;

2. The court remands for Commerce to reallocate costs for NEXTEEL's non-prime merchandise based on the actual costs of prime and non-prime products;

3. The court remands for Commerce to further explain or reconsider its treatment of SeAH's production line suspension costs;

4. The court remands for Commerce to recalculate SeAH's further manufacturing cost; and

5. The court remands for Commerce to further explain or reconsider its decision to include SeAH's inventory valuation losses as G&A expenses.

Accordingly, it is hereby

**ORDERED** that the Final Results are remanded to Commerce for further proceedings consistent with this opinion; and it is further

**ORDERED** that this case will proceed according to the following schedule:

1. Commerce shall file the remand results on or before June 30, 2021;

2.   Commerce shall file the remand administrative record on or before

July 14, 2021;

3.   Comments in opposition to the remand results shall be filed on or

before August 13, 2021;

4.   Comments in support of the remand results shall be filed on or before

September 15, 2021; and

5.   The joint appendix shall be filed on or before October 1, 2021.


                                                        /s/ Jennifer Choe-Groves
                                                    Jennifer Choe-Groves, Judge

Dated:   April 14, 2021
         New York, New York