A-580-870
Remand
Slip Op 21-43
POR:  09/01/2016 – 8/31/2017
**Public Document**
E&C/Office VI:  CS/EK

*SeAH Steel Co. v. United States*
**Consolidated Court No. 19-00086, Slip. Op. 21-43 (CIT April 14, 2021)**

**Final Results of Redetermination
Pursuant to Court Remand**

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or

the Court) in *SeAH Steel Corporation v. United States*, Consol. Court No. 19-00086, Slip. Op.

21-43 (April 14, 2021) (*Remand Order*) and its July 8, 2021 and July 14, 2021, orders that

authorized Commerce to correct a clerical error in the June 30, 2021 Remand Results and the

July 9, 2021, correction to the Remand Results.  These final results of redetermination concern

*Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping*

*Duty Administrative Review; 2016–2017*, 84 FR 24085 (May 24, 2019) (*Final Results*) and

accompanying Issues and Decision Memorandum (IDM).

In the *Remand Order*, the Court remanded five issues to Commerce:  (1) further

explanation or reconsideration of Commerce's particular market situation (PMS) determination

and adjustment; (2) reallocation of costs for NEXTEEL Co., Ltd.'s (NEXTEEL) non-prime

products based on the actual costs of prime and non-prime products; (3) further explanation or

reconsideration of Commerce's treatment of NEXTEEL's production line suspension costs;[1]
(4) recalculation of SeAH Steel Corporation's (SeAH) further manufacturing costs; and
(5) further explanation or reconsideration of Commerce's inclusion of SeAH's inventory
valuation losses as general and administrative (G&A) expenses.[2]

The Court sustained two issues:  (1) calculation of constructed value (CV) and inclusion
of a penalty in SeAH's G&A expense ratio; and (2) differential pricing analysis.[3]

On June 4, 2021, we released our Draft Results of Redetermination to interested parties.[4]
On June 14, 2021, we received comments from United States Steel Corporation (U.S. Steel),[5]
Maverick Tube Corporation (Maverick), Tenaris Bay City, Inc. (Tenaris), IPSCO Tubulars Inc.,
Vallourec Star, L.P. (Vallourec), Welded Tube USA Inc., and U.S. Steel (collectively, the
domestic industry),[6] ILJIN Steel Corporation (ILJIN),[7] AJU Besteel Co., Ltd., (AJU Besteel),[8]
Husteel Co., Ltd. (Husteel),[9] Hyundai Steel Company (Hyundai Steel),[10] SeAH,[11] and

---

[1] *See Remand Order* at 76.  The Court refers to SeAH's production line suspension costs; however, it appears that this is an error, and that the Court intended to remand to Commerce the issue of NEXTEEL's production line suspension costs.

[2] *See Remand Order* at 76.

[3] *Id.* at 75-76.

[4] *See* "Draft Results of Redetermination Pursuant to Court Remand Oil Country Tubular Goods from the Republic of Korea," dated June 4, 2021 (Draft Results of Redetermination).

[5] *See* U.S. Steel's Letter, "Oil Country Tubular Goods from the Republic of Korea:  United States Steel Corporation's Comments on Draft Remand Redetermination," dated June 14, 2021 (U.S. Steel's Draft Remand Comments).

[6] *See* Domestic Industry's Letter, "Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review, 2016-2017, Remand:  Comments on Draft Results of Redetermination Pursuant to Court Remand," dated June 14, 2021 (Domestic Industry's Draft Remand Comments).

[7] *See* ILJIN's Letter, "Oil Country Tubular Goods from the Republic of Korea:  Comments on Draft Remand Results," dated June 14, 2021 (ILJIN's Draft Remand Comments).

[8] *See* AJU Besteel's Letter, "Oil Country Tubular Goods from the Republic of Korea:  Comments on Draft Remand Results," dated June 14, 2021 (AJU Besteel's Draft Remand Comments).

[9] *See* Husteel's Letter, "Oil Country Tubular Goods from South Korea:  Comments on the Department's Draft Remand Results," dated June 14, 2021 (Husteel's Draft Remand Comments).

[10] *See* Hyundai Steel's Letter, "Oil Country Tubular Goods from the Republic of Korea:  Hyundai Steel's Comments on Draft Remand Redetermination," dated June 14, 2021 (Hyundai Steel's Draft Remand Comments).

[11] *See* SeAH's Letter, "Administrative Review of the Antidumping Order on Certain Oil Country Tubular Goods from Korea — Comments on Draft Redetermination on Remand," dated June 14, 2021 (SeAH's Draft Remand Comments).

NEXTEEL Co., Ltd. (NEXTEEL).[12]  After considering these comments and analyzing the

record, we have further explained our methodology employed in the Draft Results of

Redetermination.  On June 30, 2021, Commerce issued and filed with the Court the Final Results

of Remand Redetermination, which contained an inadvertent clerical error in the dumping

margins listed on page 3.   On July 8, the Court issued an order that authorized Commerce to

correct this error.  On July 9, 2021, Commerce filed with the Court its correction to the Final

Results of Remand Redetermination, which contained another inadvertent clerical error in the

dumping margin for non-individually examined respondents on pages 3 and 66.  Accordingly,

we have corrected the clerical error, but did not otherwise modify the June 30, 2021 Remand

Results.   Based upon the results of our analyses, we have recalculated the weighted-average

dumping margins for SeAH, NEXTEEL, and the non-examined companies which are parties to

this litigation, which have changed from 16.73 percent to 5.28 percent for SeAH, 32.24 percent

to 9.77 percent for NEXTEEL, and 24.49 percent to 7.53 percent for the non-examined

companies.

## II.    BACKGROUND

### 1. *Particular Market Situation*

In its *Remand Order*, the Court disagreed with Commerce's determination that a PMS

existed in Korea during the POR, finding that it was not supported by record evidence.

Specifically, the Court stated that Commerce's conclusion that the Korean steel market was

heavily subsidized was unreasonable because it was "based on the subsidy rate of almost 60

{percent} from a timeframe outside the period of review," even though the *Final Results* cited

---

[12] *See* NEXTEEL's Letter, "Oil Country Tubular Goods from the Republic of Korea:  NEXTEEL's Comments on
Draft Remand Redetermination," dated June 14, 2021 (NEXTEEL's Draft Remand Comments).

"alternate subsidy rates of less than 2 {percent} for the relevant period of review."[13]  Regarding the second factor that Commerce considered in its PMS decision, the effects of global steel excess capacity on the Korean market, the Court stated that, "record evidence cited by Commerce does not support a conclusion that the global glut of Chinese hot-rolled coil imports caused price distortions specific to the Korean steel market."[14]  Regarding the third and fourth factors, strategic alliances and government control over electricity rates, the Court found that none of the documents on which Commerce relied pertain to the relevant period of review, and, therefore, Commerce's conclusions were speculative and unsupported.[15]

After the Court remanded this issue to Commerce, we gave interested parties an opportunity to submit comments on the record regarding the application of a PMS adjustment in this proceeding.[16]  Specifically, we asked the parties to identify documents on the record that are relevant to the issue of PMS, which relate to the current period of review, and which the Court has not already considered and rejected.  We received comments from SeAH on May 12, 2021,[17] and from U.S. Steel on May 12 and 13, 2021.[18]

---

[13] *Id.* at 42.

[14] *Id.* at 47.

[15] *Id.* at 48 and 51.

[16] *See* Commerce's Letter, "Certain Oil Country Tubular Goods from the Republic of Korea:  Participating Parties' Comments on a Particular Market Situation," dated May 5, 2021.

[17] *See* SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to the Department's May 5 Request for Comments on a 'Particular Market Situation,'" dated May 12, 2021.

[18] *See* U.S. Steel's Letters, "Oil Country Tubular Goods from the Republic of Korea:  Response to Commerce's Request for Participating Parties' Comments on a Particular Market Situation," dated May 12, 2021; and "Oil Country Tubular Goods from the Republic of Korea:  Updated Response to Commerce's Request for Participating Parties' Comments on a Particular Market Situation," dated May 13, 2021.  On May 12, 2021, U.S. Steel informed Commerce that it had not received a notification from Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS) and was, thus, unaware of this opportunity to comment.  U.S. Steel filed comments on May 12, 2021, but also requested, and received, an extension until May 13, 2021, to update those comments.

2. *NEXTEEL's Allocation of Costs*

During the antidumping duty administrative review, Commerce determined that non-prime products were not subject merchandise, stating that if a product is not capable of the same functions, the product's market value is impaired, potentially to a point where the full cost cannot be recovered.[19]  Therefore, Commerce "adjusted NEXTEEL's reported costs for the value of downgraded non-prime products at their sales prices, while allocating the difference between the full production cost and market value of the non-prime products to the production costs of prime-quality {(oil country tubular goods)}OCTG."[20]  The Court, citing *Dillinger*,[21] remanded Commerce's adjustment, stating that neither Commerce's adjustment of NEXTEEL's reported cost for non-prime products to market value, nor the subsequent adjustment to NEXTEEL's reported cost for prime OCTG to include the net cost for non-prime products reflect{s} actual costs."[22]  The Court remanded the issue for Commerce to re-allocate costs based on the actual costs of prime and non-prime products.[23]

3. *NEXTEEL's Production Line Suspension Costs*

In the *Final Results*, Commerce allocated costs related to the production line suspensions from NEXTEEL's costs of goods sold to its G&A expenses, stating that a suspended production line for an extended period of time appropriately required an adjustment to the reported G&A expenses.[24]  Commerce stated that, consistent with its finding in *OCTG I*,[25] unlike a routine

---

[19] *See Final Results* IDM at Comment 12.
[20] *Id.*
[21] *See Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020) (*Dillinger*).
[22] *See Remand Order* at 61.
[23] *Id.*
[24] *See Final Results* IDM at Comment 15.
[25] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2014–2015*, 82 FR 18105 (April 17, 2017), and accompanying IDM, unchanged in *Certain Oil Country Tubular Goods from the Republic of Korea:  Amended Final Results of Antidumping Duty Administrative Review; 2014–2015*, 82 FR 31750 (July 10, 2017) (collectively, *OCTG I*).

maintenance shutdown, once a production line is suspended, it no longer relates to the ongoing production, as there are no longer products produced on those same production lines that can bear the burden of the costs associated with those production lines.[26]  The Court stated that, "{s}ection 1677b(f)(1)(A) directs Commerce to use NEXTEEL's records so long as the records are {Generally Accepted Accounting Principles} (GAAP)-compliant and reasonably reflect costs," and remanded the issue for further explanation or reconsideration consistent with this opinion.[27]

### 4.  SeAH's Further Manufacturing Costs

In the *Final Results*, Commerce applied Pusan Pipe America, Inc.'s (PPA) reported general expense ratio to the further manufacturing costs plus the cost of the imported OCTG that was further manufactured and included these general expenses as further manufacturing.[28] Commerce argued that SeAH did not dispute that PPA, its affiliated U.S. reseller, employed individuals responsible for overseeing the purchases and sales of both further and non-further manufactured products.  Thus, PPA's G&A activities supported the general activities of the company, including the sale of further and non-further manufactured products, and the further manufacturing of products.[29]  Therefore, in addition to applying the G&A expense ratio to the further manufacturing costs, Commerce also calculated the G&A expenses related to the pipe products sold in the United States (*i.e.*, the imported pipe, whether further manufactured or not) by applying PPA's G&A expense ratio to the cost of production (COP) of imported pipes.  We then adjusted the constructed export price (CEP) for the G&A expenses related to all resold and

---

[26] *Id.* (citing *OCTG I* IDM at Comment 34).
[27] *See Remand Order* at 63.
[28] *See Final Results* IDM at Comment 6.
[29] *Id.*

further manufactured pipes that were reported in the sales database.[30]  The Court found that the COP of imported OCTG is not a cost incurred for further manufacturing and concluded that Commerce's calculation of SeAH's further manufacturing costs was not in accordance with the law.[31]

### 5. SeAH's Inventory Valuation Losses

In the *Final Results*, Commerce included SeAH's inventory valuation losses that related to raw materials and work-in-process (WIP) in its calculation of SeAH's G&A expense ratio.[32] Commerce determined that the inventory valuation losses were periodic adjustments related to SeAH's general operations, as a whole.  Furthermore, Commerce determined that the inventory valuation losses were properly recognized in SeAH's GAAP-based financial statements. Therefore, Commerce found it appropriate to include the raw materials and WIP in its calculation of SeAH's G&A expense ratio.[33]  The Court stated that Commerce failed to cite record evidence "demonstrating that the inventory valuation losses became realized costs, which it seems would occur only if the raw materials and work-in-process were sold."  The Court concluded, therefore, that Commerce's decision to include SeAH's inventory valuation losses as G&A expenses was unsupported by record evidence and remanded the issue for explanation or reconsideration.[34]

## III.   ANALYSIS

### 1) Particular Market Situation

---

[30] *Id.*
[31] *See Remand Order* at 69.
[32] *See Final Results* IDM at Comment 8.
[33] *Id.*
[34] *See Remand Order* at 75.

In the *Remand Order*, the Court considered Commerce's determination of a PMS and application of a PMS adjustment and remanded the issue to Commerce for further explanation or reconsideration.[35]  In its *Remand Order*, the Court recounted its finding in the remands of *OCTG I* and *OCTG II*.[36][37]  The Court found that Commerce's determination that a PMS distorted the COP of OCTG based on the cumulative effect of the original four factors alleged in the prior administrative reviews was unsupported by substantial evidence.  However, the Court stated:

> Although the record in OCTG III contains some additional documents
> not included on the OCTG I or OCTG II records, the court observes that
> Commerce's examination of the OCTG III record overall, including
> previously submitted documents and newly submitted documents, with
> related explanations, does not support Commerce's OCTG III
> determination that a particular market situation affected the cost of
> production of OCTG.

