UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| Plaintiff, | ) |
| and | ) |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD., AND AJU BESTEEL CO., LTD., | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| HYUNDAI STEEL COMPANY, AND ILJIN STEEL CORPORATION | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 19-00086 |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., TMK IPSCO, VALOUREC STAR, L.P., AND WELDED TUBE USA INC. | ) |
| Defendant-Intervenors. | ) |

COMMENTS OF
SEAH STEEL CORPORATION
ON COMMERCE'S JULY 16 REDETERMINATION

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

August 13, 2021

Table of Contents

Page

ARGUMENT ................................................................................................. 2

    A.   Particular Market Situation................................................................ 2

    B.   U.S. Affiliate's General and Administrative Expenses ...................... 3

    C.   Inventory-Valuation Losses............................................................... 6

CONCLUSION ............................................................................................. 13

Table of Authorities

Page

COURT DECISIONS

*SeAH Steel Corporation v. United States,*
Slip Op. 21-043 (CIT April 14, 2021)................................................................... 2, 3, 6, 9


STATUTES

19 U.S.C. § 1677a(d)................................................................................................. 5


ADMINISTRATIVE DECISIONS

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of the*
*Antidumping Duty Administrative Review,*
75 Fed. Reg. 34980 (June 21, 2010) ............................................................... 12

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea,*
86 Fed. Reg. 35060 (July 1, 2021) ................................................................... 4

*Certain Welded Stainless Steel Pipes from the Republic of Korea: Final Results of*
*Antidumping Duty Administrative Review,*
75 Fed. Reg. 27987 (May 19, 2010) ............................................................... 12

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION,<br><br>   Plaintiff,<br><br>   and<br><br>HUSTEEL CO., LTD., NEXTEEL CO., LTD., AND AJU BESTEEL CO., LTD.,<br><br>   Consolidated Plaintiff,<br><br>   and<br><br>HYUNDAI STEEL COMPANY, AND ILJIN STEEL CORPORATION<br><br>   Plaintiff-Intervenors,<br><br>   v.<br><br>UNITED STATES,<br><br>   Defendant,<br><br>   and<br><br>UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., TMK IPSCO, VALOUREC STAR, L.P., AND WELDED TUBE USA INC.<br><br>   Defendant-Intervenors. | Consol. Court No. 19-00086 |

COMMENTS OF SEAH STEEL CORPORATION
ON COMMERCE'S REDETERMINATION ON REMAND

   This brief is submitted on behalf of SeAH Steel Corporation ("SeAH") to comment on the redetermination on remand submitted to the Court by the Department of Commerce on July 16, 2021.[1]

---

[1] *See* Commerce's June 30, 2021, Final Results of Redetermination Pursuant to Court Remand (Public Remand Record Document ("PRRD") 21). It should be noted that following Commerce's original filing of its Redetermination with this Court on June 30, 2021, a corrected version of the Redetermination was filed on July 9, 2021 (PRRD-24). Subsequently, a second corrected version of the Redetermination was filed on July 16, 2021 (ECF No. 118) (hereinafter "Redetermination"). The second corrected version was

*(footnote continued on following page)*

ARGUMENT

   *A.   Particular Market Situation*

   The Court's April 14 decision held that Commerce's initial determination that Korean prices for hot-rolled coils were distorted by a particular market situation ("PMS") was not supported by substantial evidence on the record, and the Court therefore remanded the matter for Commerce to further explain or reconsider its particular market situation determination and adjustment.[2]  In its Redetermination, Commerce concluded, "under respectful protest," that "the record evidence is insufficient to sustain an affirmative PMS finding," and that "any interplay of these factors also is insufficient in this instance for Commerce to make an affirmative PMS determination and PMS adjustment."[3]

   As explained at length in our previous submissions to the Court, we fully agree that Commerce's PMS finding was not supported by substantial evidence on the record.[4]  And, while we believe that there were additional legal errors in Commerce's analysis,[5] those errors have now been rendered moot by Commerce's determination that the evidence does not support its previous PMS finding.  The Court should, therefore, affirm the

---

*(footnote continued from previous page)*

submitted after the administrative record of this remand proceeding had been filed with this Court.  Therefore, the second corrected version of Commerce's Redetermination was not included in the Remand Record Index filed with this Court on July 14, 2021 (ECF No. 117).  These comments refer to the second corrected version of Commerce's Redetermination, which was filed on July 16, 2021 (ECF No. 118).

