# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

|  |  |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| Plaintiff, | ) |
|  | ) |
| AND | ) |
| NEXTEEL CO., LTD., *ET AL.,* | ) |
| Consolidated Plaintiffs, | ) |
|  | ) |
| AND | ) |
| ILJIN STEEL CORPORATION, *ET AL.,* | ) |
| Plaintiff-Intervenors | ) |
| V. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
|  | ) |
| AND | ) |
| UNITED STATES STEEL CORPORATION, *ET AL.,* | ) |
|  | ) |
| Defendant-Intervenors. | ) |
|  | ) |

Consol. Court. No. 19-00086

**NONCONFIDENTIAL VERSION**

Proprietary Information Removed from Brackets on Pages 12, 26-27

## UNITED STATES STEEL CORPORATION'S COMMENTS IN PARTIAL OPPOSITION TO REMAND REDETERMINATION

Thomas M. Beline
Myles S. Getlan
James E. Ransdell
CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
(202) 567-2300

*Counsel to United States Steel Corporation*

August 13, 2021

# Table of Contents

Page

I. ARGUMENT ...........................................................................................................3

    A. Standard of Review ........................................................................................3

    B. Commerce's PMS Determination Misconstrues the Court's *Remand Order*, Contravenes the Statute, Is Otherwise Unsupported by Substantial Evidence, and Should Be Remanded .......................................................4

        1. Commerce Misconstrued the Terms of the Court's *Remand Order* to Command an Unlawful Result ................................................4

        2. There Is No Legal Basis for Commerce to Substitute the Court's Fact-Finding for Its Own ...........................................................8

        3. Commerce's *Remand Redetermination* Is Unsupported by Substantial Evidence Because Commerce Explicitly Declined to Evaluate the Entire Administrative Record ................................11

        4. Commerce's Conclusions Concerning Government Restructuring and the Impact of Overcapacity on the Korean Market Specifically Are Unsupported by Substantial Evidence ................................13

            a. Contrary to Commerce's Conclusion, OCTG Producers Actually Participated in Korean Government Restructuring During the Period of Review ...........................................................................14

            b. Contrary to Commerce's Conclusion, Overcapacity Caused Downward Pricing Pressures in the Korean Market; Contrary Evidence Does Not Exist ...................................................18

            c. Commerce's Creation of a New Restriction Out of Whole Cloth Contravenes the Statute, Prior Decisions of this Court, and Commerce's Heretofore Consistent Practice ....................................20

    C. Commerce Misinterpreted the Federal Circuit's *Dillinger* Opinion, and its Allocation of NEXTEEL's Costs Is Not in Accordance with Law ......................24

        1. After Defending its Treatment of NEXTEEL's Non-Prime Costs Before the Court, Commerce Summarily Reversed Itself on Remand .....................................................................................24

        2. *Dillinger* Does Not Compel the Result Commerce Reached on Remand; Nor Does the Statute Permit It; the Cost of Producing Scrap is a Cost of Prime Production ........................................25

II. CONCLUSION ....................................................................................................29

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B)(i).................................................................3, 9

19 U.S.C. § 1677(15)(C)...............................................................................21

19 U.S.C. § 1677(15).............................................................................21, 23

19 U.S.C. § 1677b(f)......................................................................................25

19 U.S.C. § 1677b(a)(4)(e) ...........................................................................10

19 U.S.C. § 1677b(e) ...........................................................................8, 22-23

19 U.S.C. § 1677b(f)(1)(A)....................................................................2, 26

Court Decisions

*Ad Hoc Shrimp Trade Action Comm. v. United States,* 515 F.3d 1372
(Fed. Cir. 2008).............................................................................................5

*Altx Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004).........................5

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984)........3, 12

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003).......5-6

*Cary v. Curtis*, 44 U.S. 236 (1845) ..........................................................3-4

*Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d
1287 (Ct. Int'l Trade 2020) ..........................................................................7

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d
1367 (Fed. Cir. 2012).....................................................................................6

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467
U.S. 837 (1984)......................................................................................3, 10

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ....................................3

*Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356
(Ct. Int'l Trade 2018)...................................................................................28

*Dong-A Steel v. United States*, 475 F. Supp. 3d 1317 (Ct. Int'l Trade 2020) ........................................................................................................21

*Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) ............................. *passim*

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ................................3

*Jinxiang Hejia Co. v. United States*, 35 C.I.T. 1190 (2011) ....................................7

*Kearns v. Chrysler Corp.*, 32 F.3d 1541 (Fed. Cir. 1994) ...................................3, 7, 11

*Marbury v. Madison*, 5 U.S. 137 (1803) ........................................................3

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983) ...............................................................21

*Nakornthai Strip Mill Public Co. Ltd. v. United States*, 587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) ....................................................................4

*Nippon Steel Corp. v. ITC*, 345 F.3d 1379 (Fed. Cir. 2003) ..........................................6

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ...........................................2

*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371 (Fed. Cir. 2007) ........................................................................21

*Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317 (Fed. Cir. 2012) .........................................9

*POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) ............................................5

*Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337 (Ct. Int'l Trade 2015) .............................................4

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807 (Fed. Cir. 1992) .......................................................10

*Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (Ct. Int'l Trade 1999) ....................................................................7

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................3, 13-14

*Usinor Sacilor v. United States*, 1999 U.S. App. LEXIS 20070 (Fed. Cir. 1999) ........................................................................6

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435
U.S. 519 (1978)...................................................................................................................6


Administrative Determinations

*Certain Oil Country Tubular Goods from the Republic of Korea,* 84 Fed.
Reg. 24,085 (May 24, 2019) ........................................................................... 14, 27-28

*Certain Cold Rolled Steel Flat Products from the Republic of Korea*, 85
Fed. Reg. 41,955 (July 13, 2020)..................................................................................17

*Certain Corrosion-Resistant Steel Products from Korea*, 84 Fed. Reg.
10,784 (Mar. 22, 2019) .................................................................................................21

*Large Diameter Welded Pipe from the Republic of Korea*, 84 Fed. Reg.
6,374 (Feb. 27, 2019)....................................................................................................21


Other Legislative Materials

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504(a)
129 Stat. 362 ..................................................................................................................8

S. Rept. 114-45 (2015) ...................................................................................................8

Senate Finance C'tee Rpt. 114-45 (2015)....................................................................23

Statement of Administrative Action, H.R. Rep. 103-412 (1994),
reprinted in 1994 U.S.C.C.A.N. 4040, 4172 ........................................................ 26- 27

161 Cong. Rec. H4655, H4690, H4695, H4697 (June 25, 2015) .............................. 8-9

161 Cong. Rec. S2897, S2900, S2902 (May 14, 2015)..................................................9

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE**

| | |
|---|---|
| SEAH STEEL CORPORATION, )<br><br>Plaintiff, )<br><br>AND )<br><br>NEXTEEL CO., LTD., *ET AL.,* )<br><br>Consolidated Plaintiffs, )<br><br>AND )<br><br>ILJIN STEEL CORPORATION, *ET AL.,* )<br><br>Plaintiff-Intervenors )<br><br>V. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>AND )<br><br>UNITED STATES STEEL CORPORATION, *ET AL.,* )<br><br>Defendant-Intervenors. )<br>) | Consol. Court. No. 19-00086<br><br>**NONCONFIDENTIAL VERSION**<br><br>Proprietary Information Removed from Brackets on Pages 12, 26-27 |

## UNITED STATES STEEL CORPORATION'S COMMENTS IN PARTIAL OPPOSITION TO REMAND REDETERMINATION

This proceeding returns to the Court after the U.S. Department of Commerce, in respectful protest, reversed its underlying administrative determinations by reasoning that the Court did not give it a choice to reach its preferred conclusions concerning two different aspects of the Court's decision in *SeAH Steel Corp. v. United States*, Consol. Ct. No. 19-00086, Slip Op. 21-43, ECF Doc. No. 104 (Apr. 14, 2021) (the "*Remand Order*").

