## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| Plaintiff, | ) |
| and | ) |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD., AJU BESTEEL CO., LTD., AND ILJIN STEEL CORPORATION, | ) |
| Consolidated Plaintiffs, | ) |
| and | ) |
| HYUNDAI STEEL COMPANY AND ILJIN STEEL CORPORATION, | ) Consol. Court No. 19-00086 |
| Plaintiffs-Intervenors, | ) **PUBLIC DOCUMENT** |
| v. | ) Contains No Business Proprietary Information |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., IPSCO TUBULARS INC., VALLOUREC STAR, L.P., AND WELDED TUBE USA INC., | ) |
| Defendant-Intervenors. | ) |

## COMMENTS OF DEFENDANT-INTERVENORS MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., AND IPSCO TUBULARS INC. IN SUPPORT OF COMMERCE'S FINAL REMAND DETERMINATION

Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon
**White & Case LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
202-626-3600

*Counsel to Defendant-Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc.*

Dated:  September 15, 2021

## TABLE OF CONTENTS

I.     INTRODUCTION ...............................................................................................................1

II.    COMMERCE PROPERLY APPLIED THE G&A RATIO OF SEAH'S U.S.
       AFFILIATE IN ITS FINAL REMAND DETERMINATION ...........................................2

III.   COMMERCE CORRECTLY INCLUDED INVENTORY VALUATION
       LOSSES IN THE CALCULATION OF SEAH'S G&A EXPENSE RATIO....................9

IV.    CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*SeAH Steel Co. v. United States*,
    Consol. Court No. 19-00086, Slip. Op. 21-43 (Apr. 14, 2021) .................................... passim

*Torrington Co. v. United States*,
    20 C.I.T. 632 (1996) ..............................................................................................10

## STATUTES AND REGULATIONS

19 U.S.C. § 1677a(d) ........................................................................................5, 8

19 U.S.C. § 1677a(d)(1) ........................................................................................4

19 U.S.C. § 1677a(d)(2) ......................................................................................3-4

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Final Results*
    *of Antidumping Duty Administrative Review; 2016-2018*,
    85 Fed. Reg. 3,028 (Dep't Commerce Jan. 17, 2020) ..........................................14

*Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final*
    *Determination of Sales at Less Than Fair Value*,
    82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) ..........................................8

*Certain Crystalline Silicon Photovoltaic Products From Taiwan: Final Results of*
    *Antidumping Duty Administrative Review; 2014-2016*,
    82 Fed. Reg. 31,555 (Dep't Commerce July 7, 2017) ............................... 12-13, 15

*Certain Hot-Rolled Steel Flat Products from Brazil; Final Determination of Sales*
    *at Less Than Fair Value and Final Affirmative Determination of Critical*
    *Circumstances, in Part*,
    81 Fed. Reg. 53,424 (Dep't Commerce Aug. 12, 2016*)* ..........................................8

*Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results*
    *of Antidumping Duty Administrative Review; 2016-2017*,
    84 Fed. Reg. 32,720 (Dep't Commerce July 9, 2019) ..........................................14

*Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of
    Antidumping Administrative Review; 2016-2017*,
    84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) ................................................... passim

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results
    of the Antidumping Duty Administrative Review*,
    75 Fed. Reg. 34,980 (Dep't Commerce June 21, 2010) ........................................................12

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the
    Republic of Korea: Final Results of Antidumping Duty Administrative Review;
    2018-2019*,
    86 Fed. Reg. 35,060 (Dep't Commerce July 1, 2021) ........................................................ 6-7

*Stainless Steel Wire Rod from the Republic of Korea: Final Results of
    Antidumping Duty Administrative Review*,
    69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004) ................................................... 14-15

*Welded Line Pipe from the Republic of Korea: Final Determination of Sales at
    Less Than Fair Value*,
    80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) ...................................................... 7-8

In accordance with this Court's decision and remand order in *SeAH Steel Co. v. United States*, Consol. Court No. 19-00086, Slip. Op. 21-43 (Apr. 14, 2021) ("Remand Order") (ECF No. 104), Defendant-Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc. hereby submit comments in support of the *Final Results of Redetermination Pursuant to Court Remand*, July 16, 2021 ("Final Remand Determination") (ECF No. 118) issued by the Department of Commerce ("Commerce").

