UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
_____

|  |  |  |
|---|---|---|
| SEAH STEEL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD, and | ) | |
| AJU BESTEEL CO., LTD. | ) | |
| | ) | Consol. Court No. 19-00086 |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| HYUNDAI STEEL COMPANY, and | ) | |
| ILJIN STEEL CORPORATION, | ) | |
| | ) | |
| Plaintiff-Intervenors, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) | |
| MAVERICK TUBE CORPORATION, TENARIS | ) | |
| BAY CITY, INC., IPSCO TUBULARS INC., | ) | |
| VALOUREC STAR, L.P., and | ) | |
| WELDED TUBE USA INC., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
_____

**ORDER**

Upon consideration of the Department of Commerce's final redetermination pursuant to remand, parties' comments, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's remand redetermination is sustained in all respects.

Dated: _____, 2021            _____
      New York, New York                                                      JUDGE

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE
_____

| | |
|---|---|
| SEAH STEEL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD, and ) | |
| AJU BESTEEL CO., LTD. ) | |
| ) | Consol. Court No. 19-00086 |
| Consolidated Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| HYUNDAI STEEL COMPANY, and ) | |
| ILJIN STEEL CORPORATION, ) | |
| ) | |
| Plaintiff-Intervenors, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| UNITED STATES STEEL CORPORATION, ) | |
| MAVERICK TUBE CORPORATION, TENARIS ) | |
| BAY CITY, INC., IPSCO TUBULARS INC., ) | |
| VALOUREC STAR, L.P., and ) | |
| WELDED TUBE USA INC., ) | |
| ) | |
| Defendant-Intervenors. ) | |

_____

# DEFENDANT'S RESPONSE TO
# COMMENTS REGARDING THE REMAND REDETERMINATION

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

s/Hardeep K. Josan
HARDEEP K. JOSAN
MYKHAYLO GRYZLOV                    Trial Attorney
Senior Counsel                     Commercial Litigation Branch
Office of the Chief Counsel        Civil Division
   for Trade Enforcement & Compliance    U.S. Department of Justice
U.S. Department of Commerce        26 Federal Plaza, Suite 346
                                   New York, New York 10278
                                   Tel.: (212) 264-9245
                                   Fax: (212) 264-1916
                                   Email: hardeep.k.josan@usdoj.gov

September 15, 2021                  Attorneys for Defendant

# TABLE OF CONTENTS

Background ................................................................................................................ 2

   I.   Administrative Proceeding ................................................................ 2

   II.  Proceedings Before This Court ......................................................... 3

ARGUMENT ............................................................................................................. 4

   I.   Commerce's Finding  That A Particular Market Situation
      Does Not Exist In Korea Is Consistent With The Court's Order .................................. 4

   II.  Commerce Properly Reversed Its Adjustment Of NEXTEEL's Reported Costs ............. 5

   III.  Commerce's Decision To Include  Suspension  Loss
       Costs In NEXTEEL's G&A Expenses Is Reasonable ................................................. 8

   IV.  Commerce's Inclusion  Of SeAH's Inventory  Valuation
       Losses In Its G&A Expense Ratio Is Supported
       By Substantial Evidence And In Accordance With Law ................................................14

   V.  Commerce's Treatment Of SeAH's G&A
      Expenses Is Supported By Substantial Evidence And Is In Accordance With Law ........20

CONCLUSION ........................................................................................................25

Certificate of Compliance .......................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Aramide Maatschappij V.o.F. v. United States,*
901 F. Supp. 353 (Ct. Int'l Trade 1995) .................................................................... 22, 23, 25

*Dillinger France S.A. v. United States,*
981 F.3d 1318 (Fed. Cir. 2020) .................................................................................. 5, 6, 7

*Haixing Jingmei Chem. Prod. Sales Co. v. United States,*
335 F. Supp. 3d 1330 (Ct. Int'l Trade 2018) .............................................................. 10

*Husteel Co. Ltd. v. United States,*
Consol. Ct. No. 19-00112, Slip. Op. 21-70 (Ct. Int'l Trade June 7, 2021) ................. 8, 10, 13, 14

*IPSCO, Inc. v. United States,*
965 F.2d 1056 (Fed. Cir. 1992) .................................................................................. 7

*NEXTEEL Co. v. United States,*
Consol. Ct. No. 18-00083, Slip. Op. 20-69 (May 18, 2020) ....................................... 22, 25

*SeAH Steel Corp v. United States,*
Consol. Ct. No. 19-00086, Slip. Op. 21-43, Dkt. 104 (April 14, 2021) ...................... *passim*

*SeAH Steel Corp. v. Unite States,*
Consol. Ct. No. 19-00086, Slip. Op. 21-43, Dkt. 108-1 (April 14, 2021) ................... *passim*

*Shandong Rongxin Imp. & Exp. Co. v. United States,*
203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) .............................................................. 11

*Timken Co. v. United States,*
699 F. Supp. 300 (Ct. Int'l Trade 1988) ..................................................................... 11

*United States Steel Corp. v. United States,*
712 F. Supp. 2d 1330 (Ct. Int'l Trade 2010) .............................................................. 20, 21

**Statutes**

19 U.S.C. § 1677a(d) ................................................................................................. 20, 21

19 U.S.C. § 1677a(d)(1)(D) ....................................................................................... 21, 24

19 U.S.C. § 1677b(f)(1)(A) ........................................................................................ 7, 9, 10, 11, 13, 16, 17

**Other Authorities**

*Certain Oil Country Tubular Goods From The Republic of Korea,*
84 Fed. Reg. 24, 085 (Dep't of Commerce May 24, 2019) ....................................................... 2

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes From Korea,*
86 Fed. Reg. 35060 ( Dep't of Commerce July 1, 2021) ....................................................23, 24

*Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2014-2015*,
81 Fed. Reg. 91, 120 (Dep't of Commerce Dec. 16, 2016) ........................................................13

*Certain Polyester Staple Fiber from Korea: Final Results of the 2005 -2006*
*Antidumping Duty Administrative Review*,
72 Fed. Reg. 69, 663 (Dep't of Commerce Dec. 10, 2007) ........................................................13

