UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| SeAH Steel Corporation,<br><br>    Plaintiff,<br><br>and<br><br>Husteel Co., Ltd., NEXTEEL Co., Ltd., and AJU Besteel Co., Ltd.,<br><br>    Consolidated Plaintiffs,<br><br>and<br><br>Hyundai Steel Company, and Iljin Steel Corporation<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>United States,<br><br>    Defendant,<br><br>and<br><br>United States Steel Corporation, Maverick Tube Corporation, Tenaris Bay City, Inc., TMK IPSCO, Valourec Star, L.P., and Welded Tube USA Inc.<br><br>    Defendant-Intervenors. | Consol. Court No. 19-00086 |

Comments of
SeAH Steel Corporation
in Partial Support of Commerce's July 16 Redetermination

Winton & Chapman PLLC
1900 L Street, N.W., Suite 611
Washington, D.C. 20036
(202) 774-5500

Attorneys for SeAH Steel Corporation

September 15, 2021

Table of Contents

|  |  | Page |
|---|---|---|
| ARGUMENT | | 2 |
| A. | Commerce's Negative PMS Finding in its Remand Redetermination Complied with This Court's Remand Order | 2 |
| B. | U.S. Steel Has Not Satisfied the Burden of Proof with Respect to Its PMS Claim | 4 |
| | 1. The Evidence Demonstrates that Korean Market Prices for Steel Coils Was Not Distorted | 6 |
| | 2. Contrary to U.S. Steel's Claims, Commerce Actually Did Consider Articles Cited by U.S. Steel Pertaining to Alleged Government Restructuring Programs | 7 |
| | 3. U.S. Steel's Reliance on Evidence of Chinese Overcapacity Does Not Establish that Korean Market Prices Were Distorted or Failed to Reflect the Cost of Production in the Ordinary Course of Trade | 9 |
| | 4. U.S. Steel's Arguments Are Inconsistent with the Explicit Language of the Statute | 10 |
| CONCLUSION | | 13 |

Table of Authorities

Page

CASES

*Creswell Trading Co. Inc. v. United States*,
   15 F. 3d 1054 (Fed. Cir. 1994) .................................................................................... 5

*SeAH Steel v. United States,*
   Slip Op. 21-043 (CIT April 14, 2021) ............................................................................. 2

*Universal Camera Corp. v. National Labor Relations Board,*
   340 U.S. 474 (1951). ...................................................................................................... 10

STATUTES

19 U.S.C. § 1677b ................................................................................................. *passim*

ADMINISTRATIVE DECISIONS

*Certain Oil Country Tubular Goods from the Republic of Korea:*
   *Final Results of Antidumping Duty Administrative Review and*
   *Final Determination of No Shipments; 2015-2016,*
   83 Fed. Reg. 17146 (Apr. 18, 2018) ................................................................................ 6

*Cut-to-Length Carbon-Quality Steel Plate from Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2016,*
   83 Fed. Reg. 32840 (July 16, 2018) ................................................................................ 7

*Cut-to-Length Carbon-Quality Steel Plate from Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2017,*
   84 Fed. Reg. 42893 (Aug. 19, 2019) ............................................................................... 8

*Cut-to-Length Carbon-Quality Steel Plate from Korea:*
   *Final Results of Countervailing Duty Administrative Review; 2018,*
   85 Fed. Reg. 84296 (Dec. 28, 2020) ............................................................................... 8

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| SEAH STEEL CORPORATION, | ) |
| Plaintiff, | ) |
| and | ) |
| HUSTEEL CO., LTD., NEXTEEL CO., LTD., AND AJU BESTEEL CO., LTD., | ) |
| Consolidated Plaintiff, | ) |
| and | ) |
| HYUNDAI STEEL COMPANY, AND ILJIN STEEL CORPORATION | ) |
| Plaintiff-Intervenors, | ) Consol. Court No. 19-00086 |
| v. | ) |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| UNITED STATES STEEL CORPORATION, MAVERICK TUBE CORPORATION, TENARIS BAY CITY, INC., TMK IPSCO, VALOUREC STAR, L.P., AND WELDED TUBE USA INC. | ) |
| Defendant-Intervenors. | ) |

