UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| SEAH STEEL CORPORATION et al., | ) |
| *Plaintiff and Consolidated Plaintiffs,* | ) |
| HYUNDAI STEEL COMPANY and ILJIN STEEL CORPORATION, | ) |
| *Plaintiff-Intervenors,* | ) |
| v. | ) Court No. 19-00086 |
| UNITED STATES, | ) (consol.) |
| *Defendant,* | ) |
| and | ) |
| UNITED STATES STEEL CORPORATION et al., | ) |
| *Defendant-Intervenors.* | ) |

**COMMENTS OF CONSOLIDATED PLAINTIFF
NEXTEEL CO., LTD. IN PARTIAL SUPPORT OF REMAND RESULTS**

ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999

J. David Park
Henry D. Almond
Daniel R. Wilson
Leslie C. Bailey
Kang Woo Lee

*Counsel to NEXTEEL Co., Ltd.
Consolidated Plaintiff*

**Dated: September 15, 2021**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii
I. INTRODUCTION ..................................................................................................... 1
II. ARGUMENT .............................................................................................................. 3
    A.     The *Remand Results* Comply with the Court's Order Regarding the
            Particular Market Situation Determination and Adjustment ................................. 3
            1.     U.S. Steel Mischaracterizes Commerce's Interpretation of the
                    Court's Order ............................................................................................. 4
            2.     Commerce's *Remand Results* Did Not Misconstrue the Court's
                    Order as Narrow ........................................................................................ 6
            3.     Commerce Correctly Re-Reviewed the Record and Determined
                    that It Does Not Contain Substantial Evidence of a Particular
                    Market Situation ........................................................................................ 6
    B.     The *Remand Results* Comply with the Court's Order Regarding the
            Allocation of Costs of Production of NEXTEEL's Non-Prime Products .............. 10
            1.     U.S. Steel Ignores the Relevance of Supplemental Authority ................... 11
            2.     Commerce Reached the Only Reasonable Result on Remand, in
                    light of the Record, Case Law, and the Statute .......................................... 12
III. CONCLUSION ......................................................................................................... 16

# Table of Authorities

**Federal Cases**                                                                                                   **Page(s)**

*Dillinger France S.A. v. United States*,
    981 F.3d 1318 (Fed. Cir. 2020)..................................................................................*passim*

*Dong-A Steel Co. v. United States*,
    337 F. Supp. 3d 1356 (Ct. Int'l Trade 2018) ................................................................14, 15

*SeAH Steel Corporation v. United States*,
    513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ...................................................................1, 8


**Federal Statutes**

19 U.S.C. § 1677b(f)(1)(A).................................................................................................13


**Department of Commerce Decisions**

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea:
    Final Results of Countervailing Duty Administrative Review; 2018*,
    86 Fed. Reg. 47,621 (Dep't Commerce Aug. 26, 2021)............................................................7

I.  **INTRODUCTION**

Consolidated Plaintiff NEXTEEL Co., Ltd. ("NEXTEEL") respectfully submits these comments in support of certain determinations reached in the Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Court Remand, July 16, 2021, ECF No. 118 ("*Remand Results*"). These comments respond to the partial opposition comments of Defendant-Intervenor United States Steel Corporation ("U.S. Steel"), filed on August 13, 2021. *See* United States Steel Corporation's Comments in Partial Opposition to Remand Redetermination, Aug. 13, 2021, ECF No. 123 ("U.S. Steel Opp'n Comments").

In *SeAH Steel Corporation v. United States*, 513 F. Supp. 3d 1367 (Ct. Int'l Trade 2021) ("*SeAH*"), the Court of International Trade ("CIT") remanded Commerce's *Final Results* on three issues relevant to NEXTEEL: 1) Commerce's particular market situation ("PMS") determination and adjustment; 2) Commerce's reallocation of costs of production of NEXTEEL's non-prime pipe products; and 3) Commerce's reclassification of NEXTEEL's costs for losses associated with suspended production on certain of NEXTEEL's production lines during the POR. *See SeAH*, 513 F. Supp. 3d at 1406.