As an initial matter, we respectfully disagree with the Court's method of evaluation of the record evidence present in this proceeding and with the Court's findings.  Commerce has been consistent in its statement that, in response to SeAH's and NEXTEEL's arguments that regarding *the circumstances present* in *OCTG I* and *OCTG II*, the facts were "largely unchanged."  As Commerce stated in its Final Results of Redetermination in *OCTG II*,

---

[35] *Id.* at 76.

[36] *See Certain Oil Country Tubular Goods from the Republic of Korea:  Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015–2016*, 83 FR 17146 (April 18, 2018) (*OCTG II*), and accompanying IDM.

[37] *See Remand Order* at 30-37.  The Court noted that Commerce's reversal of its determination of a PMS and adjustment have been appealed to the Court of Appeals for the Federal Circuit (CAFC).  *See NEXTEEL Co. v. United States*, 44 CIT __, __, 475 F. Supp. 3d 1378, 1379–80 (2020), appeal docketed, Appeal No. 21-1430 (Fed. Cir. December 21, 2020).

However, the context is important.  This statement was in response to

SeAH and NEXTEEL's arguments that the facts in this instant review

have changed significantly, such that no PMS exists.  To clarify, the

facts demonstrating the existence of a PMS are similar, and the same

evidence considered in the first administrative review is also included on

the record of the instant review; however, Commerce also considered

additional record evidence establishing existence of such factors beyond

that present on the record of the first administrative review and

conducted additional analysis that was not performed in the first

administrative review or in our original determination in this review.[38]

Each administrative review stands on its own and has its own administrative record.

Even in situations, where, as here, there is some overlap between the administrative records of

several administrative reviews, the agency's determination must be evaluated solely based on the

record of the current administrative review.  Although some documents are present on the

records of several administrative reviews, the record of this administrative review includes

documents and exhibits that were presented to Commerce for the first time in this review.

We also respectfully disagree with the Court's reliance on the remands in *OCTG I* and

*OCTG II* in its evaluation of the evidence on the record for this period of review.  For example,

the Court indicates in the *Remand Order* which documents were included on previous records.

The Court states:

---

[38] *See* "Final Results of Redetermination Pursuant to Court Remand Oil Country Tubular Goods from the Republic of Korea, *Nexteel Co. v. United States*, Consolidated Court No. 18-00083, Slip. Op. 19-73 (CIT June 17, 2019)," dated November 6, 2019 (Final Results of Redetermination).

In addition to citing the Steel Watch Article (OCTG II) and the Bloomberg POSCO Article (OCTG II), Commerce also relied on the following record documents introduced on the OCTG III record:  Global Trade Atlas, South Korea Import Statistics for Hot-Rolled Products, 2012–2017 ("GTA 2012–2017"); an article in The Investor, Korea Herald, dated September 20, 2016, titled "POSCO, Hyundai Steel merger to benefit industry: report;" an article in Pulse by Maeil Business Newspaper, dated November 23, 2016, titled "Hyundai Steel, Dongkuk Steel become latest beneficiaries of fast-track restructuring program;" an article in Business Korea, dated September 19, 2016, titled "Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half;" an article in the Korea Times, dated September 22, 2016, titled "Voices growing for merger of POSCO, Hyundai Steel" ("Korea Times Article"); and Korean Purchases of Hot-Rolled Coils – Calendar Year 2017, United Nations COMTRADE ("COMTRADE").[39]

The Court continues this method in its evaluation of the second factor, as well:  Commerce also cited statistics that China was the top hot-rolled coil exporter into Korea from 2012 to 2017.  *Id.* (citing GTA 2012–2017; COMTRADE).  Commerce considered the challenges faced by POSCO, a Korean hot-rolled coil producer, in competing with low-priced Chinese

---

[39] *See Remand Order* at 43-44.

hot-rolled coil imports. *Id.* (citing Bloomberg POSCO Article (OCTG

II)).[40]

The record in this administrative review is not split into two separate categories of

evidence: old and new. Rather, one piece of evidence, which may not have been enough to

demonstrate a contributing factor of a PMS in prior reviews due to contemporaneity concerns or

lack of corroborating data, may play a crucial role in Commerce's determination of a PMS in a

subsequent review, when coupled with further evidence submitted on the record of that

subsequent review. In this way, each individual piece of evidence, which was on the record of

*OCTG I* or *OCTG II*, should not be summarily dismissed from consideration as insufficient

evidence from those reviews. Rather, these documents are record evidence for this review and

require independent, *de novo*, assessment and evaluation by both the agency and the Court in

consideration of the whole record of this administrative review.

Secondly, we disagree with the Court's findings regarding the issue of overcapacity of

Chinese steel inputs, as well as the parties' comments submitted to Commerce after the *Remand

Order*. The Court stated that, "{t}he articles and statistics cited by Commerce do not support a

determination that the influx of Chinese hot-rolled coil is particular to Korea because the record

documents describe a global influx that affected many other countries in addition to Korea,

rather than an effect that is unique or particular to Korea." To the extent that the Court may have

concluded that global overcapacity cannot contribute to a PMS in a specific country, and we

hope that the Court did not intend to reach such a sweeping conclusion, we disagree with this

conclusion. Commerce has consistently recognized the presence of a global overcapacity of

---

[40] *Id.* at 45.

Chinese steel products.[41]  However, that does not mean that a global overcapacity cannot be experienced more acutely in a single market than it is in others.

The Court stated that Commerce "conceded" that an oversupply of Chinese hot-rolled coil (HRC) has depressed the prices in other countries.[42]  We disagree with this characterization. Commerce has never claimed that Chinese steel overcapacity was affecting Korea alone, but any statement acknowledging a widely observed global trend should not be interpreted as Commerce yielding in its opinion that:  (a) there is global overcapacity of Chinese steel inputs; and (b) global overcapacity has affected the Korean market in a more severe and particular way.  While the global market has undoubtedly been impacted, all countries were not necessarily affected equally, and, thus, any conclusion that Commerce found or conceded that the impact on each market is equal is incorrect.  Accordingly, as a conceptual matter, a party alleging that global overcapacity contributed to a PMS in a particular market could potentially provide evidence that the market at issue was affected more severely or differently (*i.e.*, "particularly") from other markets.

Even so, we recognize that the Court has found the evidence of a PMS to be insufficient in this proceeding.  While we respectfully disagree, we are complying with the Court's *Remand Order* by reconsidering our finding of a PMS during this POR.  Commerce has considered the comments from U.S. Steel, as well as the documents that U.S. Steel identified as not being previously considered by the Court, in light of the Court's opinion.  However, upon review of the evidence on the record of this proceeding, we find that the additional evidence on the record of

---

[41] *See, e.g., Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review; 2016–2017*, 83 FR 63619 (December 11, 2018), and accompanying PDM at 12 (Commerce stated that Chinese overcapacity is a "well-documented and global problem which has been recognized and addressed across Commerce's proceedings.")
[42] *See Remand Order* at 46.

this underlying proceeding, which the Court has not previously addressed and rejected, as identified in the remand comments by the interested parties, is insufficient, on its own, to sustain a finding of a PMS within the analytical framework that the Court articulated in its opinion in this case.  As a result, under protest, we are reversing our finding of a PMS and have removed the PMS adjustment from our margin calculations for SeAH and NEXTEEL.[43]  To be clear, as explained earlier, we disagree with the Court's approach to considering the evidence on the record of this review.  We believe that each document should be evaluated as it relates to the period of review at issue and the specific analysis that the agency employed in its determination regarding that specific review period.  Accordingly, in future proceedings involving steel products from Korea, we intend to continue to evaluate *all* evidence on the record of each specific segment of a proceeding in light of the analysis adopted in that specific administrative segment and, if appropriate, we may continue to consider and/or rely on identical or similar pieces of evidence as part of our PMS analysis.

We believe that the evidence of overcapacity could be indicative of the presence of a PMS in Korea; however, a party alleging that overcapacity contributed to a PMS in a particular country during a particular period should be able to demonstrate that the effects of global overcapacity were more acute or severe in that particular country during the relevant period. Government programs, like the steel industry restructuring programs announced, but not enacted, by the Government of Korea, as documented on the record of this review, could be evidence that Commerce would find demonstrative of a PMS.  However, on this record there is no evidence

---

[43] *See* Memoranda, "Analysis of Data Submitted by NEXTEEL Co., Ltd. for the Draft Redetermination Results of the 2016-2017 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea"; and "Analysis of Data Submitted by SeAH Steel Co. for the Draft Redetermination Results of the 2016-2017 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea," both dated concurrently with this document.

that any of the respondents availed themselves of the programs or that the programs were in effect during the POR.  While a companion countervailing duty (CVD) case, or a CVD case involving a major input, is not a necessary prerequisite for making an affirmative PMS determination, such cases can inform Commerce's decision.  To find that a subsidy is countervailable requires satisfying a particular set of criteria that are necessary for imposing countervailing duties; however, an inquiry into whether a PMS exists is distinct from the analysis of whether a subsidy is countervailable.  Even a subsidy found to be not countervailable (or one that has not been examined by Commerce) may cause distortions in the market that are significant enough to contribute to a PMS.  However, a party alleging that a subsidy that has not been found to be countervailable causes distortions in the market must substantiate its allegations with evidence.

Additionally, the Court has found that the record did not support Commerce's finding that overcapacity has created a downward pressure on prices in the Korean market.  In light of the Court's decision, a party alleging that the overcapacity has created a downward pressure on prices in the market should be able to provide additional evidence and data that more clearly demonstrate such a trend as it relates to the POR in order for Commerce to make an affirmative PMS determination that can be sustained by the Court.

2. *NEXTEEL's Allocation of Costs*

In the *Final Results*, Commerce adjusted NEXTEEL's reported costs, assigning to the downgraded non-prime products an amount equal to their sales price, while allocating the difference between the full production cost and sales price to the production costs of prime OCTG.[44]  The Court remanded the issue to Commerce to reallocate costs for NEXTEEL's non-

_____

[44] *See Final Results* IDM at Comment 12.

prime merchandise based on the actual costs of non-prime products, consistent with *Dillinger*,[45] where the U.S. Court of Appeals for the Federal Circuit (CAFC) remanded Commerce's adjustment of non-prime product costs, based on recorded projected sales prices, and directed Commerce to determine the actual costs of non-prime products.[46]

For purposes of this redetermination and consistent with the CAFC decision in *Dillinger*, we have reversed the adjustment made in the *Final Results* and have relied on the actual costs of prime and non-prime products as reported by NEXTEEL.

### 3. NEXTEEL's Production Line Suspension Costs

In the *Final Results*, Commerce reclassified NEXTEEL's suspended loss (*i.e.*, production line costs related to the suspension of production on a line) to G&A expenses and excluded from the cost of goods sold (COGS) denominator the reclassified suspended loss.[47]  The Court remanded the issue to Commerce for further explanation or reconsideration of its treatment of NEXTEEL's production line suspension costs.[48]  According to the Court, Commerce explained its own practice, but did not explain the deficiency in NEXTEEL's records that warrants Commerce's departure from the statutory preference for determining costs according to an exporter's or producer's records.[49]

In the underlying administrative review, NEXTEEL suspended production on slitting (*i.e.*, used for skelp production) and threading (*i.e.*, used for OCTG production) lines for limited periods during the POR.[50]  The costs related to these suspended lines were not assigned to

---

[45] *See Dillinger* at 1324.
[46] *See Remand Order* at 60-61 and 76.
[47] *See Final Results* IDM at Comment 15.
[48] *See Remand Order* at 76.
[49] *See Remand Order* at 63.
[50] *See* NEXTEEL's Letter, "Oil Country Tubular Goods from the Republic of Korea:  NEXTEEL's Sections C-D Questionnaire Response," dated February 27, 2018 (NEXTEEL's February 27, 2018 CDQR) at 10-11; *see also* Memorandum, "Verification of the Cost Response of NEXTEEL Co. Ltd. in the Antidumping Duty Administrative

products but were transferred directly to COGS in accordance with NEXTEEL's normal accounting treatment.[51]   NEXTEEL did not account for these costs in the reported costs of producing OCTG, as these costs are unrelated to production activities.[52]   It is Commerce's normal practice to include routine shutdown expenses (*i.e.*, maintenance shutdowns) in a respondent's reported costs and to associate them with the products produced on those lines (*i.e.*, as part of cost of manufacturing (COM)).[53]   However, in the underlying review, the suspended loss was not related to a routine shutdown; rather, it related to NEXTEEL's suspension of production on certain lines for an extended period of time (*i.e.*, throughout fiscal years 2016 and 2017).[54]   Unlike a routine maintenance shutdown, once a production line is suspended, it no longer relates to ongoing production.   A company can suspend production lines for numerous reasons; for example, the company has low current sales and no necessity to inventory the product produced on those production lines, or a company may suspend a production line while it assesses whether it should permanently close the production line.   Regardless of the reason for the suspension, in contrast to the routine maintenance shutdowns, there are no longer products produced on those production lines or current intentions to produce products on those lines that can bear the burden of the costs associated with those production lines.[55]   However, the suspended lines, akin to idled assets, remain available to the company pending resumption of production on those lines, and represent excess capacity held by the company.[56]   We consider the