[2] *See SeAH Steel Corporation v. United States,* Slip Op. 21-043, at 51-52 (CIT April 14, 2021).

[3] *See* Redetermination at 4-5 (ECF No. 118).

[4] *See, e.g.,* SeAH's October 18, 2019, Initial Rule 56.2 Brief at 21-27.

[5] *See, e.g., id.* at 22-24, and 27-28.

Redetermination's decision to recalculate the dumping margins for SeAH without any

PMS adjustment.

### B.   U.S. Affiliate's General and Administrative Expenses

In its April 14 decision, this Court held that the statute does not permit Commerce to

deduct the portion of the general and administrative ("G&A") expenses of SeAH's U.S.

affiliate that were allocated to imported pipe as part of the adjustment for further

manufacturing costs.[6]  In its Remand Determination, Commerce has attempted to evade

this holding by claiming that the portion of G&A expenses allocated to imported pipe

should be considered selling expenses.[7]  In effect, the Redetermination asserts that the

---

[6] *See* Slip Op. 21-043 at 69 ("The statute authorizes Commerce to reduce the constructed export price by 'the cost of any further manufacture or assembly (including *additional* material and labor)....' 19 U.S.C. § 1677a(d)(2) (emphasis added). The cost of production of the imported OCTG pipe is not a cost incurred for further manufacture.  Commerce's application of PPA's G&A expense ratio to the cost of production of the imported OCTG pipe is not permitted by the statute.  The court concludes that Commerce's calculation of further manufacturing cost is not in accordance with the law.").

[7] *See* Redetermination at 59 (ECF No. 118).

Commerce's Remand Determination also asserts that SeAH contended that no G&A expenses may be included in the adjustment for further manufacturing costs that is permitted by the statute.  *Id.* at 58.  That assertion is false.  In fact, SeAH's comments on Commerce's draft redetermination explicitly agreed that Commerce could allocate a portion of the G&A expenses to further-manufacturing activities and deduct *that portion* from Constructed Export Price.  As SeAH explained,

> While it may be permissible to allocate a portion of the G&A expenses to further-manufacturing activities, only the portion that can be properly allocated to the further-manufacturing activities can be classified as part of the adjustment for further manufacturing and deducted from constructed export price.

> As a final matter, it should be noted that the inclusion of a portion of the G&A expenses in the further-manufacturing cost does not transform the G&A expenses into manufacturing costs.  The Department's consistent practice has been to treat G&A expenses as part of the cost of production of merchandise, not as part of the cost of manufacture.  And, G&A expenses are included in the calculation of

*(footnote continued on following page)*

decision to allocate a portion of the G&A expenses to the imported products transforms the allocated G&A expenses into selling expenses.

That assertion is, however, contrary to Commerce's established practice of distinguishing between G&A expenses and selling expenses.  For example, in a recent determination in a review involving *Heavy-Walled Rectangular Pipe from Korea*, Commerce rejected an allocation that would have assigned a portion of the salary of the respondent company's Chief Executive Officer to indirect selling expenses ("ISE").  As Commerce explained,

> With regards to the CEO salary, we agree with the petitioner that this expense should not be allocated equally between ISE and G&A expenses. DOSCO argues that the CEO salary was reasonably allocated because the CEO oversees both the selling and administrative functions of the company. However, in addition to the selling and administrative functions, the CEO also oversees the production and investment functions, as well as the general operations of the company. Likewise, we agree with the petitioner that the nature most of the expenses included under "Service fees" relates to the general operations of the company as a whole. Consequently, we find it appropriate to allocate the CEO salary and certain "Service fees" completely to G&A.[8]

Under that decision, expenses incurred for activities that relate to "the production and investment functions, as well as the general operations of the company," are classified as

---

*(footnote continued from previous page)*
> the further manufacturing adjustment only because the Department long ago decided that the adjustment for further-manufacturing costs should be determined at a level equivalent to cost of production, and thus include both G&A expenses and financial expenses.