With regard to reversing its long-held finding that a particular market situation ("PMS") exists in Korea that distorts the costs of materials and fabrication to produce oil country tubular

goods ("OCTG"), the *Remand Redetermination*, *see* ECF No. 118-1 (July 16, 2021) (P.R.R. 21),[1]

misconstrued the Court's *Remand Order*, *see, e.g.*, *Remand Redetermination* at 40, 42, 44

("Commerce has no authority to overrule the Court."); violated the statutory framework by

replacing the Court's assessment of the facts for that of Commerce, *see, e.g.*, *Nippon Steel Corp.*

*v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006) ("Congress placed responsibility for the

LTFV determination with industry experts at the Department of Commerce."); failed to address

the entirety of the administrative record, reasoning that the *Remand Order* precluded

consideration of substantial swathes of that record; and otherwise ignored evidence that

undermined certain conclusions about the impacts of government restructuring and overcapacity

on HRC prices in Korea.

Commerce also acted contrary to law in treating the Court's order to reconsider its

reallocation of NEXTEEL's non-prime production costs in light of *Dillinger* as compelling a

particular result. *Dillinger* concerned a materially different situation, and 19 U.S.C. §

1677b(f)(1)(A) absolutely permits Commerce to modify NEXTEEL's reported costs to account

for the unrecovered cost of producing scrap, *i.e.*, non-prime OCTG, as a cost of producing the

intended product, *i.e.*, subject OCTG. Commerce's approach on remand, by contrast, violates

the statutory prerequisites that reported costs <u>must</u> be GAAP compliant and reasonably reflect

the costs associated with production and sale of subject merchandise. 19 U.S.C. §

1677b(f)(1)(A).

---

[1] Citations to the record take the form "C.R." and "P.R." for the confidential and public versions of the administrative record, *see* ECF Doc. Nos. 20-1, 20-2, and "C.R.R." and "P.R.R." for the confidential and public versions of the remand record, *see* ECF Doc. Nos. 117-1, 117-2.

Given these errors, the Court should again remand Commerce's *Remand Redetermination* so that Commerce can fulfill the statutory mandates and not merely defer to the Court's supplantation of Commerce as administrator of the antidumping duty laws.

## I.     ARGUMENT

### A.     Standard of Review

The Court must remand any redetermination on remand that is ""unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The Federal Circuit has long held that substantial evidence requires that the agency's determination "tak{e} into account the *entire record*, including whatever fairly detracts from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (emphasis supplied); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").  Nevertheless, a court undertaking substantial evidence review is not a venue in which parties may retry factual issues *de novo*.  *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1548 (Fed. Cir. 1994).

Whereas Commerce's reasonable interpretation of an ambiguous statutory provision is due deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–3 (1984), Commerce's understanding of the meaning of a judicial opinion is owed no such deference.  Interpretation of judicial opinions is inherently the "province and duty" of the judiciary, *see Marbury v. Madison*, 5 U.S. 137, 177 (1803); *Cary* v. *Curtis*, 44 U.S. 236

(1845) (Story, J., dissenting) (if the "right to interpret the laws" is taken away from courts and "confided to an executive functionary," then "the judicial power, designed by the Constitution to be the final and appellate jurisdiction to interpret our laws, is superseded in its most vital and important functions"), such that *de novo* review applies. In addition, "Commerce's results in its redetermination pursuant to court remand are also reviewed for 'compliance with the court's remand order.'" *Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337, 1341 (Ct. Int'l Trade 2015) (quoting *Nakornthai Strip Mill Public Co. Ltd. v. United States*, 587 F. Supp. 2d 1303, 1306 (Ct. Int'l Trade 2008)).

B. **Commerce's PMS Determination Misconstrues the Court's *Remand Order*, Contravenes the Statute, Is Otherwise Unsupported by Substantial Evidence, and Should Be Remanded**

 1. **Commerce Misconstrued the Terms of the Court's *Remand Order* to Command an Unlawful Result**

The Court held that Commerce's finding was unsupported by substantial evidence, and remanded "for further explanation or reconsideration consistent with this opinion." *Remand Order* at 52. This was a broad remand order, but on remand, Commerce interpreted the Court's order to only allow it to continue to find a PMS in Korea if other record evidence not considered, reweighed, and rejected by the Court in part or in whole established the existence of a PMS. *See, e.g.*, *Remand Redetermination* at 12-13 ("we recognize that the Court has found the evidence of a PMS to be insufficient in this proceeding….the additional evidence on the record…which the Court has not previously addressed and rejected…is insufficient, on its own, to sustain a finding of a PMS within the analytical framework that the Court articulated in its opinion in this case."); Draft Remand Results at 10 (same) (P.R.R. 7). Thus, Commerce solicited the parties' comments as to (1) whether the record contained documents relevant to the PMS analysis that "were not already considered and rejected by the Court;" (2) the relevance of the Federal Circuit's decision

in *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020); and (3) whether Commerce should consider Korean government restructuring efforts in its PMS analysis on remand. *See* Letter from Commerce, "Participating Parties' Comments on a Particular Market Situation" (May 5, 2021) at 1 (P.R.R. 1).

U. S. Steel identified this misconstruction of the Court's *Remand Order* both in its response to Commerce's request and in U. S. Steel's comments upon remand. Letter from U. S. Steel, "United States Steel Corporation's Comments on Draft Remand Redetermination" (June 14, 2021) ("*USS Remand Comments*") at 7-9 (C.R.R. 10); *see also* Letter from U. S. Steel, "Updated Response to Commerce's Request for Participating Parties' Comments on a Particular Market Situation" (May 13, 2021) ("*USS Updated PMS Comments*") at 2-3 (P.R.R. 6). As U. S Steel explained, Commerce should not construe the Court's *Remand Order* as directing a particular verdict because that would be unlawful. *USS Remand Comments* at 2-3, 7-9 (C.R.R. 10). But Commerce did not address U. S. Steel's argument. Instead, Commerce summarily stated that "U. S. Steel's comments… reargue the issue of a PMS beyond addressing the merits of Commerce's Draft Results of Redetermination." *Remand Redetermination* at 36.