## I.   INTRODUCTION

This Court's Remand Order instructed Commerce to take further action regarding five issues in Commerce's final results for the third administrative review of oil country tubular goods ("OCTG") from Korea:  (1) to further explain or reconsider its particular market situation determination and adjustment; (2) to reallocate costs for NEXTEEL's non-prime merchandise based on the actual costs of prime and non-prime products; (3) to further explain or reconsider its treatment of NEXTEEL's production line suspension costs; (4) to recalculate SeAH's further manufacturing cost; and (5) to further explain or reconsider its decision to include SeAH's inventory valuation losses as general and administrative ("G&A") expenses.  Remand Order at 76; *Certain Oil Country Tubular Goods from the Republic of Korea:  Final Results of the Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 24,085 (Dep't Commerce May 24, 2019) ("Final Results") (PR Doc. 359).[1]

These comments address the two issues pertaining to SeAH Steel Corporation ("SeAH"): Commerce's application of the G&A expense ratio of SeAH's U.S. affiliate Pusan Pipe America Inc. ("PPA") to imported pipe that was subsequently further manufactured and resold, and Commerce's inclusion of SeAH's inventory valuation losses that related to raw materials and

---

[1] Citations to the administrative record indicate the public record document numbers ("PR Doc.") and the remand public record document numbers ("RPR Doc.").

work-in-process ("WIP") in its calculation of SeAH's G&A expense ratio. Separate comments previously and concurrently submitted by Defendant-Intervenors United States Steel Corporation address other issues from the Final Remand Determination. *See United States Steel Corporation's Comments in Partial Opposition in Remand Redetermination*, Aug. 13, 2021 (ECF No. 124).

Commerce's Final Remand Determination addresses the Court's concerns and the parties' arguments, and provides a robust discussion and explanation of its rationale for reaching its conclusions regarding each of these issues. As demonstrated below, SeAH's arguments in opposition provide no basis for the Court to disturb the Final Remand Determination. *See Comments of SeAH Steel Corporation on Commerce's July 16 Redetermination*, Aug. 13, 2021 ("SeAH Comments") (ECF No. 119). Commerce's Final Remand Determination is consistent with the relevant statutory requirements, supported by substantial evidence on the record, and addresses the concerns identified in the Court's Remand Order. The Court should affirm the Final Remand Determination with respect to these issues.

## II.   COMMERCE PROPERLY APPLIED THE G&A RATIO OF SEAH'S U.S. AFFILIATE IN ITS FINAL REMAND DETERMINATION

In the Final Results, Commerce allocated the G&A expenses of SeAH's U.S. affiliate PPA to imported pipe, whether further manufactured or not, sold in the U.S. market. *See Issues and Decision Memorandum accompanying the Final Results at Comment 6 ("Final IDM") (PR Doc. 351). Commerce applied PPA's general expense ratio to the cost of the imported OCTG that was not further manufactured and included these expenses as indirect selling, and applied PPA's general expense ratio to the further manufacturing costs plus the cost of the imported OCTG (that was further manufactured) and included these general expenses as further manufacturing. Final IDM at 79. The Court sustained Commerce's application of PPA's general

expense ratio to the cost of the imported OCTG that was not further manufactured.  However, the Court remanded to Commerce to recalculate SeAH's further manufacturing cost.  Remand Order at 69, 76.

In its Remand Order, the Court stated that Commerce's "explanation as to balanced accounting does not address Commerce's statutory authority or the reasonableness of applying PPA's expense ratio to the cost of further manufacturing plus the cost of the imported OCTG pipe to calculate the amount deductible as the cost of further manufacturing under 19 U.S.C. § 1677a(d)(2)."  Remand Order at 68-69.  The Court also stated that "{t}he statute authorizes Commerce to reduce the constructed export price by 'the cost of any *further* manufacture or assembly (including *additional* material and labor)," but that "{t}he cost of production of the imported OCTG pipe is not a cost incurred for further manufacture."  Remand Order at 69 (citing 19 U.S.C. § 1677a(d)(2) (emphasis added)).