Statement of Administrative Action, H.R. Doc. 103-316, vol. 1 (SAA)...................21, 22, 24, 25

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
)
SEAH STEEL CORPORATION,                        )
                                               )
                Plaintiff,                     )
                                               )
                and                            )
                                               )
HUSTEEL CO., LTD., NEXTEEL CO., LTD, and       )
AJU BESTEEL CO., LTD.                          )
                                               )    Consol. Court No. 19-00086
                Consolidated Plaintiffs,       )
                                               )
                and                            )
                                               )
HYUNDAI STEEL COMPANY, and                     )
ILJIN STEEL CORPORATION,                        )
                                               )
                Plaintiff-Intervenors,         )
                                               )
                v.                             )
                                               )
UNITED STATES,                                 )
                                               )
                Defendant,                     )
                                               )
                and                            )
                                               )
UNITED STATES STEEL CORPORATION,               )
MAVERICK TUBE CORPORATION, TENARIS             )
BAY CITY, INC., IPSCO TUBULARS INC.,           )
VALOUREC STAR, L.P., and                       )
WELDED TUBE USA INC.,                          )
                                               )
                Defendant-Intervenors.         )
_____)

**DEFENDANT'S RESPONSE TO**
**COMMENTS REGARDING THE REMAND REDETERMINATION**

Defendant, the United States, respectfully submits this response to comments of plaintiff

SeAH Steel Corporation (SeAH), consolidated plaintiffs Husteel Co., Ltd. (Husteel), NEXTEEL

Co., Ltd. (NEXTEEL) and AJU Besteel Co., Ltd. (AJU), plaintiff-intervenors Hyundai Steel Company (Hyundai) and Iljin Steel Corporation (Iljin), and defendant-intervenor United States Steel Corporation (U.S. Steel) concerning the Department of Commerce's (Commerce) redetermination filed in accordance with this Court's decision and remand order in *SeAH Steel Corporation v. United States*, Consol. Ct. No. 19-00086, Slip Op. 21-43 (Apr. 14, 2021), Dkt. No. 104 (*Remand Order*). *Final Results of Redetermination Pursuant to Court Remand*, dated July 16, 2021, Dkt. No. 118-1 (*Remand Redetermination*).

For the reasons we explain below, this Court should sustain Commerce's *Remand Redetermination*.

## BACKGROUND

### I.      Administrative Proceeding

The administrative determination under review is *Certain Oil Country Tubular Goods From the Republic of Korea*, 84 Fed. Reg. 24,085 (Dep't of Commerce May 24, 2019) (final admin. results), P.R. 359, and accompanying Issues and Decision Memorandum (IDM), P.R. 351. Relevant here, in the final results Commerce: (1) determined that a particular market situation exists in Korea and made an upward adjustment to NEXTEEL's and SeAH's reported costs; (2) adjusted NEXTEEL's reported costs to value the downgraded non-prime products at their sales price, while allocating the difference between the reported full production cost and market value of the non-prime products to the production costs of prime-quality oil country tubular goods (OCTG); (3) included the loss from NEXTEEL's suspension of production in NEXTEEL's general and administrative (G&A) expenses; (4) included SeAH's raw material work-in-process inventory valuation losses in its G&A expense ratio; and (5) deducted G&A

expenses related to resold U.S. products, which were further manufactured, for SeAH's U.S. affiliate.

## II. Proceedings Before This Court

NEXTEEL and SeAH filed actions challenging Commerce's final results before this Court, and the cases were consolidated, along with challenges by other parties. On April 14, 2021, the Court sustained in part and remanded in part Commerce's final results. *Remand Order*. The Court remanded five issues: (1) the finding of a particular market situation; (2) reallocation of costs for NEXTEEL's non-prime products based on the actual costs of prime and non-prime products; (3) treatment of NEXTEEL's production line suspension costs; (4) recalculation of SeAH's further manufacturing costs; and (5) inclusion of SeAH's inventory valuation losses as G&A expenses.

Commerce filed the remand redetermination on July 16, 2021. On remand, Commerce, under protest, reversed the particular market situation finding and removed the adjustment from SeAH's and NEXTEEL's margin calculation. *See Remand Redetermination* at 7-14, 36-45. Commerce also reversed its finding with respect to reallocation of NEXTEEL's non-prime products, relying instead on the actual costs of prime and non-prime products as reported by NEXTEEL. *Id.* at 14-15, 48. Regarding the remaining issues, Commerce provided further analysis and explanation. *See generally id.* As a result, Commerce recalculated the weighted-average dumping margins for SeAH, NEXTEEL, and non-examined companies, which have changed from 16.73 percent to 5.28 percent, 32.24 percent to 9.77 percent, and 24.49 percent to 7.53 percent, respectively.

## ARGUMENT

As set forth below, Commerce's *Remand Redetermination* fully complies with the Court's order, is supported by substantial evidence, and is in accordance with law.

## I. Commerce's Finding That A Particular Market Situation Does Not Exist In Korea Is Consistent With The Court's Order

U.S. Steel argues that in finding that a particular market situation does not exist in Korea, Commerce "misconstrued the Court's *Remand Order*," "violated the statutory framework by replacing the Court's assessment of the facts for that of Commerce," "failed to address the entirety of the administrative record," and "ignored evidence that undermined certain conclusions." U.S. Steel Cmts. at 2. U.S. Steel is wrong.

First, Commerce fully complied with the Court's order and, under protest, reversed the finding of a particular market situation and removed the particular market situation adjustment from the margin calculations. *Remand Redetermination* at 13. Commerce explained that, while respectfully disagreeing with the Court's *Remand Order*,

> upon review of the evidence on the record of this proceeding, we find that the additional evidence on the record of this underlying proceeding, which the Court has not previously addressed and rejected, as identified in the remand comments by the interested parties, is insufficient, on its own, to sustain a finding of a {particular market situation} within the analytical framework that the Court articulated in its opinion in this case.