COMMENTS OF SEAH STEEL CORPORATION
IN PARTIAL SUPPORT OF COMMERCE'S REDETERMINATION ON REMAND

These comments are submitted on behalf of SeAH Steel Corporation ("SeAH") in partial support of the redetermination on remand submitted to the Court by the Department of Commerce on July 16, 2021.[1]

---

[1] *See* Commerce's June 30, 2021, Final Results of Redetermination Pursuant to Court Remand (Public Remand Record Document ("PRRD") 21). It should be noted that following Commerce's original filing of its Redetermination with this Court on June 30, 2021, a corrected version of the Redetermination was filed on July 9, 2021 (PRRD-24). Subsequently, a second corrected version of the Redetermination was filed on July 16, 2021 (ECF No. 118) (hereinafter "Redetermination"). The second corrected version was

*(footnote continued on following page)*

ARGUMENT

### A. Commerce's Negative PMS Finding in its Remand Redetermination Complied with This Court's Remand Order

The Court's April 14 decision held that Commerce's initial determination that Korean prices for hot-rolled coils were distorted by a particular market situation ("PMS") was not supported by substantial evidence on the record, and the Court therefore remanded the matter for Commerce to further explain or reconsider its particular market situation determination and adjustment.[2] In its Redetermination, Commerce concluded, "under respectful protest," that "the record evidence is insufficient to sustain an affirmative PMS finding," and that "any interplay of these factors also is insufficient in this instance for Commerce to make an affirmative PMS determination and PMS adjustment."[3]

As explained at length in our previous submissions to the Court, we fully agree that Commerce's PMS finding was not supported by substantial evidence on the record.[4] And, while we believe that there were additional legal errors in Commerce's original PMS analysis,[5] those errors have now been rendered moot by Commerce's determination that the evidence does not support its previous PMS finding. The Court should, therefore,

---

*(footnote continued from previous page)*
submitted after the administrative record of this remand proceeding had been filed with this Court. Therefore, the second corrected version of Commerce's Redetermination was not included in the Remand Record Index filed with this Court on July 14, 2021 (ECF No. 117). These comments refer to the second corrected version of Commerce's Redetermination, which was filed on July 16, 2021 (ECF No. 118).

[2] *See SeAH Steel Corporation v. United States,* Slip Op. 21-043, at 51-52 (CIT April 14, 2021) (hereinafter "Remand Order").

[3] *See* Redetermination at 4-5 (ECF No. 118).

[4] *See, e.g.*, SeAH's October 18, 2019, Initial Rule 56.2 Brief at 21-27.

[5] *See, e.g., id.* at 22-24, and 27-28.

affirm the Redetermination's decision to recalculate the dumping margins for SeAH without any PMS adjustment.

In this regard, U.S. Steel's objection to Commerce's Redetermination is based on a gross mischaracterization of Commerce's actual decision. For example, U.S. Steel claims that Commerce's Redetermination incorrectly interpreted the Court's Remand Order to "only allow" Commerce to continue to find a PMS in Korea if other record evidence not reviewed by the Court on appeal established the existence of a PMS.[6] In addition, U.S. Steel also accuses Commerce of substituting what U.S. Steel has characterized as the Court's fact-finding for Commerce's own fact-finding.[7] But that is not, in fact, what Commerce did.

In reality, Commerce's Redetermination explicitly rejected the suggestion that its reconsideration was limited to documents that were new to the current review period.[8] Instead, Commerce explicitly confirmed that it reviewed the record of this administrative review as a whole.[9] In making its redetermination, Commerce made a reasonable decision not to revisit the materials that had already been discussed by the Court's decision. Instead, Commerce chose to "focus" on the additional record evidence identified by U.S. Steel that had not been considered by the Court's decision.[10] After reviewing those materials, Commerce found that the additional evidence identified by U.S. Steel was not sufficient, "either independently or when considered with evidence reviewed by the

---

[6] *See* U.S. Steel's August 13, 2021, Comments in Partial Opposition, at 4.

[7] *Id.* at 7-8.