In the *Remand Results*, Commerce complied with the Court's remand order with respect to two of these three issues.[1] First, on remand Commerce reconsidered its PMS determination and adjustment, and in doing so found (under protest) that the record evidence does not support

---

[1] With respect to the third issue, the treatment of costs related to suspended production, on remand Commerce continued to reallocate NEXTEEL's costs to G&A expenses rather than COGS, as reported in NEXTEEL's normal reporting in its books and records. NEXTEEL filed partial opposition comments on August 13, 2021, opposing the Department's remand determination with respect to this issue. *See* NEXTEEL's Remand Comments Aug. 13, 2021, ECF No. 121. NEXTEEL argued in its opposition comments that on remand Commerce again failed to identify any deficiency in NEXTEEL's records justifying a departure from the reporting of these costs as COGS in NEXTEEL's normal books in records. *See id.*

an affirmative PMS finding or subsequent adjustment. *See Remand Results* at 7-14. Accordingly, Commerce reversed its prior PMS finding and applied no PMS adjustment. *Id.* at 12. Second, Commerce reconsidered its adjustment to NEXTEEL's reported costs of production for non-prime pipe, and found that the record does not support reallocating those non-prime costs of production. *See id.* at 14. Accordingly, on remand Commerce instead relied on the actual costs of prime and non-prime products as reported by NEXTEEL. *Id.* at 14, 48. NEXTEEL supports the determinations reached in the *Remand Results* on both of these issues.

U.S. Steel, however, opposes Commerce's remand determination with respect to these two issues. *See* U.S. Steel Opp'n Comments at 4-29. With respect to the now-negative PMS finding, U.S. Steel argues that Commerce erred in interpreting the Court's remand order narrowly, contending that such a narrow order would exceed the Court's authority and asserting that Commerce had latitude to reach an affirmative PMS determination on remand. *See id.* at 4-13. U.S. Steel further argues that Commerce's conclusions with respect to alleged Korean government restructuring programs and the alleged impact of the overcapacity in the Korean steel market of Chinese imports were unsupported by the record. *Id.* at 13-24. With respect to non-prime costs of production, U.S. Steel argues that Commerce erred in "treating the Court's order…as compelling a particular result," *id.* at 2, and thus restricting itself to a conclusion dictated by the recent holding of the Court of Appeals for the Federal Circuit in *Dillinger France S.A. v. United States*, 981 F.3d 1318 (Fed. Cir. 2020). *See id.* at 24-29. U.S. Steel seeks to distinguish the two cases. *See id.*

For the reasons detailed below, U.S. Steel's arguments on both issues must fail. On both issues, Commerce reached the only determination on remand that complies with the Court's remand order. Accordingly, NEXTEEL respectfully submits that the Court should sustain

Commerce's remand determination with respect to the PMS and non-prime cost allocation issues.[2]

## II. ARGUMENT

### A. The *Remand Results* Comply with the Court's Order Regarding the Particular Market Situation Determination and Adjustment

On remand, Commerce complied with the Court's instructions to reconsider or further explain its particular market situation ("PMS") determination and adjustment from the final results, which the Court found unsubstantiated and unreasonable. On remand, Commerce properly determined, "consistent with the Court's opinion and under respectful protest, . . . that the record evidence is insufficient to sustain an affirmative PMS finding." *Remand Results* at 44-45. Specifically, Commerce concluded:

> {U}pon review of the evidence on the record of this proceeding, we find that the additional evidence on the record of this underlying proceeding, which the Court has not previously addressed and rejected, as identified in the remand comments by the interested parties, is insufficient, on its own, to sustain a finding of a PMS within the analytical framework that the Court articulated in its opinion in this case. As a result, under protest, we are reversing our finding of a PMS and have removed the PMS adjustment from our margin calculations for SeAH and NEXTEEL.