Review of Oil Country Tubular Goods from the Republic of Korea," dated December 20, 2018 (NEXTEEL's Cost Verification Report) at 2 and 12-13.
[51] *See* NEXTEEL's February 27, 2018 CDQR at 10-11.
[52] *See* NEXTEEL's Letter, "Oil Country Tubular Goods from the Republic of Korea:  NEXTEEL's Supplemental Sections A-D Questionnaire Response," dated June 7, 2018 (NEXTEEL's June 7, 2018 SQR) at SD-8.
[53] *See, e.g., Gray Portland Cement and Clinker from Mexico:  Final Results of Antidumping Duty Administrative Review*, 62 FR 17148 (April 9, 1997), and accompanying IDM at Comment 9.
[54] *See* NEXTEEL's Cost Verification Report at 2, 12-13, and Exhibit CV-6.
[55] *See OCTG I* IDM at Comment 34.
[56] *See Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663 (December 10, 2007) (*PSF from Korea*), and accompanying IDM at Comment 8.

cost of holding idle assets a period cost that relates to the general operations of the company as a whole, and not to the manufacture of specific products.  Our practice has been to include depreciation on idle assets as part of the calculation of the G&A expense ratio.[57]

We disagree with NEXTEEL's argument, highlighted by the Court, that Commerce's reallocation contravened section 773(f)(1)(A) of the Tariff Act of 1930, as amended (the Act) (*i.e.*, 19 U.S.C. § 1677b(f)(1)(A)) and that costs should be attributed to cost of sales, consistent with NEXTEEL's normal books and records and "appropriately borne by the products manufactured on the lines that were shut down."  Consistent with section 773(f)(1)(A) of the Act, Commerce normally relies on data from a respondent's normal books and records where those records are prepared in accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sales of merchandise.  However, in those instances where it is determined that a company's normal books and records do not reasonably reflect the production costs of the merchandise under consideration, Commerce's practice has been to adjust these costs as necessary.[58]  In its normal books and records, NEXTEEL did not allocate the labor and overhead costs related to the suspended lines to its pipe products but recorded the suspension loss directly to COGS,[59] skipping the assignment of the costs to products and inflating the COGS figure used in the allocation of G&A expenses.  Thus, this suspended loss was excluded from the reported costs (*i.e.*, not included in either per-unit COM or in G&A expense).[60]  The fact that Commerce included these non-product costs as G&A expenses, does not contravene the statute.  Section 773(b)(3)(B) of the Act directs Commerce to

---

[57] *See Certain Pasta from Italy:  Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 91120 (December 16, 2016) (*Pasta from Italy*), and accompanying IDM at Comment 7.
[58] *See, e.g., Acetone from the Republic of Korea:  Final Determination in the Less-Than-Fair-Value Investigation*, 85 FR 8252 (February 13, 2020) (*Acetone from Korea*), and accompanying IDM at Comment 1.
[59] *See* NEXTEEL's Cost Verification Report at 12-13.
[60] *See* NEXTEEL's June 7, 2018 SQR at SD-8; *see also* NEXTEEL's Cost Verification Report at 2 and 12-13.

include as part of COP costs associated with the general operations of the company (*i.e.*, costs that are not directly associated with a product but rather are expensed directly). Commerce's normal practice in determining whether particular items should be included in G&A is to review the nature of the item and its relation to the general operations of the company as a whole.[61] In this instant case, NEXTEEL suspended certain production lines for an extended period of time during the POR. No revenue from any products normally produced on those lines was generated for the period because those production lines were suspended and not producing products.[62] Therefore, the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced. The suspended lines remain available to NEXTEEL for future production activities but, for the period, constitute excess capacity. Nothing on the record indicates that these lines were permanently shut down or removed. Accordingly, Commerce reasonably associated these costs with the general operations of the company as a whole, essentially idle assets, and it was reasonable for Commerce to allocate such costs as part of G&A expenses.

### 4. SeAH's Further Manufacturing Costs

In the *Final Results*, Commerce applied PPA's reported general expense ratio to the further manufacturing costs plus the cost of the imported OCTG that was further manufactured and included these general expenses as further manufacturing.[63] Commerce also applied PPA's general expense ratio to the cost of the imported OCTG that was not further manufactured and included these expenses as indirect selling.[64] The Court did not question Commerce's

---

[61] *See Magnesium Metal from Russian Federation:  Notice of Final Determination of Sales at Less Than Fair Value*, 70 FR 9041 (February 24, 2005), and accompanying IDM at Comment 10.
[62] *See* NEXTEEL's February 27, 2018 CDQR at 10-11.
[63] *See Final Results* IDM at Comment 6.
[64] *Id.*

application of PPA's general expense ratio to the further manufacturing costs and sustained the application of PPA's general expense ratio to the cost of the imported OCTG that was not further manufactured.[65]  However, with regard to the imported OCTG that was further manufactured, the Court determined that the cost of the imported OCTG was not a cost incurred for further manufacture; therefore, Commerce's application of PPA's general expense ratio to the cost of the imported OCTG and the deduction of these general expenses as further manufacturing costs under section 772(d)(2) of the Act was not in accordance with the law.[66]  Thus, the Court remanded for Commerce to recalculate SeAH's further manufacturing costs in accordance with the law.[67]

Given the Court's finding that the COP of imported pipe, which was subsequently further manufactured, does not qualify as PPA's further manufacturing expenses, we must decide on the appropriate treatment of such cost.  SeAH's U.S. affiliate, PPA, operates essentially as a selling arm of SeAH and does not have any manufacturing facilities (and related factory overhead expenses); thus, PPA's business operations can be classified under two main activities:  (1) the reselling of imported products to U.S. customers, where the imported products were not further manufactured in the United States; and, (2) the reselling of imported products to U.S. customers, where the imported products were further manufactured by third parties prior to delivery to U.S. customers.[68]  Thus, the general expenses in question are incurred in PPA's discharge of these two activities only – reselling imported products and arranging for third parties to further manufacture certain imported products for which PPA pays a processing or tolling fee.  In fact,

---

[65] See Remand Order at 68-70 and 75-76.
[66] Id. at 69 (citing 19 U.S.C. § 1677a(d)(2)).
[67] Id. at 76.
[68] See Final Results IDM at Comment 6; see also SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to Sections C, D, and E of Department's January 10 Questionnaire," dated February 27, 2018 (SeAH's February 27, 2018 EQR) at 3-4, where SeAH explains that PPA did not have any production facilities and that the processing of all imported products was performed by third parties.

SeAH's reporting of PPA's general expense ratio recognizes this fact because it represents the division of the general expenses in question by the costs for these two activities, *i.e.*, the costs of the imported products that were sold, whether or not further manufactured, and the further manufacturing fees associated with sold products.[69]  Thus, SeAH's reported general expense ratio for PPA recognizes that PPA's general expenses were incurred in the pursuit of these two activities and are therefore properly allocated to the cost of sales for all imported products whether or not further manufactured and any associated further manufacturing fees, both of which serve as the denominator to PPA's reported general expense ratio.

In this matter, the Court disagrees that a portion of the general expenses, which are attributable to the cost of the imported pipe, that SeAH allocates to the cost of the imported OCTG that were further manufactured are properly classified and deductible as further manufacturing expenses under section 772(d)(2) of the Act.  Consequently, consistent with the Court's findings, we have adopted a revised approach which does not deduct the cost of imported pipe as further manufacturing expenses.

Consistent with our normal practice, we continue to find that general expenses relate to the entire activities of the company and therefore should be allocated proportionally to those activities.[70]  In *Hot-Rolled Steel from Brazil*, for example, Commerce explained how the general expenses of an affiliated U.S. importer, which engaged in both further manufacturing and selling activities, should be treated:

---

[69] *See* SeAH's February 27, 2018 EQR at 16 and Appendix E-5, demonstrating that the denominator to PPA's reported general expense ratio is the total cost of sales.
[70] *See, e.g.*, *Welded Line Pipe from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61366 (October 13, 2015) (*Line Pipe from Korea*), and accompanying IDM at Comment 20; *see also Certain Hot-Rolled Steel Flat Products from Brazil; Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 FR 53424 (August 12, 2016) (*Hot-Rolled Steel from Brazil*), and accompanying IDM at Comment 5.

G&A activities support the general activities of a company as a whole, including its sales and manufacturing functions.  Therefore, consistent with our decision in *Line Pipe from Korea*, we find it is appropriate to allocate G&A expenses to all company activities where the company engages in both further manufacturing and reselling activities … Thus, if we are now applying the G&A expense ratio to the total cost of all further manufactured and non-further manufactured goods, then the denominator of the ratio, which as reported includes only further processing costs, must be revised to include not only the further processing costs, but also the cost of the imported coils that were further processed, as well as the cost of all non-further manufactured products.[71]

In *CTL Plate France*, Commerce also faced the same issue and used the same allocation of G&A expenses:

The record evidence indicates that BSPC engages in both further manufacturing and reselling activities.  Therefore, consistent with our decisions in *Cold-Rolled Steel from Brazil*, *Line Pipe from Korea*, and *Hot-Rolled Steel from Brazil*, we find that it is appropriate to allocate G&A expenses to all company activities.[72]

---

[71] *See Hot-Rolled Steel from Brazil* IDM at Comment 5 (citing *Line Pipe from Korea*).

[72] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017) (*CTL Plate France*), and accompanying IDM at Comment 17 (where Commerce explained:  "In such instances, it is appropriate that the denominator of the G&A expense ratio be revised to include not only the further processing costs, but also the cost of the imported subject merchandise that was further processed and the cost of all non-further manufactured products (*i.e.*, the total cost of goods sold) because the G&A expenses incurred relate to all of the company's operations.  Further, to ensure that the denominator of the ratio and the per-unit cost to which it is applied are on the same basis, we apply the G&A expense ratio to the per-

Further, we find that it would distort the accuracy of the calculations if we were to allocate PPA's company-wide general expense ratio only to two of the three components of the company's activities, *i.e.*, the imported products that were not further manufactured and the further manufacturing fees, but not to the third component, *i.e.*, the imported products that were further manufactured, where in fact all three activities serve as the denominator for PPA's reported general expense ratio calculation.

The antidumping statute, section 772(d), provides that the price used to establish CEP must be reduced by certain expenses, such as direct selling expenses, indirect selling expenses, and costs of any further manufacture or assembly. The courts explained that, "in calculating U.S. prices using the {constructed export price} methodology, Commerce is to deduct any expenses generally incurred by or for the account of … the affiliated seller in the United States, in selling subject merchandise."[73] In other words, the statute *requires* that Commerce deduct both the selling expenses and costs of further manufacture from the price used to determine CEP. Accordingly, if all G&A expenses incurred by an affiliated U.S. reseller can be treated as indirect selling expenses when the affiliated U.S. reseller only performs reselling activities, and all G&A expenses incurred by an affiliated U.S. further-manufacturer/reseller can be treated as further manufacturing expenses when the affiliated U.S. further manufacturer/reseller performs both further manufacturing and reselling activities, Commerce unquestionably has the authority to allocate G&A expenses to both types of activities when both activities occur and to make appropriate deductions.

---

unit further manufacturing cost plus the COP of the underlying subject merchandise.") (citing *Certain Cold-Rolled Steel Flat Products from Brazil: Final Determination of Sales at Less Than Fair Value*, 81 FR 44946 (July 29, 2016), and accompanying IDM at Comment 7; *Line Pipe from Korea*; and *Hot-Rolled Steel from Brazil*).
[73] *See United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1336 (CIT 2010).

Because it is appropriate to allocate general expenses to the entire activities of the company, which here incorporate both directly resold products and products resold after further processing, we have continued to allocate PPA's general expenses to the further processing fees and to the costs of the imported products, whether further processed or not. However, in this remand redetermination, we provide further explanation that the portion of PPA's general expenses that is reasonably classified as further manufacturing where applied to the further manufacturing costs and as indirect selling where applied to the cost of all imported OCTG, *i.e.*, the imported OCTG that were further manufactured and the imported OCTG that were not further manufactured. Accordingly, for further manufactured products, we applied PPA's G&A expense ratio to the total cost of further manufacturing, and we included the amount as further manufacturing under section 772(d)(2) of the Act. Additionally, we applied PPA's G&A expense ratio to the COP of the imported OCTG, whether further manufactured or not, and included the amount as indirect selling expenses under section 772(d)(1)(D) of the Act. This revised classification both satisfies the requirements of the statute and allows for a logical and full accounting of the company's general expenses. It also complies with the Court's remand instructions to recalculate SeAH's further manufacturing costs in accordance with the law.

     *5. SeAH's Inventory Valuation Losses*

In the *Final Results*, Commerce included SeAH's inventory valuation losses as they pertained to raw materials and WIP in the calculation of SeAH's total G&A expenses. The Court found that Commerce failed to cite to relevant record evidence demonstrating that the inventory valuation losses were actual expenses.[74] Citing *Torrington*, the Court stated that the inventory valuation losses would seemingly only become realized costs if the raw materials and

---

[74] *See Remand Order* at 75.

WIP inventories were sold.[75]  Thus, the Court concluded that Commerce's decision to include SeAH's inventory valuation losses as G&A expenses was not supported by substantial evidence and remanded the issue for further explanation or reconsideration.

We respectfully disagree with the Court's finding that Commerce failed to cite relevant record evidence that demonstrates the inventory valuation losses were indeed expenses.  In the *Final Results*, Commerce detailed how the inventory valuation losses are recognized by SeAH in its normal books and records (on the audited income statement).[76]  In doing so, Commerce included the requisite citations to the record to support our description of SeAH's inventory revaluations, including our statement that the valuation losses are reported in SeAH's income statement.[77]  However, we also recognize that this is a technical issue, and we understand the Court's desire to seek further clarity.  Consistent with Court's opinion, we have provided further explanation of SeAH's inventory valuation adjustments with additional detail that more clearly demonstrates that the inventory valuation losses are indeed recognized as actual expenses in SeAH's normal books and records.