SeAH Comments on Draft Redetermination, June 14, 2021, at 5 (PRRD-16).

[8] *See Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea*, 86 Fed. Reg. 35060 (July 1, 2021), and accompanying Issues and Decision Memorandum at 46 (Comment 6).

G&A expenses, and not as selling expenses.  Allocation does not alter the nature of those expenses.

Finally, Commerce's Redetermination argues that a failure to deduct the G&A expenses allocated to the imported pipe would "improperly" require "Commerce to ignore a significant portion of G&A expenses."[9]  In other words, Commerce asserts that it is authorized and required by statute to deduct any and all expenses incurred in the United States from Constructed Export Price.  But that claim cannot be reconciled with the statute, which explicitly describes the items that may be deducted from Constructed Export Price, and does not include G&A expenses incurred by the U.S. affiliate among them.[10]  The Redetermination's insistence on deducting G&A expenses that do not relate to further-

---

[9] *See* Redetermination at 57 (ECF No. 118).

[10] Thus, 19 U.S.C. § 1677a(d) provides that Commerce may deduct the following items from Constructed Export Price:

> (1)  the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise…
>
> > (A)  commissions for selling the subject merchandise in the United States;
> >
> > (B)  expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
> >
> > (C)  any selling expenses that the seller pays on behalf of the purchaser; and
> >
> > (D)  any selling expenses not deducted under subparagraph (A), (B), or (C);
>
> (2)  the cost of any further manufacture or assembly (including additional material and labor).…

Expenses that do not fall under one of the listed categories may not be deducted from constructed export price.

manufacturing activities from Constructed Export Price is contrary to the statute, and should not be sustained.

C.  *Inventory-Valuation Losses*

In its April 14 decision, the Court instructed Commerce to reconsider its decision to include inventory-valuation "losses" in its calculation of SeAH's cost of production.  As the Court explained, "Commerce did not cite record evidence demonstrating that the inventory valuation losses became realized costs, which it seems would occur only if the raw materials and work-in-process were sold."[11]  In reaching that decision, the Court also noted that, "Contrary to assertions by Maverick and Tenaris that SeAH attempted to use the lower market value to calculate its cost of production, Commerce confirmed that the periodic adjustments for inventory losses did not alter the purchase price of consumed raw materials and work-in-process used in calculating the cost of production."[12]

In its Redetermination, Commerce contended that the inventory-valuation losses are "actual expenses" because they are reflected in SeAH's audited income statement and in the reconciliation between SeAH's normal accounting system and the audited financial statements that was provided in SeAH's questionnaire responses.[13]  Commerce also attempted to refute SeAH's contention that the inclusion of inventory-valuation losses in the calculated costs resulted in a double-counting of SeAH's actual cost of materials. However, in responding to SeAH's argument, Commerce actually conceded that the losses in question are not realized, and that its inclusion of the Losses in its cost calculation was based on a demonstrably false assumption.

---

[11] *See* Slip Op. 21-043 at 74-75.

[12] *Id.* at 74.

[13] See Redetermination at 26-27 (ECF No. 118).

In this regard, SeAH's comments on Commerce's draft redetermination provided the following example to demonstrate how Commerce's calculations double-counted the actual costs:

> Suppose, for example, that SeAH purchased hot-rolled coils in November 2016 at a price of $1,000 per ton. Suppose, further that the market price for hot-rolled coils fell to $900 per ton as of December 31. In such circumstances, SeAH is required, under Korean accounting principles, to write-down the value of any hot-rolled coils remaining in inventory as of December 31 by $100 per ton to reflect the market price of $900, and it is also required to record an inventory-valuation "loss" equal to the amount of that write-down….
>
> {B}ecause SeAH's cost calculations (in its normal accounting system and in its questionnaire responses) reflect the full historical cost of the raw-materials and work-in-process inventories used in production, the reported costs reflect the full cost of the inventories used in production, including any inventory-valuation adjustments and inventory-valuation losses recorded for those inventories before the inventories were used.
>
> Thus, if SeAH purchased coils at a price of $1,000 per ton in November 2016 and then used those coils in production in 2017, its cost calculations would reflect the actual $1,000 per ton purchase price for the coils, even if the market price for the coils had fallen after they were purchased. If the value of the raw-materials inventory was written down to a market price of $900 per ton at the end of 2016, and if SeAH therefore recorded an inventory-valuation loss of $100 per ton at year-end 2016, the cost calculations would still use a value of $1,000 per ton for the coils. In such circumstances, the $1,000 per ton value used in SeAH's calculations already equals the sum of the reduced inventory value ($900 per ton) and the inventory valuation "loss" ($100 per ton). Consequently, SeAH's cost calculations necessarily capture both the adjusted inventory values and the "loss" recorded as a result of the adjustment to the inventory values. On the other hand, by insisting that the amount of the inventory valuation "loss" be added to SeAH's costs, the Department has effectively assigned a cost of $1,100 per ton to the coils used in production — that is, the $1,000 per ton original cost used in SeAH's cost calculations plus the $100 per ton year-end inventory adjustment. That result is contrary to the evidence on the record and fundamentally inaccurate.[14]

---

[14] *See* SeAH's Comments on Draft Redetermination, June 14, 2021, at 8-10 (PRRD-16).

SeAH recognized that other companies might account for inventory-valuation losses differently and that it might be appropriate, in such cases, to make an adjustment for inventory-valuation losses.[15]  However, because SeAH's cost calculations used the original historical cost for the purchased materials, and did not use the lower post-write-down value, such an adjustment for SeAH would necessarily double-count the amount of the inventory-value loss.

Commerce's Redetermination responded to SeAH's argument regarding this double-counting as follows:

> We disagree with SeAH that by including both the material costs consumed during the year and the net year-end adjustment of the cost of materials that remain in the inventory (*i.e.*, materials that have not been consumed) under Korean GAAP Commerce double counts costs. Rather, the net year-end adjustment is comprised of two parts: (1) the beginning of the year reversal of the prior year end adjustment (a gain if raw materials were written down at the prior year end), which offsets the historical costs of the raw materials that were in inventory at the prior year end, but enter production during the current year; and (2) the end of the year adjustment to record any impairments in the value of raw material inventory on hand at year-end (*i.e.*, raw materials not consumed during the year). *Thus, the reversal that SeAH makes to return inventory on hand to historical cost is effectively a "gain" (or reversal of the provision) and would act to offset the fact that those materials entered production at their historical costs.* The loss taken on the value of raw materials still on hand at year-end is recorded separately. To simplify these accounting transactions, we can continue with SeAH's example, where the raw materials in inventory at year end had a historical cost of $1,000 per ton but were found to have a

---

[15] *Id.,* at 10, n.16 ("We agree that an adjustment for the inventory-valuation loss would be appropriate if SeAH's cost calculations had reflected only the lower cost of the raw-material and work-in-process inventory after the inventory-loss adjustment was made. In other words, if (to return to the example above) SeAH calculated its production costs using the $900 per ton post write-down inventory value for the hot-rolled coils, then it would be appropriate to increase the reported costs by $100 per ton to ensure that the reported costs fully reflected the actual historical cost of $1,000 per ton for the hot-rolled coils. But that is not the situation in this case. Instead, because SeAH is already using the actual historical cost of $1,000 per ton for the hot-rolled coils in its reported costs, no further adjustment is appropriate.") (PRRD-16).

market value of only $900 per ton. Thus, under GAAP, the company was required to recognize a $100 inventory valuation loss. The entry is recorded as a loss of $100 on the income statement (debit entry), and a $100 reduction in inventory value on the balance sheet (credit entry). At the beginning of the following year, this adjustment is reversed, so now in the new fiscal year, there is an inventory valuation gain of $100 (credit entry) and the inventory value on the balance sheet is increased by $100 (debit entry), *i.e.*, returned to historical cost. *As a result, when the raw material is consumed in the new fiscal year at its historical cost of $1000 per ton, it is offset by the $100 inventory valuation gain and, as a result, reflects the net market value of $900.* At the end of that year, assume the raw material inventory on hand is re-evaluated and written down to market, reduced by $50. The net year end adjustment is $50 ($50=$100-$50). Thus, we disagree that there is any double-counting of expenses by picking up the net year end adjustment under Korean GAAP.[16]