Contrary to Commerce's summary conclusion, U. S. Steel explained why Commerce's misconstruction in the draft remand was invalid as "a narrow remand is not legally permissible under the USCIT's standard of review." *USS Remand Comments* at 7-8 (C.R.R. 10) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 515 F.3d 1372, 1383 (Fed. Cir. 2008) ("the Court of International Trade is precluded by statute from ever outright reversing a decision by Commerce . . . when reviewing countervailing duty and antidumping duty proceedings. Rather, at most it can simply remand for further consideration consistent with its decision.") (citing *Altx Inc. v. United States*, 370 F.3d 1108, 1111 n.2 (Fed. Cir. 2004)); *see also, e.g., Am. Silicon*

*Techs. v. United States*, 334 F.3d 1033, 1039 (Fed. Cir. 2003) ("On remand, the Federal Circuit generally disfavors limits that "prevent Commerce from undertaking a fully balanced examination."); *Nippon Steel Corp. v. ITC*, 345 F.3d 1379, 1381-82 (Fed. Cir. 2003) ("Thus, to the extent the Court of International Trade engaged in refinding the facts (*e.g.*, by determining witness credibility), or interposing its own determinations on causation and material injury itself, the Court of International Trade, we hold, exceeded its authority.")); *Usinor Sacilor v. United States*, 1999 U.S. App. LEXIS 20070 at *10, *12 (Fed. Cir. 1999) (nonprecedential opinion) ("This standard of review does not allow a reviewing court to substitute its judgment for that of Commerce….the trial court evaluated and weighed the evidence in order to make its own determination whether the subsidies were likely to benefit foreign subsidiaries. That was error."). Therefore, there was no lawful basis for Commerce to construe the *Remand Order* in the severely limiting way that it did, particularly given that the Court expressly remanded for "further explanation or reconsideration," a necessarily open-ended mandate.

Supreme Court precedent establishes that Commerce erred as a matter of law by construing the *Remand Order* the way it did, because "while a court may have occasion to remand an agency decision because of the inadequacy of the record, the agency should normally be allowed to exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops." *USS Remand Comments* at 9 (C.R.R. 10) (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 544, (1978) (internal quotation marks omitted)); *see also Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("limited

remands that restrict Commerce's ability to collect and fully analyze data on a contested issue" are "generally disfavor{ed}.").

This Court has regularly followed the Supreme Court's and Federal Circuit's direction to allow Commerce to broadly act on remand. For example, in *Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310 (Ct. Int'l Trade 1999), the Court remanded Commerce's redetermination for having improperly limited its review of the record, stating:

> Commerce…chose to view the Court's use of the word "cost" {in the remand order} in a restrictive manner, and concluded that the Court's use of this term limited its ability to consider market prices on remand. In so doing, Commerce rendered the Remand Order legally erroneous, since its interpretation led the Remand Order to directly conflict with, and limit, Commerce's statutory discretion to consider prices.

*Id.* at 1319; *see also Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1301 (Ct. Int'l Trade 2020) (dismissing arguments that sought to narrow the Court's remand order and stating that the Court's broad remand was "{c}onsistent with the normal preference of the Federal Circuit"); *Jinxiang Hejia Co. v. United States*, 35 C.I.T. 1190, 1196 (2011) ("the court will not interpret the order as having limited Commerce's ability to reach an accurate determination on remand.").

So, too, does Commerce's incorrect interpretation of the Court's *Remand Order* in this instance render the *Remand Redetermination* "legally erroneous." In effect, Commerce has adopted the Court's previous weighing of the evidentiary record as if these were Commerce's own findings of fact, while expressly disagreeing with the same. But, as is well-established, the Court is not itself permitted to re-weigh the record evidence and render findings of fact in the first instance. *See, e.g.*, *Kearns*, 32 F.3d at 1548. It follows that Commerce is likewise prohibited from treating any such re-weighing of evidence or findings of fact as Commerce's own. Yet, Commerce did exactly that. When U. S. Steel brought Commerce's error to its

attention, Commerce compounded the problem by refusing to address U. S. Steel's criticisms as somehow attempting to reargue issues already decided.  As the misconstruction persisted, it severely curtailed Commerce's entire PMS analysis, rendering the *Remand Redetermination* unlawful.  The Court should follow well-established precedent and disabuse Commerce of its misconstruction of the *Remand Order*.

### 2. There Is No Legal Basis for Commerce to Substitute the Court's Fact-Finding for Its Own

Recognizing that distorted production costs could frustrate calculation of an accurate dumping margin, Congress added the "cost-based PMS" provision to the constructed value subsection of the normal value statute, 19 U.S.C. § 1677b(e), through the 2015 Trade Preferences Extension Act, Pub. L. No. 114-27, § 504(c), 129 Stat. 362, 385.  Congress consistently emphasized its intent that the "cost-based PMS" provision be flexibly applied *by Commerce* to enforce the trade remedy laws where those laws were otherwise incapable of identifying and remedying injurious dumping.  The Senate Finance Committee report introducing the cost-based PMS provision stated broadly "that where a particular market situation exists that distorts pricing or cost…Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs."  S. Rept. 114-45 (2015) at 37.  Building upon this, Congress expressed its intent — on a bipartisan, bicameral basis — that Commerce would exercise its broad discretion to apply the cost-based PMS provision to address distorted production costs, specifically with respect to Korean OCTG.[2]  Thus, Congress fulfilled its

---

[2] During House floor debates, Representative Meehan specifically stated that Title V would "give{ Commerce} the kind of discretion to be able to look at the facts and to take recalcitrant countries and hold them accountable by creating what is accurate" – *i.e.*, undistorted – and that Commerce "will be empowered to…disregard prices or costs of inputs that foreign producers purchase if {it} has reason to believe or suspects that the inputs in question have been subsidized or dumped."  161 Cong. Rec. H4655, H4690 (June 25, 2015).  This is consistent with all other statements concerning Title V in the House.  *See id*. at H4695 (Rep. Jackson Lee) (praising the

constitutional duty to craft new trade remedy laws to address a heretofore unremedied circumstances.

Commerce, having been delegated both the authority and obligation to administer the U.S. trade remedy laws, first activated the cost-based PMS provision in an administrative review of the OCTG from Korea order. In fulfillment of Congress' intent, Commerce evaluated the record evidence, found multiple, mutually reinforcing distortions to Korean production costs, and applied a "totality of the circumstances" test to conclude that a PMS existed in Korea. Consistent with the statute and Commerce's constitutional role, Commerce found a PMS in Korea and adjusted OCTG production costs upward to address PMS-related distortion in calculating the dumping margin.

The statute further empowers the U.S. Court of International Trade to review Commerce's decision-making for the limited purposes of determining whether Commerce has identified record evidence to support its conclusion and whether Commerce's analysis comports with law. *Norgren Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1326 (Fed. Cir. 2012) ("The

_____

PMS provision for "allowing…Commerce to use a different calculation methodology to compare domestic and foreign costs if the methodology does not produce an appropriate comparison"); *id.* at H4697 (Rep. Ryan) ("when another country…dump{s} product into our market, we ought to be able to do something about it. So there is a bipartisan acknowledgment on that front…").