Following Commerce's issuance of a Draft Remand Determination, and its consideration of the parties' respective comments, in the Final Remand Determination Commerce continued to apply PPA's general expense ratio to the cost of imported OCTG, but addressed the Court's comments and reclassified all such expenses allocated to the COP of imported pipe as indirect selling expenses.  Final Remand Determination at 23; *see also Draft Results of Redetermination Pursuant to Court Remand Oil Country Tubular Goods from the Republic of Korea, SeAH Steel Co. v. United States, Consolidated Court No. 19-00086, Slip. Op. 21-43 (April 14, 2021)* (June 4, 2021) (RPR Doc. 7).  In response to the Court's remand instructions, Commerce "adopted a revised approach which does not deduct the cost of imported pipe as further manufacturing expenses."  Final Remand Determination at 20.  Instead, Commerce reclassified as indirect selling expenses the amount of G&A expenses applied to the COP of further manufactured pipe.

Final Remand Determination at 22.  Commerce explained that this approach is consistent with the statutory requirements and permits a full accounting of the PPA's general expenses.  Final Remand Determination at 23.

When calculating CEP, the statute directs Commerce to deduct both indirect selling expenses incurred by the affiliated reseller and U.S. further manufacturing costs.  *See* 19 U.S.C. § 1677a(d)(1) (The price used to establish CEP "shall also be reduced by" the amount of any selling expenses "generally incurred by or for the account of … the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)"); *id.* § 1677a(d)(2) (noting that price used to establish CEP "shall also be reduced by . . . the cost of any further manufacture or assembly").  PPA's G&A expenses relate to just two business activities: "reselling imported products and arranging for third parties to further manufacture certain imported products for which PPA pays a processing or tolling fee."  Final Remand Determination at 19.  These two activities are comprised of three components: the imported pipe that was not further manufactured; the imported pipe that was further manufactured; and the further processing fees.  For this reason, Commerce explains:

> {I}t would distort the accuracy of the calculations if we were to allocate PPA's company-wide general expense ratio only to two of the three components of the company's activities, *i.e.*, the imported products that were not further manufactured and the further manufacturing fees, but not to the third component, *i.e.*, the imported products that were further manufactured, where in fact all three activities serve as the denominator for PPA's reported general expense ratio calculation.

Final Remand Determination at 22.  Commerce's Final Remand Determination distinguishes between "the portion of PPA's general expenses that is reasonably classified" as (1) "further manufacturing where applied to the further manufacturing costs" and (2) "indirect selling where applied to the cost of all imported OCTG, *i.e.*, the imported OCTG that were further

manufactured and the imported OCTG that were not further manufactured." Final Remand Determination at 23. Commerce also addresses the Court's specific concern that the COP of the imported OCTG pipe is not a cost incurred for further manufacture by reclassifying as indirect selling expenses the amount of G&A expenses applied to the COP of further manufactured pipe:

> {F}or further manufactured products, we applied PPA's G&A expense ratio to the total cost of further manufacturing, and we included the amount as further manufacturing under section 772(d)(2) of the Act. Additionally, we applied PPA's G&A expense ratio to the COP of the imported OCTG, whether further manufactured or not, and included the amount as indirect selling expenses under section 772(d)(1)(D) of the Act.

Final Remand Determination at 23. Commerce states that "{t}his revised classification both satisfies the requirements of the statute and allows for a logical and full accounting of the company's general expenses." Final Remand Determination at 23. On remand, through its reclassification, Commerce continues to properly allocate the G&A expenses to both "the cost of sales for all imported products *whether or not* further manufactured" and "any associated further manufacturing fees," because both "serve as the denominator to PPA's reported general expense ratio." Final Remand Determination at 20 (emphasis added). There is no statutory argument for not accounting for a portion of the expenses incurred by a related party seller in the United States in the CEP calculation. Whether, in the case of PPA, the U.S. expenses relate to general operations of the company (whose function is to sell), to further manufacturing, or to selling, the expenses must be deducted. *See* 19 U.S.C. § 1677a(d) (requiring that CEP be reduced by "any selling expenses" and "the cost of any further manufacture"). Commerce's approach to deducting these expenses as selling expenses is reasonable.

In order to make the changes described above, Commerce revised the relevant margin calculation programming language in the Final Remand Determination. *See* Final Remand Determination at 59-60 ("while both selling expenses and further manufacturing costs are

deductions from U.S. price in calculating CEP, due to interested party comments we have revised the variable name used for the G&A expenses related to the imported pipes to denote selling expenses rather than further manufacturing expenses"). Commerce's revised programming language accurately reflects the reclassification of the imported pipe general expenses to indirect selling expenses. Commerce's approach to PPA's G&A expenses in the Final Remand Determination is consistent with the statute, addresses the Court's concerns, and represents a reasonable approach to allocating PPA's G&A expenses.