*Id.* Contrary to U.S. Steel's assertion, Commerce did not ignore record evidence or somehow limit the reconsideration to documents that were new to the period of review. Rather, Commerce reviewed the administrative record as a whole in light of the fact that the Court has already found much of the evidence insufficient to establish a particular market situation. *Id.* at 38 ("{W}e cannot find that a {particular market situation} exists on the basis of evidence that the Court has already found insufficient."). Beyond this record evidence, as Commerce explained, interested

parties did not identify further evidence that is sufficient to demonstrate the presence of a particular market situation. *Id*. Thus, Commerce reversed the application of a particular market situation on remand.

Second, contrary to U.S. Steel's assertion, Commerce properly concluded that there is no further evidence beyond that already considered and rejected by the Court in the *Remand Order* to demonstrate that government restructuring and overcapacity impacted the Korean market. *Id*. at 13-14. Specifically, as Commerce explained, interested parties were unable to demonstrate that the evidence of overcapacity in the Korean market "led to a situation in which, 'the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade.'" *Id*. at 39.

Further, although Commerce found that evidence regarding restructuring may contribute to a particular market situation, because the Court found the record evidence insufficient, Commerce reasonably concluded that any interplay among all the factors (including restructuring) "also is not sufficient in this instance for Commerce to make an affirmative {particular market situation} determination" and adjustment. *Id*. at 45. Thus, to the extent U.S. Steel believes that the record supports the finding of a particular market situation, its recourse lies with the Court, not Commerce.

## II.   Commerce Properly Reversed Its Adjustment Of NEXTEEL's Reported Costs

Commerce properly reversed its adjustment of NEXTEEL's reported costs of production of non-prime pipe, consistent with the Court's order and with the U.S. Court of Appeals for the Federal Circuit's holding in *Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020) (*Dillinger*). In *Dillinger*, as this Court explained, "the U.S. Court of Appeals for the Federal Circuit remanded Commerce's assignment of costs for Commerce to determine the actual costs of prime and non-prime products when Commerce calculated costs based on

recorded projected sales prices rather than costs of producing and selling merchandise." *Remand Order* at 61. This Court held that the "*same defect impairs Commerce's adjustment of NEXTEEL's reported cost* for non-prime products to market value and the subsequent adjustment to NEXTEEL's reported cost for prime OCTG to include the net cost for non-prime products since neither adjustment reflects actual costs." *Id. (emphasis added).* Accordingly, Commerce reversed the adjustment to NEXTEEL's reported costs, which it made in the *Final Results*, and relied on the actual costs of prime and non-prime products as reported by NEXTEEL. *Remand Redetermination* at 14.

This treatment of the non-prime costs is consistent with NEXTEEL's reporting in its normal books and records, the statute, the Court's order, and the Federal Circuit's holding in *Dillinger*, in which the Court stated that Commerce is required to determine the actual costs of prime and non-prime products. U.S. Steel contends that Commerce's reversal of the adjustment is inconsistent with both *Dillinger* and this Court's order. U.S. Steel Cmts. at 30. U.S. Steel also contends that while the *Remand Order* instructed Commerce to use actual costs, it did not presuppose that it would involve reallocation of costs. *Id.*

Contrary to U.S. Steel's arguments, this Court held that Commerce's adjustments to NEXTEEL's reported costs for prime and non-prime products were inconsistent with *Dillinger*, "since neither adjustment reflects actual costs." *Remand Order* at 61. Accordingly, by eliminating these adjustments to reported costs, Commerce complied with this Court's order, which relied on *Dillinger*.

Further, U.S. Steel contends that the key distinction between this case and *Dillinger* is that in *Dillinger* Commerce relied on the respondent's normal books and records, which the Federal Circuit determined did not accurately reflect production costs, whereas here Commerce

6

originally adjusted the reported costs from NEXTEEL's books and records, *i.e.*, deviated from those books and records. U.S. Steel Cmts. at 31. However, the allocation in the respondent's normal books and records in *Dillinger*, which the Federal Circuit rejected, was substantially similar to Commerce's original adjustment in this case, which Commerce reversed on remand. If Commerce were to agree with U.S. Steel in this case, which it does not, Commerce would have had an additional burden to justify a departure from NEXTEEL's normal books and records.

U.S. Steel also argues that section 1677b(f)(1)(A) does not require Commerce to use NEXTEEL's normal books and records in all circumstances, but only provides that Commerce will *normally* do so. This may be true, but here Commerce simply reversed an adjustment to the reported cost after the Court found that the adjustment, which U.S. Steel favors, did not reflect actual costs.

Finally, U.S. Steel advances several arguments that range from an assertion that NEXTEEL's reported costs are inconsistent with Korean GAAP to a contention that NEXTEEL's non-prime products are out of scope products that should be treated as scrap. U.S. Steel Cmts. at 26-28. These arguments, however, provide no basis for adjusting NEXTEEL's reported costs of non-prime products to be equal to "the amount it is able to recoup through the sale of such non-prime product (*i.e.* its market price)." U.S. Steel Cmts. at 29. In *Dillinger*, the Federal Circuit followed its earlier decision in *IPSCO*, where it held a method that "calculate{ed} costs for both limited-service and prime products on the basis of their relative prices" to be "an unreasonable circular methodology" because it "contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." *Dillinger*, 981 F.3d at 1322 (quoting *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992)). Accordingly, *Dillinger*, as interpreted by this Court in the *Remand*

7

*Order*, specifically precludes the adjustment of NEXTEEL's reported costs that U.S. Steel seeks, *i.e.*, assigning to non-prime products the cost that is equal to their market price.