[8] *See* Redetermination at 38 (ECF No. 118).

[9] *See id.* (ECF No. 118).

[10] *See id*. (ECF No. 118).

Court," to support an affirmative PMS finding.[11] As a result, Commerce correctly reversed it PMS finding.[12]

### B. U.S. Steel Has Not Satisfied the Burden of Proof with Respect to Its PMS Claim

As the Court is aware, the relevant statutory language does not permit Commerce to make an adjustment to constructed value whenever it finds that there was some "particular market situation" affecting input prices in the relevant country. Instead, the statute permits an adjustment only when "a particular market situation exists *such that* the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."[13] In order to satisfy the statutory requirements, Commerce must make three distinct findings:

(1) that there is a particular market situation in the relevant country;

(2) that the PMS had an effect on the prices in that country for the relevant material and fabrication inputs; and

(3) that the resulting prices in that country for the relevant material and fabrication inputs "did not reflect the cost of production in the ordinary course of trade."

Each of these findings must be supported by substantial evidence. Furthermore, because the statute permits Commerce to make a PMS adjustment to constructed value only when Commerce finds that the statutory prerequisites have been satisfied, the ultimate burden of

---

[11] *See id.* at 38-39 (ECF No. 118).

[12] *See id.* at 44-45 (ECF No. 118).

[13] *See* 19 U.S.C. § 1677b(e) (emphasis added).

proof falls on Commerce (and those proposing the adjustment) to establish that the relevant prerequisites have been satisfied.[14]

In its August 13 comments, U.S. Steel contends that Commerce's redetermination "misconstrued the terms of the Court's Remand Order to command an unlawful result" and that Commerce "substituted the Court's fact-finding for its own."[15] U.S. Steel also argues that Commerce's PMS determination is unsupported by substantial evidence and that Commerce's analysis involved a "new restriction" that is in contravention of law and its prior practice.[16] But, at a fundamental level, U.S. Steel simply fails to demonstrate that it satisfied its burden of proof.

It is undoubtedly true that the PMS allegation in this review contains endless pages of news reports and other documents. But, even when viewed in the light most favorable to U.S. Steel, those materials demonstrate only that there were factors that could theoretically have affected the Korean market for hot-rolled coils. U.S. Steel has not demonstrated that the Korean hot-rolled coil market was actually distorted by any of those factors. And, it has provided no evidence — absolutely none — that the prices for hot-rolled coils in the Korean market during the review period failed to reflect the cost of production for such coils in the ordinary course of trade. As a matter of law, U.S. Steel has failed to satisfy its evidentiary burden for departing from the normal cost calculation methodologies required by statute.

---

[14] *See, e.g.*, *Creswell Trading Co. Inc. v. United States*, 15 F. 3d 1054, 1060-61 (Fed. Cir. 1994) ("The 'if' clause ... sets forth on its face a statutory condition that Commerce must establish before it may exercise its right to levy a countervailing duty against an investigated party, as opposed to an exception into which that party must prove its actions fall. The ultimate burden of proof is thus upon Commerce to establish by a preponderance of the evidence" that the statutory condition has been satisfied").

[15] *See* U.S. Steel's August 13, 2021, Comments in Partial Opposition, at 4-11.

[16] *See id*. at 11-23.

### 1. The Evidence Demonstrates that Korean Market Prices for Steel Coils Was Not Distorted

U.S. Steel's argument is premised on the assumption that imports of hot-rolled coils into Korea from China must have resulted in a dramatic reduction in Korean-market prices for such coils. But the evidence simply does not support that claim. As we have explained previously,[17] there is no evidence of any Korean findings of dumping against Chinese coils by the applicable Korean government authorities. And, more fundamentally, there is no evidence that the alleged dumping of Chinese coil into the Korean market had any impact on the prices that SeAH paid for its coils.

Instead, record evidence shows that the average price SeAH paid its Korean supplier POSCO for coil was higher than the average price SeAH paid its Japanese suppliers for the same grades.[18] In fact, the prices for POSCO's products were up to 9 percent higher than the prices for identical products from SeAH's Japanese supplier. That evidence fully refutes any suggestion that the prices POSCO charged SeAH were inappropriately low.[19]

---

[17] *See* SeAH's October 18, 2019, Initial Rule 56.2 Brief at 25.