*Remand Results* at 12-13. Commerce accordingly recalculated the respondents' weighted-average dumping margins without a PMS adjustment to the costs of production for the sales-below cost test. *Id.* at 13.

This determination is the only outcome that would be supported by the record and therefore comply with the Court's order. As Commerce concedes, the record does not support a PMS determination under the framework set forth in the Court's remand order. Under such

---

[2] Of course, as detailed in its opposition comments, NEXTEEL respectfully submits that the Court must remand again Commerce's remand determination on the issue of the costs related to suspension loss. *See* NEXTEEL's Remand Comments Aug. 13, 2021, ECF No. 121.

circumstances, the only determination supported by the record evidence and sustainable by this Court is the determination that *no* PMS existed. Commerce has now properly reached that determination in the *Remand Results*, and accordingly the Court should sustain the *Remand Results* on this issue.

Nevertheless, in its opposition comments petitioner U.S. Steel argues that the remand determination on the PMS issue is erroneous in that Commerce has mistakenly construed the Court's remand order narrowly, and that the determination contravenes the statute and is otherwise contrary to law. *See* U.S. Steel Opp'n Comments at 4-24. As detailed below, U.S. Steel's arguments do not raise serious deficiencies in Commerce's analysis or conclusions. Instead, U.S. Steel relies on mischaracterizations of the facts and law, and seeks to relitigate issues that have already been reviewed thoroughly by the Court in this proceeding. U.S. Steel does not present any argument that would suggest that Commerce's *Remand Results* should not be affirmed on this issue.

### 1. U.S. Steel Mischaracterizes Commerce's Interpretation of the Court's Order

As a preliminary matter, U.S. Steel argues that the Commerce erred in interpreting the Court's remand order to require bifurcating the evidence of record into "old" evidence previously considered and "new" evidence, not previously considered. U.S. Steel Opp'n Comments at 11-13; *see also* 4-8. U.S. Steel contends that Commerce erred in limiting its assessment of the evidence for purposes of the remand determination to an assessment of evidence not previously considered in the OCTG proceedings. *See id.* at 4-8, 11-13.

As U.S. Steel raised the same concern in its draft remand comments, Commerce addressed this argument in the final *Remand Results*, confirming that on remand it in fact reviewed the full record:

> U.S. Steel claims that Commerce's Draft Results of Redetermination appear to suggest that our reconsideration was limited to documents that were new to this POR. Such a conclusion is inaccurate. We reviewed the record of this administrative review as a whole. However, we cannot ignore the fact that the Court also already reviewed much of the record evidence and found it insufficient to establish the PMS in its *Remand Order*. Although we disagree with the Court's findings, we cannot reverse the Court's findings with respect to that evidence. We find that it would not be productive, at this time, to reargue the very same evidence, which the Court already found insufficient, as part of this redetermination. Rather, in the Draft Results of Redetermination, we sought to reexamine and focus on any evidence that interested parties identified that the Court had not considered in its *Remand Order*, understanding that the evidence that had already been examined by the Court had been determined by the Court to be insufficient to demonstrate a PMS. Had record evidence, including interested parties' comments regarding record evidence, provided further evidence that is sufficient to demonstrate the presence of a PMS, either independently or when coupled with evidence already reviewed by the Court, Commerce would have reached a different conclusion. However, as stated above, we cannot find that a PMS exists on the basis of evidence that the Court has already found insufficient. Therefore, for these final results of redetermination, we have continued to reverse our application of a PMS and remove any PMS adjustments from the margin calculations for the mandatory respondents and non-examined companies.

*Remand Results* at 38. Thus, it is clear that Commerce did not simply review the new evidence on the record, or uncritically adopt the Court's conclusions for its own, but rather undertook a complete additional review of the record in light of the Court's conclusions that the prior determination was not adequately supported by the record. As confirmed by Commerce, the agency reviewed the record evidence and reached the ultimately conclusion that the record in fact could not support an affirmative PMS finding. That U.S. Steel disagrees with the result of this further record review does not render the additional review insufficient pursuant to the substantial evidence standard.