First, the *Torrington* case addresses inventory carrying costs in the context of an antidumping proceeding, which are distinct in form and purpose from inventory valuation gains and losses that are part of a company's normal books and records.  As noted in *Torrington*, "{i}nventory carrying costs are designed to measure the cost to a company of holding merchandise that could be sold to generate revenue.  Because raw materials and work in process are, by definition, not yet salable merchandise {Commerce} bases inventory carrying cost on the value of finished goods only."[78]  In an antidumping proceeding, inventory carrying costs

---

[75] *See Remand Order* at 75-76 (citing *Cf. Torrington Co., v. United States*, 20 CIT 632, 640 (1996) (*Torrington*)).
[76] *See Final Results* IDM at Comment 8.
[77] *Id*.
[78] *See Torrington Co*, 20 CIT 632, 640 (1996).

represent opportunity costs (or interest revenue forgone) that are imputed by respondent companies based on Commerce's explicit instructions in its standard section B and C questionnaires.[79]  For example, in the instant case, Commerce instructed SeAH to report its inventory carrying costs in its U.S. sales database to account for "the unit opportunity cost incurred from the time of final production to the time of arrival in the United States, computed at the actual cost of short-term debt incurred by your company in the country of exportation."[80] Thus, inventory carrying costs of this type are not normally itemized in a respondent company's normal books and records, but rather are imputed adjustments that Commerce makes with the intention to promote the comparability of the U.S. and comparison market sales prices that are used in Commerce's antidumping calculations.  Consequently, inventory carrying costs necessarily relate only to the finished goods that a respondent sold in these markets.

Inventory valuation gains and losses, however, are recognized by companies, including SeAH, in their normal books and records in compliance with GAAP.  These principles require the restatement of currently held inventory values to the lower of their cost or net realizable value.[81]  The purpose of this rule, which is also a part of U.S. GAAP and International Accounting Standards, as well as many other national accounting systems, is to comply with a basic tenet of accounting – the "matching" principle.[82]  In the context of inventory valuation, the

---

[79] *See, e.g.*, SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to Sections C, D, and E of Department's January 10 Questionnaire," dated February 27, 2018 (SeAH's February 27, 2018 CQR) at 56; and *Notice of Final Results of Antidumping Duty Administrative Review:  Carbon and Certain Alloy Steel Wire Rod from Trinidad and Tobago*, 70 FR 12648 (March 15, 2005), and accompanying IDM at Comment 6, where Commerce explained that "Inventory carrying costs are the interest expense incurred (or interest revenue forgone) between the time the merchandise leaves the production line at the factory to the time the goods are shipped to the first unaffiliated customer."

[80] *See* SeAH's February 27, 2018 CQR at 56-57.

[81] *See, e.g.*, SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to the Department's May 16 Supplemental Questionnaire," dated June 8, 2018 (SeAH's June 8, 2018 SAQR) at Appendix SA-2-B, note 2(5) to SeAH's audited financial statements, explaining that SeAH's inventories are stated at the lower of cost or net realizable value.

[82] *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea*, 64 FR 73196, 73204 (December 29, 1999) (*CTL Plate Korea Final*).

matching principle requires that a loss of inventory value during a given accounting period be charged against the revenues of the period in which it occurs.[83]  In the case of SeAH, the company's audited financial statements articulate that SeAH follows the lower of cost or net realizable value policy for its inventories and that any such losses in inventory value are recognized as a current expense on the income statement.[84]

Thus, the key record evidence that SeAH's inventory valuation losses are actual and not imputed expenses is found in SeAH's audited income statement and in its reported reconciliation of the total costs from the income statement to the total reported costs.[85]  While not a separate line item on SeAH's income statement, the inventory valuation loss can be seen as a component of the company's total costs in the overall reconciliation worksheets and supporting documentation.[86]  Specifically, SeAH's overall reconciliation ties the total costs from the audited income statement to the total costs broken out by business area.[87]  We can then see from a review of the specific expense accounts that comprise each business area that SeAH recorded the inventory valuation losses under the headquarter business area.[88]  Because the headquarter business area is a component of the total costs on SeAH's income statement, we can confirm that the inventory valuation losses were recognized as expenses on SeAH's 2017 audited income statement.  Accordingly, because the raw material and WIP inventory valuation losses were

[83] *See CTL Plate Korea Final*, 64 FR 73196, 73204.
[84] *See, e.g.*, SeAH's June 8, 2018 SAQR at Appendix SA-2-B, note 2(5) to SeAH's audited financial statements, explaining that the inventory valuation loss for inventories reduced to net realizable values are recognized by SeAH as expenses.
[85] *See* SeAH's June 8, 2018 SAQR at Appendix SA-2-B; *see also* SeAH's Letter, "Oil Country Tubular Goods from the Republic of Korea – Response to the Department's July 20 Supplemental Questionnaire," dated August 3, 2018 (SeAH's August 3, 2018 SDQR) at 11, Appendix S2D-6, Appendix S2D-7, and Appendix S2D-8.
[86] *See* SeAH's June 8, 2018 SAQR at Appendix SA-2-B; *see also* SeAH's August 3, 2018 SDQR at 11, Appendix S2D-6, Appendix S2D-7, and Appendix S2D-8.
[87] *See* SeAH's June 8, 2018 SAQR at Appendix SA-2-B; *see also* SeAH's August 3, 2018 SDQR at Appendix S2D-6.
[88] *See* SeAH's August 3, 2018 SDQR at Appendix S2D-7.  We note that based on Appendix S2D-6 the costs under this business area were excluded from the reported costs, thus, there was no double-counting of the inventory valuation losses.

recognized as expenses by SeAH on its audited income statement, we have continued to include the valuation losses in the calculation of SeAH's G&A expense ratio.

## IV.   INTERESTED PARTY COMMENTS ON DRAFT RESULTS OF REDETERMINATION

On June 4, 2021, we released our Draft Results of Redetermination to interested parties.[89] One June 9, 2021, we extended the deadline for interested parties' comments on the Draft Results of Redetermination.[90]  On June 14, 2021, we received comments from U. S. Steel,[91] the domestic industry,[92] ILJIN,[93] AJU Besteel,[94] Husteel,[95] Hyundai Steel,[96] SeAH,[97] and NEXTEEL.[98]  No other interested parties submitted comments.

**Issue 1:  Particular Market Situation**

*U.S Steel's Comments[99]*

- If Commerce continues to reverse its determination of the existence of a PMS, it should continue to do so under protest.

- Commerce should reaffirm its disagreement with the Court's analyses regarding "old and new" evidence and any perceived "yielding" of Commerce's position regarding global overcapacity in its final redetermination.

- Commerce should correct the Court's finding that "none of the cited documents pertain to

---

[89] *See* Draft Results of Redetermination.
[90] *See* Memorandum, "SeAH Steel Co. v. United States, Consolidated Court No. 19-00086, Slip. Op. 21-43 (CIT April 14, 2021) Draft Results of Redetermination Pursuant to Court Remand Oil Country Tubular Goods from the Republic of Korea:  Comment Extension," dated June 9, 2021.
[91] *See* U.S. Steel's Draft Remand Comments.
[92] *See* Domestic Industry's Draft Remand Comments.
[93] *See* ILJIN's Draft Remand Comments.
[94] *See* AJU Besteel's Draft Remand Comments.
[95] *See* Husteel's Draft Remand Comments.
[96] *See* Hyundai Steel's Draft Remand Comments.
[97] *See* SeAH's Draft Remand Comments.
[98] *See* NEXTEEL's Draft Remand Comments.
[99] *See* U.S. Steel's Draft Remand Comments at 2-35.

the relevant period of review in this case" regarding government control of the over the Korean electrical industry.  The record contains Form 20-F filed with the Securities and Exchange Commission dated April 2016, which establishes that "the Government regulates the rates we charge for the electricity we sell to our customers" and "our ability to pass on fuel and other cost increases to our customers is limited."[100]  Since this was the sole reason for the Court's negative finding regarding the electricity PMS factor, Commerce should correct this erroneous conclusion.

- The Court states that Commerce recalculated the dumping margins in *OCTG I* and *OCTG II* without a PMS adjustment, but it does not state that Commerce did so under protest. Commerce should correct this omission.

- The Court states that "Maverick … made the identical four particular market situation allegations in *OCTG II* that Commerce reviewed in *OCTG I* and submitted the same supporting exhibits."[101]  This is incorrect; the record in *OCTG II* contained twenty-nine exhibits distinct from the record of *OCTG I*, and additional updated datasets, which are all on the record of this administrative review, distinguishing it from the record of *OCTG I*.  Commerce should correct this statement.

- The Court states that "Commerce conceded that it presented no evidence to support the existence of strategic alliances during the OCTG III period of review,"[102] which is untrue. Commerce should correct this mischaracterization.

---

[100] *See* U.S. Steel's Draft Remand Comments (citing Maverick, Tenaris, U.S. Steel, TMK IPSCO, Vallourec, and Welded Tube USA's Letter, "Other Factual Information Submission for Valuing the Particular Market Situation in Korea and Respondents' CV Profit," dated May 16, 2018 (PMS Allegation) at Exhibit 4, Sub-Exhibit 6).
[101] *See* U.S. Steel's Draft Remand Comments at 5 (citing *Remand Order* at 31).
[102] *Id.* (citing *Remand Order* at 51).

- Commerce should continue to protest the various analytical strictures imposed by the Court, but it should reverse its position in the final determination and find that record evidence supports an affirmative PMS determination.

  o Commerce's Draft Results of Redetermination appears to suggest that Commerce's reconsideration was limited to documents that were entirely new to the third administrative review and were not otherwise mentioned in the *Remand Order*. This was not mandated by the *Remand Order* and such a narrow remand is not legally permissible. Furthermore, Commerce is not bound by questions that the Court neither considered nor decided and should broaden its consideration of the evidence to include documents, or aspects thereof, that the Court has not yet specifically addressed.

  o Commerce concluded that "there is no evidence that any of the respondents availed themselves of the programs or that the programs were in effect during the POR." Yet, such evidence does exist on the record.

  o The Court has never considered that government-led restructuring distorted the Korean market during the relevant period of review.

  o Commerce implicitly concludes that "additional evidence and data that more clearly demonstrate … a trend {of downward pressure on prices in the market} as it relates to the POR" is not on the record. The record demonstrates otherwise.

  o If Commerce's PMS finding in *OCTG II* were upheld on appeal with the CAFC, a PMS finding on this record would *a fortiori* be entitled to affirmance. In the final remand results, Commerce should thus find that a PMS exists, or, at a bare minimum, deepen its analysis to acknowledge the supporting record evidence.

*Overcapacity*

➢ Chinese overcapacity distorted the cost of HRC.  The Court acknowledged evidence that Korea was China's largest HRC export market in 2014, that China was Korea's largest source of HRC imports from 2012 to 2017.

➢ Implicit in the USCIT's conclusions respecting the "particularity" of the overcapacity PMS factor in isolation is a definition of "particular market situation" wherein each individual factor is by itself particular.  This is unfaithful to the statutory text, which is unambiguous.  Commerce is required to determine whether "a particular market situation exists." The word "particular" modifies "market situation." The "market situation," in a totality of circumstances analysis such as that applied in Commerce's *Final Results*, is the collection of all contributing PMS factors.  It is thus this collection of factors as a whole that must be "particular," not the individual factors in isolation.

➢ Given that "particular" is a statutory term that may be construed as ambiguous, and given that, Commerce's interpretation of ambiguous statutory terms is owed deference.

➢ Though the statute does not require such qualitative judgment, China was by far Korea's largest source of HRC imports, by volume.

*Subsidization*

➢ The Court's *de facto* requirement that Commerce, when weighing both a preliminary and final CVD determination, rely on the more contemporaneous of the two, oversteps the court's role in reviewing

Commerce's determination for substantial evidence.  The CAFC has regularly reaffirmed that it is Commerce's assigned role to weigh and select among competing evidence, and even where some record evidence is opposed to other evidence relied upon by Commerce, the evidence relied upon can nevertheless constitute "substantial evidence."[103]

➤ Commerce may further explain its rationale, as outlined above, for relying upon the final results of the CVD investigation in the final remand results. Commerce may, however, believe that the Court's categorical approach in the *Remand Order* has, in effect, constrained Commerce to rely upon the preliminary results of the first CVD administrative review.  If so, it is vital that Commerce say so explicitly and under protest.

➤ Even the lower preliminary CVD rate of the first administrative review is indicative of massive subsidization in absolute terms.  Commerce should thus continue to find that government HRC subsidization was significant and contributed to a PMS.

*Strategic Alliances*

➤ Strategic alliances distorted the cost of HRC and the Court was incorrect to categorize Commerce's conclusions as "purely speculative." Commerce reasonably concluded that, given the practical impossibility of uncovering POR-specific clandestine cartel activity within the statutory time limits for Commerce's administrative review, record evidence establishing longstanding and recent cartel practices and the repeated

---

[103] *Id*. at 22 (citing *Meridian Prods., LLC v. United States*, 890 F.3d 1272, 1281 (Fed. Cir. 2018)).

involvement of four OCTG respondents supported an inference that such

distortive practices continued over the POR.