This explanation depends, critically, on the assumption that the cost of materials used in SeAH's cost calculations is reduced by the amount of the inventory-valuation loss, and that it is therefore necessary to add the inventory-valuation loss to SeAH's costs in order to capture the full costs of raw materials.[17]  But that assumption is contrary to the evidence on the record, to Commerce's own initial determination, and to this Court's April 14 decision, which explicitly held that SeAH captured the full historical cost of materials in its cost calculations.[18]

---

[16] *See* Redetermination at 65 (emphasis added) (ECF No. 118).

[17] *Id.* ("As a result, when the raw material is consumed in the new fiscal year at its historical cost of $1000 per ton, it is offset by the $100 inventory valuation gain and, as a result, reflects the net market value of $900.").

[18] *See* Slip Op. 21-043 at 74-75.  *See also* Issues and Decision Memorandum for the Final Results of the 2016-2017 Administrative Review of the Antidumping Duty Order on Certain Oil Country Tubular Goods from the Republic of Korea, at 82 (May 17, 2019) ("{T}he adjustments are recorded to separate contra-inventory accounts which, as SeAH pointed out, do not impact the item-specific raw material and WIP values that are ultimately used to calculate product-specific costs.") (Public Record ("PR") 351).

In fact, Commerce's treatment of this issue reflects a fundamental misunderstanding of the actual accounting for the inventory-valuation losses.  The actual accounting entries are as follows:

1.  When SeAH purchases raw materials, it records the receipt of the materials into inventory as a *debit* to its raw-material inventory in account 1120601.[19]

2.  When SeAH uses raw materials in production, it records the consumption of the materials from inventory as a *credit* to its raw-material inventory in account 1120601.  This credit is made at the average inventory value for the raw material (based on previously recorded beginning inventory and purchases during the period).[20]

3.  When SeAH records an inventory-valuation loss at the end of an accounting period, that loss is recorded as a *credit* to the separate account for "raw material-allowance for valuation loss on inventory" in account 1120603.[21]  The amounts recorded in account 1120603 do not affect the raw-materials inventory values

---

[19] *See, e.g.,* SeAH's February 7. 2018, Section A Response, Appendix A-7-C (PR-53, Confidential Record ("CR") 85); SeAH's August 3, 2018, Submission at 11 and Appendix S2D-8 (PR-228, CR-400).

[20] *See, e.g.,* SeAH's February 27, 2018, Section D Response at 13 and 20 (PR-92, CR-128).

[21] *See* SeAH's February 7. 2018, Section A Response, Appendix A-7-C (PR-53, CR-85); SeAH's August 3, 2018, Appendix S2D-8 (PR-228, CR-400).

It should be noted that, when SeAH's individual account balances are summarized in its audited financial statements, the amount shown on the balance sheet for raw-materials inventories reflects the net of the balances in accounts 1120601 and 1120603.  As a result, the *net* raw materials asset value shown in the balance sheet reflects not only the historical cost of the inventories recorded in account 1120601, but also any reduction in inventory values recorded as credits to account 1120603.  That balance-sheet presentation does not, however, mean that any reduction in inventory values recorded through credits to account 1120603 would affect the historical-cost values recorded in account 1120601 that are used in SeAH's cost calculations.

recorded in the account for raw materials inventory (account 1120601), and they are not used in the calculation of the cost of manufacture in SeAH's normal accounting system or in the calculations submitted in SeAH's questionnaire responses.[22]

4. If the inventory-valuation loss is reversed at the start of the next period (as Commerce has supposed), that reversal is recorded as a *debit* to the separate account for "raw material-allowance for valuation loss on inventory" in account 1120603. The reversal of the inventory-valuation loss does not affect the raw-materials inventory values recorded in the account for raw materials inventory (account 1120601), and it does not affect the calculation of the cost of manufacture in SeAH's normal accounting system or in the calculations submitted in SeAH's questionnaire responses.[23]

In short, the entries to record inventory-loss adjustments are made only to an account (account 1120603) that is used only to record those adjustments and that is *not* used to calculate the costs in SeAH's normal accounting system or in its questionnaire responses. Instead, SeAH's cost calculations only consider the costs recorded in its raw-material inventory account (account 1120601), and those costs are not affected by the inventory-valuation adjustment.