In the Senate, Senator Brown specifically invoked the example of Korean OCTG as a focus of Title V. 161 Cong. Rec. S2897, S2900 (May 14, 2015) ("Imports for OCTG…have doubled since 2008….Korea has one of the world's largest steel industries, but get this, not one of these pipes that Korea now dumps in the United States—illegally subsidized—is ever used in Korea for drilling because Korea has no domestic oil or gas production. In other words, Korea has created this industry only for exports and has been successful because they are not playing fair. So their producers are exporting large volumes to the United States, the most open and attractive market in the world, at below-market prices. That is clear evidence that our workers and manufacturers are being cheated, and it should be unacceptable to the Members of this body. It hurts our workers, our communities, and our country. It is time to stop it."). Senator Wyden stated that Title V "is about guaranteeing that the United States has a queen on the chess board, no matter what competitive tactic it faces." *Id.* at S2902.

responsibility of this court is not to re-weigh *de novo* the evidence on close factual questions; it is to review the decision of the {agency} for substantial evidence."). The court's evidentiary review must defer to the agency's assessment of the record as factfinder. *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992) ("It is not for this court on appeal to re-weigh the evidence or to reconsider questions of fact anew."). Similarly, the court's legal review tests only whether Congress has directly spoken to an issue and if not, whether the agency has reasonably explained the implementation of the statute. *See Chevron*, 467 U.S. at 842-43 (1984). This careful framework, with which the Court is intimately familiar, empowers the Judiciary to review Commerce's determinations for record support, without burdening (or empowering) the Judiciary with the role of fact-finder.

In its *Remand Redetermination*, however, Commerce upsets this balance, as it shirks its responsibility to evaluate the record, find facts, and reach a determination as to the existence of a PMS. *See* 19 U.S.C. § 1677b(a)(4), (e) (placing the burden upon the "administering authority," *i.e.*, Commerce). Instead, without Congressional or constitutional imprimatur, Commerce imposes the burden of evaluating the record and finding facts upon the Court. *See, e.g., Remand Redetermination* at 40 (reasoning that overcapacity does not establish a PMS "consistent with evidentiary findings that the Court already made"); *id.* at 40 (reasoning that Korean government subsidization does not establish a PMS because "the Court has already found that the evidence of subsidization on the record…{is} insufficient"); *id.* at 41 (rejecting reliance upon strategic alliances to evidence a PMS because "Commerce has no authority to reverse the Court and establish a different {factual} standard"); *id.* at 42 (reasoning that electricity does not establish a PMS because "Commerce has no authority to overrule and reverse the decision of the Court"); *id.* at 44 (rejecting the application of the totality of the circumstances test because "Commerce

has no authority to overrule the Court"). Commerce's theory, apparently, is that Commerce's findings of fact on remand were in fact required by the Court itself. The *Remand Order* contained no such mandate, *see Remand Order* at 52, and indeed could not possibly have done so. "Substantial evidence" review does not permit the parties to retry factual issues *de novo* before the reviewing court. *See Kearns*, 32 F.3d at 1548. Thus, the Court's assessment of the substantiality of the record evidence in support of Commerce's final administrative determination was not itself a finding of fact. By nevertheless treating the Court's previous review of certain record evidence as indisputable fact-finding for purposes of the PMS analysis, Commerce acted contrary to law and ignored swathes of the administrative record, including documents and portions of documents the Court itself never considered. The Court must correct Commerce's misapprehension of the *Remand Order* and abdication of its statutory responsibilities. A further remand is necessary, so that Commerce may undertake its statutory and constitutional duties as fact finder.

### 3. Commerce's *Remand Redetermination* Is Unsupported by Substantial Evidence Because Commerce Explicitly Declined to Evaluate the Entire Administrative Record

Commerce's *Remand Redetermination* ignored substantial portions of the administrative record, rendering it unsupported by substantial evidence and contrary to law. Commerce repeatedly excused its failure to follow the statutory standard by claiming that it "is not in a position to reverse the Court's findings." *See, e.g.*, *Remand Redetermination* at 37 (finding that U. S. Steel correctly pointed out contemporaneous period of review documents establishing government control of the Korean electricity market); *id.* at 37 (agreeing with U. S. Steel that the administrative record is more developed and substantial than the administrative records of prior administrative reviews); *id.* at 38 (agreeing with U. S. Steel that Commerce did not concede that no evidence of strategic alliances existed during the period of review).

11

In adopting this narrow view of the *Remand Order*, Commerce solicited from the interested parties citations to the administrative record not reviewed or considered by the Court. Letter from Commerce, "Participating Parties' Comments on a Particular Market Situation" (May 5, 2021) at 1 (P.R.R. 1). Despite being presented with a variety of exhibits and subparts of exhibits entirely new to the record of the third administrative review that had not been discussed by the Court, *see USS Updated PMS Comments* at 2-6 (P.R.R. 6), Commerce declined to consider this evidence alongside other aspects of the administrative record. For example, as detailed in Sections I.B.4.a and I.B.4.b, *infra*, Commerce wholly ignored evidence of distortive government restructuring efforts contemporaneous with the POR, as well as evidence of high volumes of low-priced Chinese HRC depressing OCTG producers' pipe-making costs and driving down import average unit values. Commerce also declined to address evidence that, notwithstanding the CVD rate, the absolute magnitude of subsidy benefits was in fact substantial, equaling roughly [

]. *See USS Remand Comments* at 21-25 (C.R.R. 10). In addition, while acknowledging that the record did in fact contain contemporaneous evidence of government control over the Korean electricity market, *see id.* at 29; PMS Allegation at Ex. 4, Sub-Ex. 6 (C.R. 174), Commerce treated it as a nullity, claiming it was unable to correct the Court's *Remand Order*. *Remand Redetermination* at 37.

Commerce is required by statute to reach determinations based on the entire administrative record, not just some subset thereof. By bifurcating the record on remand and refusing to consider large swathes, Commerce necessarily rendered a determination unsupported by substantial evidence. *See, e.g.*, *Atl. Sugar*, 744 F.2d at 1562 (substantial evidence must "tak{e} into account the entire record, including whatever fairly detracts from the substantiality

of the evidence."). U. S. Steel raised a list of complete and partial documents that had not yet

been considered by the Court, much of which Commerce ignored. As for documents that the

Court had considered, even if only in part, Commerce ignored these completely. The "new"

evidence identified by U. S. Steel, *see USS Remand Comments* at 6-35; *USS Updated PMS*

*Comments* at 2-6, 13-16, when combined with other evidence on the administrative record

painted a picture of a distorted cost environment for production of OCTG in Korea. But beyond

that, Commerce's premise — that any document found insufficient by the Court at any point

could not ever constitute substantial evidence of a PMS, even when combined with new

information — flies in the face of logic and the well-established requirements to render a

determination supported by substantial evidence, *i.e.*, based on the entire record.

### 4. Commerce's Conclusions Concerning Government Restructuring and the Impact of Overcapacity on the Korean Market Specifically Are Unsupported by Substantial Evidence

Beyond failing to consider the entire administrative record, Commerce further expounded

upon two aspects of the Court's *Remand Order* and made specific conclusions of fact. But these

factual conclusions are contradicted by the administrative record. *First*, in reference to Korean

government restructuring programs, Commerce concluded that "there is no evidence that any of

the respondents availed themselves of the programs or that the programs were in effect during

the POR." *Remand Redetermination* at 13-14. Second, with respect to overcapacity, Commerce

concluded that "additional evidence and data that more clearly demonstrate…a trend {of

downward pressure on prices in the market} as it relates to the POR" is not on the record.

*Remand Redetermination* at 14. Both conclusions are belied by the record, and Commerce's

contrary conclusions make no attempt to engage with evidence identified by U. S. Steel,

resulting in a *Remand Redetermination* unsupported by substantial evidence. *See, e.g.*, *Universal*

*Camera*, 340 U.S. at 488 ("{t}he substantiality of evidence must take into account *whatever in the record* fairly detracts from its weight.") (emphasis supplied).