SeAH raises two arguments regarding Commerce's approach on remand. First, that Commerce's classification of G&A expenses versus selling expenses is contrary to the statute and Commerce's normal practice. Second, that the statute does not allow for the deduction from CEP of G&A expenses incurred by the U.S. affiliate. Both arguments should be rejected.

As for its first argument, SeAH asserts that the Court held that the statute "does not permit Commerce to deduct the portion of {PPA's G&A expense} that were allocated to imported to pipe as part of the adjustment for further manufacturing costs," and claims that "Commerce has attempted to evade th{e} holding by claiming that the portion of G&A expenses allocated to imported pipe should be considered selling expenses." SeAH Comments at 3. SeAH further maintains that Commerce's approach in the Final Remand Determination is contrary to its established practice of distinguishing between G&A expenses and selling expenses, and SeAH relies on Commerce's recent decision in *Heavy-Walled Rectangular Pipe from Korea*. *See* SeAH Comments at 3-5 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,060 (Dep't Commerce July 1, 2021),

accompanying Issues and Decision Memorandum at 46 ("*Heavy Walled Rectangular* Final IDM")).

SeAH's arguments are flawed and should be rejected.  Commerce's reallocation of PPA's G&A expenses allocated to imported pipe from further manufacturing to indirect selling is consistent with the statute, responds to the Court's instructions, and is reasonable given PPA's predominant role as a selling entity.  As Commerce explains:

> {I}t is significant that PPA is not performing further manufacturing on its own and does not maintain any production facilities for further manufacturing. Rather, these processes are performed by tollers, and SeAH's involvement in further manufacturing is perfunctory in nature and is limited to paying a processing fee, which we accounted for as a further manufacturing expense. Apart from paying the processing fee to the tollers, which we accounted for, SeAH is predominantly a selling entity and, thus, it is reasonable to treat the portion of its G&A expenses that are related to the cost of the imported products as selling expenses.

Final Remand Determination at 58.  SeAH's reliance on *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from Korea* is similarly misplaced.  In that case, Commerce allocated the salary of the respondent's Chief Executive Officer to G&A expenses, not indirect selling expenses, because "G&A expenses are those expenses that relate to the general operations of the company as a whole."  *Heavy Walled Rectangular* Final IDM at 46.  Unlike in that case, the classification of expenses is not under dispute in this proceeding.  Indeed, in the Final Results of the underlying review, Commerce recognized that "G&A expenses are those expenses which relate to the general operations of the company as a whole," and made clear that "the calculation of the G&A expense ratio is not at question here."  Final IDM at 77.  The issue here is whether Commerce properly allocated PPA's G&A expenses to further manufacturing and reselling activities.  Relying on several past cases, Commerce concluded that PPA's "general expenses relate to the entire activities of the company and therefore should be allocated proportionally to those activities."  Final Remand Determination at 20-21 (citing *Welded Line Pipe from the*

*Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015), accompanying Issues and Decision Memorandum at Comment 20 ("Because PPA's G&A activities support the general activities of the company as a whole, including its sales and further manufacturing functions, we applied the G&A ratio to the total cost of further manufactured products (including the cost of producing the pipe), as well as to the cost of all non-further manufactured products"); *Certain Hot-Rolled Steel Flat Products from Brazil; Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 81 Fed. Reg. 53,424 (Dep't Commerce Aug. 12, 2016), accompanying Issues and Decision Memorandum at Comment 5 ("we agree that G&A activities support the general activities of a company as a whole, including its sales and manufacturing functions … {and} find it is appropriate to allocate G&A expenses to all company activities where the company engages in both further manufacturing and reselling activities'); *Certain Carbon and Alloy Steel Cut-to-Length Plate from France: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017), accompanying Issues and Decision Memorandum at Comment 17 ("The record evidence indicates that BSPC engages in both further manufacturing and reselling activities. Therefore … we find that it is appropriate to allocate G&A expenses to all company activities")).