## III. Commerce's Decision To Include Suspension Loss Costs In NEXTEEL's G&A Expenses Is Reasonable

The Court remanded for clarification or reconsideration Commerce's decision to include NEXTEEL's suspended losses as part of the company's G&A expenses. *Remand Order* at 63. Specifically, the Court stated that although Commerce explained its practice, it did not sufficiently explain why the deficiency in NEXTEEL's records warranted a departure from the statutory preference of using the producer's or exporter's records. *Id.* On remand, Commerce provided further explanation why reclassification of NEXTEEL's reported losses was reasonable and why NEXTEEL's allocation of labor and overhead costs relating to suspended lines to the cost of goods sold in its records was distortive. *Remand Redetermination* at 17. This Court recently sustained substantially identical treatment by Commerce of NEXTEEL's suspended losses in *Husteel Co. Ltd. v. United States*, Consol. Ct. No. 19-00112, Slip. Op. 21-70 (Ct. Int'l Trade June 7, 2021) ("The court cannot say that it is unreasonable for Commerce, in its expertise, to determine that a company's attribution of costs relating to the extended suspension of certain non-subject product lines as costs of goods sold results in an inaccurate reflection of the general expenses incurred in the production of subject merchandise."). The Court should do the same here.

It is Commerce's practice to include routine shutdown expenses (such as maintenance shutdowns) in a respondent's reported costs of manufacturing, and to associate those expenses with products produced on those lines. *Remand Redetermination* at 16. However, the suspended losses at issue were not related to a routine shutdown; they concerned NEXTEEL's suspension of production on certain lines for an extended period of time (*i.e.*, throughout fiscal years 2016

and 2017). *Id.* Commerce explained that "{u}nlike a routine maintenance shutdown, once a production line is suspended, it no longer relates to ongoing production." *Id.* Commerce highlighted the difference between routine maintenance shutdowns in that, regardless of the reason for an extended suspension of production activity, "there are no longer products produced on those suspended production lines or current intentions to produce products on those lines that can bear costs associated with those production lines." *Id.* Commerce explained that "the suspended lines, akin to idled assets, remain available to the company pending resumption of production on those production lines, and represent excess capacity held by the company" and that the agency "consider{s} the cost of holding idle assets a period cost that relates to the general operations of the company, as a whole, and not to the manufacture of specific products." *Id.* at 16-17.

Consistent with the *Remand Order*, Commerce reasonably explained why the treatment of suspended losses in NEXTEEL's books and records does not reasonably reflect production and selling costs pursuant to 19 U.S.C. § 1677b(f)(1)(A). *Id.* at 16-17. Specifically, "where {the agency determines} that a company's normal books and records do not reasonably reflect the production costs of the merchandise under consideration, Commerce's practice has been to adjust these costs as necessary." *Id.* at 16. Because NEXTEEL "did not allocate the labor and costs related to suspended lines to pipe products but recorded the suspension loss directly to COGS, skipping the assignment of the costs to products and inflating the COGS figure used in allocation of G&A's expense," treatment of suspended costs in NEXTEEL's normal books and records was distortive. *Id.* at 17. Accordingly, "this suspended loss was excluded from the reported costs (*i.e.*, not included in either per-unit {cost of manufacturing} or in G&A expense)." *Id.*

Further, "Section 773(b)(3)(B) of the Act directs Commerce to include as part of {cost of production} costs associated with the general operations of the company (*i.e.*, costs that are not directly associated with a product but rather are expensed directly)." *Id.* Consistent with its normal practice for determining whether a particular item should be included in G&A expenses, Commerce reviewed the nature of the item (suspended losses) and its relation to the general operations of NEXTEEL. *Id.* Commerce found that production of these lines was suspended for an extended period of time, the suspended lines were essentially idle assets, and no revenue was realized because no products were produced on such lines during the relevant period. Therefore, it was reasonable to associate these costs with the general operations of the company as a whole (*i.e.*, with general expenses), and not specific to products associated with that production line (*i.e.*, costs of goods sold), because by suspending its production lines for an extended period of time during the period of review, no revenue from those products was generated for that period, and the associated costs were necessarily covered by all the other products produced by NEXTEEL. *Id.* This Court recently sustained the substantially identical approach to NEXTEEL's suspended losses in a recent decision in *Husteel*, explaining that "{a}lthough a company may shut down product lines from time to time for various intervals, at some point an extended shutdown suggests that the costs of that product line are more akin to expenses borne by the company in its general operations." *Husteel Co. Ltd. v. United States*, Consol. Ct. No. 19-00112, Slip. Op. 21-70 (Ct. Int'l Trade June 7, 2021).

NEXTEEL disagrees with Commerce's adjustment and argues that the agency's decision contravenes 19 U.S.C. § 1677b(f)(1)(A). NEXTEEL Cmts. at 4-5. NEXTEEL simply disagrees with Commerce's evidentiary conclusions. IDM at 14-18, 50-54; *see also Haixing Jingmei Chem. Prod. Sales Co. v. United States*, 335 F. Supp. 3d 1330, 1346 (Ct. Int'l Trade 2018)

10

("mere disagreement with Commerce's weighing of the evidence" is insufficient basis for legal challenge); *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (noting "tremendous amount of deference" afforded Commerce factual findings); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that the Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

Section 1677b(f)(1)(A) provides: "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise." However, where, as in this case, a company's normal books and records do not reasonably reflect the production costs of the merchandise under consideration, Commerce adjusts the costs as necessary. *Remand Redetermination* at 16-17. As Commerce explained, the costs in question "were not assigned to products" in NEXTEEL's cost accounting system, but rather were "transferred {in aggregate} directly to {cost of goods sold} without assignment to specific products." *Id*. at 51. In other words, NEXTEEL failed to recognize such costs either as part of per-unit cost of manufacturing for a specific product or as part of G&A expenses and, instead, improperly "inflat{ed} the {cost of goods sold} figure used in allocation of G&A expenses." *Id*. at 17 & 51.

NEXTEEL contends that reallocating NEXTEEL's production suspension costs is unreasonable "because doing so *reattributes* costs that are not associated with any production to the production of subject merchandise through G&A." NEXTEEL Cmts. at 5 (emphasis added). NEXTEEL argues that suspended losses from its idle assets are unrelated to the company's overall operations. *Id*. NEXTEEL is wrong. In any dumping case, the G&A expense ratio

11

necessarily allocates period costs (which are not directly tied to any specific product but relate to the general operations of the company as a whole) to *all* products, including subject merchandise, proportionately. There is nothing unreasonable about allocating such costs through the G&A expense ratio to various products.