[18] *See, e.g.*, SeAH's February 12, 2019, Case Brief at 3-4 (Public Record ("PR") 330, CR-554).

[19] *See id.* (PR-330, CR-554).

We understand that Commerce has previously asserted that low Korean prices for Japanese coils means only that the Japanese suppliers had to sell at prices in Korea that were affected by other "distortions." *See Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016,* 83 Fed. Reg. 17146 (Apr. 18, 2018) and accompanying Issues and Decision Memorandum at 19 (Apr. 11, 2018). However, that assertion fails to explain *why* the Japanese producers would do so. If the distortions were "particular" to the Korean market, then the Japanese suppliers should have been able to sell their products at undistorted prices to other markets. It defies commercial logic to assume that the Japanese suppliers would agree to sell at "distorted" prices in Korea, when they could have made higher profits by selling the same products elsewhere. The only possible conclusion is that Korean-market prices were not distorted compared to other prices in other markets.

There certainly is no evidence that those prices somehow failed to "accurately reflect the cost of production in the ordinary course of trade," or that the cost of production and constructed value calculated for SeAH based on its normal accounting records were in any way distorted.

### 2. Contrary to U.S. Steel's Claims, Commerce Actually Did Consider Articles Cited by U.S. Steel Pertaining to Alleged Government Restructuring Programs

Despite the absence of evidence that Korean prices for hot-rolled coils were actually distorted or that those prices failed to reflect the cost of production in the ordinary course of trade, U.S. Steel suggests that evidence of Korean-government restructuring programs supported a finding that a PMS adjustment was appropriate. In this regard, U.S. Steel contends that Commerce erred when it stated that "there is no evidence that any of the respondents availed themselves of the {restructuring} programs or that the programs were in effect during the {review period}."[20] In particular, U.S. Steel argues that record evidence indicates that at least two Korean companies — Hyundai Steel and Dongkuk Steel — benefitted from a restructuring program known as the "One-Shot Act.".[21]

But, U.S. Steel's claim is simply not true. In fact, as U.S. Steel's counsel is undoubtedly aware, Commerce has looked into the claim that Hyundai Steel and Dongkuk Steel benefitted from restructuring support under the One-Shot Act on numerous occasions. In each review in which those claims were examined, the One-Shot Act was

---

[20] *See* Redetermination at 13-14 (ECF No. 118).

[21] *See* U.S. Steel's Draft Remand Comments at 10 (PRRD-20; Confidential Remand Record Document ("CRRD") 10) (citing *PMS Allegation*, at Ex. 44, "Hyundai Steel, Dongkuk Steel Become Latest Beneficiaries of Fast-Track Restructuring Program," *Pulse by Maeil Business News Korea* Nov. 23, 2016) (Confidential Record ("CR") 174)).

- 7 -

found not to be used and was not countervailed for either of those companies.[22] In our view, U.S. Steel's representations to the Court that such benefits did exist, without acknowledging Commerce's own findings that they did not, raises serious ethical concerns.

And, in any event, it is simply untrue that Commerce's Redetermination failed to consider evidence of alleged Korean-government restructuring programs.[23] In fact, the Redetermination cited the very news articles that, according to U.S. Steel, were "wholly ignored" by Commerce.[24] The Redetermination explicitly discussed the article identified by U.S. Steel as reporting that a Korean government agency "gave the green light" to the restructuring programs.[25] And, the Redetermination also explicitly cited another article identified by U.S. Steel, which reported that the Korean Export-Import Bank had concluded that, as a short-term solution, production volumes had to be reduced to cope with the global oversupply.[26] In short, U.S. Steel's criticisms of the Redetermination are

---

[22] *See, e.g.*, *Cut-to-Length Carbon-Quality Steel Plate from Korea: Final Results of Countervailing Duty Administrative Review; 2016,* 83 Fed. Reg. 32840 (July 16, 2018), and accompanying Issues and Decision Memorandum at 6 (finding no use of the Special Act on Corporation Revitalization, also known as the "One-Shot Act"); *Cut-to-Length Carbon-Quality Steel Plate from Korea: Final Results of Countervailing Duty Administrative Review; 2017,* 84 Fed. Reg. 42893 (Aug. 19, 2019), and accompanying Issues and Decision Memorandum at 7; *Cut-to-Length Carbon-Quality Steel Plate from Korea: Final Results of Countervailing Duty Administrative Review; 2018,* 85 Fed. Reg. 84296 (Dec. 28, 2020), and accompanying Issues and Decision Memorandum at 8.