U.S. Steel further alleges that "Commerce's theory, apparently, is that Commerce's findings of fact on remand were in fact required by the Court itself. The *Remand Order* contained no such mandate, and indeed could not possibly have done so. 'Substantial evidence' review does not permit the parties to retry factual issues *de novo* before the reviewing court."

5

U.S. Steel Opp'n Comments at 11 (internal citations omitted). Again, U.S. Steel mischaracterizes Commerce's actions on remand. As U.S. Steel points out, the "careful framework" established by the statute with respect to Commerce and the CIT "empowers the Judiciary to review Commerce's determinations for record support, without burdening (or empowering) the Judiciary with the role of fact-finder." U.S. Steel Opp'n Comments at 10. Commerce acted within that framework in reviewing the record on remand.

    **2.    Commerce's *Remand Results* Did Not Misconstrue the Court's Order as Narrow**

Further, U.S. Steel submits that "there was no lawful basis for Commerce to construe the *Remand Order* in the severely limiting way that it did, particularly given that the Court expressly remanded for 'further explanation or reconsideration,' a necessarily open-ended mandate." U.S. Steel Opp'n Comments at 6. Contrary to U.S. Steel's argument, the court did not issue an impermissibly narrow order, and Commerce did not misconstrue that order. While U.S. Steel may have preferred that Commerce take a different approach, their comments do not identify an actual legal or factual shortcoming in Commerce's chosen path on remand.

While the Court's order was phrased broadly, the Court found that substantial evidence does not support an affirmative PMS finding. As such, Commerce necessarily determined that it could not reach an affirmative PMS finding, and did so after conducting its own review and analysis. Simply put, Commerce reviewed the record information and consistent with the Court's opinion determined (under protest) that no PMS existed. This conclusion is consistent with the record facts and in line with the Court's opinion.

    **3.    Commerce Correctly Re-Reviewed the Record and Determined that It Does Not Contain Substantial Evidence of a Particular Market Situation**

U.S. Steel argues that Commerce's remand determination on the PMS issue was further flawed because, "{b}eyond failing to consider the entire administrative record, Commerce

6

further expounded upon two aspects of the Court's *Remand Order* -- Korean government restructuring programs and the overcapacity -- and made specific conclusions of fact" which U.S. Steel alleges are contradicted by the record. U.S. Steel Opp'n Comments at 13-23.

First, with respect to restructuring, U.S. Steel alleges that there is evidence that these government programs demonstrate "distortive government market interference," but neither U.S. Steel nor any of the other petitioners in the underlying review included restructuring in the particular market situation allegation. *See id.* at 14-18. Nor, indeed, did petitioners reference restructuring throughout the proceeding. Their complaint, then, is that on remand Commerce did not adopt their view on an issue which they had not previously alleged.

Moreover, *there is no evidence of any actual restructuring*. Indeed, the "evidence" cited by U.S. Steel on remand includes no finding or determination as to restructuring; the materials cited do nothing to affirmatively establish the existence of any restructuring programs, let alone the impact of any such programs. Further, while U.S Steel highlights other steel producers that may or may not have utilized such programs, U.S. Steel does not invoke NEXTEEL as among them. Simply put, there is no evidence of any restructuring program from which NEXTEEL benefited nor restructuring involving an upstream supplier that could have benefited NEXTEEL in such a way as to give rise to a PMS. Indeed, U.S. Steel cites to an article relating to a claimed "Fast-Track Restructuring Program," U.S. Steel Opp'n Comments at 14, but Commerce has in multiple cases confirmed that Korean steel producers did not use or benefit from this claimed program. *See, e.g.*, *Certain Hot-Rolled Steel Flat Products From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 47,621 (Dep't Commerce Aug. 26, 2021) and accompanying Issues and Decision Memorandum at 8 (listing the "Fast-Track Restructuring Program" among the programs "Determined to be Not Used or Not to

7

Confer a Measurable Benefit During the POR."). The articles U.S. Steel references do not overcome these findings and do not call into question Commerce's analysis of the claimed restructuring programs (again, an element of the alleged PMS which Petitioners did not even include in their allegation).