➢ When substantial evidence review is properly applied, "the question here

is whether the evidence and reasonable inferences from the record support

{Commerce's} finding,"[104] "not whether some other inference could

reasonably have been drawn."[105]

*Electricity*

➢ The Korean government's dominance of the electricity market distorted

OCTG production costs and the cost of material inputs, and *Seamless Pipe*

*from Korea Commerce* has recently found the provision of electricity

countervailable.[106]

➢ The CAFC has rejected Commerce's cost-recovery analysis, specifically

its limited focus on KEPCO, stating that Commerce's "limited analysis

does not support its conclusion that electricity prices paid to KEPCO by

respondents are consistent with prevailing market conditions because

Commerce failed to evaluate the Korean Power Exchange's (KPX) impact

on the Korean electricity market."[107] Specifically, as KPX's pricing

constitutes a significant portion of KEPCO's total cost it is implausible

that Commerce adequately investigated Korea's prevailing market

condition for electricity absent a thorough understanding of the costs

---

[104] *Id*. at 28 (citing *Matsushita Electric Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).
[105] *Id*. (citing *Daewoo Elecs. Co. v. Int'l Union of Elec., Technical, Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993)).
[106] *Id*. at 30 (citing *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 85 FR 80024 (December 11, 2020)).
[107] *Id*. (citing *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (*POSCO v United States*)).

associated with generating and acquiring that electricity.

➢ Given that domestic producers supplied ample, heretofore unaddressed evidence of far-reaching government control over Korean electricity and pricing during the POR, Commerce should continue to find that such market distortion contributed to Korea's PMS, for purposes of the final remand results.

*Restructuring*

➢ The Korean government's restructuring programs evidence pervasive HRC market distortion and exacerbated distortions to steelmakers' cost structure.

➢ Because this factor was not discussed in Commerce's *Final Results*, the Court did not address the record evidence with respect to this factor. Commerce first found Korean government restructuring programs to contribute to a PMS in the remand redetermination on the record of the second administrative review. The Court reviewed Commerce's determination in *OCTG II*, but found it unsupported by substantial evidence solely because the court found it "unreasonable for Commerce to find that a government announcement of industry restructuring efforts five months after the *OCTG II* period of review ended" was indicative of a PMS. Five months after the *OCTG II* POR is directly in the midst of this POR and, thus, what the Court previously perceived to be a problem is no longer an issue with respect to this review.

*Interplay Between the Factors*

➢ The interplay of these factors exacerbated the PMS in Korea and the Court has never meaningfully addressed this.

➢ Given the overlap in record evidence and prevailing market conditions in this review and *OCTG II*, the foregoing analytical framework and findings of fact are equally applicable to this POR.

*ILJIN's Comments*[108]

• Commerce complied with the Court's instruction by reversing its finding of a PMS in Korea with respect to inputs of HRC and removing the PMS adjustment from the recalculation of the weighted-average dumping margins for the two mandatory respondents.

*AJU Besteel's Comments*[109]

• Commerce complied with the Court's instruction by reversing its finding of a PMS in Korea with respect to inputs of HRC and removing the PMS adjustment from the recalculation of the weighted-average dumping margins for the two mandatory respondents.

• Although AJU Besteel agrees with the ultimate decision not to make any PMS adjustment, it disagrees with Commerce's analysis in the Draft Results of Redetermination.

---

[108] *See* ILJIN's Draft Remand Comments at 1-2.
[109] *See* AJU Besteel's Draft Remand Comments at 1-2.

*Husteel's Comments*[110]

- Commerce's Draft Results of Redetermination fully complies with the Court's decision regarding the PMS issue. Husteel urges Commerce to adopt without amendment the Draft Results of Redetermination regarding the PMS issue as the final remand results in this case and transmit those results to the Court.

- Husteel notes that it continues to disagree with Commerce's analysis of the PMS issue.

*Hyundai Steel's Comments*[111]

- While Commerce indicated that it disagreed with the Court's *Remand Order* on this issue, the record shows that a PMS does not exist in this review.

*SeAH's Comments*[112]

- After reviewing the evidence identified by domestic interested parties, Commerce correctly declined to make an adjustment to CV for the alleged PMS.

- While domestic interested parties have asserted that the factors they identified resulted in a "distortion" of Korean HRC prices, they have not alleged (and they have identified no evidence) that those factors resulted in prices for HRC in Korea that did not reflect the COP in the ordinary course of trade. The statute, however, only permits adjustments to CV when "a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[113] Because this allegation failed to meet the statutory burden, it should have been rejected *ab initio*.

---

[110] *See* Husteel's Draft Remand Comments at 1-2.
[111] *See* Hyundai Steel's Draft Remand Comments at 1-2.
[112] *See* SeAH's Draft Remand Comments at 1-2.
[113] *Id*. at 2 (citing 19 U.S.C. § 1677(e), *i.e.*, section 771(e) of the Act).

*NEXTEEL's Comments*[114]

- Commerce's reversal of the PMS finding and removal of the PMS adjustment in the Draft Results of Redetermination complies with the *Remand Order*.

- While NEXTEEL agrees with Commerce's proposition that "each segment stands on its own," the issue here is whether the record of this administrative review supports the conclusion that a PMS exists in this review; the record does not support such a conclusion.

- The Draft Results of Redetermination states that "the additional evidence on the record, which the Court has not previously addressed and rejected, as identified in the remand comments by {Petitioners} is insufficient, on its own, to sustain a finding of a PMS" is dispositive. Accordingly, Commerce should continue to maintain its decision to reverse the PMS finding and remove the PMS adjustment in the final redetermination.

**Commerce's Position:**

As an initial matter, we will respond to U. S. Steel's comments, which reargue the issue of a PMS beyond addressing the merits of Commerce's Draft Results of Redetermination. First, U.S. Steel argues that, should Commerce continue its reversal of an affirmative finding regarding PMS, it should continue to do so under protest. As explained above in the Analysis section, Commerce's remand determination with respect to the issue of PMS was made under protest in the draft remand and we continue to make our determination under protest in the final redetermination. Additionally, Commerce continues to respectfully disagree with the Court's

---

[114] *See* NEXTEEL's Draft Remand Comments at 3-7.

treatment of "old and new" evidence, as well as maintaining its disagreement with any interpretation of "yielding" of Commerce's position regarding global overcapacity.

To the extent that U.S. Steel contends that the Court's statement in the *Remand Order* that "none of the cited documents pertain to the relevant period of review in this case" regarding government control of the Korean electrical industry is factually incorrect, we find that U.S. Steel cited to certain record evidence that is contemporaneous with the POR.[115]  However, Commerce is not in a position to reverse the Court's findings.  If U.S. Steel believes that the Court made factual findings that are manifestly incorrect, then U.S. Steel is free to seek reconsideration from the Court, if appropriate, or pursue an appeal to an appellate court. Secondly, U.S. Steel contends that, while it is accurate to state that Commerce recalculated the dumping margins in *OCTG I* and *OCTG II* without a PMS adjustment, to understand the circumstances of those recalculations, it should be noted that they were conducted under protest. As a factual matter, U.S. Steel is correct that Commerce recalculated the dumping margins in *OCTG I* and *OCTG II* under protest.  However, this remand redetermination stands on its own and is made independently based on the administrative record of this review in a manner that is consistent with the Court's remand opinion and order.  Thirdly, U.S. Steel contends that the records in both *OCTG II* and this POR are more substantial than that of *OCTG I*, even though the Court found that these records as "identical."[116]  Once again, Commerce is not in a position to reverse the Court's factual findings and, if U.S. Steel believes that the Court made factual findings that are manifestly incorrect, then U.S. Steel is free to seek reconsideration from the Court, if appropriate, or pursue an appeal to an appellate court.  Finally, U.S. Steel contends that it is incorrect for the Court to state that, "Commerce conceded that it presented no evidence to

---

[115] *See* U.S. Steel's Draft Remand Comments at 4 (citing PMS Allegation at Ex. 4, Sub-Ex. 6).
[116] *See Remand Order* at 31.

support the existence of strategic alliances during the OCTG III period of review."[117]  Although we respectfully disagree with the Court's characterization of the agency's position, as noted earlier, Commerce is not in a position to reverse the Court's findings.  For the sake of accuracy, however, we clarify that Commerce stated in the *Final Results* that, while "the record does not contain specific evidence showing that strategic alliances directly created a distortion in HRC pricing in the current period of review," Commerce agreed, "that the record evidence supports that such strategic alliances exist in Korea and that these strategic alliances may have affected prices in the period covered by the original LTFV investigation," and that these "distortions in the prices of HRC in the past … may continue to impact HRC pricing in a distortive manner during the instant POR and in the future."[118]

U.S. Steel claims that Commerce's Draft Results of Redetermination appear to suggest that our reconsideration was limited to documents that were new to this POR.  Such a conclusion is inaccurate.  We reviewed the record of this administrative review as a whole.  However, we cannot ignore the fact that the Court also already reviewed much of the record evidence and found it insufficient to establish the PMS in its *Remand Order*.  Although we disagree with the Court's findings, we cannot reverse the Court's findings with respect to that evidence.  We find that it would not be productive, at this time, to reargue the very same evidence, which the Court already found insufficient, as part of this redetermination.  Rather, in the Draft Results of Redetermination, we sought to reexamine and focus on any evidence that interested parties identified that the Court had not considered in its *Remand Order*, understanding that the evidence that had already been examined by the Court had been determined by the Court to be insufficient to demonstrate a PMS.  Had record evidence, including interested parties' comments

---

[117] *Id*. at 51.
[118] *See Final Results* IDM at Comment 1-B.

regarding record evidence, provided further evidence that is sufficient to demonstrate the presence of a PMS, either independently or when coupled with evidence already reviewed by the Court, Commerce would have reached a different conclusion. However, as stated above, we cannot find that a PMS exists on the basis of evidence that the Court has already found insufficient. Therefore, for these final results of redetermination, we have continued to reverse our application of a PMS and remove any PMS adjustments from the margin calculations for the mandatory respondents and non-examined companies.

In response to U.S. Steel's arguments that Commerce should find that a PMS does exist, or expand its analysis, we will address each of the five factors presented by U.S. Steel below.

*Overcapacity*

We addressed this factor specifically in the Draft Results of Redetermination because, as stated above in the Analysis section, we find that the evidence of overcapacity could be indicative of the presence of a PMS in Korea. We continue to find that the record contains data that demonstrate the acute and particular presence of overcapacity in the Korean market. However, a party alleging the existence of a PMS must demonstrate that this overcapacity has led to a situation in which, "the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[119]   In other words, the overcapacity factor, which we believe could be a factor contributing to a PMS in this proceeding, is not enough to make an affirmative PMS determination unless a party demonstrates that overcapacity led to a situation in which, "the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[120]   The statute requires a second step of demonstrating that this overcapacity, or any other

---

[119] *See* section 771(e) of the Act.
[120] *See* section 771(e) of the Act.

factor, is distorting the COP such that it no longer reflects the COP in the ordinary course of trade. On this specific record, consistent with evidentiary findings that the Court already made, we find that this has not been demonstrated by U.S. Steel or other domestic interested parties.

*Subsidization*

We also addressed this factor in our Draft Results of Redetermination, insofar as we stated subsidization may contribute to a PMS, even when subsidies have not been found to be countervailable or have not been examined in a CVD proceeding. We agree with U.S. Steel that it is Commerce's role to weigh and select among competing evidence, as we have done in this proceeding, and will continue to consider evidence on the record, which may or may not be strictly contemporaneous to a POR. However, the Court has already found that the evidence of subsidization on the record is insufficient.[121] The Court made it clear that it believed that it was unreasonable for Commerce to rely on the final results of CVD investigation of hot-rolled steel from Korea and, thus, despite our respectful disagreement with the Court, we can no longer consider the determination from the CVD investigation to be evidence of subsidization in the context of this remand. Furthermore, to the extent that U.S. Steel contends that in relying on the rate from the administrative review of hot-rolled steel from Korea the Court did not address the fact that CVD rates are calculated as a percentage of sales and that even lower subsidization rates still reflect massive subsidization,[122] Commerce has no authority to overrule the Court's analysis and findings, even if it disagrees with them. Accordingly, under respectful protest, we find, consistent with the Court's decision, that there is not sufficient record evidence that subsidization programs were in effect during the POR for Commerce to make an affirmative PMS determination that can be sustained by the Court.

---

[121] *See Remand Order* at 42-43.
[122] *See* U.S. Steel's Draft Remand Comments at 24-25.

*Strategic Alliances*

As an initial matter, we also respectfully disagree with the Court's characterization of this finding as "speculative."[123]  Factors present in any market, whether or not those factors contribute to a PMS, do not always fall neatly within periods of review.  Rather, factors like strategic alliances can have effects which may stretch out for long periods of time – far beyond the periods of review in which the strategic alliances were first established or in effect.  Moreover, U.S. Steel contends that there is "a practical impossibility of uncovering POR-specific clandestine cartel activity within the statutory limits of Commerce's administrative review" and the fact that it took fourteen years for the Korean government to uncover and investigate longstanding and recent cartel practices and the repeated involvement of four OCTG respondents demonstrates that it is practically impossible to require petitioners to produce POR-specific evidence of such activities.[124]  As we understand U.S. Steel's argument, it appears to contend that the Court has established a standard that is practically impossible to meet.  However, even if we were to agree with U.S. Steel, Commerce has no authority to reverse the Court and establish a different standard.  Accordingly, under respectful protest and consistent with the Court's decision, we find that the evidence supporting the factor of strategic alliances is not sufficient to demonstrate the existence of a PMS, whether alone or coupled with the other factors alleged in this proceeding.

*Electricity*

U.S. Steel contends that the CAFC reversed and remanded Commerce's subsidy analysis in *POSCO v United States*[125] and, thus, rendered the Court's reliance on non-countervailability

---

[123] *See Remand Order* at 36.
[124] *See* U.S. Steel's Draft Remand Comments at 26-27.
[125] *See POSCO v United States*.

41

of Korea's government-controlled electricity market inapposite.[126]  As an initial matter, the

*POSCO* litigation is still ongoing and has not yet reached its final and conclusive resolution.