---

[22] *See* SeAH's August 3, 2018, Submission at 11 (PR-228, CR-400).

[23] *See id.* (PR-228, CR-400).

In this regard, it should be noted that the accounting for semi-finished goods is similar, but uses different accounts. The actual costs for semi-finished goods are recorded in account 1120301. The inventory-valuation adjustments for semi-finished goods are recorded in account 1120303. *See* SeAH's February 7. 2018, Section A Response, Appendix A-7-C (PR-53, CR-85); SeAH's August 3, 2018, Appendix S2D-8 (PR-228, CR-400).

In these circumstances, Commerce's assertion that the inventory-valuation loss recorded in one period would be reversed at the end of the next period may well demonstrate (as the Court had suggested) that the losses are not "real" and that they are not "realized."[24]  But, it does not mean that those adjustments have any effect on the costs calculated by SeAH's normal cost accounting system.  Instead, as Commerce itself found in its initial determination, and as this Court has confirmed, SeAH's normal cost calculations reflect only the actual historical cost for inventories of raw materials and semi-finished goods that are used in production.  The costs recorded in SeAH's normal cost accounting system and reported in SeAH's questionnaire responses are not reduced by the write-downs of inventory values that give rise to the inventory-loss adjustment.  Adding the inventory-valuation losses to the costs reported by SeAH therefore results in an improper double-counting of SeAH's costs.

In fact, Commerce has previously recognized that, because SeAH's cost calculations use historical purchase costs for materials without reflecting the inventory-valuation adjustment reflected in the financial statements, it is not appropriate to adjust the reported costs to include the inventory-valuation loss.  In particular, in the 2007-2008 review of Circular Welded Non-Alloy Pipe ("CWP") from Korea, Commerce addressed the same issue concerning inventory-valuation losses and concluded that, "because SeAH did not actually write down its inventory values and continued to use the actual inventory historical costs in calculating production costs in its normal books and records, we find that

---

[24] *See* Redetermination at 65 ("{T}he net year-end adjustment is comprised of … the beginning of the year reversal of the prior year end adjustment (a gain if raw materials were written down at the prior year end), which offsets the historical costs of the raw materials that were in inventory at the prior year end, but enter production during the current year….") (ECF No. 118).

SeAH's reported costs reasonably reflect the cost of producing and selling merchandise under consideration."[25]  Since SeAH's reported costs "reflected the higher historical costs of unwritten down raw materials and WIP," Commerce concluded that "including the LCM adjustment in the reported costs would result in the overstatement of costs."[26] Commerce's failure to follow that precedent in the present case reflects a clear error as a matter of both law and accounting.

CONCLUSION

For the foregoing reasons, we respectfully request that this case be remanded, once more, to Commerce for reconsideration of (1) the treatment of PPA's G&A expenses in the U.S. price calculation, and (2) the treatment of inventory-valuation losses in the calculation of SeAH's cost of production.

Respectfully submitted,

/s/Jeffrey M. Winton

Jeffrey M. Winton
Michael Chapman
Amrietha Nellan
Vi N. Mai

---

[25] *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of the Antidumping Duty Administrative Review*, 75 Fed. Reg. 34980 (June 21, 2010), and accompanying Issues and Decision Memorandum at 17-19.

[26] *See id.  See also Certain Welded Stainless Steel Pipes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 27987 (May 19, 2010), and accompanying Issues and Decision Memorandum at cmt. 2.

WINTON & CHAPMAN PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

August 13, 2021

<u>Certificate of Compliance</u>

 Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 3,945 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.


        /s/Jeffrey M. Winton      


August 13, 2021