> a. *Contrary to Commerce's Conclusion, OCTG Producers Actually Participated in Korean Government Restructuring During the Period of Review*

The mandatory respondents in this review were NEXTEEL Co. Ltd. and SeAH Steel Corporation. Other respondent companies not individually examined included, *e.g.*, Hyundai Steel Company, which furthermore produces hot-rolled steel coil inputs used in OCTG production.[3] Hyundai was reported — in a November 2016 document new to this administrative review — to have been approved as the "latest beneficiar{y} of the country's newly enacted law designed to facilitate and encourage voluntary corporate restructuring" in order to "sell off its 500,000-ton-capacity electric furnace." Letter from Domestic Interested Parties, "Other Factual Information Submission for Valuing the Particular Market Situation in Korea and Respondents' CV Profit" (May 16, 2018) ("PMS Allegation") at Ex. 44 (C.R. 174) ("Hyundai Steel, Dongkuk Steel Become Latest Beneficiaries of Fast-Track Restructuring Program," *Pulse by Maeil Business News Korea* (Nov. 23, 2016)).

The program Hyundai Steel participated in was prototypical distortive government market interference, as the "Ministry of Trade, Industry and Energy…gave the green light to the steelmaking conglomerates' restructuring plans under the One-Shot Act that will allow the two companies to receive a {sic} wide ranging government support including fast-track procedures of mergers and acquisitions, tax benefits and research and development aid for their business reform efforts." *Id.* (C.R. 174). Moreover, it was *during* the AR3 POR that the Korean Export-

---

[3] *Certain Oil Country Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085, 24,087 (May 24, 2019) (AD 2016-17 AR Final).

Import Bank concluded that "reducing production volumes to cope with the global oversupply is only a short-term solution, {and} stress{ed} that the domestic steel industry should undergo fundamental changes through mergers and acquisitions." *See* PMS Allegation at Ex. 47 (C.R. 174) ("Voices Growing for Merger of POSCO, Hyundai Steel," *Korea Times via South East Asian Iron and Steel Institute* (Sept. 22, 2016)).  Each piece of evidence emphatically supports the conclusions that (1) steel market conditions in Korea were so distorted as to prompt aggressive government interference; and (2) Korean steelmakers – including OCTG producers subject to this review and their Korean HRC suppliers – were actively benefitting from such restructuring programs during the 2016-2017 POR.

More such evidence exists.  In May and June 2016, South Korea's steel industry was reportedly "speeding up restructuring amid growing concerns over chronic oversupply in the sector," including "chronic oversupply of the nation's three largest steelmakers – POSCO, Hyundai Steel and Dong Kuk Steel Mill," while legislation had already been passed "aimed at revitalizing struggling industries by providing regulatory relief and tax breaks."  PMS Allegation at Ex. 25, Sub-Ex. 5 (C.R. 173) ("Steel Industry Speeds Up Restructuring," *The Korea Herald* (May 25, 2016)); *see also id.* at Sub-Ex. 6 (C.R. 173) ("South Korean Government to Support Domestic Steel Industry," *Steel Orbis* (June 15, 2016)) ("the country's Minister of Trade, Industry and Energy Hyeong-whan Joo said that the government will also actively help the South Korean steel industry to spontaneously accelerate its business reorganization through simplifying administrative procedures, relaxing regulations and providing taxation support according to the Corporate Vitality Enhancement Act that will take effect from August this year.").  At that time, Korea's Industry Minister stated that the "steel industry needs restructuring plans *the most*

among others."  PMS Allegation at Ex. 25, Sub-Ex. 5 (C.R. 173) ("Steel Industry Speeds Up

Restructuring," *The Korea Herald* (May 25, 2016)) (emphasis supplied).

Subsequent reports from September 2016 describe dire oversupply issues continuing to

plague Korea's steel market and the implementation of government-backed restructuring

programs in response.  *See* PMS Allegation at Ex. 25, Sub-Ex. 8 (C.R. 173) (Jung Min-hee,

"Korean Steel Industry Advised to Reduce Number of Steel Plate Plants by Half," *Business

Korea* (Sept. 19, 2016)) ("The {Boston Consulting Group} report said that the steel plate

business…is now suffering from a decrease in demand and a flood of cheap Chinese products.

Accordingly, the longer domestic firms run their steel plate production plants, the more losses

they would see."); *id.* at Sub-Ex. 9 (C.R. 173) (K. Boram, "S. Korea to Induce Steel,

Petrochemicals Firms to Cut Output, Upgrade Facilities," *Yonhap News Agency* (Sept. 30, 2016))

("The South Korean government said Friday it will encourage local steel…manufacturers to

reduce output of oversupply items and upgrade their facilities…for such uncompetitive products

as thick plates {and} steel tubes….To that end, the government will extend policy, financial and

taxation support…The measures focus on cutting production of mediocre products, which

countries such as China can catch up on with low production costs….") (emphasis supplied); *id.*

at Sub-Ex. 11 (C.R. 173) (N. Hyun-woo, "Gov't Seeks Restructuring of Steelmaking,

Petrochemical Industries" *Korea Times* (Sept. 29, 2016)) (Boston Consulting Group

"recommended Korea decrease its number of steel pipe companies through mergers….The

government will announce its schemes for restructuring the steelmaking and petrochemical

industries {in two days} and the consulting firms' opinions are anticipated to affect the

government's plan heavily.  Minister Joo mostly echoed the consulting firms' reports…")

(emphasis supplied).

Next, a government report from January 2017 espoused Korea's "2017 Action Plan for Industrial Restructuring," which targeted "approv{al of} 6 business restructuring plans" intended "to manage oversupply" specific to the steel industry, and the promotion of "smart and eco-friendly manufacturing."  PMS Allegation at Ex. 25, Sub-Ex. 12 (C.R. 173) ("Press Release: Government Unveils 2017 Action Plan for Industrial Restructuring," *Korean Ministry of Strategy and Finance* (Jan. 25, 2017)).  Finally, a March 2017 news report confirmed that the number of steel industry "One Shot Act beneficiaries approved by the government" had increased to five, stated that such beneficiaries receive "financial support," "tax benefits," and "help{} find{ing} new business lines," and described the act as "a major tool for companies planning to proceed with turnaround."  PMS Allegation at Ex. 25, Sub-Ex. 13 (C.R. 173) ("Five More Companies to Receive 'One Shot' Funds," *Korea JoongAng Daily* (Mar. 1, 2017)).