 SeAH's second argument is that Commerce's approach of deducting G&A expenses that do not relate to further manufacturing activities from CEP is contrary to the statute because "{t}he statute explicitly describes the items that may be deducted from CEP, and does not include G&A expenses incurred by the U.S. affiliate."  SeAH Comments at 5 (citing 19 U.S.C. § 1677a(d)).  Commerce addresses this precise point on remand:

> {W}e disagree with SeAH that the statutory intent was to exclude G&A expenses
> from the calculation of further manufacturing costs that may be deducted from

> CEP.  More importantly, the only portion of G&A expenses that we deducted as further manufacturing expenses is the amount of the tolling fee paid for further manufacturing activities.  As for the portion of G&A expenses at issue in this remand, as explained earlier, we treated them as selling expenses of PPA, which is SeAH's selling arm.

Final Remand Determination at 59.  As Commerce makes clear, the G&A expenses that are the subject of this remand properly are treated as selling expenses because PPA's role is that of a reseller.

Commerce's revised allocation in the Final Remand Determination addresses the Court's remand instructions, is in accord with statutory requirements, and is supported by substantial evidence on the record.

## III.    COMMERCE CORRECTLY INCLUDED INVENTORY VALUATION LOSSES IN THE CALCULATION OF SEAH'S G&A EXPENSE RATIO

In the Final Results, Commerce followed its normal approach and included raw material and WIP inventory valuation losses in the calculation of SeAH's total G&A expense ratio.  Final IDM at 83.  In its Remand Order, the Court found that Commerce's determination regarding its treatment of the inventory valuation losses as G&A expenses was not supported by record evidence, and remanded the issue to Commerce for further explanation or reconsideration.  Remand Order at 75-76.  In its Final Remand Determination, Commerce explains that the inventory losses were actual, not imputed, expenses, and cites to substantial evidence on the record demonstrating such treatment in SeAH's books and records.    Final Remand Determination at 23-27, 60-66.  Commerce's approach is consistent with its normal practice and should be upheld.

The Court held that "Commerce's decision to include SeAH's inventory valuation losses as G&A expenses is not supported by substantial evidence," stating that:

> It is unclear from the record or from Commerce's explanation whether the inventory valuation losses related to SeAH's raw materials and work-in-process

9

were expenses. Commerce did not cite record evidence demonstrating that the
inventory valuation losses became realized costs which it seems would occur only
if the raw materials and work-in-process were sold.

Remand Order at 74-75.  The Court relies on *Torrington Co. v. United States*, but that case
addressed *inventory carrying costs – not* inventory valuation losses.  Remand Order at 74-75
(citing *Torrington Co. v. United States*, 20 C.I.T. 632, 640 (1996))  In *Torrington*, the Court
found that inventory carrying costs should be based on the value of finished goods only, and not
raw materials and WIP.  *See Torrington*, 20 C.I.T. at 641.

In its Final Remand Determination, Commerce both distinguishes the Court's decision in
*Torrington* and demonstrates that the Final Remand Determination is supported by substantial
record evidence.  Commerce first states that it "respectfully disagree{s} with the Court's finding
that Commerce failed to cite relevant record evidence."  Final Remand Determination at 24.
Commerce then provides further explanation and "additional detail that more clearly
demonstrates that the inventory valuation losses are indeed recognized as actual expenses in
SeAH's normal books and records."  Final Remand Determination at 24.

Commerce shows that the *Torrington* case relied on by the Court is not on point because
that case addresses inventory carrying costs, "which are distinct in form and purpose from"
inventory valuation gains and losses.  Final Remand Determination at 24-26.  Commerce
explains the importance of this distinction, stating that "*inventory carrying costs* … are imputed
adjustments that Commerce makes with the intention to promote the comparability of the U.S.
and comparison market sales prices that are used in Commerce's antidumping calculations …
relat{ing} only to the finished goods that a respondent sold in these markets."  Final Remand
Determination at 25 (emphasis added).  In contrast, Commerce explains that "*inventory valuation*
*gains and losses* … are recognized by companies, including SeAH, in their normal books and

10

records in compliance with GAAP."  Final Remand Determination at 25 (emphasis added).  In the Remand Order, the Court referred to inventory carrying costs, as did the Court in *Torrington*. Remand Order at 74-75.  However, SeAH's inventory carrying costs are not at issue.  Rather, the issue pertains to SeAH's inventory valuation losses in this case, which, unlike inventory carrying costs, are *actual* – not imputed – expenses.  *See* Final Remand Determination at 26.  Therefore, the Court's reliance on *Torrington* was misplaced.  Remand Order at 74-75.