NEXTEEL also claims that "Commerce branded the suspended lines 'idled assets' with no elaboration or explanation of the underlying facts that support its characterization of the suspended lines as 'idled assets.'" NEXTEEL Cmts. at 9. This is simply not true. Commerce explained that "unlike routine maintenance shutdown, once a production line is suspended, it no longer relates to ongoing production." *Remand Redetermination* at 16. Commerce further explained that, although there may be various reasons for the extended suspension of production, regardless of the reason, "there are no longer products produced on those production lines or current intentions to produce products on those lines that can bear the burden of the costs associated with those production lines." *Id*.

Moreover, the record establishes that "{n}o revenue from any products normally produced on those lines was generated for the period because these lines were suspended and not producing any products," that the "lines remain available to NEXTEEL for future production, but for the period, constitute excess capacity," and "nothing on the record indicates that these lines were permanently removed or shut down." *Id*. at 17. Accordingly, "the suspended lines, akin to idled assets, remain available to the company pending resumption of production on those lines and represent excess capacity held by the company" and the cost of holding such assets "is a period cost that relates to the general operations of the company as a whole, and not manufacture of specific products." *Id*. 16. Further, the verification report indicates that "the assets were idle through fiscal years 2016 and 2017," *i.e*., they were idle for approximately 2

years. *Id.* at 52 (citing to verification report). Thus, Commerce provided reasonable explanation for its findings and supported them with record evidence.

NEXTEEL further contends that Commerce's practice of including expenses from idle assets in the G&A expense ratio is inapposite. NEXTEEL Cmts. at 6 (citing *Pasta from Italy* and *Certain Polyester Staple Fiber from Korea*). However, in this case, Commerce determined that "nothing in the record indicates that that these lines were permanently shut down or removed." *Remand Redetermination* at 17.[1] Accordingly, consistent with *Pasta from Italy* and *Certain Polyester Staple Fiber from Korea*, Commerce properly included the costs of idle production lines in its G&A expense ratio calculations.

NEXTEEL also contends that "the accounting treatment employed by the respondents in those cases is not entirely clear" and the cases do not appear to address the issue of what to do when a respondent classifies such expenses as cost of goods sold. NEXTEEL Cmts. at 6-7. However, NEXTEEL's contentions are misplaced. Here, Commerce found that NEXTEEL's classification of the expenses at issue as cost of goods sold "does not reasonably reflect the production costs of merchandise under consideration or other products included within {cost of goods sold}." *Remand Redetermination* at 51; *Husteel Co. Ltd. v. United States*, Consol. Ct. No. 19-00112, Slip. Op. 21-70, at 18. Consistent with 19 U.S.C. § 1677b(f)(1)(A), Commerce has authority to adjust respondent's costs, if a company's books and record do not reasonably reflect production costs. Furthermore, this Court recently affirmed Commerce's inclusion of NEXTEEL's suspended production costs in its G&A expense ratio calculations, as consistent

---

[1] NEXTEEL claims that Commerce "makes inconsistent references" that suspension was "for limited periods of time" and "for an extended period of time," which according to NEXTEEL means that the determination is not well reasoned or explained. NEXTEEL Cmts. at 10. However, there is no inconsistency, because Commerce's reference to a "limited" period indicates that the shutdown was not permanent. A shutdown could last for an extended period of time, while still being "limited," *i.e.*, not permanent.

with the statute, in litigation concerning welded line pipe from Korea. *Husteel Co. Ltd. v. United States*, Consol. Ct. No. 19-00112, Slip. Op. 21-70, at 18 (Ct. Int'l Trade June 7, 2021).

Finally, NEXTEEL contends that "Commerce has not articulated a standard for distinguishing between routine shutdowns (which in Commerce's view do not warrant cost reclassification) and more prolonged shutdowns (a situation which Commerce views as appropriate to reclassify costs) and has not done so with a reference to a relevant statutory provision." NEXTEEL Cmts. at 10. As an initial matter, the statute does not expressly provide how shutdown expenses should be treated in dumping calculations, leaving the discretion to the agency. Nor does the statute require Commerce to develop a bright-line test or address all possible permutations of potential shutdowns, which NEXTEEL appears to advocate. NEXTEEL Cmts. at 10. NEXTEEL concedes that Commerce could make its determination regarding the length of a period on a case-by-case basis. *Id.* In this case, Commerce found, based on verified information that the shutdown at issue lasted for approximately two years. *Remand Redetermination* at 52 (citing verification report). In other words, the production shutdown started before the period of review and continued well after. *Id.* at 53. NEXTEEL's disagreement with Commerce's finding that a prolonged two-year shutdown of production lines, which exceeds the duration of the period of review, constitutes an extended shutdown does not make Commerce's determination unreasonable or unlawful. Thus, Commerce's determination should be sustained.

## IV. Commerce's Inclusion Of SeAH's Inventory Valuation Losses In Its G&A Expense Ratio Is Supported By Substantial Evidence And In Accordance With Law

Consistent with the *Remand Order*, Commerce provided further explanation and clarification for including SeAH's raw material work-in-process inventory valuation losses in its G&A expense ratio. Specifically, the Court found that it "is unclear from the record or from

Commerce's explanation whether the inventory valuation losses related to SeAH's raw materials and work-in-progress were expenses." *Remand Order* at 74. The Court held that Commerce failed to cite record evidence "demonstrating that the inventory valuation losses became realized costs, which it seems would occur only if the raw materials and work-in-process were sold" and, thus, remanded this issue for further explanation or reconsideration. *Id.* On remand, Commerce provided further explanation of SeAH's inventory valuation adjustments with additional details and citations to record evidence that more clearly demonstrates that the inventory valuation losses are indeed recognized as actual in SeAH's normal books and records. *Remand Redetermination* at 24-27.

Commerce explained that inventory valuation gains and losses "are recognized by companies, including SeAH, in their normal books and records in compliance with GAAP." *Id.* at 25. GAAP "principles require the restatement of currently held inventory values to the lower of their cost or net realizable value." *Id.* The "purpose of this rule, which is also a part of U.S. GAAP and International Accounting Standards, as well as many other national accounting systems, is to comply with a basic tenet of accounting – the "matching" principle." *Id.* "In the context of inventory valuation," Commerce explained, "the matching principle requires that a loss of inventory value during a given accounting period be charged against the revenues of the period in which it occurs." *Id.* at 25-26. Commerce examined SeAH's audited financial statements and concluded that "SeAH follows the lower of cost or net realizable value policy for its inventories and that any such losses in inventory value are recognized as a current expense on the income statement." *Id.* at 26.