[23] *See* Redetermination at 42 (ECF No. 118).

[24] *Id. See also* U.S. Steel's August 13, 2021, Comments in Partial Opposition, at 12.

[25] *See* Redetermination at 43 (ECF No. 118) (citing U.S. Steel's Draft Remand Comments at 11 (PRRD-20, CRRD-10) (citing "Hyundai Steel, Dongkuk Steel Become Latest Beneficiaries of Fast-Track Restructuring Program," *Pulse by Maeil Business News Korea* (Nov. 23, 2016)).

[26] *See* U.S. Steel's August 13, 2021, Comments in Partial Opposition, at 14-15 (citing *PMS Allegation*, at Ex. 47, "Voices Growing for Merger of POSCO, Hyundai Steel," *Korea Times via South East Asian Iron and Steel Institute* (Sept. 22, 2016) (CR-174)).

*(footnote continued on following page)*

based on false claims that Commerce failed to consider articles that Commerce did explicitly address. And, in the end, none of U.S. Steel's complaints can overcome the fundamental fact that Commerce has explicitly examined restructuring support allegedly provided to the two Korean producers named in the article and found that that support did not exist.

    3.   *U.S. Steel's Reliance on Evidence of Chinese Overcapacity Does Not Establish that Korean Market Prices Were Distorted or Failed to Reflect the Cost of Production in the Ordinary Course of Trade*

U.S. Steel also argues at length that Commerce erred in not considering evidence of overcapacity causing "downward pricing pressures" in the Korean market. In this regard, U.S. Steel has cited data that purportedly demonstrate the "large and increasing" volumes of imported Chinese hot-rolled coil into Korea from 2014 to 2017.[27] In addition, U.S. Steel has cited a Korean government report "published" during the review period that found, among other things, that imported Chinese hot-rolled coil prices were "$118/ton" less than domestic hot-rolled coil.[28]

In effect, U.S. Steel's argument is based on the assumption that the allegedly large volumes of allegedly low-priced hot-rolled coil from China *must have* distorted the prices charged by Korean producers of hot-rolled coils. However, as discussed above, U.S.

---

*(footnote continued from previous page)*
  *See also* Redetermination at 43 (ECF No. 118) (citing U.S. Steel's Draft Remand Comments, at 11 (PRRD-20, CRRD-10) (citing "Hyundai Steel strongly denies merger with POSCO," *Korea Herald* (Nov. 1, 2016))). It should be noted that it appears that U.S. Steel has mistakenly cited to the portion of record that does not contain the relevant evidence discussed in its Draft Remand Comments. It also appears that Commerce has relied on U.S. Steel's incorrect record citation in its Redetermination. The language of the Korean Export-Import Bank's conclusion cited in U.S. Steel's August 13 Comments to this Court and in Commerce's Redetermination is identical, nonetheless.

[27] *See* U.S. Steel's August 13, 2021, Comments in Partial Opposition, at 18-20.

[28] *Id.* at 18.

Steel's assumption is refuted by the evidence of the actual prices paid by SeAH for hot-rolled coils during the review period. U.S. Steel's theoretical assumptions simply cannot overcome the unrebutted evidence that the prices paid by SeAH to its Korean coil supplier POSCO were higher than the prices offered by Japanese producers, who had no reason to sell their products at "distorted" prices in Korea when other global markets were available to them.[29] In short, when the evidence is viewed as a whole,[30] there is no basis for finding that the prices paid to Korean producers of hot-rolled coils were distorted by imports from China.