Second, with regard to overcapacity, U.S. Steel simply seeks to relitigate issues already presented to the Court in the initial round of briefing. Specifically, U.S. Steel alleges that "{a}mple record evidence — unaddressed by Commerce in its *Remand Redetermination*, and unaddressed in any opinions of this Court — establishes both that the Korean HRC market was distorted by overcapacity, including spillover of cheap HRC from China, and that this distortion placed prices in Korea outside the ordinary course of trade," U.S. Steel Opp'n Comments at 18, reviewing the record evidence that U.S. Steel contends supports its position. *Id.* at 18-20. However, the Court already reviewed for substantial evidence the evidence on which Commerce relied in its *Final Results*, and found that the cited evidence came up short. Specifically, the Court noted, with respect to the evidence cited as demonstrating overcapacity in the Korean steel market of Chinese imports which were distorting the market, that

> {t}he articles and statistics cited by Commerce do not support a determination that the influx of Chinese hot-rolled coil is particular to Korea because the record documents describe a global influx that affected many other countries in addition to Korea, rather than an effect that is unique or particular to Korea . . . The court observes that the statistics and articles cited by Commerce do not indicate that the experience in Korea due to Chinese hot-rolled coil imports is distinct from the experience in other countries around the world, which were also inundated with the global oversupply of low-priced Chinese products. Although it is clear that the oversupply of low-priced Chinese products affects many countries in the global market, the court notes that Commerce has cited nothing on the record to support its determination that the oversupply of low-priced Chinese products is *particular* to the Korean market.

*SeAH*, 513 F. Supp. 3d at 1393.

Despite U.S. Steel's attempt to relitigate this issue, it remains the case that the record materials do not provide a link to the claim that Chinese imports "plac{e} downward pressure on Korean domestic steel prices." That Korea is a destination for Chinese exports does not support the statement that Chinese imports into Korea adversely affect the Korean market or impacted the respondents' costs. Moreover, NEXTEEL submitted evidence that it sourced an insignificant amount of hot-rolled coil from Chinese producers during the POR, and demonstrated that the Korean steel industry produced significant volumes of hot rolled steel, while Korea imported a small volume of hot rolled steel from China. *See* Memorandum in Support of Consolidated Plaintiff NEXTEEL Co., Ltd's Rule 56.2 Motion for Judgment on the Agency Record at 19-21, Oct. 18, 2019, ECF Nos. 63 (confidential) and 66 (public). These facts demonstrate that the claimed impact of Chinese hot rolled steel simply does not have the impact on NEXTEEL's costs that U.S. Steel suggests. Moreover, these issues have been addressed ad nauseum in this litigation and the various other related appeals, with the record materials -- which have been extensively cited to Commerce and to the Court -- demonstrating that Chinese imports of hot rolled steel do not give rise to a PMS. U.S. Steel's claims to the contrary ignore these record facts and Commerce's analysis of those facts on remand.

In short, the record evidence on which U.S. Steel attempts to rely was reviewed by Commerce thoroughly in the underlying review and again on remand, and Commerce determined that record evidence does not support an affirmative finding on this factor (*see, e.g., id.* at 13-14 ("In light of the Court's decision, a party alleging that the overcapacity has created a downward pressure on prices in the market should be able to provide additional evidence and data that more clearly demonstrate such a trend as it relates to the POR in order for Commerce to make an affirmative PMS determination that can be sustained by the Court.")). As Commerce

9

noted, if U.S. Steel believes that the Court erred in its assessment of the facts presented in this case, "U.S. Steel is free to seek reconsideration from the Court, if appropriate, or pursue an appeal to an appellate court." *Id.* at 36-37.