Moreover, the Court expressly referenced the *POSCO* decision in its *Remand Order*[127] and, thus,

it is clear to us that the Court was well-aware of the CAFC decision in *POSCO* when it remanded

the case to Commerce.  U.S. Steel's disagreement with the Court's decision in this proceeding

does not invalidate the CIT holding with respect to the electricity factor.  Commerce has no

authority to overrule and reverse the decision of the Court.  Accordingly, we have complied with

the Court's decision under protest.  To the extent that U.S. Steel contends that "the USCIT's

conclusion in Slip Op. 21-43 amounts to an easily corrected misapprehension of the record,"[128]

Commerce's redetermination results are not an appropriate forum for correcting alleged judicial

errors.  If U.S. Steel believes that the Court misapprehended the record, U.S. Steel is free to seek

reconsideration from the Court or appeal this aspect of the Court's decision to the CAFC, if

appropriate.  Finally, U.S. Steel contends that Commerce recently found the provision of

electricity countervailable in a preliminary determination of *Seamless Pipe from Korea*.

Although we note that a subsidy need not necessarily be countervailable in order to contribute to

a PMS, US Steel's argument regarding the affirmative determination in Seamless Pipe from

Korea does not apply due to Commerce's final determination that there is no benefit  However,

more recently, Commerce has found no countervailable subsidies for the provision of

---

[126] *See* U.S. Steel's Draft Remand Comments at 30.
[127] *See Remand Orde*r at 40-41, fn. 8 ("This court's decision in *POSCO v. United States*, 43 CIT __, 378 F. Supp. 3d 1348 (2019), sustaining the AFA-based subsidy rate of 41.57% assigned in the countervailing duty investigation, was vacated and remanded for further proceedings consistent with *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020), by an order issued as a mandate on March 4, 2021.  *See POSCO v. United States*, Appeal No. 19-2095 (Fed. Cir. March 4, 2021).")
[128] *See* U.S. Steel's Draft Remand Comments at 31.

electricity.[129]

*Restructuring*

We find the evidence presented by U.S. Steel regarding restructuring to be salient to this redetermination. As stated above in the Analysis section, this factor, "could be evidence that Commerce would find demonstrative of a PMS." We agree with U.S. Steel that the evidence cited is now within the POR, resolving the timing problem cited by the Court regarding this factor in *OCTG II*. Based on our review of the record before us, we find there is information on this record that the programs were in effect during the POR, as argued by U.S. Steel. Specifically, U.S. Steel cites to an article stating that the "Ministry of Trade, Industry and Energy … gave the green light to the steelmaking conglomerates' restructuring plans under the One-Shot Act that will allow the two companies to receive a {sic} wide ranging government support including fast-track procedures of mergers and acquisitions, tax benefits and research and development aid for their business reform efforts."[130] U.S. Steel also cites the Korean Export-Import Bank's conclusion that, "reducing production volumes to cope with the global oversupply is only a short-term solution, {and} stress{ed} that the domestic steel industry should undergo fundamental changes through mergers and acquisitions."[131]

As U.S. Steel states, this factor was not discussed in the *Final Results*; however, this was because U.S. Steel did not argue during the underlying administrative review that this was a contributing factor. Indeed, "Commerce first found Korean government restructuring programs to contribute to a PMS in the remand redetermination on the record of the second administrative

---

[129] *See* "Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea: Final Affirmative Countervailing Duty Determination," (signed June 25, 2021, not yet published), and accompanying IDM at Comment 1.

[130] *See* U.S. Steel's Draft Remand Comments at 11 (citing "Hyundai Steel, Dongkuk Steel Become Latest Beneficiaries of Fast-Track Restructuring Program," *Pulse by Maeil Business News Korea*, dated November 23, 2016).

[131] *Id.* at 12 (citing "Hyundai Steel strongly denies merger with POSCO," *Korea Herald*, dated November 1, 2016).

review,"[132] which was prepared after the final results of this third administrative review.  As in *OCTG II*, when Commerce first made this finding in its remand redetermination, we found that this may be a contributing factor to a PMS.  However, the Court found that remand redetermination unsupported by record evidence because the record evidence was not contemporaneous with the POR.  That said, now these articles and statements on the record of this POR involve actions or announcements that fall within the period of review, as explained earlier, and announce plans, intentions, or approved programs by the Korean government to assist Korean steel producers' restructuring efforts in response to Chinese overcapacity.  Thus, we find that such programs may contribute to a PMS, and we agree with U.S. Steel that this factor was not addressed in the *Remand Order*.

*Interplay Between the Factors*

As Commerce determined in *OCTG I* and *OCTG II*, the interplay between these factors is an important factor itself when evaluating a PMS allegation.  It is true, as U.S. Steel argues, that factors can exacerbate one another resulting in a distortion which is greater than the effect of any number of individual factors.  To the extent that U.S. Steel believes the Court has erred in not meaningfully addressing the interplay between the factors, U.S. Steel is free to seek reconsideration or appeal, if appropriate.  Commerce has no authority to overrule the Court.

While we continue to believe that it is not necessary for any single factor to demonstrate the existence of a PMS on its own, a party should demonstrate both the existence of the factors and the resulting distortions on the COP, or other factors which have been shown to distort the COP, for the interplay of those factors to be considered as part of Commerce's analysis.  As discussed above, consistent with the Court's opinion and under respectful protest, we find that

---

[132] *Id.* at 32.

the record evidence is insufficient to sustain an affirmative PMS finding.  Therefore, we find that

any interplay of these factors also is not sufficient in this instance for Commerce to make an

affirmative PMS determination and PMS adjustment.

In response to ILJIN's, AJU Besteel's, Husteel's and Hyundai Steel's comments, we

agree that our Draft Results of Redetermination comply with the Court's *Remand Order*.

However, as discussed in the Analysis section above, we continue to respectfully disagree with

the Court's method of analysis as well as its findings regarding certain evidence on the record of

this review.

In response to SeAH's comments, we agree that the statute allows for adjustments when

the COP does not reflect the ordinary course of trade.  However, we do not agree with SeAH's

comment that Commerce should have declined to make an adjustment in the *Final Results*.  As

expressed in the Analysis section above, we conducted this remand under protest and consistent

with the Court's *Remand Order*.

We note NEXTEEL's agreement with Commerce's statement that each segment stands

on its own, and we will continue to evaluate the evidence of future segments as they relate to the

respective periods of review.  Therefore, as stated above, record evidence in one review may not

have been enough to demonstrate a contributing factor of a PMS, but evidence with respect to

the same factor in another review may play a crucial role in Commerce's determination of a PMS

in that review.

**Issue 2:  NEXTEEL's Allocation of Costs**

*NEXTEEL's Comments*

- Commerce's Draft Results of Redetermination comply with the Court's *Remand Order*.

    In the final results of redetermination, Commerce should maintain its decision to reverse

45

the allocation of NEXTEEL's non-prime cost made in the *Final Results* and rely on the actual costs of producing prime and non-prime products as reported by NEXTEEL.[133]

*Hyundai Steel's Comments*

- Commerce's Draft Results of Redetermination comply with the Court's *Remand Order*. Hyundai Steel supports Commerce's decision regarding the allocation of costs for NEXTEEL's non-prime products.[134]

*U.S. Steel's Comments*

- In *Dillinger*, the Federal Circuit found that Commerce had improperly allocated costs between Dillinger's non-prime and prime products based on Dillinger's books and records because those books and records allocated costs based on selling price and therefore "did not reasonably reflect the costs associated with the production and sale of the merchandise as required by 19 U.S.C. § 1677b(f)."[135]  Accordingly, Commerce was remanded to determine the actual costs of prime and non-prime products.[136]

- In the *Remand Order*, the court equated Commerce's adjustment in the *Final Results* with the situation presented in *Dillinger*.[137]  However, Commerce can "allocate costs based on the actual costs of prime and non-prime products" in compliance with the terms of the Court's *Remand Order*,[138] while explaining how *Dillinger* does not control Commerce's adjustment in this action.

- *Dillinger* does not require Commerce to simply rely on NEXTEEL's costs as reported.[139]

---

[133] *See* NEXTEEL's Draft Remand Comments at 7.
[134] *See* Hyundai Steel's Draft Remand Comments at 2.
[135] *See* U.S. Steel's Draft Remand Comments at 35 (citing *Dillinger*).
[136] *Id.* at 35-36 (citing *Dillinger* at 1324, noting that the CIT declined to hold oral arguments, therefore, the parties were never given an opportunity to brief or argue the points raised in *Dillinger*).
[137] *Id.* at 36 (citing *Remand Order* at 58-61).
[138] *Id.* (citing *Remand Order* at 61).
[139] *Id.* (citing Draft Results of Redetermination at 12; and *Remand Order* at 12).

- In *Dillinger*, Commerce was relying on respondent's price-based cost allocation records, which the CAFC determined did not reasonably reflect production costs. In the instant case, Commerce deviated from the costs reported in NEXTEEL's books and records by adjusting the reported costs of prime OCTG.

- In other words, Commerce's decision to rely on actual costs as reported by NEXTEEL complies with the CAFC's holding in *Dillinger*, only if NEXTEEL's reported actual costs both comply with Korean GAAP and reasonably reflect the costs associated with the production and sale of the merchandise.[140]

- The Court concluded that subject merchandise is limited to prime OCTG products.[141] In the *Final Results*, Commerce correctly determined that NEXTEEL's recorded cost for prime OCTG products did not accurately reflect the costs associated with its production.[142]

- NEXTEEL's unintentional manufacture of non-prime products is an actual cost in its production of prime OCTG that the statute, and the CAFC in *Dillinger*, require Commerce to account for in its allocation methodology. Consistent with Commerce's existing methodology, Commerce accounted for these costs by treating non-prime merchandise akin to scrap produced during the manufacture of OCTG.[143]

- NEXTEEL can recover some of the costs of producing non-prime products by scrapping or selling these products. However, the costs of producing these non-prime products are OCTG production costs. Commerce's allocation methodology in the *Final Results* intended to account for this commercial reality and further recognize Korean GAAP.

---

[140] *Id.* at 37 (citing *Dillinger* at 1321, quoting section 773(f)(1)(A) of the Act).
[141] *Id.* at 38 (citing *Remand Order* at 61).
[142] *Id.* (citing, *e.g.*, *Final Results* IDM at Comment 12).
[143] *Id.* at 38-39 (citing *Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1368 (CIT 2018)).

- To capture all of the costs associated with the production and sale of prime OCTG merchandise, Commerce must include not only NEXTEEL's reported costs of production for prime merchandise but also the costs of the associated production failures that unintentionally result in the manufacture of non-prime products (*i.e.*, the difference between NEXTEEL's reported production costs for non-prime merchandise and the amount it is able to recover through their sale).

- In accordance with *Dillinger*, Commerce's allocation methodology in the *Final Results* reasonably and accurately accounted for these costs, while Commerce's revised approach in the Draft Results of Redetermination does not.

**Commerce's Position:**

We disagree with U.S. Steel.  In *Dillinger*, the CAFC clearly stated that Commerce was required to determine the actual costs of prime and non-prime products.[144]  In the instant case, NEXTEEL does not separately classify prime and non-prime products, nor does it value these products differently for inventory purposes, because the costs incurred in manufacturing them are the same.[145]  In its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime products.[146]  Consequently, NEXTEEL's reported costs reflect the actual costs of producing its prime and non-prime products as required by the court in the *Remand Order*.[147]  Therefore, for purposes of this redetermination and consistent with the CAFC decision in *Dillinger*,[148] we have continued to reverse the adjustment made in the *Final Results* and rely on the actual costs of prime and non-prime products as reported by NEXTEEL.

---

[144] *See Dillinger* at 1324.
[145] *See* NEXTEEL's June 7, 2018 SQR at SD-5.
[146] *See* NEXTEEL's Cost Verification Report at 17.
[147] *See Remand Order* at 60-61 and 76.
[148] *See Dillinger* at 1318, 1324.

**Issue 3:  NEXTEEL's Production Line Suspension Costs**

*NEXTEEL's Comments*

- Commerce's Draft Results of Redetermination do not comply with the Court's *Remand Order*.  Although Commerce references the statute and the agency's practice, the reasons identified in Commerce's explanation do not cast doubt that there is any deficiency in NEXTEEL's records.[149]  NEXTEEL's classification of its suspended loss accurately reflects the costs in accordance with NEXTEEL's books and records that are consistent with Korean GAAP.

- Reallocating NEXTEEL's production line suspension costs does not "reasonably reflect the costs associated with the production and sales of the merchandise,"[150] because it reattributes costs of production for non-subject merchandise indirectly to subject merchandise through G&A.

- Suspended losses are not related to the company's overall management of its operations, but rather consisted of manufacturing-related expenses NEXTEEL incurred on specific production lines that were temporarily suspended.  Although production was suspended, those costs were still associated with those specific lines and those specific, non-subject products.

- Commerce has not articulated a standard for differentiating between routine shutdowns (which do not warrant cost reclassification) and more prolonged shutdowns (a situation which Commerce views as appropriate to reclassify costs).

---

[149] *See* NEXTEEL's Draft Remand Comments at 7-8 (citing *Remand Order* at 63; and *Draft Remand Results* at 14-15).

[150] *See* NEXTEEL's Draft Remand Comments at 9 (citing 19 U.S.C. 1677b(f)(1)(A)), *i.e.*, section 773(f)(1)(A) of the Act).

- Commerce has also not explained why it considers these particular suspensions to have been "for an extended period of time during the POR."[151]  Neither has Commerce pointed to anything with specificity to provide clarity to respondents as to which production suspensions may be considered to be "temporary" and which might be considered to go on for an "extended period."