The foregoing demonstrates that Korean government restructuring programs *were* in effect during the POR; benefited the Korean steel industry, including manufacturers of OCTG and inputs into OCTG production; and that the plans themselves were predicated upon the existence of severe oversupply in the Korean steel market, conditions which Commerce has elsewhere acknowledged establish a PMS.  *See, e.g.*, *Certain Cold Rolled Steel Flat Products from the Republic of Korea*, 85 Fed. Reg. 41,955 (July 13, 2020) (AD 2017-18 AR Final), and accompanying IDM at 29-30 ("Outside government interference in the steel industry in response to particular market conditions that affected such industry to the point that the industry needs to undergo restructuring is highly unusual and does not represent the ordinary course of trade.").  Commerce agreed that "the evidence cited is…within the POR, resolving the timing problem cited by the Court regarding this factor in {previous administrative reviews segments}."  *Remand Redetermination* at 43.  Despite concluding that "such programs may contribute to a

PMS," *Remand Redetermination* at 44, Commerce never explained why this evidence does not *establish* a PMS, thus rendering this aspect of its *Remand Redetermination* unsupported by substantial evidence. Indeed, Commerce failed to address much of this evidence at all in reaching a negative PMS determination. *See Remand Redetermination* at 43-44 (mentioning only Exhibits 43 and 44 of the PMS Allegation).

      b. *Contrary to Commerce's Conclusion, Overcapacity Caused Downward Pricing Pressures in the Korean Market; Contrary Evidence Does Not Exist*

Ample record evidence — unaddressed by Commerce in its *Remand Redetermination*, and unaddressed in any opinions of this Court — establishes both that the Korean HRC market was distorted by overcapacity, including spillover of cheap HRC from China, and that this distortion placed prices in Korea outside the ordinary course of trade. Yet, Commerce reached a contrary conclusion unsupported by any evidence.

A Korean government report published during the POR specifically establishes that (1) China's "share of low-priced imports in key steel consumer countries{, including Korea, is} expanding," (2) that imported Chinese HRC prices are "$118/ton" less than domestic HRC prices; and (3) that "the number of companies** importing / manufacturing low-priced, improved quality Chinese hot rolled steel sheets {is} increasing," including the specific example of respondent SeAH Steel Corp. forming Chinese hot-rolled steel into pipe. *See USS Updated PMS Comments* at 5 (P.R.R. 6) (quoting PMS Allegation at Ex. 24, Sub-Ex. 5 (C.R. 172) ("Proposal for Strengthening the Competitiveness of the Steel Industry" (Sept. 30, 2016) at 76, 81)).[4] Commerce does not address this evidence.

---

[4] Prior opinions of the Court have addressed other aspects of this document, but to the best of counsel's knowledge, none have addressed the three points noted above.

Furthermore, datasets new to this record further corroborate the Korean government conclusions reflected in the foregoing report. Chinese HRC export volumes to Korea increased starting in 2014, and remained above 2013 levels through the end of 2017. PMS Allegation at Ex. 36 (C.R. 173) (Global Trade Atlas, China Export Statistics for Hot-Rolled Products, 2013-2017). Those data show that whereas Korea was China's single largest HRC export destination in 2013, annual export volumes from 2014 through 2017 were at least 8.8 percent greater. These large and increasing volumes logically equate to a large and increasing impact on Korean market prices, particularly considering that China remained *by far* Korea's largest source of HRC imports over the POR. PMS Allegation at Ex. 38 (C.R. 173) (Global Trade Atlas, South Korea Import Statistics for Hot-Rolled Products, 2012-2017). Korean HRC import AUVs were lower in both 2016 and 2017 than they had been in 2015 and import AUVs otherwise remained depressed during the POR. *See* PMS Allegation at Ex. 37 (C.R. 173) (Global Trade Atlas, South Korea Import Statistics for HRC, by AUV, 2015-2017); *id.* at Ex. 38 (C.R. 173) (Global Trade Atlas, South Korea Import Statistics for Hot-Rolled Products, 2012-2017) (weight averaging the "China" and the "World Excluding China," the annual AUVs were 0.55 in 2015, 0.42 in 2016, and 0.54 in 2017; this comparison is only possible with Exhibit 37, which is new to this record); *id.* at Ex. 39, p.1 (C.R. 174) (International Steel Statistics Bureau, Data Regarding Hot-Rolled Imports to Korea for September 2016 to August 2017 (2018)) (showing six months of the POR with an average import AUV below $500).

Notwithstanding the foregoing, Commerce declined to find a PMS, reasoning that although "the record contains data that demonstrate the acute and particular presence of overcapacity in the Korean market…{it} is not enough to make an affirmative PMS determination unless a party demonstrates that overcapacity led to a situation in which, 'the cost

of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade.'" *Remand Redetermination* at 39. But Commerce did not reckon with the foregoing evidence, which establishes the contrary; *viz.*, a downward pricing trend for HRC *in Korea — caused by — Chinese overcapacity*. In point of fact, Commerce did not conclude otherwise. The worsening domestic Korean market conditions — recently increasing proportion and absolute volume of HRC imported from China; that Chinese HRC was trading $118/ton below domestic prices during the POR; that such Chinese HRC was being used by a mandatory respondent to create pipe during the POR; and that import average unit values were continuing to decline — evidence a situation in which HRC costs no longer reflect what it costs to produce OCTG in the ordinary course of trade. Yet, Commerce did not make *any* finding by reference to the record evidence, and thus failed to support the conclusions of its *Remand Redetermination* with substantial evidence.

> *c.* *Commerce's Creation of a New Restriction Out of Whole Cloth Contravenes the Statute, Prior Decisions of this Court, and Commerce's Heretofore Consistent Practice*

As explained above, ample record evidence supports the conclusion that a PMS existed due to the distortive effects of overcapacity on the Korean HRC market. Nevertheless, Commerce's analysis introduced a new hurdle — heretofore disavowed by Commerce — that is without basis in the statue, *viz.*, that a party alleging a PMS must prove that a distortion led costs to "not accurately reflect the cost of {subject merchandise, *i.e.*, OCTG} production in the ordinary course of trade." *Remand Redetermination* at 39. Because record evidence exists that is sufficient to satisfy this new barrier, the Court need not reach this issue, but if it does, the Court should correct Commerce's misconstruction of the statute and remand for further proceedings.

As an initial matter, prior to the final version of this *Remand Redetermination*,[5]

Commerce's heretofore consistent position was as follows:

> Commerce disagrees with the view that input prices (*i.e.*, production costs) must be found to be outside the ordinary course of trade in order to find the existence of a PMS. To the contrary, a finding that a PMS exists results in a determination that the relevant input prices are outside of the ordinary course of trade.

*Large Diameter Welded Pipe From the Republic of Korea*, 84 Fed. Reg. 6,374 (Feb. 27, 2019)

(LTFV Final), IDM Comment 1; *see also Certain Corrosion-Resistant Steel Products From*

*Korea*, 84 Fed. Reg. 10,784 (Mar. 22, 2019) (2016-17 AD AR Final), IDM Comment 1 (same).

"When an agency decides to change course…it must adequately explain the reason for a reversal

of policy." *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1378 n.5 (Fed. Cir.

2007); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*,

463 U.S. 29, 57 (1983) ("an agency changing its course must supply a reasoned analysis")

(internal quotation and citation omitted). Commerce, however, made no explanation for its

sudden reversal in policy, arbitrariness which itself demands remand.

Moreover, Commerce *cannot* lawfully explain its change in position, as the statute

negates Commerce's newly imposed barrier, and the Court has explicitly rejected Commerce's

premise. *See Dong-A Steel v. United States*, 475 F. Supp. 3d 1317, 1340 (Ct. Int'l Trade 2020)

("…a PMS by its very definition exists outside the 'ordinary course of trade.'") (quoting 19

U.S.C. § 1677(15)(C)).[6] By statute, Commerce "shall consider the following sales and

transactions, among others, to be outside the ordinary course of trade: … (C) Situations in which

the administering authority determines that the particular market situation prevents a proper

---

[5] Because Commerce made no mention of this new requirement in its Draft Remand Results, U. S. Steel had no occasion to address it in *USS Remand Comments*.