Second, Commerce points to record evidence submitted by SeAH regarding its actual inventory valuation losses, and explains that:

> {T}he key record evidence that SeAH's inventory valuation losses are actual and not imputed expenses is found in SeAH's audited income statement and in its reported reconciliation of the total costs from the income statement to the total reported costs. While not a separate line item on SeAH's income statement, the inventory valuation loss can be seen as a component of the company's total costs in the overall reconciliation worksheets and supporting documentation. Specifically, SeAH's overall reconciliation ties the total costs from the audited income statement to the total costs broken out by business area. We can then see from a review of the specific expense accounts that comprise each business area that SeAH recorded the inventory valuation losses under the headquarter business area. Because the headquarter business area is a component of the total costs on SeAH's income statement, we can confirm that the inventory valuation losses were recognized as expenses on SeAH's 2017 audited income statement.

Final Remand Determination at 26 (citations omitted).  Commerce's treatment of inventory valuation losses is based on how they are recorded in SeAH's audited income statement. Commerce explains that its approach is dictated by the recognition of these losses as expenses, noting that "because the raw material and WIP inventory valuation losses were recognized as expenses by SeAH on its audited income statement, we have continued to include the valuation losses in the calculation of SeAH's G&A expense ratio."  Final Remand Determination at 26-27.

SeAH argues that, because SeAH's cost calculations used the original historical cost for the purchased materials, and did not use the lower post-write-down value, such an adjustment for

SeAH double-counts the amount of the inventory-value loss.  *See* SeAH Comments at 8.  SeAH further argues that Commerce's approach is based:

> … on the assumption that the cost of materials used in SeAH's cost calculations is reduced by the amount of the inventory-valuation loss, and that it is therefore necessary to add the inventory-valuation loss to SeAH's costs in order to capture the full costs of raw materials. But that assumption is contrary to the evidence on the record, to Commerce's own initial determination, and to this Court's April 14 decision, which explicitly held that SeAH captured the full historical cost of materials in its cost calculations.

SeAH Comments at 9.  SeAH cites to the 2007-2008 review in *Circular Welded Pipe from Korea*, in which Commerce held that, "because SeAH did not actually write down its inventory values and continued to use the actual inventory historical costs in calculating production costs in its normal books and records, we find that SeAH's reported costs reasonably reflect the cost of producing and selling merchandise under consideration."   SeAH Comments at 12-13 (citing *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of the Antidumping Duty Administrative Review*, 75 Fed. Reg. 34,980 (Dep't Commerce June 21, 2010), accompanying Issues and Decision Memorandum at 17-19 ("*Circular Welded Pipe from Korea* Final IDM").

Commerce dismisses SeAH's reference to the decision in *Circular Welded Pipe from Korea* as outdated and unrepresentative of Commerce's approach: "{w}hile SeAH notes a single instance where Commerce previously excluded raw material and WIP inventory revaluation gains and losses from a respondent's reported costs, our normal and more recent practice is to follow a company's GAAP-based normal books and records and treat such inventory valuation gains and losses as period costs."  Final Remand Determination at 63-64.

*Circular Welded Pipe from Korea* does not reflect Commerce's current practice. *Compare Circular Welded Pipe from Korea* Final IDM at Comment 2 *with*, *e.g.*, *Certain*

*Crystalline Silicon Photovoltaic Products From Taiwan: Final Results of Antidumping Duty Administrative Review; 2014-2016*, 82 Fed. Reg. 31,555 (Dep't Commerce July 7, 2017), accompanying Issues and Decision Memorandum at Comment 10 ("We agree that the expenses related to the loss in inventory devaluation should be included in G&A expenses. While the Department has at times excluded such adjustments as temporary timing differences, in recent cases the Department has resorted to its overarching principle of recognizing period expenses when they are recognized in the company's financial statements") ("*Certain Crystalline Silicon Photovoltaic Products From Taiwan* Final IDM").  SeAH's claim that there is double-counting of the inventory valuation loss also fails on its own merits.  Commerce devotes several pages to explaining why SeAH's claims of double-counting – and the examples SeAH relies on – are simply wrong.  Commerce concludes:

> We disagree with SeAH that by including both the material costs consumed during the year and the net year-end adjustment of the cost of materials that remain in the inventory (*i.e.*, materials that have not been consumed) under Korean GAAP Commerce double counts costs. Rather, the net year-end adjustment is comprised of two parts: (1) the beginning of the year reversal of the prior year end adjustment (a gain if raw materials were written down at the prior year end), which offsets the historical costs of the raw materials that were in inventory at the prior year end, but enter production during the current year; and (2) the end of the year adjustment to record any impairments in the value of raw material inventory on hand at year-end (*i.e.*, raw materials not consumed during the year). Thus, the reversal that SeAH makes to return inventory on hand to historical cost is effectively a "gain" (or reversal of the provision) and would act to offset the fact that those materials entered production at their historical costs. The loss taken on the value of raw materials still on hand at year-end is recorded separately … Thus, we disagree that there is any double-counting of expenses by picking up the net year end adjustment under Korean GAAP.

Final Remand Determination at 64-66.

SeAH also asserts that Commerce's approach "reflects a fundamental misunderstanding of the actual accounting for the inventory-valuation losses," and proceeds to outline its inventory-related accounting entries.  SeAH Comments at 10-11.  SeAH's arguments must be

rejected because they would lead to a result that fails to account for SeAH's actual expenses and are inconsistent with both Commerce's established practice and SeAH's own GAAP-based books and records. Even if SeAH records inventory valuation gains and losses in a different account than the one used to calculate costs, the fact remains that inventory valuation losses for inventories reduced to net realizable values were recognized by SeAH in its audited financial statements as expenses. *See* SeAH Comments at 10-11; Final Remand Determination at 26. These expenses must be accounted for, and because they relate to the general operations of the company, they are properly included in the G&A expense ratio calculation. This is Commerce's established practice. *See*, *e.g.*, *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium: Final Results of Antidumping Duty Administrative Review; 2016-2018*, 85 Fed. Reg. 3,028 (Dep't Commerce Jan. 17, 2020), accompanying Issues and Decision Memorandum at Comment 2 ("inventory valuation losses are periodic adjustments, which are related to the general operations of the company as a whole and should be included in a respondent's reported G&A expense ratio calculation"); *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 Fed. Reg. 32,720 (Dep't Commerce July 9, 2019), accompanying Issues and Decision Memorandum at Comment 12 ("In calculating a G&A expense ratio, we usually include such period expenses, *i.e.*, those that are more related to an accounting period and not directly related to manufacturing merchandise, as they are related to the general operations of the company as a whole … As a periodic adjustment then, we find that it is appropriate to include UPI's inventory variance in the numerator for the company's G&A expense ratio"); *Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153 (Dep't Commerce Apr. 12, 2004), accompanying Issues and Decision Memorandum at Comment 7

14

("we have continued to include Dongbang's loss on the valuation of inventory in the G&A expenses used to calculate its G&A expense ratio"); *Certain Crystalline Silicon Photovoltaic Products From Taiwan* Final IDM at Comment 10.

As instructed by the Court, Commerce's Final Remand Determination provides further explanation of its decision to include SeAH's inventory valuation losses as they pertained to raw materials and WIP in the calculation of SeAH's total G&A expenses.  Commerce's decision is supported by substantial evidence on the record, is consistent with Commerce's established practice, and fully complies with the Remand Order.

## IV.   CONCLUSION

As demonstrated above, the Final Remand Determination provides a thorough explanation of Commerce's methodologies and rationale supporting its decisions with respect to (1) its application of PPA's G&A expense ratio; and (2) its treatment of SeAH's inventory valuation losses.

Commerce's Final Remand Determination is based on substantial evidence on the record and in accordance with law.  Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc. respectfully request that the Court reject SeAH's comments and affirm the Final Remand Determination with regard to these two issues.

Respectfully submitted,

/s/ Gregory J. Spak
Gregory J. Spak
Frank J. Schweitzer
Kristina Zissis
Matthew W. Solomon

**White & Case LLP**
701 Thirteenth Street, N.W.
Washington, D.C.  20005
202-626-3500

*Counsel to Defendant-Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc.*

Dated: September 15, 2021

CERTIFICATE OF COMPLIANCE

I, Gregory J. Spak, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures.  The word count for the Comments of Defendant-Intervenors Maverick Tube Corporation, Tenaris Bay City, Inc., and IPSCO Tubulars Inc. in Support of Commerce's Final Remand Determination, as computed by the White & Case word processing system (Microsoft Word 2016), is 4,697 words.

/s/ Gregory J. Spak
Gregory J. Spak