Moreover, "the key record evidence that SeAH's inventory valuation losses are actual and not imputed expenses is found in SeAH's audited income statement and in its reported reconciliation of the total costs from the income statement to the total reported costs." *Id.* at 26. Although the inventory loss is not a separate item in the financial statements, Commerce

explained that it is included as a component of the company's total costs in the overall reconciliation worksheets and supporting documentation. *Id.* The agency further explained how the inventory valuation loss can be traced from SeAH's normal books and records to its audited financial statement and confirmed that "the inventory valuation losses were recognized as expenses on SeAH's 2017 audited income statement." *Id.* Because the statute directs Commerce to rely on a company's GAAP-based normal books and records unless such books and records do not reasonably reflect the costs associated with the production and sale of the merchandise, Commerce properly accounted for these costs in its dumping calculations. 19 U.S.C. § 1677b(f)(1)(A).

Rather than refuting this record evidence, SeAH contends that Commerce allegedly conceded "that the losses in question are not realized, and that its inclusion of the Losses {*sic*} in its cost calculation was based on a demonstrably false assumption." SeAH Cmts. at 9. SeAH is wrong. *See generally Remand Redetermination* 1-67. Commerce found that "the inventory valuation losses are indeed *recognized as actual expenses* in SeAH's normal books and records." *Id.* at 26 (emphasis added). Commerce also explained that "GAAP seeks to ensure that a company's balance sheet is not overstated and that the current period net profit or loss is appropriately charged for any significant changes in the value of the assets held by the company." *Id.* at 64. Commerce explained that the inventory revaluation of losses is "similar to a company's recognition of bad debt expenses, translation gains or losses, or impairment losses, all of which reflect changes in the values of assets or liabilities held by a company at a period end." *Id.* Consistent with its home country GAAP, SeAH recognized various estimated valuations as actual costs in its own audited financial statements, which (for example) resulted in bad debt expenses, depreciation expenses, etc., including the inventory valuation losses that are at question, on its profit and loss statement. *See e.g.,* C.R. 285, SeAH's supplemental section A response dated June 8, 2018, at Exhibit SA-2-B,

16

SeAH 2017 audited financial statements at note 4 (showing allowance for doubtful accounts), note 7 (showing loss on valuation on inventories), note 8 (showing accumulated depreciation), note 24 (showing depreciation expense, bad debt expense, etc.).

To demonstrate an error in Commerce's treatment of its inventory valuation losses, SeAH must demonstrate that its GAAP compliant audited financial statements do not reasonably reflect the costs associated with the production and sale of the merchandise, which SeAH has failed to do. 19 U.S.C. § 1677b(f)(1)(A). Because the costs at issue are reflected in SeAH's own GAAP-based financial statements, SeAH essentially argues that its own books are unreasonable and must be set aside because they result in a double-counting of costs. SeAH Cmts. at 9 ("Commerce also attempted to refute SeAH's contention that the inclusion of inventory-valuation losses in the calculated costs resulted in a double-counting of SeAH's actual cost of materials."). To the contrary, there is no double-counting. *Remand Redetermination* at 64 ("We also disagree that following a company's GAAP-based normal books and records results in a double-counting of raw material and WIP consumption costs.").

Further, SeAH contends that "Commerce's explanation of why costs are not double counted reflects a demonstrably false assumption that the raw material costs used in SeAH's cost calculations are reduced by the inventory valuation losses." SeAH Cmts. at 9. SeAH is mistaken. SeAH's argument hinges on a faulty assumption that the total costs of manufacturing assigned to finished goods (which include the full value of raw material costs consumed during the production) include the same costs as SeAH's G&A expenses (which include the net inventory valuation losses from the profit and loss statement that recognize the net change in the value of inventories on hand *i.e.*, the inventory that has not been consumed during the production). However, SeAH improperly conflates two distinct types of expenses: the loss

associated with the inventory *on hand* (*i.e.*, inventory that has not been consumed in production) and the cost of the raw materials and semi-finished goods consumed during the production process.

In its comments to the agency, SeAH unsuccessfully attempted to demonstrate the alleged double-counting through a hypothetical example, which Commerce addressed. *Remand Redetermination* at 65. Specifically, Commerce explained why SeAH's hypothetical example demonstrated the opposite – that is, it shows why the net cost of production, *i.e.*, the TOTCOM assigned to finished goods (including the full value of raw material costs consumed during production) plus the G&A expenses (including the net inventory valuation losses from the profit and loss statement that recognize the net change in the value of inventories *on hand*), do not double-count costs. *Id.* Even though SeAH presented the hypothetical example, it now faults Commerce for elaborating on hypothetical facts, which SeAH now claims differ from how its accounting system works. SeAH Cmts. at 12-13 (claiming that Commerce misunderstood its accounting). Commerce's response to SeAH's hypothetical was not intended to imply that SeAH consumed raw materials at the lower value, but only to demonstrate why the net of the two categories of expenses, *i.e.*, TOTCOM plus G&A expenses or COP, would not double-count costs. GAAP's intention with the lower of cost or market policy is for a company to immediately recognize a loss in asset value and therefore "match" it to the current period activity. Commerce's G&A expense calculations are based on the current period in which the inventory valuation losses in value of inventory *on hand* was recognized by SeAH in its audited profit and loss statement; therefore, Commerce likewise included the inventory valuation losses in its calculation SeAH's G&A expenses.