### 4. U.S. Steel's Arguments Are Inconsistent with the Explicit Language of the Statute

In addressing U.S. Steel's arguments concerning the effect of alleged Chinese overcapacity, Commerce's Redetermination explained that "a party alleging the existence of a PMS {on that basis} must demonstrate that overcapacity has led to a situation in which, 'the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade'"[31] As Commerce recognized, "The statute requires a second step of demonstrating that this overcapacity, or any other factor, is distorting the COP such that it no longer reflects the COP in the ordinary course of trade."[32] In the end, Commerce's Redetermination agreed with U.S. Steel that the record contained "data that demonstrate the acute and particular presence of

---

[29] *See, e.g.*, SeAH's February 12, 2019, Case Brief at 3-4 (PR-330, CR-554).

[30] *See Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 488 (1951).

[31] *See* Redetermination at 39 (citing 19 U.S.C. § 1677b(e)) (ECF No. 118).

[32] *Id.* at 39-40 (ECF No. 118).

overcapacity in the Korean market."[33] Nevertheless, Commerce found that the evidence failed to establish the second-step required by the statute, and it therefore made a negative PMS determination.[34]

U.S. Steel contends that Commerce's two-step analysis improperly "created" a new restriction that contravenes that statute. But U.S. Steel reaches that conclusion only by ignoring the explicit terms of the statute.

As we argued at length in our initial Rule 56.2 brief, the statute itself explicitly requires the two-stage analysis described by Commerce. As we have explained previously, paragraph (1) of the statutory definition of "constructed value" requires Commerce to include in its calculations "the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade."[35] The PMS provision then states that:

> For purposes of paragraph (1), if a particular market situation exists *such that* the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.[36]

By its terms, this provision applies only where, as a result of a "particular market situation," the cost of materials and other inputs "does not accurately reflect the cost of

---

[33] We note that SeAH does not agree with this characterization of the record evidence. However, in light of Commerce's negative PMS finding, that issue is now moot.

[34] *Id*.

[35] *See* 19 U.S.C. § 1677b(e)(1).

[36] *See* 19 U.S.C. § 1677b(e) (emphasis added).

production in the ordinary course of trade." In the absence of such a finding, Commerce is not permitted to depart from the normal cost calculation methodologies.

Consequently, the redetermination's requirement of evidence demonstrating that the cost of materials and other inputs "does not accurately reflect the cost of production in the ordinary course of trade" is not inconsistent with the statute's requirements. Instead, that requirement is directly mandated by the statutory language.

As we have explained previously, the record contains no evidence whatsoever of what the cost of production for hot-rolled coils should have been in the ordinary course of trade.[37] Consequently, as a matter of law, U.S. Steel has failed to provide evidence satisfying the statutory burden for making a PMS adjustment. Commerce's Redetermination correctly implemented the statutory requirements. U.S. Steel's criticisms of the Redetermination are dishonest and without merit and should be summarily dismissed.

---

[37] *See* SeAH's February 10, 2020, Reply Brief at 14-15.

CONCLUSION

For the foregoing reasons, we respectfully request that this case be affirmed with respect to Commerce's finding that no PMS adjustment is appropriate in the circumstances of this case. However, for the reasons set forth in SeAH's August 13 comments, we request that this case be remanded, once more, to Commerce for reconsideration of (1) the treatment of PPA's G&A expenses in the U.S. price calculation, and (2) the treatment of inventory-valuation losses in the calculation of SeAH's cost of production.

    Respectfully submitted,

    /s/Jeffrey M. Winton

    Jeffrey M. Winton
    Amrietha Nellan
    Vi N. Mai

    WINTON & CHAPMAN PLLC
    1900 L Street, N.W., Suite 611
    Washington, D.C. 20036
    (202) 774-5500

    Attorneys for SeAH Steel Corporation

September 15, 2021

Certificate of Compliance

      Pursuant to the Court's "Standard Chambers Procedures," I, Jeffrey M. Winton, hereby certify that the word count function of the word-processing system used to prepare the foregoing brief indicates that the brief contains 3,361 words including headings, footnotes, and quotations, but not including the cover, caption, table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block.

                                                   /s/Jeffrey M. Winton

September 15, 2021