**B.     The *Remand Results* Comply with the Court's Order Regarding the Allocation of Costs of Production of NEXTEEL's Non-Prime Products**

U.S. Steel argues that Commerce's remand redetermination misinterprets the Court of Appeals for the Federal Circuit's recent *Dillinger* opinion and that Commerce's allocation of NEXTEEL's costs of production consistent with its reporting in its books and records is contrary to law. U.S. Steel Opp'n Comments at 24-29. As detailed below, U.S. Steel's arguments rely on a mischaracterization of *Dillinger* as well as a mischaracterization of the nature of NEXTEEL's non-prime products, and are wholly unpersuasive.

As an initial matter, Commerce responded in the final remand determination to these same arguments, initially raised by U.S. Steel in its comments on draft remand. In the final remand determination, Commerce made clear that it was reaching the only result on this issue that would be consistent with the Court's remand order and with the *Dillinger* opinion, and that it found U.S. Steel's arguments unconvincing. Specifically, addressing U.S. Steel's argument that this result is not compelled by CAFC precedent, Commerce states:

> We disagree with U.S. Steel. In *Dillinger*, the CAFC clearly stated that Commerce was required to determine the actual costs of prime and non-prime products. In the instant case, NEXTEEL does not separately classify prime and non-prime products, nor does it value these products differently for inventory purposes, because the costs incurred in manufacturing them are the same. In its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime products. Consequently, NEXTEEL's reported costs reflect the actual costs of producing its prime and non-prime products as required by the court in the *Remand Order*. Therefore, for purposes of this redetermination and consistent with the CAFC decision in *Dillinger*, we have continued to reverse the adjustment made in the *Final Results* and rely on the actual costs of prime and non-prime products as reported by NEXTEEL.

10

*Remand Results* at 48. Nevertheless, U.S. Steel seeks to raise these same issues to the Court. The Court should find them unconvincing, for the reasons that Commerce did and the reasons detailed below.

### 1. U.S. Steel Ignores the Relevance of Supplemental Authority

U.S. Steel asserts that, in considering the issue of non-prime cost reallocation, in its remand opinion the Court "question{ed}, *sua sponte*, whether Commerce's reallocation was consistent with *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 (Fed. Cir. 2020), an opinion published about ten months after briefing in this case had already closed." U.S. Steel Opp'n Comments at 24. U.S. Steel contends that "{n}either Commerce nor Defendant-Intervenor was afforded an opportunity to respond." *Id.* U.S. Steel's procedural argument that it was not afforded an opportunity to respond, is not only misguided, but also ignores NEXTEEL's notice of supplemental authority on this precise issue. In particular, NEXTEEL filed a Notice of Supplemental Authority with the Court on December 7, 2020, soon after the *Dillinger* opinion was published, alerting the Court -- and, indeed, the other interested parties -- to the relevant and controlling holding on this precise issue. *See* Notice of Supplemental Authority, Dec. 7, 2020, ECF No. 99.

This is not the first time a Court has issued relevant precedent following briefing, and a notice of supplemental authority is the standard mechanism for parties to alert the Court and parties to relevant new authorities. U.S. Steel does not suggest that the notice of supplemental authority was improper or that it was not afforded an opportunity to respond to the notice of supplemental authority. Indeed, U.S. Steel did not seek leave to file any comments on the relevance of the *Dillinger* opinion to the case at bar, despite the notice of supplemental authority being available for all parties for at least four months prior to the Court issuing its opinion in this case. Finally, to the extent there is any concern about whether U.S. Steel had an opportunity to

11

brief issues related to the *Dillinger* opinion, U.S. Steel has now briefed the issue before Commerce in response to the Draft Remand and the Court via the pending comments in opposition to the *Remand Results*.

> **2. Commerce Reached the Only Reasonable Result on Remand, in light of the Record, Case Law, and the Statute**

U.S. Steel asserts that 1) *Dillinger* does not compel the result Commerce reached on remand; 2) the statute does not permit the result that Commerce reached on remand; and 3) non-prime products are in fact "scrap," and the cost of producing scrap is a cost associated with the production of prime subject merchandise. U.S. Steel Opp'n Comments at 25-29. As detailed below, each of these arguments lacks merit.