*U.S. Steel's Comments*

- In its Draft Results of Redetermination, Commerce fully explained why relying on the costs reported in NEXTEEL's books and records was inappropriate in this circumstance and why an adjustment was required.

- Commerce explained that once a production line is suspended for non-routine, non-maintenance reasons those shuttered production lines no longer produce (and are no longer intended to produce) product that can bear the burden of the costs associated with ownership and upkeep of those production lines.  Instead, suspended production lines are akin to idle assets "that relate { } to the general operations of the company as a whole, and not to the manufacture of specific products." Commerce's established practice with respect to such idle assets is to include depreciation as part of the G&A expense ratio.

- Commerce explained that NEXTEEL's allocation of the shutdown expenses to COGS was unreasonable because no product was produced while the lines were shuttered, and thus no revenue was generated.  Therefore, "the costs associated with the suspended production lines were necessarily covered by all the other products NEXTEEL produced" and thus appropriately included in NEXTEEL's G&A expense, which is allocated among all of NEXTEEL's products, including OCTG.

---

[151] *See* NEXTEEL's Draft Remand Comments at 10 (citing Draft Results of Redetermination at 15).

- Because NEXTEEL's ordinary books and records did not reasonably reflect its actual costs, Commerce appropriately adjusted its dumping calculations.

**Commerce's Position:**

We disagree with NEXTEEL's contention that Commerce's Draft Results of Redetermination failed to comply with the Court's *Remand Order* and that the reasons identified in Commerce's explanation do not articulate any deficiency in NEXTEEL's records. In the Draft Results of Redetermination, we stated that, consistent with section 773(f)(1)(A) of the Act, Commerce normally relies on data from a respondent's normal books and records where those records are prepared in accordance with the GAAP of the exporting country and reasonably reflect the costs associated with the production and sales of merchandise. However, in those instances where it is determined that a company's normal books and records do not reasonably reflect the production costs of the merchandise under consideration, Commerce has the authority to adjust the costs as necessary, if there is sufficient record evidence to support an adjustment.[152]

In NEXTEEL's normal books and records, the costs related to the suspended production lines were not assigned to products, but rather were transferred directly to COGS without assignment to specific products.[153] The costs related to these suspended lines were also excluded from the reported costs (*i.e.*, not included in either per-unit COM or in G&A expense).[154] No revenue from any products normally produced on those lines was generated for the period because those production lines were suspended and not producing products.[155] Therefore, the costs associated with the suspended production lines were necessarily covered by NEXTEEL

---

[152] *See, e.g.*, *Acetone from Korea* IDM at Comment 1.
[153] *See* NEXTEEL's February 27, 2018 CDQR at D-10 and D-11; *see also* NEXTEEL's Cost Verification Report at 2 and 12-13.
[154] *See* NEXTEEL's June 7, 2018 SQR at SD-8; *see also* NEXTEEL's Cost Verification Report at 2 and 12-13.
[155] *See* NEXTEEL's February 27, 2018 CDQR at 10-11.

generally, that is by all the other products NEXTEEL produced.  Section 773(b)(3)(B) of the Act directs Commerce to include as part of COP costs associated with the general operations of the company (*i.e.*, "general" expenses of the company that are not directly associated with a product).  NEXTEEL's classification of these costs as part of COGS but not to any product therein does not reasonably reflect the production costs of the merchandise under consideration or the other products included within COGS.  Consequently, Commerce adjusted NEXTEEL's reported costs to allocate the suspended production lines cost to G&A expenses, and thus to be carried by the overall production and sales of the company.

We also disagree with NEXTEEL that the expenses in question are manufacturing-related expenses as they were not reflected in the company's normal books and records in inventory or product costs.  As explained in the cost verification report, the assets associated with these production lines were idle throughout fiscal years 2016 and 2017, and the related labor and overhead (*e.g.*, depreciation, *etc*.) costs were not attributed to any products, but rather were recorded directly to COGS.[156]  When products are being produced on these production lines, the expenses would relate to manufacturing-specific products; however, during these long down periods, no products were manufactured as the operations were suspended and the assets are held for some future use, can reasonably be attributed to the general expenses of the company as a whole.[157]

Further, we disagree with NEXTEEL that suspended losses are not related to the company's overall management of its operations and reallocating NEXTEEL's production line suspension costs does not "reasonably reflect the costs associated with the production and sales

---

[156] *See* NEXTEEL's Cost Verification Report at 2 and 12-13.
[157] *See* NEXTEEL's February 27, 2018 CDQR at D-10 and D-11; *see also* NEXTEEL's Cost Verification Report at 2 and 12-13.

of the merchandise." Costs related to a prolonged shutdown are absorbed by the operations of the whole company and are considered general in nature.[158] As explained above, suspended lines, akin to idled assets, remain available to the company pending resumption of production on those lines, and represent excess capacity held by the company.[159] We consider the cost of holding idle assets a period cost that relates to the general operations of the company as a whole, and not to the manufacture of specific products. Our practice has been to include depreciation on idle assets as part of the calculation of the G&A expense ratio.[160] Accordingly, Commerce reasonably associated these costs with the general operations of the company as a whole, essentially idle assets, and it was reasonable for Commerce to allocate such costs as part of G&A expenses. The Court recently sustained Commerce's allocation of NEXTEEL's suspended losses to G&A expenses in *Husteel Co. Ltd. et al. v. US*:

> The court cannot say that it is unreasonable for Commerce, in its expertise, to determine that a company's attribution of costs relating to the extended suspension of certain non-subject product lines as costs of goods sold results in an inaccurate reflection of the general expenses incurred in the production of subject merchandise. Although a company may shut down product lines from time to time for various intervals, at some point an extended shutdown suggests that the costs of that product line are more akin to expenses borne by the company in its general operations. Therefore, Commerce's determination is sustained.[161]

NEXTEEL's argument that suspended losses consisted of expenses NEXTEEL incurred on specific production lines is off point as there were no products produced to which to attach

---

[158] *See OCTG from Korea POR 1* IDM at Comment 34.
[159] *See PSF from Korea* IDM at Comment 8.
[160] *See Pasta from Italy* IDM at Comment 7.
[161] *See Husteel Co. Ltd. et al. v. US*, Consol. Court No. 19-00112, Slip Op. 21-70 (CIT June 7, 2021).

such costs.  In the suspended loss schedule provided by NEXTEEL during the cost verification, it was evident that expenses related to the suspended production lines were incurred continuously for very long periods.[162]  The production shutdown started before the POR and continued after the POR, establishing that it was not a routine shutdown but a prolonged shutdown for an extended period.[163]  A routine shutdown (*i.e.*, maintenance shutdowns for short periods) is required by the company to repair machines to keep them efficient.  While no specific time is associated with a routine shutdown, normally the shutdown is short-term.  In the instant case, the shutdown was not a short-term, routine shutdown.

NEXTEEL argues that Commerce has not pointed to anything with specificity to provide clarity to respondents as to which production suspensions may be considered to be temporary and which might be considered to go on for an extended period.  However, as noted by the Court in *Husteel Co. Ltd. et al. v. US*, NEXTEEL cites no authority to support the position that Commerce may not assess the length of a shutdown on a case-by-case basis.[164]  On the facts before us, the shutdown started before the POR and continued after the POR,[165] which demonstrates that this shutdown is an extended period shutdown.

### Issue 4.  SeAH's Further Manufacturing Costs

*Domestic Industry's Comments*[166]

- Commerce's approach on remand satisfies the statutory requirements, is supported by substantial evidence and addresses the concerns raised in the Court's *Remand Order*.

---

[162] *See* NEXTEEL's Cost Verification Report at CV-6.
[163] *See* NEXTEEL's Cost Verification Report at CV-6.
[164] *See Husteel Co. Ltd. et al. v. US*.
[165] *See* NEXTEEL's Cost Verification Report at CV-6.
[166] *See* Domestic Industry's Draft Remand Comments at 3-6.

- Commerce's approach to allocating general expenses is driven by how SeAH has reported its data, and Commerce's statutory obligations that "the price used to establish {CEP} must be reduced by certain expenses, such as direct selling expenses, indirect selling expenses, and costs of any further manufacture or assembly."

- SeAH has reported PPA's G&A expenses as a percentage of its company-wide activities and PPA's only activities are the importing and reselling products and arranging for third parties to further manufacture certain imported products before their resale.  Thus, on remand, Commerce continues to allocate PPA's G&A expenses to all of PPA's activities – the importation of pipes and the further manufacturing – but provides further clarification for why this is reasonable and in accordance with law.

- Commerce distinguishes between "the portion PPA's general expenses that is reasonably classified" as (1) "further manufacturing where applied to further manufacturing costs"; and (2) "indirect selling where applied to the cost of all imported OCTG" whether further manufactured or not.

- Thus, Commerce addresses the Court's specific concern that the COP of the imported OCTG is not a cost incurred for further manufacture by considering the G&A expenses related to the imported pipe cost to be indirect selling expenses.

- Commerce's approach is reasonable and in accordance with the statute.  Since PPA's essential function is to sell SeAH's pipe, the "general expenses" of PPA all relate to that function and can all be treated fairly as "indirect selling expenses."  However, because part of the sales involves further manufacturing, a part of those general expenses can also be reasonably attributed to that further manufacturing activity and be deducted, as directed by the statute.

- Commerce should amend its Draft Results of Redetermination margin programming language to reflect the reclassification of the imported pipe general expenses to indirect selling expenses.

*SeAH's Comments*[167]

- The Draft Results of Redetermination concede that PPA's reported G&A expenses related to all of PPA's activities.

- The statute does not authorize Commerce to deduct all expenses incurred by a U.S. affiliate when calculating CEP; instead, the statute provides a list of permissible deductions.

- While it is Commerce's practice to recognize as indirect selling expenses all G&A expenses of a company that is performing only reselling activities, in its Draft Results of Redetermination Commerce falsely contends that it can deduct as further manufacturing all G&A expenses where an affiliated company performs both further manufacturing and selling.

- Because PPA's G&A expenses relate to PPA's overall activities, they necessarily relate to activities that go beyond further manufacturing. While it may be permissible to allocate a portion of the G&A expenses to further manufacturing and deduct those from CEP, there is no provision in the statute to adjust CEP for the G&A expenses that are related to PPA's other activities.

- It should be noted that classifying a portion of G&A expenses as further manufacturing does not transform the G&A expenses into manufacturing expenses. Commerce treats G&A expenses as part of the COP, not the cost of manufacturing, thus, it is only under

---

[167] *See* SeAH's Draft Remand Comments at 3-6.

long-standing Commerce practice that a portion of G&A expenses have been allowed to be considered further manufacturing costs.

- While Commerce may allocate G&A expenses to all activities of the company, that does not transform the nature of the expense. G&A expenses allocated to further manufacturing and other company activities are still G&A expenses. Because the G&A expenses relating to non-manufacturing activities do not fall under any of the statutory adjustments to the CEP, they may not be deducted from the U.S. price.

**Commerce's Position:**

Commerce's approach complies with the statutory requirement that Commerce deduct both the selling expenses and the costs of further manufacturing from the price used to determine the CEP. SeAH agrees that PPA's G&A expenses are related to all of PPA's activities and SeAH also agrees that where a company performs only reselling functions its G&A expenses are properly and wholly classified as indirect selling expenses. However, SeAH contends that if an affiliated company engages in both further manufacturing and reselling activities, there is a loophole in the statute that prohibits the recognition of all G&A expenses. According to SeAH, had the affiliated company only imported and resold the product, the associated G&A expenses are properly recognized as indirect selling expenses, however, if the imported product is further manufactured in any way, Commerce is precluded from recognizing the portion of G&A expenses previously allocated to those imported products, *i.e.*, the amounts which were previously considered indirect selling expenses.

This argument improperly asks Commerce to ignore a significant portion of G&A expenses. The statute directs Commerce to reduce the U.S. price by any selling expenses and

further manufacturing costs.[168]  Further, it is significant that PPA is not performing further manufacturing on its own and does not maintain any production facilities for further manufacturing.[169]  Rather, these processes are performed by tollers, and SeAH's involvement in further manufacturing is perfunctory in nature and is limited to paying a processing fee, which we accounted for as a further manufacturing expense.[170]  Apart from paying the processing fee to the tollers, which we accounted for, SeAH is predominantly a selling entity and, thus, it is reasonable to treat the portion of its G&A expenses that are related to the cost of the imported products as selling expenses.

Furthermore, the Court did not question Commerce's allocation of PPA's G&A expenses to PPA's further manufacturing costs, yet SeAH seeks to relitigate this aspect of Commerce's determination, which the Court did not reverse, by redefining further manufacturing. Specifically, SeAH equates further manufacturing to cost of manufacturing (COM) while Commerce has defined it historically as including all activities associated with further processing the product and thus more akin to the COP.[171]  While noting that Commerce's consistent practice has been to allocate a portion of G&A expenses to further manufacturing costs, SeAH argues that as a matter of law G&A expenses are not "manufacturing" costs and therefore may not be deducted from CEP.[172]  According to SeAH, G&A expenses are part of COP and not COM, thus,

---

[168] *See* section 772(d)(1) of the Act (The price used to establish CEP "shall also be reduced by" the amount of any selling expenses "generally incurred by or for the account of … the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)"); *Id.* section 772(d)(2) of the Act (noting that price used to establish CEP "shall also be reduced by... the cost of any further manufacture or assembly").

[169] *See* SeAH February 27, 2018 EQR at 3-4.