[6] The *Remand Order* did not reach this issue.

comparison with the export price or constructed export price."  19 U.S.C. § 1677(15).[7]  Beyond

this mandatory statutory definition, under normal rules of statutory construction, the plain

meaning of a "particular market situation" is necessarily outside the "ordinary course of trade."

A situation cannot be both "particular" and "ordinary."  *Compare, e.g.*, Particular: "3.a.

distinctive among other examples or cases of the same general category : notably unusual."

"Particular, Adj.," *Merriam-Webster Online Dictionary*, www.merriam-webster.com (last visited

June 10, 2021), *with, e.g.*, Ordinary: "1. of a kind to be expected in the normal order of events."

"Ordinary, Adj.," *Merriam-Webster Online Dictionary*, www.merriam-webster.com (last visited

June 10, 2021).  This is a straightforward linguistic fact.  Nothing in the cost-based PMS

provision contemplates the far-reaching inquiry into "ordinary course of trade" input costs that

Commerce apparently has in mind.

  To the contrary, the cost-based PMS provision's "such that" clause directly links a PMS

to distorted *costs*, *i.e.*, clarifying that the PMS of interest for purposes of 19 U.S.C. § 1677b(e) is

one related to production costs, distinct from the pre-TPEA variety of PMS that concerned the

price of the final subject merchandise.[8]  "Such" means "of the character, quality, or extent

*previously* indicated or implied," which refers to the PMS.  "Such, Adj.," *Merriam-Webster*

*Online Dictionary*, www.merriam-webster.com (last visited June 15, 2021) (emphasis supplied);

19 U.S.C. § 1677b(e).  Taken together, therefore, the existence of the PMS means that costs

---

[7] Where, as here, normal value is based on constructed value, a cost-based PMS directly distorts
the market for inputs used to calculate constructed value, and necessarily "prevents a proper
comparison with" U.S. price, absent adjustment.

[8] For reference, the statute reads, in relevant part: "if a particular market situation exists such that
the cost of materials and fabrication or other processing of any kind does not accurately reflect
the cost of production in the ordinary course of trade, the administering authority may use
another calculation methodology under this part or any other calculation methodology."  19
U.S.C. § 1677b(e).

incurred do not reflect those incurred in the ordinary course of trade. *See also* "Such That," *Collins English Dictionary*, www.collinsdictionary.com (last accessed June 10, 2021) ("so that: used to express purpose or result"). As explained above, this was Commerce's consistent position prior to this *Remand Redetermination*, and "ordinary course of trade" as used in Section 1677b(e) ties to the definition in Section 1677(15), which explains that a PMS is outside the ordinary course of trade.

Finally, the legislative history's consistent emphasis on flexibility confirms Congress did not intend to impose rigid strictures merely by implication. *See, e.g.*, Senate Finance C'tee Rpt. 114-45 (2015) at 37 ("where a {PMS} exists…Commerce has flexibility in calculating a duty that is not based on distorted…costs"); *supra* at p.8 n.2 (collecting sources). Commerce has done worse, requiring what appears to be a benchmarking exercise (Commerce provided no specifics) that is impossible absent an ordinary course of trade price, which necessarily *does not exist* in a market-wide PMS, thus absurdly precluding 19 U.S.C. § 1677b(e) from reaching the worst of distortions. If the Court reaches this issue, it should order remand to prevent Commerce from engrafting this restriction on to the cost-based PMS provision, as it is both unexplained and without basis in the statute.

Commerce's new test unreasonably departs from past practice, is not based in the plain language of the statute or its plain meaning, and finds no further explanation beyond conclusory statements, rendering it unlawful and unsupported by substantial evidence.

C. **Commerce Misinterpreted the Federal Circuit's *Dillinger* Opinion, and its Allocation of NEXTEEL's Costs Is Not in Accordance with Law**

1. **After Defending its Treatment of NEXTEEL's Non-Prime Costs Before the Court, Commerce Summarily Reversed Itself on Remand**

Before the Court, NEXTEEL challenged Commerce's reallocation of its non-prime costs as inconsistent with Commerce's prior practice. *See* NEXTEEL Opening Br., ECF No. 66-2 (Oct. 21, 2019) at 42-44. In response, Commerce distinguished the prior determination referenced by NEXTEEL, and defended its reallocation as consistent with the GAAP-related requirements of the antidumping statute. *See* United States Response Br., ECF No. 71 (Jan. 13, 2020) at 44-46. In reply, NEXTEEL reasserted its position that Commerce deviated from its prior practice. *See* NEXTEEL Reply Br., ECF No. 87 (Feb. 10, 2020) at 33-36.

The Court's *Remand Order* asserted only that NEXTEEL "argue{d} that the cost reallocation was contrary to Commerce's prior practice," and held that Commerce's conclusion that NEXTEEL's non-prime products were non-subject merchandise was supported by substantial evidence. *See Remand Order* at 58-60. Nevertheless, the Court proceeded to question, *sua sponte*, whether Commerce's reallocation was consistent with *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020), an opinion published about ten months after briefing in this case had already closed. *See Remand Order* at 60-61. Neither Commerce nor Defendant-Intervenor was afforded an opportunity to respond. The Court concluded that, whereas *Dillinger* rejected Commerce's "calculation of costs based on recorded projected sales prices rather than costs of producing and selling merchandise," Commerce's final determination exhibited the "same defect" because Commerce's reallocation "{does not} reflect{} actual costs." The Court remanded for Commerce "to allocate costs based on the actual costs of prime and non-prime products." *Remand Order* at 61.

On remand, Commerce's half-page analysis summarily reversed its earlier position and stated that "consistent with the CAFC decision in *Dillinger*, we have reversed the adjustment made in the *Final Results* and have relied on the actual costs of prime and non-prime products as reported by NEXTEEL." *Remand Redetermination* at 14-15.

  2.  ***Dillinger* Does Not Compel the Result Commerce Reached on Remand; Nor Does the Statute Permit It; the Cost of Producing Scrap is a Cost of Prime Production**

Commerce's redetermination was the product of Commerce's understanding of the Federal Circuit's decision in *Dillinger*. Contrary to the generally high level of deference afforded Commerce's statutory interpretations, Commerce's *Remand Redetermination* presents a unique situation wherein no deference is due. Commerce's understanding of *Dillinger* is incorrect, and additionally misconstrues the Court's *Remand Order*, which directed Commerce to "allocate costs" based on "actual costs," but did not presuppose that this would necessitate a "*re*allocation" of costs. The Court should correct Commerce's misapprehension and remand for further proceedings.

In *Dillinger*, the Federal Circuit found that Commerce had "improperly allocated costs between Dillinger's non-prime and prime products based on Dillinger's books and records" because those books and records allocated costs based on selling price and therefore "did not reasonably reflect the costs associated with the production and sale of the merchandise as required by 19 U.S.C. § 1677b(f)." *Dillinger*, 981 F.3d. at 1321. The Federal Circuit accordingly remanded to Commerce "to determine the actual costs of prime and non-prime products." *Id*. at 1324 (emphasis added).