Contrary to SeAH's unsubstantiated assertions, there is no double-counting because there are two separate and distinct costs that are being captured here. The product-specific TOTCOM reported by SeAH reflects the historical costs of the raw materials and semi-finished goods that were *consumed* in production of finished goods, while the fiscal year G&A expenses reflect the net loss, as recorded on the profit and loss statement, in the value of inventory that was *on hand* (*i.e.*, not consumed) at the end of the year, a recognition that is required under the home country GAAP followed by SeAH. This recognition of loss in inventory values is no different from accounting entries that recognize the depreciation of fixed assets, bad debt expenses related to current accounts receivables, asset impairment losses, etc., all of which seek to conservatively allocate the loss in asset values to the production or revenues generated in the period in which the losses occurred.

Finally, Commerce did not misunderstand SeAH's accounting in its normal books and records. To demonstrate the alleged misunderstanding, SeAH offers a four-step mini tutorial on its accounting of inventory-valuation losses. SeAH Cmts. at 14. However, in doing so, SeAH provides only a balance sheet perspective, but omits the corresponding accounting entries that affect the company's profit and loss statement. *Id*. SeAH's tutorial reflects a fundamental omission or misunderstanding of double-entry accounting – *i.e.*, there are two sides (a debit and a credit) of each entry. For example, when SeAH records an inventory valuation loss (which is discussed in step 3 of SeAH's mini tutorial), there is a corresponding debit to current period expenses. C.R. 400, SeAH's August 3, 2018 supplemental response at Appendix S2D-8, at 2 (debit to account 440104).

In accordance with GAAP, SeAH's normal books and records restate the inventory balances on SeAH's balance sheet on a quarterly basis so that they conservatively reflect the

lower of cost or net realizable values. At the same time, SeAH records on its income statement the associated net gain or loss that is the result of this revaluation. *See Remand Redetermination* at 25-26; IDM at 83; *see also* SeAH Cost Verification Report at 4, P.R. 316. There is no double-counting of expenses since the net inventory losses recorded on SeAH's GAAP-based audited income statement are periodic expenses related to a change in the value and future utility of currently held inventory and are not related to the inventory consumed in current production. Therefore, Commerce properly included SeAH's inventory valuation losses in its G&A expense ratio.

## V. Commerce's Treatment Of SeAH's G&A Expenses Is Supported By Substantial Evidence And Is In Accordance With Law

The Court remanded for clarification or reconsideration the deduction of G&A expenses related to resold U.S. products, which were further manufactured, for SeAH's U.S. affiliate Pusan Pipe America Inc. (PPA). *See Remand Order.* This issue arose largely because PPA resells some of the purchased SeAH products without further processing, while having some of SeAH's products further manufactured and selling these further manufactured products in the United States. The Court found that the cost of production of imported OCTG is not a cost incurred for further manufacturing and, thus, concluded that Commerce's calculation of further manufacturing costs was not in accordance with law. *Id.* at 69. On remand, consistent with the Court's order, apart from the amount of the processing fee that PPA pays to unaffiliated companies for further manufacturing the products at issue, Commerce reclassified PPA's G&A expenses as indirect selling expenses and deducted them under 19 U.S.C. § 1677a(d). *Remand Redetermination* at 58-59.

This Court has been clear that the statute requires deduction of both further manufacturing costs and selling expenses. *See United States Steel Corp. v. United States*, 712 F.

Supp. 2d 1330, 1336 (Ct. Int'l Trade 2010); *Remand Order* at 67 ("Commerce must deduct both the selling expenses and the cost of further manufacture from the price used to determine constructed export price."). On remand, Commerce explained that the "antidumping statute, section 772 {*i.e.*, 19 U.S.C. § 1677a(d)}, provides that the price used to establish {constructed export price} must be reduced by certain expenses, such as direct selling expenses, indirect selling expenses, and costs of any further manufacture or assembly." *Remand Redetermination* at 22. Commerce also explained that the courts found "that, 'in calculating U.S. prices using the {constructed export price} methodology, Commerce is to deduct any expenses generally incurred by or for the account of… the affiliated seller in the United States, in selling subject merchandise.'" *Id.* (quoting *United States Steel Corp. v. United States*, 712 F. Supp. 2d 1330, 1336 (Ct. Int'l Trade 2010)).

The statute does not specify how to treat the U.S. affiliated selling entity's G&A expenses when establishing the constructed export price. In other words, the statute does not mandate in which category G&A expenses of a selling entity would be categorized. However, the statutory language under section 19 U.S.C. § 1677a(d)(1)(D), covering the adjustments to constructed export price, is broadly written to include "any selling expenses not deducted" under the other subparagraphs. Moreover, the SAA explains that 19 U.S.C. § 1677a(d)(1)(D) provides for the deduction of indirect selling expense from constructed export price. *See* Statement of Administrative Action, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 824. The SAA further defines "indirect selling expenses" as "expenses which do not meet the criteria of 'resulting from and bearing a direct relationship to' the sale of the subject merchandise, do not qualify as assumptions, and are not commissions." *Id.* In calculating indirect selling expenses, Commerce "generally will include the G&A expenses incurred by the United States selling arm of a foreign

producer" and this longstanding practice has been previously sustained by the Court, including with respect to the immediately preceding review of this antidumping duty order. *See Aramide Maatschappij V.o.F. v. United States*, 901 F. Supp. 353, 360 (Ct. Int'l Trade 1995); *NEXTEEL Co. v. United States*, Consolidated Court No. 18-00083, Slip. Op. 20-69, at 22 (May 18, 2020) ("Commerce's explanation of accounting treatment methodology for classifying PPA's G&A expenses as indirect selling expenses and deducting the expenses when calculating constructed export price is reasonable and responsive to the court's request for clarification."). Thus, our practice in this regard, as accepted by the Court, recognizes that G&A expenses are costs that support a company's overall operations. They are day-to-day costs that a business must incur to continue to exist or operate (*e.g.*, property taxes, business licenses, insurance, accounting/auditing services and personnel costs, etc.). *See, e.g.*, SeAH's February 25, 2018 section E response at Appendix E-5, C.R. 129. Consequently, these costs that enable a company to continue to operate are indirectly related to those operations. As recognized by the Court, if a company only resells goods, then these G&A expenses are appropriately considered "selling expenses." *Remand Order* at 70. Likewise, if a company both resells and manufactures, these expenses logically support both company activities – selling and manufacturing.