*First*, U.S. Steel argues that Commerce has applied an "incorrect" understanding of *Dillinger*, and that Commerce accordingly "misconstrues the Court's *Remand Order*, which directed Commerce to 'allocate costs' based on 'actual costs,' but did not presuppose that this would necessitate a '*re*allocation' of costs." U.S. Steel Opp'n Comments at 25. U.S. Steel is incorrect. Commerce has not misunderstood *Dillinger*; to the contrary, as accurately summarized by Commerce, in *Dillinger* "the {CAFC} remanded Commerce's adjustment of non-prime product costs, based on recorded projected sales prices, and directed Commerce to determine the actual costs of non-prime products." *Id.* at 14. Commerce correctly notes that the CAFC stated in *Dillinger* that Commerce is required to determine the actual costs of prime and non-prime products.

U.S. Steel states that *Dillinger* "concerned a materially distinct scenario and did not address the status of non-prime pipe as just another form of production scrap." U.S. Steel Opp'n Comments at 28. As detailed above, *Dillinger* did not concern a materially distinct scenario, but in fact concerned the very same issue present in this case. Moreover, as detailed below, the

12

record is clear that NEXTEEL's non-prime pipe is not "another form of production scrap" but rather a usable pipe product that is sold for use as pipe. Thus, despite U.S. Steel's valiant efforts to distinguish the two cases, it remains the case that *Dillinger* controls here and compels the result reached on remand.

*Second*, U.S. Steel argues unconvincingly that the statute does not permit the result that Commerce reached on remand. Specifically, U.S. Steel contends that the statute would permit Commerce to rely -- as it did on remand -- on actual costs as reported in NEXTEEL's normal books and records "*if and only if* NEXTEEL's reported actual costs both comport with Korean {GAAP} and 'reasonably reflect the costs associated with the production and sale of the merchandise,'" which U.S. Steel argues NEXTEEL's costs do not do. *Id.* at 25 (quoting 19 U.S.C. § 1677b(f)(1)(A)). U.S. Steel argues that NEXTEEL's reporting is not GAAP compliant, based on an erroneous comparison to the GAAP's guidance on the valuation of inventories. *Id.* at 26-27. However, U.S. Steel is mixing and matching two very different concepts -- actual production *costs* and inventory *valuations*. NEXTEEL reported as its production costs for non-prime pipe its actual production costs, and later inventory valuations are irrelevant to the question of what it cost to produce those products. GAAP provides separate guidance for valuing costs of production and valuing inventory; the guidance for one is simply not the relevant guidance for valuing the other. The issue of inventory valuation is simply not relevant to the issue of costs of production.

Moreover, U.S. Steel cannot argue that the reported costs do not "reasonably reflect the costs associated with the production and sale of the merchandise," as required by the statute, as the reported costs *are* the costs of production for both prime and non-prime products. U.S. Steel's statutory argument simply holds no water.

13

*Third*, and importantly, U.S. Steel's argument that non-prime products are in fact "scrap" of subject merchandise, and that such costs are actually costs associated with subject merchandise, relies on a faulty and inaccurate characterization of non-prime pipe products as "scrap." Specifically, U.S. Steel contends that:

> Consistent with Commerce's existing methodology, Commerce's *Final Results* accounted for these costs by treating non-prime merchandise as *de facto* scrap produced during the manufacture of OCTG. *See Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1368 (Ct. Int'l Trade 2018) (noting that, pursuant to its established practice "Commerce offsets costs {of non-prime products} with the revenue gained from sales of non-prime products (*i.e.*, a scrap offset) if it determines that the non-prime product cannot be used in the same general manner as its prime product counterparts."). As with other types of scrap generated in the course of producing OCTG, NEXTEEL is able to recover some of the costs associated with these production failures by scrapping or selling the non-prime merchandise it produces, but the production costs associated with non-prime pipe are *actually* OCTG production costs.