[170] *Id.*

[171] *See, e.g.*, SeAH February 27, 2018 EQR at 12-13 incorporating Commerce's instructions that further manufacturing includes (a) direct materials; (b) direct labor; (c) factory overhead (provide a list of the cost categories that comprise your submitted factory overhead cost figures); (d) research and development (R&D) costs; (e) G&A expenses (including a list of all miscellaneous income and expense items); and (f) net interest expense.

[172] *See* SeAH's Draft Remand Comments at 5-6.

G&A expenses cannot be transformed into further manufacturing costs.  We disagree with SeAH's contentions in this matter.  The statute does not equate further manufacturing costs to the calculation of a respondent's COM that is defined at section 773(e)(1) of the Act.  In fact, the antidumping law does not prescribe a specific method for calculating further manufacturing costs.  When the statute is silent or ambiguous, the determination of a reasonable and appropriate method is left to the discretion of Commerce.[173]  Consequently, and as conceded by SeAH, Commerce has developed a consistent and predictable practice of allocating a portion of the affiliated further manufacturer's G&A and financial expenses to its further manufacturing activities.[174]  Thus, we disagree with SeAH that the statutory intent was to exclude G&A expenses from the calculation of further manufacturing costs that may be deducted from CEP.  More importantly, the only portion of G&A expenses that we deducted as further manufacturing expenses is the amount of the tolling fee paid for further manufacturing activities.  As for the portion of G&A expenses at issue in this remand, as explained earlier, we treated them as selling expenses of PPA, which is SeAH's selling arm.

The courts have been clear that the statute requires a deduction of both further manufacturing costs and selling expenses.[175]  Because the G&A expenses related to the imported products are indirect selling expenses and those related to the further manufacturing are further manufacturing costs, Commerce has properly deducted them when calculating the CEP.

Finally, while both selling expenses and further manufacturing costs are deductions from U.S. price in calculating CEP, due to interested party comments we have revised the variable

---

[173] *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 827, 844 (1984).
[174] *See, e.g., Stainless Steel Wire Rod from Sweden:  Preliminary Results of Antidumping Duty Administrative Review*, 72 FR 51411, 51415 (April 10, 2007), where Commerce defines the cost of further manufacturing as "further manufacturing material, labor, and overhead, plus amounts for further manufacturing general and administrative ("G&A") expenses, and financial expenses."; and *Stainless Steel Bar from France:  Preliminary Results of Antidumping Duty Administrative Review*, 70 FR 17411, 17413 (April 6, 2005).
[175] *See United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1336 (CIT 2010).

name used for the G&A expenses related to the imported pipes to denote selling expenses rather than further manufacturing expenses.

**Issue 5.  SeAH's Inventory Valuation Losses**

*Domestic Industry's Comments*[176]

- In the Draft Results of Redetermination, Commerce clarifies that the inventory losses were actual, not imputed, expenses, and cites to substantial evidence on the record demonstrating the inventory valuation losses were treated as actual costs in SeAH's books and records.

- Commerce first distinguishes between inventory valuation losses, which are the actual raw material and WIP costs at issue here, and inventory carrying costs, which are the imputed finished good costs that were the subject of the *Torrington* decision referenced by the Court.  Therefore, the Court's reference to the *Torrington* decision is misplaced.

- Commerce also provides additional explanation and a thorough discussion of the record evidence to demonstrate that the inventory valuation losses were treated as actual costs on SeAH's normal books and records.  Therefore, Commerce's approach is supported by substantial evidence and fully complies with the *Remand Order*.

---

[176] *See* Domestic Industry's Draft Remand Comments at 8-10.

*SeAH's Comments*[177]

- The Draft Results of Redetermination is contrary to logic and to Commerce's prior practice.  Further, Commerce's discussion of this issue is fundamentally inconsistent with basic accounting principles and with the manner in which the lower of cost or market (LCM) adjustment is reflected in SeAH's normal books and records (and reported to Commerce).

- SeAH's normal books and records (and the reported costs) reflect the actual historical cost, not the lower market value, of the raw materials and semi-finished products that are consumed in production.  Consequently, there is no reason to include the inventory valuation losses that are recorded on SeAH's financial statements in SeAH's reported costs.  In fact, to do so obviously double counts the costs of the raw materials and semi-finished goods that were consumed in production.

- Suppose, for example, a raw material is purchased at $1,000 per ton, but its market value at year end is $900 per ton.  Accounting principles require that the raw materials remaining in inventory reflect the $900 per ton value at year end and the difference of $100 is reported as a loss on the income statement.  However, in the following year, the market value could rise, and the loss reversed.  Thus, the raw material's value is not known until it is actually removed from inventory and consumed.  Hence, the Draft Redetermination's insistence that the valuation loss recorded at year end represents a real expense distinct from the cost of manufacture reported by SeAH is misplaced.

- The Draft Results of Redetermination states that the purpose of the LCM adjustment is to match the loss in inventory value against the revenue for the period in which the

---

[177] *See* SeAH's Draft Remand Comments at 7-12.

reduction occurred.  By contrast, SeAH's reporting "matched" all costs incurred with its POR production.  To the extent that the inventories used in production were subject to inventory valuation adjustments before they were used in production, the reported costs, which reflect historical costs, already include both the adjusted inventory values and the "losses" recorded as a result of those adjustments.  After all, the inventory-valuation "loss" is, in concept, equal to the difference between the historical cost of the inventory and the adjusted LCM value of the inventory.

- In the above example, the inventory would eventually be consumed at its historical cost of $1,000 per ton and not at the LCM value of $900 per ton.  Thus, by insisting that the valuation "loss" of $100 is included, Commerce has effectively assigned a value of $1,100 per ton to the raw materials consumed.  This result is contrary to record evidence and is fundamentally inaccurate.

- If Commerce insists on recognizing these valuation losses, it must also reduce the historical costs of the inventory consumed to reflect the LCM values to avoid double-counting of these costs.

- In fact, Commerce has previously recognized that because SeAH's reported costs rely on historical purchase costs for materials without reflecting the inventory valuation adjustment from the financial statements, it is not appropriate to adjust the reported costs to include the inventory valuation losses.[178]

- Commerce's failure to follow that precedent in the present case reflects a clear error as a matter of both law and accounting.

---

[178] *Id.* at 11 (citing *Circular Welded Non-Alloy Steel Pipe from Republic of Korea:  Final Results of the Antidumping Duty Administrative Review*, 75 FR 34980 (June 21, 2010), and accompanying IDM at 17-19.

**Commerce's Position:**

Commerce's treatment of inventory valuation losses in the Draft Results of Redetermination is consistent with the statute, Commerce practice, and GAAP.  Furthermore, there is no double-counting of costs either in SeAH's normal books and records or in the COP relied on by Commerce in this Draft Results of Redetermination.

The statute directs Commerce to rely on a respondent's GAAP-based books and records unless such records do not reasonably reflect the cost of the merchandise.[179]  SeAH's restatement of its inventories to the lower of cost or net realizable value (also referred to as LCM) is a periodic (*e.g.*, year-end) adjustment required for its audited financial statements that are based on Korean GAAP.  Commerce has previously found that inventory valuation gains and losses are period costs that reflect the change in value for raw material inventories that a company currently holds on its balance sheet and are unrelated to the inventory that was consumed in production.[180]  In calculating a G&A expense ratio, Commerce normally includes period expenses, *i.e.*, those that are more related to an accounting period and not directly related to manufacturing merchandise, as they are related to the general operations of the company.[181]  Consequently, Commerce's practice is to include the gains and losses associated with the revaluation of raw material and WIP as period expenses that are included in the calculation of G&A expenses.[182]  While SeAH notes a single instance where Commerce previously excluded raw material and WIP inventory revaluation gains and losses from a respondent's reported costs, our normal and

[179] *See* section 773(f)(1)(A) of the Act.
[180] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium:  Final Results of Antidumping Duty Administrative Review; 2016-2018*, 85 FR 3028 (January 17, 2020) (*CTL Plate from Belgium*), and accompanying IDM at Comment 2.
[181] *Id.*
[182] *Id.*; *see also Certain Hot-Rolled Steel Flat Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019), and accompanying IDM at Comment 12; and *Stainless Steel Wire Rod from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying IDM at Comment 7.

more recent practice is to follow a company's GAAP-based normal books and records and treat such inventory valuation gains and losses as period costs.[183]

We also disagree that following a company's GAAP-based normal books and records results in a double-counting of raw material and WIP consumption costs. As noted above, the intention of this GAAP requirement is to recognize the change in the value of inventories on hand at period end; it is not intended to adjust the value of inventories already consumed in production.[184] Hence, GAAP seeks to ensure that a company's balance sheet is not overstated and that the current period net profit or loss is appropriately charged for any significant changes in the value of the assets held by the company. In this respect, the inventory revaluation of losses are similar to a company's recognition of bad debt expenses, translation gains or losses, or impairment losses, all of which reflect changes in the values of assets or liabilities held by a company at a period end. While not directly related to the cost of manufacturing, these are all period costs related to a company's overall operations and, as such, under accounting principles they are matched to a company's current period revenues or operations.[185] Where such gains and losses are reported as current period expenses on a company's income statement, Commerce accordingly treats these period expenses as selling, G&A or financial expenses in its sales and COP calculations.[186]

---

[183] *Id.*

[184] *See, e.g., CTL Plate from Belgium* IDM at Comment 2.

[185] *See, e.g., Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 72 FR 52065 (September 12, 2007), and accompanying IDM at Comment 16, stating that G&A and financial expenses are not assigned to products but are period costs that are expensed in the year incurred because they generally relate to a fiscal period.

[186] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from the Republic of Korea*, 72 FR 60630 (October 25, 2007), and accompanying IDM at Comment 14, stating that Commerce's practice is to treat bad debt expenses as an indirect selling expense; *Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 10; *Micron Technology v. United States*, 893 F. Supp. 21, Slip Op. 95-107 (CIT 1995) at 5, confirming it is appropriate to include translation gains and losses in the calculation of the financial expense ratio; and *Chlorinated Isocyanurates from Spain: Final Results of Antidumping Duty*

We disagree with SeAH that by including both the material costs consumed during the year and the net year-end adjustment of the cost of materials that remain in the inventory (*i.e.*, materials that have not been consumed) under Korean GAAP Commerce double counts costs. Rather, the net year-end adjustment is comprised of two parts:  (1) the beginning of the year reversal of the prior year end adjustment (a gain if raw materials were written down at the prior year end), which offsets the historical costs of the raw materials that were in inventory at the prior year end, but enter production during the current year; and (2) the end of the year adjustment to record any impairments in the value of raw material inventory on hand at year-end (*i.e.*, raw materials not consumed during the year).  Thus, the reversal that SeAH makes to return inventory on hand to historical cost is effectively a "gain" (or reversal of the provision) and would act to offset the fact that those materials entered production at their historical costs.  The loss taken on the value of raw materials still on hand at year-end is recorded separately.  To simplify these accounting transactions, we can continue with SeAH's example, where the raw materials in inventory at year end had a historical cost of $1,000 per ton but were found to have a market value of only $900 per ton.  Thus, under GAAP, the company was required to recognize a $100 inventory valuation loss.  The entry is recorded as a loss of $100 on the income statement (debit entry), and a $100 reduction in inventory value on the balance sheet (credit entry).  At the beginning of the following year, this adjustment is reversed, so now in the new fiscal year, there is an inventory valuation gain of $100 (credit entry) and the inventory value on the balance sheet is increased by $100 (debit entry), *i.e.*, returned to historical cost.  As a result, when the raw

---

*Administrative Review*, 74 FR 50774 (October 1, 2009), and accompanying IDM at Comment 1, stating that Commerce's established practice is to treat asset impairment losses as general expenses, and to include the total amount recorded in the respondent's financial statements in the G&A expense ratio calculation.

material is consumed in the new fiscal year at its historical cost of $1000 per ton, it is offset by

the $100 inventory valuation gain and, as a result, reflects the net market value of $900.  At the

end of that year, assume the raw material inventory on hand is re-evaluated and written down to

market, reduced by $50.  The net year end adjustment is $50 ($50=$100-$50).  Thus, we disagree

that there is any double-counting of expenses by picking up the net year end adjustment under

Korean GAAP.

Consequently, we have continued to treat SeAH's valuation losses on raw materials and

WIP inventories as period expenses that are related to the company's general operations, as a

whole.  As such, we have included the raw material and WIP inventory valuation losses

recognized on SeAH's audited income statement in the calculation of the company's G&A

expense ratio.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Order*, we have reconsidered and reversed our

application of PMS and our allocation of costs for NEXTEEL's non-prime merchandise; we

have also further explained our methodology employed in the *Final Results* with respect to the

classification of NEXTEEL's production line suspension costs and SeAH's inventory valuation

losses, and provided further explanation and revision of our calculation of SeAH's further

manufacturing costs.  Based upon the results of our analyses, we have recalculated the weighted-

average dumping margins for SeAH, NEXTEEL, and the non-examined companies which are

parties to this litigation, which have changed from 16.73 percent to 5.28 percent for SeAH, 32.24

percent to 9.77 percent for NEXTEEL, and 24.49 percent to 7.53 percent for the non-examined

companies.[187]  Upon a final and conclusive decision in this litigation, Commerce will instruct

---

[187] *See* Memoranda, "Analysis of Data Submitted by NEXTEEL Co., Ltd. for the Draft Redetermination Results of

U.S. Customs and Border Protection to liquidate appropriate entries for the September 1, 2015,

through August 31, 2016, POR consistent with these final results of redetermination.

7/16/2021

X

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

---

the 2016-2017 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea," dated June 4, 2021, unchanged for these Final Results of Redetermination; and "Analysis of Data Submitted by SeAH Steel Co. for the Final Redetermination Results of the 2016-2017 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea," dated concurrently with this document.