Commerce's *Remand Redetermination* apparently interprets the Federal Circuit's *Dillinger* decision to require Commerce to simply take NEXTEEL's costs as reported. In this, Commerce is mistaken. The Federal Circuit made clear in *Dillinger* that such indiscriminate

reliance on reported costs, whether within a respondent's books and records or otherwise, is inconsistent with Congress' intent that "{c}osts shall be allocated using a method that reasonably reflects and accurately captures *all* of the actual costs incurred in producing and selling the product under investigation or review." *Dillinger*, 981 F.3d. at 1323 (quoting Statement of Administrative Action ("SAA"), H.R. Rep. 103-316 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4172) (emphasis supplied).

*Dillinger* styled itself as an application of 19 U.S.C. § 1677b(f)(1)(A), *id.* at 1321, and therein lies a key distinction between the scenario before the Federal Circuit and the facts of this case. In *Dillinger*, Commerce was relying on *respondents'* price-based cost allocation records. Section 1677b(f)(1)(A) only allows Commerce to use respondents' records if those records are GAAP compliant and reasonably reflect production costs. The Federal Circuit determined that Dillinger's price-based cost allocation records did not. Here, Commerce has *adjusted* the costs reported in NEXTEEL's records, *i.e.*, it has deviated from those records. Importantly, Section 1677b(f)(1)(A) does not *require* that Commerce use NEXTEEL's records under any circumstance, but only provides that it will "normally" do so.

Put differently, Commerce's decision to rely on actual costs as reported by NEXTEEL thus complies with the Federal Circuit's holding in *Dillinger if and only if* NEXTEEL's reported actual costs both comport with Korean generally accepted accounting principles ("GAAP") and "reasonably reflect the costs associated with the production and sale of the merchandise." *Id.* at 1321 (quoting 19 U.S.C. § 1677b(f)(1)(A)). *First*, Korean GAAP [

]. Letter from NEXTEEL, "NEXTEEL's Section A Questionnaire Response" (Feb. 7, 2018) at Ex. A-10 (2016 Audited Statements) at 11 (PDF 149) (C.R. 107). [

], NEXTEEL's reporting

is not GAAP compliant. *Second*, the SAA makes clear that the "merchandise" whose costs must

be "reasonably reflected" is "the product under investigation or review," *i.e.* subject

merchandise, which the USCIT appropriately concluded is limited to prime OCTG product. *See*

SAA, H.R. Rep. 103-316 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4172; *see also*

*Remand Order* at 61 (holding that "Commerce's determination that NEXTEEL's non-prime

products are not subject merchandise is supported by substantial evidence").

To comply with the statute and *Dillinger*, Commerce must therefore review NEXTEEL's

recorded production costs for prime OCTG product and ensure that they "accurately reflect the

resources actually used in the production of the merchandise in question." *Dillinger*, 981 F.3d at

1323 (quoting S. Rep. No. 103-412, at 75 (1994). Commerce's *Final Results* correctly

determined this is not the case, *see, e.g.*, Issues and Decision Memorandum accompanying

*Certain Oil Country Tubular Goods from the Republic of Korea*, 84 Fed. Reg. 24,085 (May 24,

2019) (AD 2016-17 AR Final) ("IDM") at 92 ("Consequently, assigning full costs to these non-

prime products does not reasonably reflect the costs associated with the production and sale of

the merchandise.") (P.R. 351), but Commerce reversed itself in the *Remand Redetermination*

without explanation. As Commerce noted in the *Final Results*, NEXTEEL does not intentionally

manufacture non-prime merchandise. *Id.* (P.R. 351). Instead, NEXTEEL's non-prime products

are a result of a failure in the production process, when "merchandise initially intended to be

produced as OCTG was downgraded to non-prime at the end of the production process" because

they do not meet the strict technical requirements for OCTG. *Id.* (P.R. 351).

NEXTEEL's manufacture of non-prime products is thus not an end in itself, but rather an

actual "cost" in its production of prime OCTG, *i.e.*, subject merchandise, that the statute, and the

Federal Circuit in *Dillinger*, require Commerce to account for in its allocation methodology. Consistent with Commerce's existing methodology, Commerce's *Final Results* accounted for these costs by treating non-prime merchandise as *de facto* scrap produced during the manufacture of OCTG. *See Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1368 (Ct. Int'l Trade 2018) (noting that, pursuant to its established practice "Commerce offsets costs {of non-prime products} with the revenue gained from sales of non-prime products (*i.e.*, a scrap offset) if it determines that the non-prime product cannot be used in the same general manner as its prime product counterparts."). As with other types of scrap generated in the course of producing OCTG, NEXTEEL is able to recover some of the costs associated with these production failures by scrapping or selling the non-prime merchandise it produces, but the production costs associated with non-prime pipe are *actually* OCTG production costs.

Commerce's allocation methodology in the *Final Results* was specifically intended to account for this commercial reality and further recognize Korean GAAP, and Commerce unreasonably reversed itself in its *Remand Redetermination*, based solely on an incorrect interpretation of *Dillinger*, which concerned a materially distinct scenario and did not address the status of non-prime pipe as just another form of production scrap. Nor does Commerce's *Remand Redetermination* contain any reasoned consideration of these issues in the first instance, but instead ignore *USS Remand Comments*.

As noted above, NEXTEEL intends *only* to produce prime OCTG product. Nothing in the record establishes otherwise. To accurately capture all of the costs incurred by NEXTEEL in producing and selling subject merchandise — as the statute requires — Commerce must include not only NEXTEEL's reported costs of production for prime merchandise but also the unrecovered costs of production failures that unintentionally result in the manufacture of non-

28

prime product. These latter costs are reflected in the difference between NEXTEEL's reported production costs for non-prime merchandise and the amount it is able to recoup through the sale of such non-prime product (*i.e.* its market price). Consistent with *Dillinger*, Commerce's allocation methodology in the *Final Results* reasonably and accurately accounted for these costs, while Commerce's revised approach in the *Remand Redetermination* does not. Commerce's unreasoned reversal on remand requires yet another remand.

## II.      CONCLUSION

On the questions of the existence of a PMS and allocation of NEXTEEL's costs, Commerce's *Remand Redetermination* abdicates Commerce's statutory obligations as the administering authority to review the record and reach a reasoned conclusion based upon substantial evidence. Instead, Commerce failed to engage with the record by misconstruing the *Remand Opinion*. The Court should order a further remand, so that Commerce may fully assess the issues, unburdened by the imaginary legal and evidentiary strictures that drove Commerce's reversals on remand.

Respectfully submitted,

/s/ Thomas M. Beline
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
*Counsel to United States Steel Corporation*

Date:   August 13, 2021

### Certificate of Compliance

The undersigned hereby certifies that the forgoing submission of "United States Steel Corporation's Comments in Partial Opposition to Remand Redetermination," filed on August 13, 2021, contains 8,570 words, including footnotes, and excluding the table of contents, table of authorities, and signature block, and therefore, complies with the maximum 10,000 word count limitation set forth in rule 2(B)(1) of the Standard Chambers Procedures of the U.S. Court of International Trade.

BY: /s/ James E. Ransdell
James E. Ransdell