Here, PPA both resells purchased goods and provides for the further manufacture of purchased goods prior to reselling them. As noted above, had PPA only resold purchased goods, the G&A expenses would have been recognized as selling expenses. However, because PPA arranges for the further manufacture of certain purchased goods, SeAH has argued that Commerce cannot transform into selling expense the G&A expenses, *i.e.*, the expenses that support the company's overall operations (which for PPA are both reselling and further manufacturing) and therefore should recognize in its calculations as allowable deductions only

the amounts allocated to PPA's further manufacturing.  Yet, the record demonstrates that PPA's activities are largely concentrated in reselling and in not further manufacturing.  *Remand Redetermination* at 58.

Commerce examined PPA's activities and found that "it is significant that PPA is not performing further manufacturing on its own and does not maintain any production facilities for further manufacturing."  *Id.* at 58.  Commerce also found that these processes are performed by unaffiliated tollers and "SeAH's involvement in further manufacturing is perfunctory in nature and is limited to paying a processing fee, which we accounted for as a further manufacturing expense."  *Id.*  "Apart from paying the processing fee to the tollers," which Commerce accounted for, "SeAH is predominantly a selling entity and, thus, it is reasonable to treat the portion of its G&A expenses that are related to the cost of imported products as selling expenses."  *Id.*

First, SeAH contends that Commerce's decision is inconsistent with a recent determination in a review of *Heavy Walled Rectangular Pipe from Korea*, which SeAH claims constitutes an established practice of distinguishing between G&A expenses and selling expenses.  SeAH Cmts. at 7.  However, SeAH misstates Commerce's practice.  As explained above, Commerce "generally will include the G&A expenses incurred by the United States selling arm of a foreign producer" and this longstanding practice has been previously sustained by this Court.  *See, e.g., Aramide Maatschappij V.o.F. v. United States*, 901 F. Supp. 353, 360 (Ct. Int'l Trade 1995).

The issue in *Heavy Walled Rectangular Pipe from Korea* was different, *i.e.*, whether to include the entire amount of CEO's salary and certain service fees in the G&A expenses of a large Korean producer, whereas the issue here is how to treat G&A expenses of a U.S. importer, which primarily serves as a selling arm of a foreign producer.  *Heavy Walled Rectangular*

*Welded Carbon Steel Pipes and Tubes from Korea*, 86 Fed. Reg. 35060 (July 1, 2021), and accompanying Issues and Decision Memorandum at 46-47 (Cmt. 6). SeAH is essentially asking that PPA be treated the same as producers and/or companies performing further manufacturing (which have production facilities, factory overhead and other significant expenses associated with manufacturing) when *PPA is not performing further manufacturing*.

Moreover, in *Heavy Walled Rectangular Pipe from Korea*, Commerce expressly rejected the argument that its determination was inconsistent with its determination in *OCTG from Korea*. *Id.* at 47. Commerce explained that "each administrative review is a separate segment of proceedings with its own unique facts" and that "although the facts in *OCTG from Korea* may differ from those in the instant case, in determining whether particular items may be included in G&A, Commerce followed its practice by reviewing the nature of the item and its relation to the general operations of the company." *Id.*

Second, SeAH asserts that the statute does not permit Commerce to deduct G&A expenses from constructed export price, because the statute does not expressly reference G&A expenses among the items that may be deducted. SeAH Cmts. at 8. Specifically, SeAH contends that the "Redetermination's insistence on deducting G&A expenses that do not relate to further-manufacturing activities from Constructed Export Price is contrary to the statute and cannot be sustained." *Id.* SeAH misinterprets the statute. Section 1677a(d)(1)(D) provides for the deduction of indirect selling expenses from constructed export price. *See also* SAA at 824 (explaining that 19 U.S.C. § 1677a(d)(1)(D) provides for the deduction of indirect selling expenses). The SAA defines "indirect selling expenses" as "expenses which do not meet the criteria of 'resulting from and bearing a direct relationship to' the sale of the subject merchandise, do not qualify as assumptions, and are not commissions." *See* SAA at 824. In

calculating indirect selling expenses, Commerce "generally will include the G&A expenses incurred by the United States selling arm of a foreign producer." *See Aramide Maatschappij V.o.F. v. United States*, 901 F. Supp. 353, 360 (Ct. Int'l Trade 1995).

SeAH has not identified any statutory language that prohibits Commerce from treating G&A expenses of PPA, a selling arm of SeAH in North America, as indirect selling expenses. PPA is a selling arm of SeAH and does not have any production facilities, and its role in further manufacturing is "perfunctory in nature." *Remand Redetermination* at 58. Moreover, Commerce's practice of including the G&A expenses incurred by the United States selling arm of a foreign producer in indirect selling expenses has been sustained repeatedly by this Court. *See, e.g., Aramide Maatschappij V.o.F.*, 901 F. Supp. 353; *NEXTEEL Co. v. United States*, Consolidated Court No. 18-00083, Slip. Op. 20-69, at 22 (May 18, 2020) (sustaining Commerce's approach in the immediately preceding review of this antidumping duty order). Thus, Commerce properly deducted G&A expenses related to resold U.S. products, which were further manufactured, for SeAH's U.S. affiliate PPA.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's *Remand Redetermination*.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

By:    <u>s/Claudia Burke</u>
       CLAUDIA BURKE
       Assistant Director

OF COUNSEL:

       <u>s/Hardeep K. Josan</u>

       HARDEEP K. JOSAN
MYKHAYLO GRYZLOV       Trial Attorney
Senior Counsel       Commercial Litigation Branch
Office of the Chief Counsel       Civil Division
   for Trade Enforcement & Compliance    U.S. Department of Justice
U.S. Department of Commerce    26 Federal Plaza, Suite 346
       New York, New York 10278
       Tel.: (212) 264-9245
       Fax:  (212) 264-1916
       Email: hardeep.k.josan@usdoj.gov

September 15, 2021    Attorneys for Defendant

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 7,246 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

 s/ Hardeep K. Josan
Hardeep K. Josan
Trial Attorney
Department of Justice
Civil Division