U.S. Steel Opp'n Comments at 28. The cited case law and methodology is wholly irrelevant in this instance, as the record is clear that NEXTEEL's non-prime pipe products are not scrap. As NEXTEEL presented in its original Section D questionnaire response, non-prime products are distinct from pipe scrap, "which is generated at the forming, as well as quenching and tempering processes," which "NEXTEEL considers… to be scrap because they are waste from the pipe processing." NEXTEEL's Section D Questionnaire Response at D-3-4 (Feb. 27, 2018), P.R. 96, C.R. 144. As NEXTEEL noted, "{i}n addition, NEXTEEL may produce nonprime products such as defective pipe. The costs of these non-prime products are calculated in the same way as the cost of prime products." *Id.* Unlike scrap products, non-prime products are still sold as pipe and are not considered "waste from the pipe processing," but rather are usable pipes that simply are not able to be certified for use as OCTG. *Id.*

Moreover, the case law on which U.S. Steel seeks to rely does not demonstrate a relevant "existing methodology," pursuant to which Commerce should have "accounted for these costs by

14

treating non-prime merchandise as *de facto* scrap produced during the manufacture of OCTG," as alleged by U.S. Steel. U.S. Steel Opp'n Comments at 28 (citing *See Dong-A Steel Co. v. United States*, 337 F. Supp. 3d 1356, 1368 (Ct. Int'l Trade 2018). In *Dong-A Steel Co.*, Commerce did not adjust respondents' costs, and the Court affirmed Commerce's allocation of full costs of production to the non-prime merchandise. This case simply does not provide the direct support of an existing methodology for which Commerce invokes it.

### III. CONCLUSION

For the foregoing reasons, NEXTEEL respectfully requests that this Court affirm the *Remand Results* with respect to the particular market situation determination and treatment of NEXTEEL's non-prime production costs, as the *Remand Results* comply with the Court's order on these issues. At the same time, NEXTEEL continues to respectfully request that the Court hold Commerce's *Remand Results* to be unsupported by substantial evidence and otherwise not in accordance with law with respect to the allocation of NEXTEEL's costs related to suspension losses. NEXTEEL further requests that this Court again remand the agency's remand determination with instructions to Commerce to correct this error and to provide such other relief as this Court deems just and appropriate.

    Respectfully submitted,

    /s/ J. David Park
    J. David Park
    Henry D. Almond
    Daniel R. Wilson
    Leslie C. Bailey
    Kang Woo Lee

    *Counsel to NEXTEEL Co., Ltd.*

    ARNOLD & PORTER KAYE SCHOLER LLP
    601 Massachusetts Avenue, N.W.
    Washington, D.C. 20001
    Phone: (202) 942-5000
    Fax: (202) 942-5999

**Date: September 15, 2021**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE JENNIFER CHOE-GROVES

| | |
|---|---|
| SEAH STEEL CORPORATION et al., <br><br>    *Plaintiff and Consolidated Plaintiffs,* <br><br> HYUNDAI STEEL COMPANY and <br> ILJIN STEEL CORPORATION, <br><br>    *Plaintiff-Intervenors,* <br> v. <br> UNITED STATES, <br><br>    *Defendant,* <br><br>    and <br><br> UNITED STATES STEEL CORPORATION et al., <br><br>    *Defendant-Intervenors.* | Court No. 19-00086 <br> (consol.) |

## CERTIFICATE OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)

The undersigned hereby certifies that the attached Comments of Consolidated Plaintiff Nexteel Co., Ltd. in Partial Support of Remand Results, filed on September 15, 2021, contains 4,858 words, exclusive of counsel's signature block, according to the word count function of the word-processing system used to prepare this memorandum, and therefore complies with the word count limitation set forth in the Court's Chambers Procedures.

By:                                                              /s/ J. David Park

                                                                               J. David Park

**Date: September 15, 2021**